## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-1866-NYW-SKC

BENJAMIN GATES, TRAVIS SWARTZ, and NATIONAL FOUNDATION FOR GUN RIGHTS, INC.,
      Plaintiffs,
v.
JARED S. POLIS, in his official capacity as Governor for the State of Colorado,
      Defendant.

## THE GOVERNOR'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Shortly after midnight on July 20, 2012, a single person entered a movie complex in Aurora, Colorado and proceeded to a theater packed with roughly 400 moviegoers. He then left through an exit door, which he propped open, and reentered a short while later bearing three firearms, including a semi-automatic rifle equipped with a 100-round magazine. Over the next 90 seconds, he fired nearly 80 bullets into the crowded theater, only pausing to switch firearms when his rifle jammed after firing more than 50 rounds. By the time the shooting stopped, 70 Coloradans had been shot, including 12 fatally. The Aurora Theater massacre was the deadliest shooting in Colorado since the Columbine High School massacre on April 20, 1999, (13 dead, using 28-, 32-, and 52-round magazines).

For most of our nation's history, the idea that a single gunman could wreak so much havoc in such a short time was unimaginable. But as large-capacity magazines ("LCMs") began to circulate among civilians, they became the accessory of choice for mass shooters and the carnage caused by mass shootings proliferated. On the heels of the Aurora Theater massacre, a single gunman in Newtown, Connecticut used 30-round magazines to kill 26 people, including

20 children under the age of 7, during the Sandy Hook Elementary School massacre. Over the next several years, mass shootings in Las Vegas, Nevada (60 dead, using 100-round magazines), Sutherland Springs, Texas (26 dead, using 30-round magazines), Orlando, Florida (49 dead, using 30-round magazines), and elsewhere continued to destroy lives and devastate communities. Just a few months ago in Uvalde, Texas, a single gunman used 30-round magazines to kill 21 people, including 19 children under the age of 12 in the Robb Elementary School massacre.

In the wake of the Aurora Theater massacre, the Colorado General Assembly exercised its police power to protect the public health, safety, and welfare by enacting §§ 18-12-301, *et seq*., C.R.S. ("LCM Ban"). On paper, the LCM Ban prohibits, on and after July 1, 2013, the sale, transfer, or possession of LCMs, which it defines as magazines capable of accepting more than fifteen rounds of ammunition. § 18-12-301(2). But in practice, during real-life mass shootings when the stakes could not be higher, the LCM Ban mandates a critical pause during otherwise uninterrupted shooting by forcing a shooter to replace a spent magazine. This pause gives human targets the chance to flee, hide, or fight, and gives law enforcement officers the chance to disarm the shooter before more humans are murdered or injured. This pause saves lives.

The LCM Ban has been in effect continuously since July 1, 2013, and has withstood repeated challenges to its constitutional validity in this and other courts. *See Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1073–74 (D. Colo. 2014), *vacated and remanded for lack of standing*, 823 F.3d 537, 541–42 (10th Cir. 2016) (U.S. Const. amend. II challenge); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020) (Colo. Const. art. II, § 13 challenge). Plaintiffs here, two Coloradans who lawfully possess multiple LCMs under the

grandfather provision[1] of the LCM Ban and a gun advocacy organization, mount yet another challenge to the LCM Ban's validity. Specifically, they bring this suit under 42 U.S.C. § 1983 against Jared S. Polis, in his official capacity as Governor of the State of Colorado (the "Governor"), and claim that the LCM Ban violates the Second Amendment.[2]

Plaintiffs also ask this Court to enjoin the LCM Ban's continued enforcement pending a trial on the merits. [ECF # 9]. Initially, they sought both a temporary restraining order and preliminary injunction, but ultimately withdrew their request for the former. [# 22]. Yet for the reasons discussed below, Plaintiffs still fail to justify the need to preliminarily enjoin the LCM Ban, which has been in place for nearly a decade.

Besides a lack of urgency to resolve their claim, Plaintiffs lack standing to challenge the LCM Ban because each lawfully owns multiple grandfathered LCMs and does not allege the

---

[1] The LCM Ban allows a person to lawfully possess otherwise prohibited LCMs on and after July 1, 2013, provided they were acquired and maintained in the person's continuous possession on or before that date. *See* § 18-12-302.

[2] The Governor enjoys Eleventh Amendment sovereign immunity from suit where he is sued in his official capacity "'to enjoin the enforcement of an act alleged to be unconstitutional,'" *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)), but does not "'have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty,'" *id.* (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)); *see also Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965–68 (10th Cir. 2021) (same; collecting cases). The LCM Ban is a criminal statute, *see* § 18-12-302 (depending on the circumstances, violation of the LCM Ban is a class 2 misdemeanor or a class 6 felony), and the Complaint does not allege that the Governor has any criminal prosecutorial power, much less that he has demonstrated a willingness to prosecute Plaintiffs. [*See* # 1]. But for the purpose of defending the LCM Ban against Plaintiffs' Second Amendment challenge here, which seeks only declaratory and injunctive relief, *see id.*, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court in only this case, in only his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

type of concrete plans to violate the statute that are necessary to establish pre-enforcement standing. And even if Plaintiffs do have standing, they are unlikely to succeed on the merits of their claims for three reasons:

*First*, Plaintiffs cannot show as a threshold matter that LCMs are protected by the Second Amendment, which protects the right to keep and carry only arms. Rather, the record will show that LCMs are accessories, not arms.

*Second*, "the Second Amendment protects only the carrying of weapons that are those 'in common use'" for self-defense. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2143 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 (2008)); *see also Bruen*, 142 S. Ct. at 2132 (the definition of "arms" "covers modern instruments that facilitate armed self-defense"). LCMs are not commonly used for self-defense, and Plaintiffs cannot meet their burden of proving otherwise. But even if this Court determines that LCMs are arms, they are "dangerous and unusual," and thus are not afforded Second Amendment protection. *Id*. at 2128 (quoting *Heller*, 554 U.S. at 627).

And *third*, even if Plaintiffs carry their threshold burden of proving LCMs are arms commonly used for self-defense such that they fall within the Second Amendment's zone of protection, Colorado's LCM Ban is consistent with our nation's history and tradition of regulating weapons of war once they became readily available for misuse by civilians and actually began to be misused to cause great public harm. Throughout history, the federal and state governments have restricted access to weapons that pose a significant threat to civilians with little corresponding lawful defensive utility, like machine guns. And the evidence will show that the LCM Ban, on the one hand, imposes no burden on the right of armed self-defense and,

on the other, reduces mass shooting fatalities by giving potential casualties the chance to flee,

hide, or fight for their lives when the shooter pauses to reload. Plaintiffs' request to preliminarily

enjoin the LCM Ban's continued enforcement therefore should be denied.

## ARGUMENT

**I.     Plaintiffs lack standing to challenge Colorado's LCM Ban.**

To establish standing, Plaintiffs must "prove that [they have] suffered a concrete and

particularized injury that is fairly traceable to the challenged conduct, and is likely to be

redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013).

The touchstone of this inquiry is whether a plaintiff suffers concrete harm: "No concrete harm,

no standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).

The LCM Ban permits a person to possess an LCM so long as it was acquired before July

1, 2013, and the person has maintained continuous possession since that date. *See* § 18-12-

302(2). That person may not, however, transfer the LCM to another party. § 18-12-301(1)(a).

Thus, to establish standing in the context of the LCM Ban, at least one plaintiff must (1) possess

an LCM acquired after July 1, 2013, (2) intend to acquire an LCM after July 1, 2013, or (3)

intend to transfer or sell an LCM after July 1, 2013. *Colo. Outfitters Ass'n*, 823 F.3d at 550. But

for either of the latter scenarios, an allegation that the plaintiff might "*eventually*" or *possibl[ly]*"

take such steps is insufficient to establish standing. *Id.* at 551. Instead, a plaintiff must express

"concrete plans to engage in conduct" that has "any potential to violate" the LCM Ban. *Id.*

The individual plaintiffs, Gates and Swartz, cannot meet that burden. Their declarations

and the Complaint establish only that they "seek" to acquire new LCMs and transfer their

existing LCMs to family members. [*See* # 1 ¶ 1, # 9-4 ¶ 3, # 9-5 ¶ 3]. They have failed to plead

any "concrete plans" to violate the LCM Ban. *Colo. Outfitters Ass'n*, 823 F.3d at 550. Moreover, each individual Plaintiff admits that he "currently own[s] magazines capable of holding more than 15 rounds of ammunition." [# 9-4 ¶ 3, # 9-5 ¶ 3]. Plaintiffs' sole claim here is maintained under the Second Amendment, the "*central component*" of which is "individual self-defense." *Bruen*, 142 S. Ct. at 2118 (quotations omitted). Because both Gates and Swartz lawfully own multiple grandfathered LCMs, their alleged right to use LCMs in armed self-defense is unaffected, much less harmed, by the LCM Ban.

Finally, the organizational Plaintiff, the National Foundation for Gun Rights, also failed to establish standing. To do so, the Foundation must show that its members "would otherwise have standing to sue in their own right." *Colo. Outfitters Ass'n*, 823 F.3d at 550. Such a showing requires specific allegations establishing the standing of "at least one *identified* member" of the Foundation. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). But neither the Complaint [# 1, ¶ 2] nor the Declaration of Dudley Brown [# 9-3], that was filed in support of Plaintiffs' motion for preliminary injunction, [# 9], alleged or declared who Brown is in relationship to the Foundation, much less identified him (or anyone else) as an actual member of the Foundation and alleged that he (or another identified member) "ha[s] suffered or would suffer harm" caused by the LCM Ban. *Summers*, 555 U.S. at 498.

For these reasons, the Court should deny the preliminary injunction motion because all Plaintiffs lack standing to maintain this suit.

## II.   Plaintiffs fail to establish they are entitled to the extraordinary remedy of a preliminary injunction.

For nearly a decade, Colorado's LCM Ban has prevented the misuse of LCMs by civilians. By limiting access to these accessories of war, the LCM Ban protects Coloradans from

the devastating effects of mass shootings. The evidence at hearing will show that LCM restrictions like the LCM Ban reduce the incidence of mass shootings. And when mass shootings do occur, these restrictions reduce the number of fatalities.

Now, years after the LCM ban was passed and the public has relied on it safeguard lives, Plaintiffs seek to enjoin its enforcement and return to the days when LCMs were readily available to civilians for misuse in Colorado. Plaintiffs are not entitled to the relief they seek. They cannot succeed on the merits of their constitutional claim because the Second Amendment does not protect the possession of firearm accessories, like LCMs, and even if it does the LCM Ban is consistent with the nation's historical treatment of weapons and accessories of war. In short, far from condemning LCM restrictions, our nation's historical tradition demonstrates that States can act, as Colorado did, to protect their citizens from the clear and present danger posed by weapons and accessories like LCMs. Plaintiffs cannot meet their burden, and the requested injunction should be denied.

### A.  Legal standard

To obtain a preliminary injunction, Plaintiffs must establish (1) a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the party opposing the motion, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of proof to demonstrate that each factor tips in their favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003).

Plaintiffs bear an even heavier burden here because their motion seeks a preliminary injunction that is "disfavored" in two ways. First, it would upset the status quo. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). "An injunction disrupts the status quo when it changes the last peaceable uncontested status existing between the parties before the dispute develops." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070–71 (10th Cir. 2009). Colorado's LCM Ban has been in effect since July 1, 2013, so an injunction prohibiting its enforcement would upend the longtime status quo entirely. Second, a preliminary injunction would afford Plaintiffs all the relief they could recover after a full trial on the merits. *Schrier*, 427 F.3d at 1259. As a result, Plaintiffs bear "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: [they] must make a strong showing that these tilt in [their] favor." *Free the Nipple-Fort Collins v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted).

## B. Plaintiffs are not substantially likely to succeed on the merits of their Second Amendment claims.

The Second Amendment protects only arms that are commonly used for self-defense. It does not protect accessories like the LCMs that enabled the Aurora Theater shooter to fire over 50 bullets without pausing—much less 100 bullets as he intended—or those that allowed the Newtown and Uvalde gunmen to mow down dozens of children in a matter of seconds. And throughout history, states and the federal government have regulated weapons and accessories of war once they became readily available for misuse by civilians and actually began to be misused. Because the LCM Ban fits into this historical tradition—and does not even implicate the Second Amendment's plain text—Plaintiffs cannot make a heightened showing that they are likely to succeed on the merits.

1. **Legal standard for Second Amendment challenges.**

The Second Amendment states: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II. "[I]ndividual self-defense is the *central component* of the Second Amendment right." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (quotations omitted). Therefore, the Second Amendment guarantees "the individual right to possess and carry weapons *in case of confrontation.*" *Heller*, 554 U.S. at 592 (emphasis added); *see also Bruen*, 142 S. Ct. at 2122 (the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense" both inside and outside the home). But it does not protect "the right of citizens to carry arms for *any sort* of confrontation" because the rights guaranteed by the Second Amendment are "not unlimited." *Heller*, 554 U.S. at 595, 626; *see also Bruen*, 142 S. Ct. at 2128 (reiterating the limits of Second Amendment protections discussed in *Heller*).

In *Bruen*, the Supreme Court established the framework for assessing the constitutionality of firearm regulations. First, a plaintiff must prove[3] that "the Second Amendment's plain text" covers the conduct proscribed by the relevant regulation—here possession of LCMs acquired after July 1, 2013. *Bruen*, 142 S. Ct. at 2126. If Plaintiffs meet their burden on this threshold inquiry, the government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* This historical inquiry involves "reasoning by analogy," *id.* at 2132, specifically an assessment of "how and why the regulations

---

[3] In contrast to the history and tradition standard, for which *Bruen* explicitly lodges the burden with the government, the Court did not discuss the allocation of the burden for the threshold inquiry. 142 S. Ct. at 2126. Accordingly, the "default rule" prevails, in which Plaintiffs "bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).

burden a law-abiding citizen's right to armed self-defense," *id.* at 2133. Thus, courts must ask (a) whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did, and (b) is it "comparably justified." *Id.*

The *Bruen* Court clarified for lower courts that the "history and tradition" inquiry does not require them to research and examine history anew, but rather courts are "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 2130 n.6; *see also id.* (noting that "[i]n our adversarial system of adjudication, we follow the principle of party presentation" (quotation omitted)). In announcing the "history and tradition" standard, the Supreme Court also reiterated that the Second Amendment is not a "regulatory straightjacket," *id.* at 2133, nor does it protect the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 2128 (quotation omitted). Separately, both Justice Alito, writing for himself, *id.* at 2157 (Alito, J., concurring), and Justice Kavanaugh, joined by Chief Justice Roberts, underscored the "limits of the Court's decision," *id.* at 2161 (Kavanaugh, J., concurring).

Under this framework, regulations forbidding firearms in certain "sensitive places" pass constitutional muster, *id.* at 2133, as do at least some limitations on possession by "felons and the mentally ill," *Heller*, 554 U.S. at 626. States may also, consistent with the Second Amendment, regulate certain "dangerous and unusual" arms, *id.* at 627, such as sawed-off shotguns, *id.* at 622–23, or machine guns, *id.* at 624 (calling the idea that the National Firearms Act's restrictions on machine guns might be unconstitutional "startling"). And although the Second Amendment applies to the States, *McDonald*, 561 U.S. at 750, States have latitude to impose reasonable regulations based on the unique factors present in their jurisdictions, *id.* at 785

10

("State and local experimentation with reasonable firearms regulations will continue under the Second Amendment."); *id.* (the Second Amendment "limits (but by no means eliminates) [States'] ability to devise solutions to social problems that suit local needs and values").

### 2. Colorado's LCM Ban satisfies *Bruen*'s standard.

### a. Plaintiffs cannot prove that an LCM is an "arm" protected by the Second Amendment.

Under *Bruen*, the threshold question is "whether the plain text of the Second Amendment protects" Plaintiffs' proposed conduct: possessing magazines capable of accepting more than fifteen rounds of ammunition that were acquired on and after July 1, 2013. 142 S. Ct. at 2134. The operative clause of the Amendment protects the people's right "to keep and bear Arms." U.S. Const. amend. II. Colorado's LCM ban does not fit within that plain text.

"Arms," as used in the Second Amendment, refers to weapons. *Heller*, 554 U.S. at 581; 1 Dictionary of the English Language 106 (4th ed.) (reprinted in 1978) (1773 edition of dictionary defining "arms" as "[w]eapons of offence, or armour of defence"). And "[t]he term was applied, [in the 18th and 19th centuries] as now, to weapons that were not specifically designed for military use and were not employed in a military capacity." *Heller*, 554 U.S. at 581. The LCM Ban does not burden the right to possess weapons. Indeed, the primary portion of the statute challenged here does not regulate firearms at all, but rather "fixed or detachable magazine[s] . . . capable of accepting, or that [are] designed to be readily converted to accept" more than fifteen rounds. § 18-12-301(2)(a)(I).

Although LCMs can be used with certain firearms, LCMs cannot, by themselves, be used offensively or—more importantly for Second Amendment purposes—defensively. They are accessories, not arms. *See Colo. Outfitters Ass'n*, 24 F. Supp. 3d at 1068 (noting that the LCM

Ban "does not directly regulate firearms at all," and describing magazines as "nothing more than a container that holds multiple rounds of ammunition" that is "designed to feed a bullet into the firing chamber of a firearm with each cycle of the action, allowing multiple shots to be fired rapidly"). Nor is this specific accessory necessary for the operation of firearms—most, if not all, firearms can be used with magazines containing less than 16 rounds. *See Rocky Mountain Gun Owners*, 467 P.3d at 331 (holding that "virtually every gun that was available before July 1, 2013, is compatible with magazines holding 15 or fewer rounds") (quotations omitted).

**b. Plaintiffs cannot show that LCMs are in common use or prove that LCMs are *not* "dangerous and unusual."**

The Second Amendment's definition of "arms" includes only those "weapons in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134 (quotations omitted); *see also id.* at 2132 (holding that the definition of "arms" "covers modern instruments that facilitate armed self-defense"); *cf. Heller*, 554 U.S. at 628–29 (noting that handguns are "the most preferred firearm in the nation to keep and use for protection of one's home and family" (quotation omitted)). But Plaintiffs will be unable to prove that either LCMs or firearms that can be used with them are necessary or useful for lawful defensive purposes. Instead, the evidence at hearing will show that LCMs are wholly unnecessary for self-defense. This conclusion also is supported by the evidentiary findings of another court in this district, which found "no evidence . . . that the general ability of a person to defend him or herself is seriously diminished if magazines are

limited to 15 rounds." *Colo. Outfitters Ass'n*, 24 F. Supp. 3d at 1069.[4] Rather, the court

described the Act's "burden on the exercise of self-defense" as negligible:

> [I]n the relatively rare circumstances in which sustained defensive fire is
> appropriate, the statute forces a brief pause to reload or access another weapon. The
> evidence presented does not establish that such circumstances occur frequently,
> affect very many, or that the pause to reload adversely affects one's success in self-
> defense. . . . On the record presented, . . . [the LCM Ban] does not materially reduce
> the ability of a person to use a semiautomatic firearm for self-defense, nor does it
> reduce the effectiveness of self-defensive efforts.

*Id.* at 1071.[5]

Relatedly, even if this Court finds that LCMs are arms, not accessories, they nonetheless

belong in the category of "dangerous and unusual" arms that fall outside the zone of Second

Amendment protection. In *Heller*, the Court held that the "arms" within the scope of the Second

Amendment are those "in common use at the time." 554 U.S. at 627 (quoting *United States v.

Miller*, 307 U.S. 174, 179 (1939)). The Court justified this construction with reference to

founding-era sources regulating "dangerous and unusual weapons." *Id.* (quoting 4 Blackstone

148–49 (1769)). And in *Bruen*, the Court further clarified that "dangerous and unusual" arms are

not protected by the Second Amendment. 142 S. Ct. at 2143 (noting that "colonial legislatures

sometimes prohibited the carrying of 'dangerous and unusual' weapons," which, the Court had

---

[4] The district court's order in *Colorado Outfitters Association* was vacated by the Tenth Circuit
for lack of standing. *Colo. Outfitters Ass'n*, 823 F.3d at 554–55. The Governor cites that opinion
not as precedent, but to demonstrate what the evidentiary record will reflect in this action.

[5] The court analyzed the LCM Ban's burdens on self-defense in the context of deciding whether
to apply strict or intermediate scrutiny. *Colo. Outfitters Ass'n*, 24 F. Supp. 3d at 1068–71. *Bruen*
abrogated that legal framework, but the defensive utility of LCMs remains relevant to multiple
stages of the *Bruen* analysis.

explained in *Heller*, meant that the "Second Amendment protects only the carrying of weapons that are those in common use at the time") (quotations omitted).[6]

The evidence at hearing will show that firearms equipped with LCMs are both "dangerous and unusual," and Plaintiffs cannot prove otherwise. Historically, weapons that could injure many people very quickly—like dynamite—were consistently regulated. And even today, few firearms, if any, require an LCM to operate. They are unusual in the sense that they are superfluous to the operation of the weapons they accessorize. Moreover, LCMs are intended to be used alongside weapons of war. Beginning in the 1800s, the first firearms capable of firing multiple rounds were developed predominantly for military purposes. And LCMs today trace their historical roots to accessories meant to accompany firearms designed for war. Such firearms, and their accessories, fall outside the scope of the Second Amendment. *See Heller*, 554 U.S. at 627–628.

Of course, all firearms are inherently dangerous. But LCMs enable firearms to be misused in an especially dangerous fashion by eliminating or reducing the number of life-saving pauses that occur during a mass shooting. To shoot 100 rounds, a mass shooter who is limited to 15-round magazines will have to pause 6 times to reload while a mass shooter who has access to a single 100-round drum magazine may empty it without interruption. The evidence at hearing will show that LCMs greatly increase the number of fatalities during mass shootings, and

---

[6] Determining whether weapons are "'in common use at the time,' as opposed to those that 'are highly unusual in society at large,'" is not subject to the history and tradition analysis. *Bruen*, 142 S. Ct. at 2126 (quoting *Heller*, 554 U.S. at 627). *Bruen* rejected that the definition of "common use" or "dangerous and unusual weapons" was fixed in time. *See id.* (noting that handguns might have been considered dangerous in 1690s, but are common today).

therefore, even if they are found to be "arms," LCMs belong to the class of dangerous or unusual weapons or accessories that fall outside the scope of the Second Amendment.

As *Bruen* reiterated, "the right secured by the Second Amendment is not unlimited." 142 S. Ct. at 2128. That right does not extend to LCMs, and Plaintiffs are unlikely to succeed on the merits of their Second Amendment claim.

### c.  Colorado's LCM Ban is consistent with the history and tradition of firearm regulation in this nation.

If Plaintiffs clear their burden on *Bruen*'s threshold question, the Governor will demonstrate that the LCM Ban "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[7] 142 S. Ct. at 2127. The analysis required at this stage is not as simple as asking whether a given regulation existed at the founding. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132.

Instead, when addressing "modern regulations that were unimaginable at the founding," courts and parties must engage in "reasoning by analogy." *Id.* In doing so, at least two metrics are relevant: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry" under the Second

---

[7] From this point forward, the Governor will assume for the sake of argument that LCMs are "arms" or "weapons," but to be clear he does not concede that they are either and maintains that LCMs fail to satisfy the threshold inquiry required by *Bruen* for the reasons set forth above.

Amendment." *Id.* (quoting *McDonald*, 561 U.S. at 767). And "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

i.   *Governments have consistently regulated weapons once they circulate within the civilian population and present a danger to their citizens.*

Throughout history—dating back to the common law, through the founding, as well as Reconstruction, the early 20th century, and through today—"arms" have consistently been subject to regulation. As to specific firearms or accessories, this tradition follows a familiar pattern. A weapon is invented and developed, and then marketed to the military. After some time, it enters the civilian market, often as a result of soldiers returning home from military service. Once it becomes readily available for misuse by civilians and actually begins to be misused by them to cause great harm to the public, governments move to regulate the weapon. *See, e.g.*, *Heller*, 554 U.S. at 627–628 (explaining that the Second Amendment still provides meaningful protections even "if weapons that are most useful in military service—M-16 rifles and the like—may still be banned"). This is the country's tradition of regulating "arms," and Colorado's LCM Ban fits squarely within this tradition.

*Bruen* itself confirmed that pre-founding history in both England and the colonies included regulations on the carrying of certain weapons for certain purposes. 142 S. Ct. at 2139–2145. The Court held, there, that these historical regulations did not justify "broad prohibitions on all forms of public carry," but acknowledged a history and tradition of prohibitions on "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id*. at 2145. Nor were these historical regulations limited to the manner of carry; many directly regulated "the carrying of dangerous and unusual weapons." *Id.* at 2143.

16

This tradition of regulation continued throughout the founding era. In the country's early decades," the States passed regulations "aimed in part at pistols and offensive knives, . . . but also at the practice of rigging firearms to be fired with a string or similar method . . . without an actual finger on the firearm trigger." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 67 (2017) ("Spitzer, *Gun Law History*"). At one point nearly every State banned "Bowie Knives" or other particularly dangerous and unusual knives. Similarly, the storage of dynamite was heavily-regulated based on the understanding that it could cause mass public harm in a short period of time.

As threats to public safety shifted over time, so too did the Nation's and States' regulations. In the 1920s, after the unusually dangerous Thompson submachine or "Tommy" gun became readily available to civilians and actually began to be misused by them to cause great public harm, at least 28 States enacted anti-machine gun laws. Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 236 (2020) ("Spitzer, *Gun Accessories*").[8] Even the federal government placed restrictions on machine guns nationwide, 48 Stat. 1236 (1934), and banned them altogether in the District of Columbia, 47 Stat. 650 (1932).

Many of these laws also regulated the number of bullets those weapons could fire without reloading. *See* Spitzer, *Gun Law History* at 70 (collecting state prohibitions on semi-automatic weapons, including magazine limits, from 1927 through 1934). In total, between 1917 and 1934, 23 States enacted restrictions on "ammunition magazines or similar feeding devices, and/or

---

[8] *Heller*, 554 U.S. at 624–25, strongly suggests that such laws pass constitutional muster.

round capacity." Robert Spitzer, The Gun Dilemma 50 (2022) ("Spitzer, Gun Dilemma"). Setting aside that these laws reflect a tradition of limitations on LCMs, they also demonstrate the Nation's tradition of firearm regulation: "when [arms or their accessories] became a threat to the public, regulations followed." *Id*. Colorado's LCM Ban fits into this history and tradition.

        ii.    *The LCM Ban imposes comparable burdens on the right to armed self-defense to those imposed by historical regulations.*

Because "individual self-defense is the *central component* of the Second Amendment right," the Supreme Court has invalidated complete prohibitions on the right to possess handguns, which it characterized as "the quintessential self-defense weapon." *McDonald*, 561 U.S. at 767 (quotations omitted); *see also Bruen*, 142 S. Ct. at 2143; *Heller*, 554 U.S. at 629. By categorically prohibiting persons from possessing "the most preferred firearm in the nation to keep and use for protection," *Heller*, 554 U.S. at 628 (quotations omitted)—or, in the case of *Bruen*, requiring citizens to demonstrate a special justification for such weapons—those regulations impermissibly intruded on "the core lawful purpose" of the Second Amendment, *id*. at 630; *see also Bruen*, 142 S. Ct. at 2156.

Colorado's LCM Ban imposes no such burden. In 2014, a court in this district found "no evidence" that the LCM Ban inhibits the right to self-defense. *Colo. Outfitters Ass'n.*, 24 F. Supp. 3d at 1069. Notably, the court made this finding based on testimony from the *plaintiffs'* expert witness, Massad Ayoob, whose extensive literature review identified only "three anecdotal instances in which individuals engaging in defensive use of firearms fired more than 15 rounds." *Id*. Testimony from lay witnesses, including "the many law enforcement officials called to testify," corroborated this finding. *Id*. at 10. As did testimony in the state court case. *Rocky Mountain Gun Owners*, 467 P.3d at 331 ("[T]he overwhelming evidence demonstrated

that limiting magazine capacity to fifteen rounds does not significantly interfere with the . . . right to bear arms in self-defense. Indeed, testimony at trial established that in no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more.") (quotations omitted).[9] In short, Colorado's LCM Ban does not burden the right of lawful self-defense.

In *Heller*, the Supreme Court labelled "startling" the idea that "restrictions on machineguns . . . might be unconstitutional," 554 U.S. at 624, and strongly suggested that "weapons that are most useful in military service—M-16 rifles and the like—may be banned," *id.* at 627. Thus, even if this Court finds that LCMs are "arms" protected by the Second Amendment, on a spectrum from handguns—which are "the quintessential self-defense weapon," *id.* at 629—to "weapons that are most useful in military service" like machine guns, *id.* at 627, LCMs fall far closer to the latter. And just as prohibitions on machine guns did not substantially burden the core Second Amendment right to lawful self-defense, the LCM Ban imposes no substantial burdens.

---

[9] The intermediate appellate courts to have considered LCM restrictions in other jurisdictions reached similar conclusions. *See Duncan v. Bonta*, 19 F. 4th 1087, 1105 (9th Cir. 2021) ("[T]he record here, as in other cases, does not disclose whether the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home."), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *& vacated and remanded*, No. 19-55376, 2022 WL 4393577 (9th Cir. Sept. 23, 2022); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 118 (3d Cir. 2018) ("The record here demonstrates that [large-capacity magazines] are not well-suited for self-defense."); *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc) (noting the "scant evidence . . . [that] large-capacity magazines are possessed, or even suitable, for self-protection"); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) (no evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport").

> iii.     *The LCM Ban is as justified as other historical regulations that invoked the States' police power to address fear-inducing violence.*

Colorado's LCM ban is consistent with historical firearm regulations that target activity that "spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. The historic tradition of regulating fear- and terror-spreading activity is deeply rooted, from the interpretation of the Statute of Northhampton in England in the 1600s, *id.* at 2141, through the promulgation of state statutes in the U.S. near the founding, *id.* at 2143–45. Most analogous to the LCM Ban is the widespread movement to ban fully-automatic machine guns in the 1920s and 30s, driven by their misuse by civilians to facilitate organized crime. Spitzer, Gun Dilemma at 1–2. The LCM Ban likewise was passed in direct response to a spate of high-casualty mass shootings involving LCMs both inside and outside of Colorado. The devastation caused by these shootings was shocking and terrifying, and gripped the attention of both the public and regulators nationwide. During its consideration of the Act, the General Assembly heard extensive testimony, including from law enforcement officials, one of whom testified that, when LCMs and assault weapons are involved, officers are limited in their ability to protect the public or themselves.[10]

The General Assembly also heard first-person accounts of mass-shootings. Those accounts emphasized the benefit of a "pause," *i.e.*, the interruption in otherwise sustained shooting that occurs when a shooter is forced to replace a spent magazine. For example, an individual present at the January 11, 2011, mass shooting in Tucson, Arizona testified in

---

[10] This is confirmed by experience. During the Pulse nightclub shooting in Orlando, Florida in 2016, an off-duty detective providing security for the nightclub "immediately recognized that his Sig Sauer P226 9mm handgun was no match" for the assailant's weaponry, and took cover outside the club. Rescue, Response, and Resilience: A critical incident review of the Orlando public safety response to the attack on the Pulse nightclub, U.S. Dep't of Justice, at 16 (2017), *available at* https://tinyurl.com/2mxvrf62.

committee that it was a pause in shooting, brought about by a need to replace a magazine, that allowed intended victims to tackle and subdue the shooter. The primary objective of Colorado's LCM Ban is to force more critical pauses to occur, which, in turn, save lives. Evidence at the hearing will show that LCMs are the accessory of choice for mass shooters and mass shootings that involve LCMs inflict a greater loss of life because there are fewer opportunities for intended victims to flee, hide, or fight, or for law enforcement officers to disarm the shooter before more humans are murdered or injured.

States have "great latitude under their police powers to legislate as to the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon,* 546 U.S. 243, 270 (2006)  (internal quotation marks omitted)); *see also United States v. Morrison,* 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"). And as to Colorado's LCM Ban specifically, "it can hardly be argued that seeking to reduce the lethality of mass shootings and to contain their rippling, traumatic effects does not relate to the public health, safety, or welfare." *Rocky Mountain Gun Owners*, 467 P.3d at 329. After a growing number of mass shootings involving LCMs provoked terror in its people, the Colorado General Assembly enacted the LCM Ban to legislate a life-saving pause in shooting during such horrifying events.

In the post-World War I era, "guns and gun violence made headlines, especially when large numbers of people were killed with exceptionally destructive firearms." Spitzer, Gun Dilemma at 1. States responded by using their police powers to protect residents from the dangers posed by machine guns. In 2013, faced with similar headlines and threats, the Colorado

General Assembly took virtually identical steps to regulate LCMs. The pause in shooting created by the LCM Ban returns modern day firearms' capability to a period when multi-round firearms were not and could not be used to inflict mass casualties in a short period of time. It is therefore comparably justified to historical regulations, and consistent with the nation's history and tradition of firearm regulation.

### C. Plaintiffs will not suffer irreparable harm absent a preliminary injunction.

Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Schrier*, 427 F.3d at 1268 (quotations omitted). To support a preliminary injunction, the alleged injury must be "certain, great, actual and not theoretical.' *Heideman*, 348 F.3d at 1189 (quotations omitted). In cases alleging a violation of constitutional rights, this factor often collapses into the likelihood of success on the merits. *See, e.g.*, *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 806 (10th Cir. 2019). But "[w]hat makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Id.* In most cases, a deprivation of a constitutional right "fits that bill." *Id.*

But it is the irreparability of the injury, not the constitutional assertion, that governs. And that makes a significant difference here. According to their motion for preliminary injunction, both individual Plaintiffs lawfully own multiple LCMs. [*See* # 9 at 4; # 9-4 at ¶ 3; # 9-5 at ¶ 3]. Yet Plaintiffs maintain their sole claim under the Second Amendment, the "*central component*" of which is "individual self-defense." *Bruen*, 142 S. Ct. at 2118 (quotations omitted). Thus, even assuming without conceding that LCMs are arms commonly used for self-defense, Plaintiffs may use their grandfathered LCMs to fully exercise their core Second Amendment rights. They will suffer no irreparable injury while litigating the merits of their claim on a full and comprehensive

22

record in the absence of a preliminary injunction. *See id.* at 2130 n.6 (contemplating a significant "historical record compiled by the parties" upon which courts can conduct *Bruen*'s history and tradition analysis). And although Plaintiffs want to transfer their weapons to family members, that activity does not fall within the Second Amendment's protection of the right to "keep and bear arms" for individual self-defense, so it is irrelevant to the irreparable injury analysis.

In the same vein, Plaintiffs' lack of urgency in prosecuting their claim belies their assertion of ongoing irreparable injury. Indeed, their delay in initiating this case "weighs heavily against the issuance of a preliminary injunction." *Colo. Union of Taxpayers v. Griswold*, No. 20-cv-02766-CMA-SKC, 2020 WL 6290380, at *3 (D. Colo. Oct. 27, 2020); *cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1946 (2018) (per curiam) (noting that "the record suggests that the delay largely arose from a circumstance within plaintiffs' control" and concluding that "[i]n considering the balance of equities among the parties, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request"). Although Plaintiffs ostensibly filed this lawsuit because of the Supreme Court's recent holding in *Bruen*, their only arguments for why the LCM Ban is unconstitutional stem directly from the Court's 2008 holding in *Heller*. [*See, e.g.*, # 9 at 7–9]. If the basis for Plaintiffs' claim is that the LCM Ban is inconsistent with *Heller*'s "dangerous and unusual" framework, [# 9 at 8], their failure to seek relief on those grounds for close to a decade after its enactment is indicative of the lack of irreparable harm they would suffer absent preliminary relief.

### D. The balance of the equities and public interest weigh heavily in the Governor's favor and against Plaintiffs.

The last two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because

Plaintiffs seek a disfavored injunction, they face a heavier burden at this stage and must show that these factors weigh heavily in their favor. *Free the Nipple*, 916 F.3d at 797. But to the contrary, they strongly favor the Governor in this case.

Plaintiffs' requested preliminary relief would enjoin a public safety law that has been on the books for nearly a decade. The LCM Ban was enacted in direct response to an increasing number of deadly mass shootings, including here in Colorado. In enacting the LCM Ban, Colorado's General Assembly found that it would serve the public interest to create critical, life-saving pauses during mass shooting events. Evidence at the hearing will show that mass shootings are a significant threat to the public interest nationwide, and that the number and frequency of such events continues to increase, as does the emotional and economic trauma left in their wake. It will further show that States with LCM restrictions like the LCM Ban experience lower mass-shooting incidence and fatality rates when compared to jurisdictions that do not have such restrictions in place. Thus, the public interest in Colorado will affirmatively be harmed by an injunction prohibiting the LCM Ban's enforcement during the months and potentially years this litigation is pending.

This is especially so when weighed against Plaintiffs' modest interests. Plaintiffs are not substantially likely to succeed on their Second Amendment claim. And because both individual Plaintiffs lawfully possess multiple grandfathered LCMs, their core right of armed self-defense is unaffected by the LCM Ban. Thus, even if LCMs are constitutionally protected, which they are not, maintaining the longtime status quo during this litigation will not deprive Plaintiffs of any constitutional right. *Cf. Free the Nipple-Fort Collins*, 916 F.3d at 806 (noting that balance of the harms factor favors injunction when it results in "deprivation" of a constitutional right). Because,

in addressing the public interest and balance of the equities factors, Plaintiffs' motion relies solely on their likelihood of success on the merits [# 9 at 7], they have failed to carry their burden on these final prongs. *See Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1114 (D. Colo. 2021).

## CONCLUSION

Plaintiffs have failed to carry their heavy burden of demonstrating an entitlement to a preliminary injunction and therefore their motion should be denied.

DATED: October 13, 2022.

PHILIP J. WEISER
Attorney General

*s/* Peter G. Baumann
*LEEANN MORRILL\**
First Assistant Attorney General
*EMILY B. BUCKLEY\**
Senior Assistant Attorney General
*PETER G. BAUMANN\**
Assistant Attorney General
*DANIEL R. MAGALOTTI\**
Assistant Attorney General Carr Fellow
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: leeann.morrill@coag.gov
emily.buckley@coag.gov
peter.baumann@coag.gov
daniel.magalotti@coag.gov
*Attorneys for Defendant Governor*
*Jared S. Polis*
*Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2022, I served a true and complete copy of the foregoing **THE GOVERNOR'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Eric Paul Apjoke
Shaun Pearman
Pearman Law Firm, P.C.
4195 Wadsworth Blvd.
Wheat Ridge, CO  80033
eric@pearmanlawfirm.com
shaun@pearmanlawfirm.com

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO  80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

<u>s/ Peter G. Baumann</u>
Peter G. Baumann