IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-CV-1866-GPG-SKC

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

    Defendant.

## DEFENDANT'S MOTION TO PARTIALLY STRIKE EXPERT REPORT AND PARTIALLY EXCLUDE TESTIMONY OF MR. MARK PASSAMANECK UNDER FEDERAL RULE OF EVIDENCE 702

On April 14, 2023, Plaintiffs disclosed an expert report authored by Mr. Mark Passamaneck. Ex. A. In the report, Mr. Passamaneck, a mechanical engineer, opines on two topics: (1) the number of AR-15 style semi-automatic rifles and large capacity magazines (LCMs) in the United States, and (2) the operation and durability of firearm magazines.

For the first topic, Mr. Passamaneck relies on surveys, industry reports, and Facebook messages to reach his conclusions. But he has no training or experience in statistical analysis or surveying that would enable him to assess the accuracy of those sources. And even if he did, Mr. Passamaneck's methodology for choosing what statistics and surveys to include was unreliable. He did not understand several of the charts in his sources; he invented statistics; and he made basic arithmetic errors. In short, Mr. Passamaneck's opinions on the prevalence of certain firearms or magazines bear none of the indicia of expertise required by Federal Rule of Evidence

702. The Court should preclude Mr. Passamaneck from offering testimony on the prevalence of LCMs or any other information outside of the operation and durability of firearm magazines.[1]

## CERTIFICATE OF CONFERRAL

Defendant's counsel conferred with counsel for the Plaintiffs by telephone on June 26, 2023. Plaintiffs' counsel indicated that Plaintiffs oppose the relief requested.

## LEGAL STANDARD

"In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702). "[A]ppropriate qualifications are a threshold requirement which, if not met, requires exclusion of expert opinions." *Basanti v. Metcalf*, 35 F. Supp. 3d 1337, 1343 (D. Colo. 2014). "Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Nacchio*, 555 F.3d at 1241. "The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008). That burden "is an exacting one, as any inadequacy in the proof on any of Rule 702's elements renders the entire affected opinion inadmissible." *Id.* at 1221.

---

[1] Defendant does not seek to strike or limit testimony on the second topic from the report.

# ARGUMENT

## I. Mr. Passamaneck lacks the necessary qualifications to opine on statistical analysis or surveying methods.

Mr. Passamaneck opines, in part, on the prevalence of LCMs in our society. Ex. A at 1–2. For his conclusions, he relies on public opinion and industry surveys by the *Washington Post*, the National Shooting Sports Foundation (NSSF), and Georgetown University Professor William English, as well as Facebook messages between him and an acquaintance employed by a magazine manufacturer. *See id*; Ex. B (Dep. Transcript) at 160:5–17. But Mr. Passamaneck has no background in statistical analysis or survey research, and his opinions reflect his lack of relevant "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

*First*, Mr. Passamaneck has no training or education in statistical analysis. According to his report, Mr. Passamaneck offered his opinion on behalf of Entropy Engineering Corp. ("Entropy"). Ex. A at 1, 3, 4. Although Mr. Passamaneck did not include a resume with his report, Defendant's counsel found one on Entropy's website. *See* Ex. C, Dep. Ex. 2 at 1.[2] Mr. Passamaneck has a Bachelor of Science in Mechanical Engineering and some "[m]aster's level coursework in Mechanical Engineering." *Id.* But this coursework did not include any courses involving statistical analysis, "how to design a survey to identify public opinion on something," or how "to survey the number of a given item in the population." Ex. B at 23:25–28:20. And Mr. Passamaneck himself admitted that he had "no training in statistical analysis . . . [o]ther than what is in [his] coursework" and had "no training in survey design." *Id.* at 33:12–17.

---

[2] The page numbers referred to in Exhibit C are the page numbers added to the lower lefthand corner of the document, running continuously throughout the deposition exhibits.

3

*Second*, Mr. Passamaneck has no skill or experience with statistical analysis or surveying methods. On his resume, he lists his areas of expertise as mechanical, plumbing, and automotive. And although his resume states that he has "extensive knowledge related to firearms, cartridge reloading and shooting incidents," Ex. C, Dep. Ex. 2 at 1, that experience is restricted to "shooting reconstruction . . . from an engineering perspective" and manufacturing firearm magazines, basepads, and other accessories for shooting competitions, as well as participating in such competitions and visiting trade shows, Ex. B at 15:14–16:3, 30:21–32:24, 182:18–183:4.[3]

Although the scope of past expert testimony is not dispositive, all of Mr. Passamaneck's prior testimony has related to his engineering background, and he has never previously testified about statistical analysis or surveying methods. *Id.* at 7:23–8:14, 12:7–18, 12:23–16:5.

*Third*, Mr. Passamaneck lacks the necessary knowledge to evaluate the accuracy of surveys conducted by others. For example, Mr. Passamaneck was unable to answer basic questions about the methodology used in one of his cited surveys. When asked his opinion about "raked weighting" in one survey he cited, Ex. C, Dep. Ex 10 at 6, Mr. Passamaneck replied that did not "have one" and admitted that he did not know what raked weighting was, Ex. B at 92:21–93:9.[4] Nor could Mr. Passamaneck explain what sample size would be appropriate for a survey,

---

[3] At the deposition, Plaintiffs' counsel tried to rehabilitate Mr. Passamaneck's qualifications by citing the number of "articles about firearms" Mr. Passamaneck has read, conversations Mr. Passamaneck has had with firearm manufacturers, and trade shows Mr. Passamaneck has attended. Ex. B at 181:5–183:4. But Mr. Passamaneck admitted that his report contained the "full basis" for his opinions, *id.* at 7:5–7, and none of these items are listed in the report.

[4] "Raked weighting" is the "most prevalent method for weighting" public opinion surveys, and involves choosing "a set of variables where the population distribution is known," and then "iteratively adjust[ing] the weight for each case until the sample distribution aligns with the population for those variables." Mercer et al., *How different weighting methods work*, Pew Research Center (Jan. 26, 2018), available at https://tinyurl.com/ecnd6c5j (Ex. D).

4

how to "ensure there's no drop off" in survey responses, or whether he considered telephone or online surveys to be more accurate. *Id.* at 89:22–91:4.

The English survey also includes the following language: "48.0% of gun owners (95% CI 47.2%-48.7%) responded yes . . . ." Ex. C, Dep. Ex. 10 at 23. When asked what the parenthetical text meant, Mr. Passamaneck replied, "[s]ome statistical number," and he "d[id] not" know what it means. Ex. B at 96:7–13.

*Fourth*, Mr. Passamaneck admitted multiple times during his deposition that he was not an expert in statistical analysis or survey design. He said he was not "qualified to do . . . research" about "the number of firearms and/or magazines" and that is why he "quote[d] other people who do the research." *Id.* at 17:16–18:23. He agreed that he was "not qualified to opine on survey methodology." *Id.* at 86:23–87:3. He said he is "not a survey expert" and was "merely relying on information that's in the public realm." *Id.* at 89:3–8. He said he had no "specialized knowledge of survey mechanics." *Id.* at 91:22–92:6.

Court-qualified experts in statistical analysis or surveying have had far more training and experience. *See, e.g.*, *Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1280 (N.D. Ala. 2017) ("Dr. Taylor does have extensive training and expertise in statistics in the pharmaceutical and medical device industries."); *Kodiak Cakes, LLC v. JRM Nutrasciences, LLC*, No. 2:20-cv-00581-DBB-JCB, 2022 WL 17340660, at *8 (D. Utah Nov. 30, 2022) ("Mr. Franklyn has twenty years of experience designing consumer surveys. He has conducted over 100 consumer surveys to date. He has taught graduate-level courses on marketing and advertising, including a course on survey design."). Formal training in statistics is not required. But even when an expert "did not consider himself a statistician," he still had "used statistics throughout [his] career and [had]

5

worked with other individuals that perform statistical analyses for the projects that [he had] been involved with." *Cal. Dep't of Toxic Substances Control v. NL Indus., Inc.* __ F. Supp. 3d __, 2022 WL 14769903, at *28 (C.D. Cal. 2022) (citations and internal quotation marks omitted).

In contrast, courts within the Tenth Circuit have rejected experts who merely recite survey results without possessing the training, skill, or experience necessary to evaluate the accuracy of the survey itself. For example, in *Fish v. Kobach*, it was "clear that [the defendant's proffered expert was] not qualified to testify as an expert about [a] survey" because the defendant had "not demonstrated that [the proffered expert] possesse[d] any special skill or experience required to testify about the survey results; indeed, all but one paragraph simply recite[d] the survey's findings, rather than any opinion." 304 F. Supp. 3d 1027, 1038 (D. Kan. 2018). As in *Fish*, Mr. Passamaneck is unqualified to opine on surveying or statistical analysis.

In sum, Mr. Passamaneck's "curriculum vitae does not mention anything about his purported experience" to interpret surveys or perform statistical analysis. *Straughen v. BHS, Inc.*, No. 21-cv-02230-NYW-SP, 2023 WL 3437375, at *5 (D. Colo. May 12, 2023). He "has never been employed by a company that" specializes in statistical analysis or survey design. *Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1049 (D. Colo. 2011).[5] His "deposition testimony . . . does not indicate that Mr. [Passamaneck] obtained specific training or has any experience" in those areas. *Straughen*, 2023 WL 3437375, at *5. And Mr. Passamaneck himself "admits that he is not an 'expert'" in statistical analysis or survey design; "[h]e testified to as much at" his deposition. *Hauck v. Michelin N. Am., Inc.*, 343 F. Supp. 2d 976, 982 (D. Colo. 2004).

---

[5] Entropy, whom Plaintiffs hired, Ex. A at 1, 3, 4, is a forensic engineering firm, and there is no indication that the company provides services pertaining to statistical analysis or survey design.

Having no knowledge, skill, experience, training, or education in statistical analysis or survey design, Mr. Passamaneck tried to shift the basis for his expertise from these surveys to his general experience in the firearms industry. For example, he said he could analyze the surveys "[b]ecause [he has] been involved in the firearms industry for 25 or 30 years," including "running matches and training." Ex. B at 17:24–18:6; *see also id.* at 91:17–21.

"An expert witness's testimony can rely solely on experience. When that is the case, however, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Nacchio*, 555 F.3d at 1258 (internal quotation marks omitted). Mr. Passamaneck's report contains no explanation of how his experience enables him to accurately estimate the number of magazines or firearms currently in circulation. *Cf. Cascadia Wildlands v. Scott Timber Co.*, 618 F. Supp. 3d 1038, 1050–51 (D. Or. 2022) (concluding that a wildlife biologist with a Ph.D. in Zoology was qualified to provide statistical analysis because he "became active in the statistical subgroup of [a] working group" of the Pacific Seabird Group, "drafted the subgroup's report," and was "asked to head the statistical subgroup").

Mr. Passamaneck does not point to any previous firearms experience where he performed statistical analysis or survey design. His professional experience is limited to "shooting reconstruction" from "an engineering perspective" and designing firearms accessories. Ex. B at 15:14–19, 32:10–24; *see also* Ex. C, Dep. Ex. 2 at 1. And his personal experience is with hunting, shooting competitions, reading articles (including "explanations and forum posts"), and visiting trade shows. Ex. B at 30:21–32:24, 180:12–183:4. Mr. Passamaneck did not explain how visiting a trade show or performing a shooting reconstruction enables him to identify

7

methodologically sound surveys or accurately interpret their results, other than to say that he had made "[o]bservations, going to the industry trade shows, knowing what manufacturers sell." *Id.* at 159:18–20. Mr. Passamaneck's own report, under "Qualifications," states that he "has extensive knowledge of firearms desi[gn], manufacture and use" and that he "has conducted shooting reconstructions related to both intentional and unintentional firing of firearms." Ex. A at 3. It includes not a word about statistical analysis or surveying. "Nothing in the record provides the necessary connection" between Mr. Passamaneck's firearms experience and the ability to evaluate surveys. *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014).

The pertinent inquiry is "not the reasonableness *in general* of" an individual's expertise, but instead whether the individual can "draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153–54 (1999). Defendant does not contest Mr. Passamaneck's expertise in firearm operation. But Plaintiffs cannot rely on that specific expertise to have Mr. Passamaneck opine on the number of LCMs or AR-15s, simply because both topics pertain to firearms generally.

## II. Mr. Passamaneck employs unreliable methodology, including relying on sources he himself declares untrustworthy and creating numbers out of whole cloth.

Even if the Court finds Mr. Passamaneck is qualified, it should still prohibit his testimony about magazine or firearm prevalence due to unreliable methodology. First, Mr. Passamaneck does not provide a foundation for many of his statistics. Second, he did not verify the data he relied upon. Third, Mr. Passamaneck made citation, terminology, and arithmetic errors.

### A. Mr. Passamaneck did not provide a foundation for many statistics in his report.

"Rule 702(b) requires that expert testimony be based on sufficient facts or data. Expert testimony must be supported by 'appropriate validation—i.e., "good grounds," based on what is

8

known.'" *Cruz v. City & Cnty. of Denver, Colo.*, No. 21-cv-03388-KLM, 2023 WL 4073195, at *5 (D. Colo. June 20, 2023) (quoting *Daubert*, 509 U.S. at 590) (some citations omitted). Mr. Passamaneck failed to appropriately validate the statistics in his report in a number of ways.

*First*, Mr. Passamaneck simply could not provide a basis for some of his numbers. For example, he writes, "It is estimated that about 8 to 9 million AR15s were owned by US citizens prior to 1990." Ex. A at 1. Mr. Passamaneck provided no citation. During his deposition, he claimed that the number came from an NSSF report, but, when provided with the 2020 NSSF Industry Intelligence report (from which he drew other figures), he could not find the 8-9 million number. Ex. B at 74:9–75:11, 120:24–123:1, 125:2–12. He also could not provide a source for his assertion that the "2018 NSSF Magazine Chart estimates 71 million handgun magazines of 11+ rounds." Ex. A at 2; Ex. B at 138:14–25. Then, when attempting to explain how he got to his later estimate of "close to 100 million handgun magazines in the US that are over 15 rounds," Ex. A at 2, Mr. Passamaneck cited the unsupported 71 million number, but claimed it was "incomplete," Ex. B at 167:11–18. He also could not provide a source for his claim that "[t]he 2018 NSSF estimate of Semi-Automatic handguns is 89 million." Ex. A at 2; Ex. B at 152:15–153:22. And he had no foundation for his claim that "the total number of semi-automatic rifles owned in the US (2018) [is] just over 43 million." Ex. A at 1–2; Ex. B at 122:4–123:22.

Mr. Passamaneck also invents statistics to reach his conclusion that "there are at least 34 million AR15s owned by US citizens" today. Ex. A at 2. The figures in Mr. Passamaneck's report add up to only 33 million as of 2022 (at their highest estimate). *Id.* at 1–2. When confronted with the discrepancy between 33 and 34 million, he indicated that he added an extra million because, "at the current rate, they're literally selling 1 to 2 million a year" and that at

9

least one million AR-15s were sold in the first few months of 2023. Ex. B at 76:16–78:13, 123:23–125:1. Mr. Passamaneck omitted this assumption from his report, provided no source for this extra million AR-15s, and later admitted that he did not "know" if "[t]here were at least a million AR-15s sold" in the first few months of 2023. *Id.* at 123:23–124:9. This renders his report unreliable. *See Agri-Systems v. Structural Tech., LLC*, No. 19-cv-02238-CMA-STV, 2023 WL 3481397, at *5–6 (D. Colo. May 16, 2023) (noting that assumptions must be "based on the evidence rather than on pure speculation").

An expert should "explain[] his methodology . . . in sufficient detail" and "provide[] thorough explanations of the rationale underlying" his conclusions. *City of Fort Collins v. Open Int'l, LLC*, No. 1:21-cv-02063-CNS-SP, 2023WL 3249816, at *4 (D. Colo. May 3, 2023). Mr. Passamaneck's failure to provide citations shows that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Outside of pointing to the materials [he] relied on, [Mr. Passamaneck] does not explain his methodology or explain how the . . . reports he reviewed would allow him to reach any [of his] conclusions." *Midtown Invs., LP v. Auto-Owners Ins. Co.*, __ F. Supp. 3d __, 2022 WL 17039225, at *10 (D. Colo. 2022). He stated numbers without sources but did not "perform[] *any* statistical analysis." *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 241 (D. Minn. 2020).

*Second*, during his deposition Mr. Passamaneck also disclaimed reliance on nearly every survey he cited in his own report, calling several of them untrustworthy. He called the *Washington Post* survey "not accurate." *See* Ex. A at 1; Ex. B at 78:18–80:20. He said that the English survey had numbers that "seemed a little high to [him]" and that he was "not sure about the accuracy of some of the defensive gun use numbers." *Id.* at 93:23–95:3. He also said that a

10

chart concerning the number of magazines in the NSSF Industry Intelligence report was "not" "accurate." *Id.* at 167:11–168:9. When an "expert seem[s] to deny the sufficiency of his own . . . methodology," that expert's methodology is not reliable. *Kumho Tire*, 526 U.S. at 155.

*Third*, Mr. Passamaneck attempted to rely on his personal experience to provide a foundation for unsupported numbers. For example, writing that "[f]rom one third to one half of all US gun owners surely own a magazine that is over 15 rounds," Ex. A at 2, he admitted that "[w]e don't have a complete picture" for data on that point, but that he relied on his "experience in dealing with the firearms industry" to reach that estimate. Ex. B at 171:13–173:18.

As a threshold matter, that basis for his opinion is absent from his report. Regardless, "[e]xperience is not a methodology. Methodology is the process by which the expert *relates* his experience to the facts at hand in order to reach an expert opinion." *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1139 (D. Colo. 2019) (internal quotations marks omitted). And Mr. Passamaneck's report is conspicuously silent as to how his experience led him to the figures he cites. His "vague allusions to his 'experience,'" *Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021), leave the Court with "no way adequately or accurately to assess whether Mr. [Passamaneck] considered *enough* information to make his opinions reliable, as Rule 702(1) demands," *Troudt*, 369 F. Supp. 3d at 1140.

## B.  Mr. Passamaneck did not verify the information cited in his report.

Mr. Passamaneck agreed that an expert should "review all that background information before opining on the accuracy of a study." Ex. B at 55:1–4. But throughout his deposition, he admitted that he did not review the methodology for his sources. He did not review the *Washington Post* survey methodology. *Id.* at 80:21–23. He did not (and could not) analyze the

11

English survey methodology. *Id.* at 86:17–87:13. And he did not review the NSSF survey methodology or verify the accuracy of the numbers compiled by NSSF. *Id.* at 81:15–82:1.

As one particularly troubling example, Mr. Passamaneck asserted: "The 2018 NSSF estimate of Semi-Automatic handguns is 89 million." Ex. A at 2. There are several issues with this statement. *First*, Mr. Passamaneck does not say *what* this is an estimate of. Handguns ever produced? Ever owned? It is unclear, and Mr. Passamaneck did not know. Ex. B at 152:15–20. *Second*, the chart on which he relied for this information lists just over 68 million "total handguns" produced from 1991 to 2018. *See* Ex. C., Dep. Ex. 11 at 49. Somehow, without explanation or citation, Mr. Passamaneck stretched that figure to 89 million. *Third*, the relevant chart does not list "semi-automatic handguns." It lists "pistols," "revolvers," and "total handguns." *Id.* Yet he conflated "semi-automatic handguns" with "total handguns," in his report, but admitted that "a semiautomatic handgun is a subset of a pistol." Ex. B at 156:17–18.

As another example, Mr. Passamaneck claimed that "Mag-Pul, the largest manufacturer of AR15 magazines (and who also produces Glock and AR10 magazines) estimates the total number of magazines of 15+ rounds at 350 million." Ex. A at 2. When asked how Mag-Pul arrived at that number, Mr. Passamaneck said that he contacted a Mag-Pul Executive Vice President over Facebook Messenger. Ex. B at 146:23–149:4, 160:13–17, 171:7–12. Mr. Passamaneck did "not know [the] methodology" used to reach that estimate. *Id.* at 147:23–148:1.

"[E]xpert witnesses cannot simply parrot inadmissible out-of-court statements," but instead "can synthesize various out-of-court sources and apply their expertise." *Colo. Mont. Wyo. State Area Conference of the NAACP v. U.S. Election Integrity Plan*, No. 1:22-cv-00581-CNS-NRN, 2023 WL 3865720, at *2 (D. Colo. June 7, 2023). "Where an expert fails to verify the

12

accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific[,] requiring exclusion of such evidence under *Daubert*." *Dryer v. Ryder Auto. Carrier Grp.*, 367 F. Supp. 2d 413, 446 (W.D.N.Y. 2005). When an expert "call[s]" another individual, "who provide[s an] assurance" that the underlying data is accurate, a "district court [can] consider this assurance an inadequate safeguard of reliability." *Hall v. Conoco, Inc.*, 886 F.3d 1308, 1313 (10th Cir. 2018). At some point, "the information relied upon by Plaintiffs' experts" can be "so sadly lacking as to be mere guesswork." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (internal quotation marks omitted).

Mr. Passamaneck did not inquire about his sources' methodology and "fail[ed] to verify the accuracy of data upon which" he relied. *Dryer*, 367 F. Supp. 2d at 446. Instead, he blindly accepted (or changed) others' data, despite lacking the training to assess the methodological rigor of surveys. This Court should exclude Mr. Passamaneck's unverified conclusions.

### C. Mr. Passamaneck made numerous errors concerning citing information, terminology, and arithmetic.

*First*, Mr. Passamaneck made errors in his report in terms of copying information from sources. Even though Mr. Passamaneck parroted outside sources, he reported many of those sources incorrectly. For example, he made conclusions about "AR15 style rifles," *see* Ex. A at 1–2, even though his source for that data, the NSSF, uses the term "modern sporting rifles," which "include[e]s the AR-15 *and similar variants*," Modern Sporting Rifles: The Facts, NSSF The Firearm Industry Trade Association, available at https://www.nssf.org/msr/ (accessed June 26, 2023) (Ex. E) (emphasis added); *see* Ex. B at 71:1–22, 107:9–110:4; Ex. C, Dep. Ex. 11 at 54.

13

Mr. Passamaneck also used "US citizens" in his report. *See* Ex. A at 1–2. But he acknowledged that the *Washington Post* and NSSF surveys did not restrict their data to U.S. citizens and that he did not know whether the English survey did so. Ex. B at 128:16–129:19.

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). "But conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146. Here, Mr. Passamaneck's inability to accurately transpose data from outside sources should lead this Court to "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

*Second*, Mr. Passamaneck erred with regard to terminology. Throughout his report, verbs are missing. For example, Mr. Passamaneck wrote that "the 2018 NSSF Magazine Chart estimates" millions of magazines of different types, but without saying whether those are estimates of present ownership or past production. Ex. A at 2. He reports the Mag-Pul number from Facebook Messenger as "the total number of magazines of 15+ rounds at 350 million." *Id.* Again, no verb to denote ownership or production. *See also id.* ("The 2018 NSSF estimate of Semi-Automatic handguns is 89 million."). It turns out these omissions were intentional; when asked about the missing verbs, Mr. Passamaneck repeatedly could not say whether the data referred to possession or production. Ex. B at 98:3–11, 139:8–142:6, 148:19–24, 152:15–24.

*Third*, Mr. Passamaneck made basic arithmetic errors. Mr. Passamaneck's "350 million" Mag-Pul number was for "the total number of *15+ magazines*." Ex. A at 2 (emphasis added). Mr. Passamaneck then estimated "close to 100 million handgun magazines in the US that are *over 15 rounds*." *Id.* (emphasis added). From there, he estimated "approximately 250 million rifle

14

magazines *over 15 rounds*," *id.* (emphasis added), by subtracting his handgun estimate (for over 15 rounds) from the Mag-Pul estimate, Ex. B at 168:10–14. But the Mag-Pul numbers included 15-round magazines, while his estimate of handgun and rifles magazines did not. And by Mr. Passamaneck's own analysis this discrepancy is meaningful because he believes that 15-round magazines are one of the two most common for 9mm semi-automatic handguns. Ex. A at 2. Mr. Passamaneck was "inconsistent about what he was calculating. . . . These inconsistencies matter[]," *Hall*, 886 F.3d at 1314, in a case where the statute makes 16-round magazines illegal in most circumstances, but allows for possession and sale of 15-round magazines.

## CONCLUSION

Ultimately, Mr. Passamaneck did not "employ[] . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[s]" of statistical analysis and survey methodology. *Kumho Tire*, 526 U.S. at 152. He "fail[ed] to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation." *Sheehan v. Daily Racing Farm, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). Because Mr. Passamaneck is not qualified to opine in the areas of statistical analysis or surveying, and because his methodology is unreliable, Defendant respectfully requests that the Court grant this motion to partially strike Mr. Passamaneck's expert report and partially exclude his testimony.[6]

---

[6] Defendant believes that the Court can decide this matter without a hearing, although is happy to have a hearing if it would assist the Court. *See Wildearth Guardians v. Pub. Serv. Co. of Colo.*, 853 F. Supp. 2d 1086, 1090 (D. Colo. 2012).

15

DATED: June 30, 2023.

PHILIP J. WEISER
Attorney General

*s/ Daniel R. Magalotti*
LEEANN MORRILL*
First Assistant Attorney General
EMILY B. BUCKLEY*
Senior Assistant Attorney General
PETER G. BAUMANN*
Assistant Attorney General
DANIEL R. MAGALOTTI*
Assistant Attorney General Fellow
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: leeann.morrill@coag.gov
          emily.buckley@coag.gov
          peter.baumann@coag.gov
          daniel.magalotti@coag.gov
*Attorneys for Defendant Governor Jared S. Polis*
*Counsel of Record

16

## CERTIFICATE OF SERVICE

  I hereby certify that on June 30, 2023, I served a true and complete copy of the foregoing **DEFENDANT'S MOTION TO PARTIALLY STRIKE EXPERT REPORT AND PARTIALLY EXCLUDE TESTIMONY OF MR. MARK PASSAMANECK UNDER FEDERAL RULE OF EVIDENCE 702,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Eric Paul Apjoke
Shaun Pearman
Pearman Law Firm, P.C.
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
eric@pearmanlawfirm.com
shaun@pearmanlawfirm.com

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

                *s/* Daniel R. Magalotti
                *Daniel R. Magalotti*

17