**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-CV-1866-GPG-SKC

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.
    Plaintiffs,
v.
JARED S. POLIS, in his official capacity as Governor of the State of Colorado,
    Defendant.

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO PARTIALLY STRIKE
EXPERT REPORT AND PARTIALLY EXCLUDE TESTIMONY OF
MR. MARK PASSAMANECK**

The question before the Court is narrow: whether Plaintiffs' expert Mark Passamaneck is qualified to opine on the number of 16-plus round magazines circulating in the United States and whether the methodology he used to reach his opinions is reliable. Much of Plaintiffs' Response to Defendant's Motion (D. 60) is devoted to ancillary topics. But none of those topics address that Mr. Passamaneck himself admits he is unqualified to assess the accuracy of the sources on which he relied. And even if that were not the case, the methodology he used to synthesize those sources into his opinions lacks any semblance of reliability. Mr. Passamaneck's conclusions relating to the prevalence of large-capacity magazines in the United States should be excluded.

**I.    Plaintiffs cannot rehabilitate Mr. Passamaneck's qualifications or conclusions with information not disclosed in his expert report.**

Under Fed. R. Civ. P. 26(a)(2)(B), an expert's report must include "a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them;" and "the witness's qualifications." Consistent with

this rule, Mr. Passamaneck agrees that his Report, Ex. 1 to Def's Mot. (D. 56-1) ("Report"), contains "the full basis" for the opinions offered, and "all of the facts underlying those opinions," Ex. 2 to Def.'s Mot. (D. 52-2) ("Passamaneck Depo.") at 7:1–10.

Nevertheless, Plaintiffs' Response (D. 60) argues that Mr. Passamaneck's opinions are actually based on knowledge or experience not included in his Report. Over the course of two paragraphs, Plaintiffs list 13 separate qualifications for Mr. Passamaneck's conclusions concerning the prevalence of large-capacity magazines. Resp. at 7–8. *None* of those qualifications are included in Mr. Passamaneck's Report. These paragraphs cite to counsel's attempt to rehabilitate Mr. Passamaneck's testimony during his deposition, Passamaneck Depo. at 175–187, and a "Firearms shooting resume supplement" that Plaintiffs' counsel submitted as an exhibit at the deposition, *id.* at 175:3–13. But Mr. Passamaneck's "firearms shooting resume supplement" was not included in his Report, and was not available to Defendant's counsel through Mr. Passamaneck's business, which puts a different version online. *See id.* at 11:1–9.[1] Nor did Mr. Passamaneck's Report list or reference his "professional experience as a firearms instructor, engineer, and manufacturer," the "literally thousands of firearms related articles" he has read, or the "numerous firearms tradeshows" he has attended. *But see* Resp. at 7–8. It does not include his experience "produc[ing] firearms magazines through 2012," or that he has "personally spoken to over 100 firearms manufacturer agents and representatives." *Id.* at 8. The

---

[1] Mr. Passamaneck's Report indicates it is his firm, "Entropy Engineering," that "has evaluated portions of the case." Report at 1. Entropy includes a copy of Mr. Passamaneck's resume on its website, and it was that resume that Defendant's counsel used to evaluate Mr. Passamaneck's qualifications. Ex. C to Def.'s Mot. (D. 56-3) at 2. According to Mr. Passamaneck, this resume, which lists his practice areas as "mechanical, plumbing, and automotive," Passamaneck Depo. 12:4–7, "is honest in its description of [his] work," *id.* at 17:6–8.

list goes on. Nothing in the Report mentions Mr. Passamaneck's "decades of experience in the firearms field, including experience as a manufacturer of firearm magazines," which according to Plaintiffs are why he is "qualified to render an opinion on the topic of an estimate of the number of magazines with a capacity greater than 15 rounds in the United States." Resp. at 8.

Having realized that Mr. Passamaneck's Report does not establish the requisite qualifications to opine on this topic, in effect Plaintiffs now seek to supplement his report with additional information to survive this *Daubert* challenge. But that effort fails for two reasons.

***First***, Plaintiffs cannot supplement the Report through briefing. If a party fails to include information in a Fed. R. Civ. P. 26(a)(2)(b) expert report, it "is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or was harmless." Fed. R. Civ. P. 37(c)(1). In general, courts consider several factors in addressing whether a failure to disclose was justified or harmless, the first of which is "the prejudice or surprise to the party against whom the testimony is offered." *Woodworkers Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). It is Plaintiffs' burden to establish that the failure was substantially justified or harmless, *Stoker v. State Farm Mutual Auto. Ins. Co.*, 19-cv-03569-NYW, 2021 WL 4201583, at *13 (D. Colo. May 6, 2021), and Plaintiffs have offered no argument as to either.

Defendant was significantly prejudiced by this belated disclosure. According to Plaintiffs, these undisclosed qualifications are why Mr. Passamaneck is "qualified to render an opinion" on the number of LCMs that currently exist in the United States. But Defendant—at the time Mr. Passamaneck's report was disclosed, at the time of Mr. Passamaneck's deposition, and at the deadline by which Defendant had to file a Rule 702 motion—was unaware that Mr. Passamaneck

3

had these qualifications, let alone that they were as important as Plaintiffs' Response suggests in forming his opinions.

***Second***, and most importantly, Mr. Passamaneck himself admitted that none of the qualifications advanced by Plaintiffs—all of which are absent from his Report—formed a basis for his opinions. Passamaneck Depo at 7:1–10 ("Q: And [the Report] includes the full basis for [the opinions that you would offer if called to testify at trial]? A: It does.").

The "full basis" for Mr. Passamaneck's opinions on the prevalence of sixteen-plus round magazines in the United States is included in his Report. That "full basis" include several studies (all of which Mr. Passamaneck is unqualified to review) and unsubstantiated information from third-parties. His opinion was not based on trade shows he attended, firearms-related articles he read, or previous experience selling firearms magazines. *But see* Resp. at 8. It was not based on what he had learned at "seminars by some of the top firearms instructors in the country," or his membership in "the Glock Sport Shooting Foundation and the United States Practical Shooting Association." *Id.* The Court should reject Plaintiffs' attempt to add qualifications to Mr. Passamaneck's Report that he himself did not include.

**II.     Even the new qualifications advanced by Plaintiffs do not make Mr. Passamaneck qualified to opine on the prevalence of large-capacity magazines.**

**A.  Mr. Passamaneck lacks the qualifications necessary to evaluate the accuracy of the statistical studies he used to form his opinion.**

Plaintiffs' Response argues that Mr. Passamaneck is qualified to opine on the prevalence of large-capacity magazines in the United States because of his "decades of experience in the firearms field, including experience as a manufacturer of firearms." Resp. at 8. But even if the

4

Court does consider these undisclosed qualifications (which it should not), they are unrelated to the opinions Defendant seeks to exclude.

Those opinions relate to the prevalence of 16-plus round magazines in the United States. *See, e.g.*, Report at 2 ("From one third to one half of all US gun owners surely own a magazine that is over 15 rounds."). The Report does not ground Mr. Passamaneck's opinions on this topic on his general firearms experiences. If it had—and had detailed how he used those experiences to reach his conclusions—those experiences would be relevant to the *Daubert* inquiry.

Instead, Mr. Passamaneck grounded his opinion in various surveys and statistical reports. The relevant question is not whether Mr. Passamaneck could have expressed an opinion grounded in different sources, but rather whether the opinion he does express—based entirely on sources he is unqualified to analyze—should be admitted.

It should not be. To form his opinion, Mr. Passamaneck simply parroted information "that's in the public realm," Passamaneck Depo. at 89:3–8, and declared that it supported his conclusion. But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert," *i.e.*, the expert's own assertions made without proof. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 300 (10th Cir. 2010) (Tenth Circuit "precedent is clear and unequivocal that the *ipse dixit* of an expert, no matter how qualified he may be, is never enough to guarantee him a ticket to admissibility"). Although an expert may rely on third-party sources to form his opinions, he must possess independent qualifications sufficient to evaluate the hearsay on which he is relying. *See generally* Fed. R. of Evid. 703 ("If experts *in the particular field* would reasonably rely on those kinds of facts or data

5

in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.") (emphasis added).

*TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), is instructive. There, the Plaintiff sought to introduce evidence regarding projected future sales. *Id.* at 731. There were "only two possible sources of evidence" for these projections: 1) a "market survey report" (the "Werber report"), and 2) the opinions of plaintiffs' expert. *Id.* Plaintiffs did not call the author of the Werber report, but instead argued that their expert had "properly adopted [its] conclusions . . . under Rule 703." *Id.* at 732.

The Tenth Circuit rejected that argument. *Id.* It held that the expert had "clearly adopted the projections of Mr Werber, [but] there [was] no indication in the record that [the expert] had any familiarity with the methods or reasoning used by Mr. Werber in arriving at his projections." *Id.* Instead, the expert had "assumed the validity" of those projections, despite lacking the qualifications necessary to evaluate their accuracy.

So too here. Just as the plaintiffs in *TK-7* sought to introduce evidence of future sales using reports, Plaintiffs here seek to introduce evidence concerning the prevalence of large-capacity magazines using surveys and reports. And just as the plaintiffs in *TK-7* did not present testimony from the authors of the relevant report, the Plaintiffs here similarly eschewed evidence from the authors of the studies cited by Mr. Passamaneck. But just as the *TK-7* plaintiffs' expert was unqualified to opine on the "methods or reasoning" underlying the Werber report, Mr. Passmaneck is unqualified to evaluate the studies, surveys, and reports he cites in his Report.

Rule 703 is not an invitation for litigants to introduce inadmissible evidence by presenting it through an expert witness. *See Beck's Office Furniture and Supplies, Inc. v.*

6

*Haworth, Inc.*, 94 F.3d 655 (table) at *7 (10th Cir. 1996) ("Experts are allowed to rely on hearsay, and even on the opinions of others if proper foundation was laid that others in the field would likewise rely on them, but may not merely parrot the opinions of other experts whose conclusions are not themselves in the record."). That witness still must possess the qualifications necessary to evaluate the evidence and weigh its reliability. In fact, the advisory committee notes to Rule 703 expressly call out the use of surveys, saying that the focus for courts and experts should be on the "validity of the techniques employed" in conducting the survey. Fed. R. Evid. 703 advisory committee's note. Mr. Passamaneck lacks the qualifications necessary to evaluate the techniques employed in the surveys and studies he cites and cannot "invoke vague allusions to his 'experience'" to lay a foundation for his opinions. *Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021). Particularly when that experience is unrelated to statistical analysis or survey methodology.

In a similar challenge to Oregon's large capacity magazine ban, the district court excluded an expert's opinion related to statistical analysis. *Or. Firearms Fed'n v. Kotek*, 2:22-cv-01815-IM, 2023 WL 4698752, at *2 (D. Or. May 31, 2023). There, the plaintiffs' expert "ha[d] practical experience with firearms that render[ed] him sufficiently knowledgeable about how LCMs might be useful in self-defense situations," but the court declared that he could "not testify about quantifiable data on the frequency with which any particular number of rounds are fired in self-defense situation" because the expert did "not have relevant experience with *statistical analyses or data*." *Id.* (emphasis added). The same is true here. Defendant does not contest that Mr. Passamaneck is qualified to opine on the operation and durability of firearm magazines. *See* Report at 2–3; Def.'s Motion at 2 n.2. But Mr. Passamaneck's "practical experience with

firearms" does not give him "relevant experience with statistical analyses or data." *Or. Firearms Fed'n*, 2023 WL 4698752, at *2.

### B. If expertise is not necessary to analyze these sources, then expert testimony on them is inadmissible.

Plaintiffs next argue that Mr. Passamaneck's opinion "is a matter of counting, not statistical analysis. Therefore, it is not necessary for Mr. Passamaneck to be an expert in statistical analysis to rely on this data[.]" Resp. at 9. As a threshold matter, this assertion is contradicted by Mr. Passamaneck's own Report, which says that the number of magazines circulating in the population is "difficult to measure." Report at 2.

But if it were the case that an understanding of statistics and survey methodology was unnecessary to evaluate the accuracy of the sources cited in Mr. Passamaneck's Report, then Plaintiffs cannot "satisf[y] the Rule 702 requirement that the expert testimony assist the [finder of fact] because of the value of the witness's expertise." *United States v. Garcia*, 793 F.3d 1194, 1212 (10th Cir. 2015). Plaintiffs could introduce the surveys on which Mr. Passamaneck relied through other means, and allow the finder of fact to draw their own conclusions. *See generally Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701.").

What Plaintiffs cannot do is take lay evidence, introduce it through an expert unqualified to assess its reliability, and present that evidence to the finder of fact with the imprimatur of

expert testimony. If expertise is unnecessary to assess the validity of these sources, then Plaintiffs were free to try to introduce them through their authors.[2]

### III. Even if Mr. Passamaneck were qualified to rely on these studies, the technique he employed to do so was unreliable.

Plaintiffs' Response highlights the four pieces of information on which Mr. Passamaneck based his opinion. Resp. at 9–10. It then tries to bolster the credibility of those sources to salvage Mr. Passamaneck's opinion. *Id.* at 11–15. But whether courts or the Congressional Research Service have "relied on NSSF reports in reaching *conclusions* about the number of firearms and/or magazines in circulation," Resp. at 12 (emphasis added), is irrelevant to the *Daubert* inquiry. The question is whether Mr. Passamaneck used reliable methodology in finding, reviewing, and synthesizing these sources into his opinions. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) ("The focus . . . must be solely on principles and methodology, not on the conclusions that they generate."). He did not.

### A. Mr. Passamaneck did not understand the National Shooting Sports Foundation Report he relied upon.

One of the key sources Mr. Passamaneck relied upon was an "industry compilation produced by the" National Shooting Sports Foundation (NSSF). Resp. at 9 (citing Ex. C to Mot.

---

[2] To be clear, Defendant asserts that calculating the number of LCMs and other firearms products and accessories in the United States is a complex endeavor properly subject to expert analysis. Calculation of the number of LCMs and other firearms products and accessories goes "well beyond the realm of simple mathematics." *United States v. Second Chance Body Armor, Inc.*, 289 F. Supp. 3d 145, 163 (D.D.C. 2018). And Defendant maintains that Mr. Passamaneck is not qualified to opine on such matters. But Plaintiffs cannot have it both ways. Either review of existing surveys on this topic is a subject matter properly reserved for expert testimony (in which case Plaintiffs should have offered a qualified expert) or that subject matter does not require expert testimony (in which case it should be stricken from Mr. Passamaneck's expert report).

9

[D. 56-3] at 48 ("NSSF Report")). As a threshold matter, Mr. Passamaneck cited this report twice, for two separate propositions, without realizing he was doing so. Passamaneck Depo. at 110:5–19 ("Q: Did you know you were citing the same figure twice? A: No.").[3]

More fundamentally, Mr. Passamaneck misunderstood the source of the data for the NSSF Report. He claimed that the NSSF Report is based on "data from [NSSF] members which are manufacturers," which is compiled by the NSSF sending "surveys to their members." Passamaneck Depo. 100:12–23. That's incorrect. The NSSF Report is based "primarily on the data sourced from the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF's) Annual Firearms Manufacturing and Export Reports (AFMER)." NSSF Report at 1 (D. 56-3 at 48).[4]

Moreover, Mr. Passamaneck misrepresented the NSSF Report in several critical ways. *First*, he cited it for the proposition that there were 20 million "AR15 rifles" sold in the US between 1990 and 2018. Report at 1. But the NSSF Report does not track "AR15 rifles." Mr.

---

[3] Mr. Passamaneck cited the same statistic once for the proposition that there were 20 million AR-15 "owners" in the United States, and two sentences later for the proposition that there were 20 million AR-15 rifles "sold in the US" from 1990-2018. Report at 1; Passamaneck Depo. at 110:5–19. This error undermines Plaintiffs' claim that he is qualified to opine on such matters. *See* Def.'s Mot. At 13–15.

[4] One of the pages in the NSSF Report cites not only the AFMER, but also "industry estimates," which Mr. Passamaneck suggested could be the surveys he referenced (he was not sure). NSSF Report at 7 (D. 56-3 at 54); Passamaneck Depo. 113:17–22. But Mr. Passamaneck admitted he did not know a) which chart "industry estimates" related to, b) how those industry estimates were compiled, c) which members were surveyed, d) which non-members were surveyed, or e) what methodology was used to compile the estimate. Passamaneck Depo. 114:21–115:15.

Passamaneck was referring to a chart that shows production of "Modern Sporting Rifles," NSSF Report at 7 (D. 56-3 at 54), an umbrella term encompassing more than just AR-15 rifles.[5]

***Second***, he claimed the NSSF Report shows an estimate of 89 million "Semi-Automatic handguns." Report at 2. But the NSSF Report does not track "Semi-Automatic handguns." It tracks "pistols." NSSF Report at 2 (D. 56-3 at 49). And Mr. Passamaneck admits that "semiautomatic handguns" is a subset of "pistols" as that term is used in the NSSF Report. Passamaneck Depo. 156:16–22. These errors with regard to terminology undermine the reliability of Mr. Passamaneck's opinions. *Cf. Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1241 (W.D. Wash. 2018) (disqualifying an expert because, in part, the "terms are extremely general" in the expert report").

Even leaving aside that problem, Mr. Passamaneck admitted that he did not "know" whether the 89 million figure was in the NSSF report and that he would have to "keep looking through the report [to] see if it's in [t]here or not." Passamaneck Depo. At 153:19–22. Unlike Mr. Passamaneck, Defendant's counsel did look through the NSSF Report, and none of the information in the report comes close to supporting the 89 million figure for pistols, let alone semiautomatic handguns, instead topping out at 54 million pistols sold between 1991 and 2018. NSSF Report at 2 (D. 56-3 at 49). Moreover, this figure "includes firearms sold for export and

---

[5] Plaintiffs' note that "the number of AR-15s is *not* an issue in this litigation," Resp. at 10, which is true. Mr. Passamaneck also admitted that AR-15s can be sold with 10-round magazines, that "not every AR-15 in the United States is accompanied by a 16-plus round magazine," and that if someone owns an AR-15, that fact alone tells him "nothing" about the capacity of the magazine that accompanies that weapon. Passamaneck Depo. at 72:9–73:6. All of which undermines Mr. Passamaneck's reliance on AR-15-related statistics to opine on magazine prevalence.

law enforcement," *id.*, which would fall outside the relevant statistic for firearms currently circulating in the United States' civilian population.

***Finally***, and most importantly, Mr. Passamaneck did not understand what the NSSF Report depicted. The NSSF Report is a report of production. It details the number of firearms produced in a given year. *See, e.g.*, NSSF Report at 2 (D. 56-3 at 49) (showing "U.S. Firearm Production (1991 – 2018)"). But Mr. Passamaneck either did not understand that or deliberately misrepresented it. Throughout his Report he repeatedly omitted "what" the NSSF Report was showing. For example, Mr. Passamaneck noted that "the 2018 NSSF magazine chart estimates 71 million handgun magazines of 11-plus rounds." Report at 2. When pressed as to whether this meant that 71 million handguns of 11-plus rounds are currently owned or have ever been produced, Mr. Passamaneck said he didn't know. Passamaneck Depo. at 140:4–11. He admitted that he was "literally just regurgitating what's on the chart," but that he felt there was "something missing from the chart." *Id.* at 140:14–21. He even indicated that he spoke with people at the NSSF who did not know what that chart meant. *Id.* at 140:18–20.[6]

Mr. Passamaneck "regurgitated" a chart from a source despite not knowing what that chart showed, despite not being able to verify what that chart showed, and despite thinking that something was "missing" from that chart. This is not the type of reliable methodology that courts should bless in an expert opinion.

---

[6] Leaving aside the other problems with Mr. Passamaneck's statement that "[t]he 2018 NSSF estimate of Semi-Automatic handguns is 89 million," Report at 2, this statement suffers from the same problem. 89 million what? The chart on which Mr. Passamaneck based this sentence suggests that he meant "89 million produced between 1991 and 2018," NSSF Report at 2 (D. 56-3 at 49), but the Report does not say.

### B. His use of the other sources of information was similarly flawed.

Mr. Passamaneck's opinion was also based on a Facebook messenger conversation with an "executive vice president" at Magpul. Passamaneck Depo. at 147:5–11. Mr. Passamaneck asked this gentleman: "Do you have any idea how many magazines are in the United States over 15 rounds?" *Id.* 147:21–22. Mr. Passamaneck then attributed the response to the executive vice president's employer, claiming that "Mag-Pul, the largest manufacturer of AR15 magazines . . . estimates the total number of magazines of 15+ rounds at 350 million." Report at 2.

Plaintiffs admit that "Mr. Passamaneck's report would be objectionable if it *merely* quoted a statement from Magpul," but argue that he "applied his expertise to synthesize various sources, including the Magpul statement, to reach his conclusions." Resp. at 14. That's not true. Mr. Passamaneck included that statement verbatim in his Report without commentary, and then relied on it for further calculations. His ultimate conclusion regarding the prevalence of LCMs in the United States is that "there [are] certainly close to 100 million handgun magazines in the US that are over 15 rounds," which "leaves approximately 250 million rifle magazines over 15 rounds." Report at 2. These figures were reached in unwavering reliance on the executive vice president's figure. Passamaneck Depo. at 168:13–14 ("A: Magpul says there's 350 million, so if you take 100 million from 350, you end up with 250."). Mr. Passamaneck did not synthesize the estimate into his opinion; he synthesized his opinion into his contact's estimate.

Moreover, Mr. Passamaneck's methodology in obtaining this estimate, interpreting this estimate, and ultimately applying this estimate to his conclusions were each unreliable.

First, the source in question was a Facebook message from a single employee, not an official corporate statement. It was not provided in a sworn affidavit, Passamaneck Depo. at

171:7–9, and Mr. Passamaneck did not know what methodology his source used to reach that figure, *id.* at 147:23–148:1. This alone undermines his reliance on this statement. *See generally Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1139 (D. Colo. 2019) (excluding opinion because "the facts on which it is based are wholly opaque").

Second, like the NSSF Report, Mr. Passamaneck does not know (and did not ask) exactly what the 350 million figure represented. *See generally Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 24 (2d Cir. 2017) ("A failure to validate data by itself can constitute grounds for excluding an expert report." (citation omitted)); *Hauck v. Michelin NA, Inc.*, 343 F. Supp. 2d 976, 986 (D. Colo. 2004) (noting that expert has obligation to request data that would be helpful in forming his opinions). He does not know whether it means "total number produced," "owned," or "currently possessed." *Id.* at 148:21–24. Even though he agrees "350 million magazines that have ever been produced as opposed to 350 [million] magazines that are currently owned" are "vastly different things." *Id.* at 149:14–20. Nor did Mr. Passamaneck know whether that 350 million figure included members of the military or law enforcement. *Id.* at 151:17–23.

Finally, Mr. Passamaneck's methodology in applying this figure to his ultimate conclusion was fundamentally flawed. As noted, he used this figure to calculate the total number of handgun and rifle magazines "in the US that are over 15 rounds." Report at 2. But the 350 million figure included magazines of 15 rounds. Passamaneck Depo. at 152:10–14. Mr. Passamaneck then used this 15-and-over figure to run his calculations, but listed the results as reflecting magazines of "over 15 rounds." This is fundamentally flawed methodology. And critically flawed because Mr. Passamaneck admits that 15 rounds is a common magazine size.

14

Report at 2 (noting that 40% of all Semi-Automatic handguns are 9mm, "which are commonly 15 or 17 rounds depending on the frame size").

**IV.    Stipulations entered into in other cases, whether admissible in this proceeding or not, are irrelevant to this Motion.**

Finally, Plaintiffs devote a portion of their Response to stipulations made in previous challenges to the LCM Ban. As Defendant has explained, those stipulations are not binding here. *See generally* The Governor's Mot. for Ruling that Fact Stipulations from Previous Cases Are Not Binding, (D. 29).[7] Even if they are appropriate evidence—which Defendant does not concede—they are subject to the Rules of Evidence and must be handled accordingly. *See United States v. Vitek Supply Corp.*, 144 F.3d 476, 482–83 (7th Cir. 1998) (applying Rules of Evidence to stipulations entered into by party in previous litigation).

Regardless, those stipulations are irrelevant to the question of whether Mr. Passamaneck's qualifications and methodology are sufficiently reliable to satisfy Fed. R. of Evid. 702. Mr. Passamaneck did not rely on those stipulations in reaching his opinions, and did not recall having seen any of them prior to his deposition. Passamaneck Depo. at 188:24–189:1.

---

[7] The Court denied Defendant's motion as moot after Plaintiffs withdrew their request for a preliminary injunction (D. 34). But the Court did so without prejudice and held that Defendant could "renew his Motion for Ruling" in the future. *Id.* To the extent the Court wishes to entertain argument that the stipulations are binding (which, again, is irrelevant to this Rule 702 dispute), Defendant relies on his argument made in the previous motion (D. 29).

DATED: August 4, 2023.

PHILIP J. WEISER
Attorney General

*s/ Peter G. Baumann*
LEEANN MORRILL*
First Assistant Attorney General
EMILY B. BUCKLEY*
Senior Assistant Attorney General
PETER G. BAUMANN*
Senior Assistant Attorney General
DANIEL R. MAGALOTTI*
Assistant Attorney General Fellow
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: leeann.morrill@coag.gov
 emily.buckley@coag.gov
 peter.baumann@coag.gov
 daniel.magalotti@coag.gov
*Attorneys for Defendant Governor Jared S. Polis*
*Counsel of Record

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 4, 2023, I served a true and complete copy of the foregoing **DEFENDANT'S REPLY IN SUPPORT OF MOTION TO PARTIALLY STRIKE EXPERT REPORT AND PARTIALLY EXCLUDE TESTIMONY OF MR. MARK PASSAMANECK,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Eric Paul Apjoke
Shaun Pearman
Pearman Law Firm, P.C.
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
eric@pearmanlawfirm.com
shaun@pearmanlawfirm.com

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

                                               *s/ Peter G. Baumann*
                                               *Peter G. Baumann*