# **Exhibit 24** to
# The Governor's Motion for Summary Judgment

## *Order in People v. Sgaggio, 2022M5894*
## *(El Paso Cnty. Cnty. Ct. June 8, 2023)*

*Gates et al. v. Polis*, No. 1:22-cv-1866-GPG-SKC (D. Colo.)

September 11, 2023

| | |
|---|---|
| <u>COUNTY COURT, EL PASO COUNTY, COLORADO</u><br>Court Address:  270 S. Tejon<br>                            Colorado Springs, CO 80903<br>Phone Number: (719) 452-5191 | DATE FILED: June 8, 2023 10:11 AM<br>CASE NUMBER: 2022M5894 |
| PEOPLE OF THE STATE OF COLORADO<br><br>vs<br><br>DELBERT ELMER SGAGGIO,<br><br>DEFENDANT | ▲                                  ▲<br>COURT USE ONLY<br>Case Number:  2022M5894,<br><br>Division  D<br><br>Courtroom S203 |
| **ORDER RE: DEFENDANT'S FEBRUARY 21, 2023, MOTION TO DISMISS** | |

For nearly 250 years, since just after the founding of this Nation, the possession of arms by our citizens, specifically firearms for the purpose of self-defense, has been a protected by the Second Amendment to the Federal Constitution.  The question before this Court is whether Colorado's Large Capacity Magazine Ban runs afoul of those protections.  For the reasons set forth below, the Court finds that it does not.

## I.   BACKGROUND[1]

On March 20, 2013, Colorado's Governor signed House Bill 13-1224 into law thereby enacting C.R.S. §18-12-301, *et seq.* commonly referred to as Colorado's Large Capacity Magazine Ban (hereinafter the "LCM Ban").  In a nutshell, and as applicable in this matter, the ban prohibits the possession of a detachable handgun magazine that is capable of holding in excess of 15 rounds of ammunition.  *See* C.R.S. §§18-12-301(2)(a)(I), 18-12-302(1)(a).[2]

---

[1] The background facts specific to this case come from a number of sources to include the Summons, and the Pleadings and Exhibits of the Parties.  The Court will cite to those sources where critical to its determination of the Motion.

[2] Colorado defines LCM as capable of containing more than 15 rounds of ammunition.  However, some jurisdictions *currently* define a LCM as capable of holding as little as 11 rounds.  *See e.g.* D.C. Code §7-2506.01(b), or as much

1

On the morning of August 15, 2022, Mr. Sgaggio entered the Colorado Springs Police Department's Sand Creek Substation and produced a 21 Round Sig Sauer Magazine.[3] Mr. Sgaggio's magazine was confiscated as evidence and he was served a Summons and released on his promise to appear.

Mr. Sgaggio filed Motions to Dismiss pursuant to the United States and Colorado Constitutions on October 17, 2022, and November 3, 2022.  Mr. Sgaggio argued in his Motions that the LCM Ban is unconstitutional.  The Motions were denied because the issue had previously been decided by both Colorado Supreme Court in Rocky Mountain Gun Owners v. Polis, 467 P.3d 314(Colo. 2020), and the Federal District Court in Colorado Outfitters Ass'n v. Hickenlooper, 24 F. Supp 3d 1050 (D. Colo. 2014).[4]  However, because the issue was not decided under current standard for review set forth by the United States Supreme Court in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111(2022), this Court, having been newly assigned, gave leave to Mr. Sgaggio to refile his Motion to challenge the LCM Ban and provide a copy of his Motion to the Colorado Attorney General as required by C.R.S. §16-9-501.

Mr. Sgaggio filed his newest challenge pursuant only to the United States Constitution on February 21, 2023.[5]  The Colorado Attorney General's Office filed its Response on April 21, 2023,[6] and Mr. Sgaggio filed his Reply on May 2, 2023.  The Court, now being fully informed, now FINDS and ORDER as follows:

---

as 17. *See e.g.* 11 Del. C. §1468(2).  While rulings on these bans (including those with lower capacities than Colorado's) are persuasive to the Court and this Court may refer to "LCM Bans" generally, the Court's analysis and holding is narrowly tailored to the Colorado definition of an LCM.

[3] *See* Summons filed with the Court on August 23, 2022, and Defendant's October 17, 2022, Motion to Dismiss, at page 3.

[4] The Court notes the District Attorney erroneously cited this as arising out of the 10th Circuit. In fact, the citation is for the United States District Court for the District of Colorado.  The 10th Circuit reversed and remanded the case due to the Plaintiff's lack of Article III standing in Colorado Outfitters Association v. Hickelooper, 823 F.3d 527 (10th Cir. 2016).  However, neither ruling impacts this Court's Order.

[5] The Court notes that Mr. Sgaggio's Motion was filed well past the Court's 28 day deadline.  However, in light of the Constitutional nature of the Motion, the Court has allowed the Motion to proceed.

## II.  APPLICABLE LAW

On December 15, 1791, the United States ratified the Second Amendment to the United States Constitution.  The Amended reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

On July 9, 1868, the Fourteenth Amendment to the United States Constitution was ratified. Section One of the Fourteen Amendment reads, in pertinent part, as follows:  "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  In McDonald v. City of Chicago, 561 U.S. 742(2010), the United States Supreme Court held that the 2nd Amendment, through the 14th Amendment, applies to the States and prohibits States from enacting legislation that would violate a citizen's Second Amendment right to bear arms.

In District of Columbia v. Heller, 554 U.S. 570 (2008) the Supreme Court recognized an individual's right to keep and bear arms for the purpose of self-defense.  The Court also noted that the right is not absolute. Id. at 576, and legislatures can still regulate "those weapons not typically possessed by law-abiding citizens for lawful purposes," Id. at 626 *quoting* United States v. Miller, 307 U.S. 174 (1939), and those statutes related to the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Heller, at 628.

Following Heller, many jurisdictions adopted a two-part test to evaluate Second Amendment challenges.  The test developed asked first "whether the regulated activity falls within

---

[6] Mr. Sgaggio takes issue with the timeliness of the Attorney General's Response.  However, the Attorney General was granted extensions by this Court to file a Response.

3

the scope of the Second Amendment" based on text and history. And, if so, looked into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights" and evaluated the "regulatory means the government has chosen and the public-benefits end it seeks to achieve." *See* Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2011).

However, in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111(2022) the Supreme Court dispensed with the proposed two-part test and implemented a more stringent test for Second Amendment cases. The Bruen test also requires a two-part analysis: if the "Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."Bruen 142 S.Ct. at 2129-2130, *quoting* Konigsberg v. State Bar of Cal, 366 U.S. 36, at 50 n. 10 (1961).

What was left up in the air, as pointed out by the Attorney General, is the appropriate standard of proof. The Court agrees with the Attorney General that, under prevailing Colorado precedent, Mr. Sgaggio bears the initial burden of proving beyond a reasonable doubt that the Second Amendment covers his conduct. In other words, that Mr. Sgaggio's possession of a Large Capacity Magazine is protected by the Second Amendment. As our courts have long recognized, a statute is presumed to be constitutional. Curious Theater Co. v. Colo. Dep't of Pub. Health & Env't, 216 P.3d 71, 76–77 (Colo. App. 2008), *aff'd,* 220 P.3d 544 (Colo. 2009). Further, the "party challenging the constitutionality of a statute has the burden of proving the statute is unconstitutional, as applied, beyond a reasonable doubt." *See* People v. Nozolino, 350 P.3d 940, 945 (Colo. App. 2014) *citing* People v. Gutierrez, 622 P.2d 547, 555 (Colo. 1981). Of course, if Mr. Sgaggio were able to achieve that burden, then it falls to the People to prove that the LCM Ban is rooted in our country's historical tradition.

4

### III.	WHETHER "MAGAZINES" ARE ARMS

The first inquiry for the Court is whether a magazine is an "arm" within the meaning of the Second Amendment, or whether it is simply an accessory or "accoutrement" as argued by the Attorney General.

Colorado Revised Statute §18-1-901(3)(h) defines a "firearm" as including any "handgun, … pistol, or other instrument capable or intended to be capable of discharging bullets, cartridges, or other explosive charges."  The legislature has opted not to define "firearm" or "handgun" any further, and the LCM Ban is silent as to whether or not the legislature considers magazines to be part of a firearm, or merely an accessory.

The Attorney General argues that magazines are not "arms" within the meaning of the Second Amendment and has offered two expert declarations in support of their position.  Dr. Dennis Barron, an expert in the historical aspects of the English language, opines that "magazines" are merely "accoutrements" and not a part of a firearm.  His opinion is based, primarily, on the fact that magazines in their current form did not exist when the Second Amendment was ratified, and the closest analogy is a "cartridge box" or "cartouch box"[7] which was used for the storage of ammunition apart from the firearm.[8]  Dr. Barron's opinion is not based on any specialized knowledge of firearms, but that of linguistics.  This argument ignores the requirement that this Court must still consider weaponry that was not in existence at the time of the nation's founding.  *See* Heller, 554 U.S. at 582.  This analogy also ignores the fact that a "magazine" is not simply an ammunition storage box as were cartouch boxes, but a necessary part of a semi-automatic pistol designed to "feed multiple rounds of ammunition" into the chamber of the pistol (or other firearm) so it can be fired.[9]  Contrast this with an item that can accessorize a firearm or change its performance such as silencers or bump-stocks.  The former can reduce the decibel level of a firearm

---

[7] *See* Declaration of Dennis Baron at ¶9, 34, 69, 71.
[8] *See* Declaration of Joseph Bilby at p. 3.

5

a limited amount, and the latter increases the speed of firing a semi-automatic rifle through the rifle's recoil.  While both of these items are "accessories" to the firearm, neither are necessary for the firearm to function as designed.

The Attorney General's second expert suggests that magazines are not weapons since they are not classified as weapons by law enforcement authorities.[10]  However, the Court does not find this opinion to be persuasive for two reasons.  First, the list of "weapons" which includes shotguns, pistols, and other firearms, does not include *any* individual part of a firearm (i.e. firing pin, trigger, stock, etc.). The other "weapon" categories include, *inter alia*, "drowning", "blunt objects", "none", "unknown", "unarmed", and "other." Given the expansive definition of "weapons" used by law enforcement, which includes the catchall words "unknown" and "other," it is clear that *any* object falls into the definitional category of weapon, including "magazines" dependent on how it is used.

This conclusion is also support by Colorado Law.  Colorado Revised Statute §18-1-901(1)(e)(II) defines a "Deadly Weapon" to include a "knife, bludgeon, or any other weapon, *device, instrument*, material, or substance, whether animate or inanimate, *that, in the manner it is used or intended to be used, is capable of producing death or serious bodily injury*." [Emphasis added].  LCMs (and all magazines) were designed for military service with a clear purpose of causing injury and death. *See generally* §IV *infra.*  It is clear to this Court that the Colorado Legislature has a very broad definition of what constitutes a deadly weapon which would include all magazines.  *See also* People v. Pennese, 830 P.2d 1085 (Colo. App. 1991) (Fists as a deadly weapon); People in Interest of J.R., 867 P.2d 125 (Colo. App. 1993) (BB Gun as a deadly weapon).  The Court also notes the legislature's concern regarding LCM in establishing the ban: that LCMs have the potential of causing substantially more injury and loss of life due to their design in limiting breaks in firearm operation.  *See* §IV.c. *infra*.

---

[9] *See* Declaration of James E. Yurgealitis at ¶15.
[10] *See* Declaration of Jeffrey Zax, Ph.D. at ¶ I.A.

Given that magazines have been described by the Attorney General's experts as a necessary part of the proper function of a firearm, the Court finds persuasive the 3rd Circuit Court of Appeals' holding in New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey, 910 F.3d 106 (3d Cir. 2018). The 3rd Circuit held, "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." Id. at 116. This conclusion is supported by caselaw cited by the Attorney General. See Fyock v. Sunnyvale, 779 F.3d 991(9th Cir. 2015). Therein, the 9th Circuit Court of Appeals noted recognized the Second Amendment includes a limited "right to possess the magazines necessary to render … firearms operable." Id. at 998.

The Attorney General also concedes in their brief that a ban on magazines would likely be a *de facto* regulation of "arms" which require magazines to function.[11] Of course, that is not necessarily at issue in the instant matter for two reasons: First, Mr. Sgaggio admits that his firearm functions without the need for a magazine, it simply becomes a single-shot pistol which requires reloading after each round is fired.[12] Second, and more importantly, the statute at issue prohibits the sale, transfer, or possession of LCMs. See C.R.S. §18-12-302(1)(a). There is no requirement in the statute that the LCM be inside a firearm, in the vicinity of a firearm, intended to be used with a firearm, or that the possessor of the LCM even have *access* to a firearm. The simple *possession* of the LCM is the crime for which Mr. Sgaggio is charged, not his intended use. This is also in line with other Colorado Statutes that outlaw simple possession of an illegal item, regardless of whether the item will, or even can be used. See e.g. C.R.S. §18-18-403.5 (Possession of a Controlled Substance, as opposed to *Use* a Controlled Substance prohibited by C.R.S. §§18-18-404; 18-12-102 (Possession illegal weapons including brass knuckles and dangerous weapons including ballistic knives and

---

[11] *See* "The Attorney General's Response Under §16-9-501, C.R.S. to Defendant's Constitutional Challenge," at n. 6.
[12] *See* Mr. Sgaggio's "Response to the Attorney General's Motion for Extension of Time to File Response to Defendant's Constitutional Challenge" filed on March 20, 2023, at p. 1.

7

silencers); 18-5-903.5(Possession of another's driver's license); 42-4-1415 (Possession of Radar Jamming Device).

The Court finds that a magazine, and specifically a LCM is an "arm" within the meaning of the Second Amendment irrespective of whether a firearm is present for its use. The fact that Mr. Sgaggio has a pistol to be used in conjunction with the LCM only supports this conclusion as the LCM Ban applies to him personally. It matters not that Mr. Sgaggio's firearm may operate effectively as a single-shot pistol without the magazine, but that Mr. Sgaggio's firearm only functions as designed with a magazine inserted. Modern semi-automatic firearms are designed to operate with the use of a magazine, thus making the magazine an "arm" within the meaning of the Second Amendment.

The Court finds, based on the record before it, including the Attorney General's Exhibits, that Mr. Sgaggio has met the threshold burden of proving beyond a reasonable doubt that the "Second Amendment's plain text covers [his] conduct" in possessing an LCM. The Court now turns to whether the LCM Ban "is consistent with the Nation's historical tradition of firearm regulation." Bruen 142 S.Ct. at 2129-2130.

### IV. WHETHER LCMS ARE SUBJECT TO RESTRICTIONS

Having concluded that magazines are "arms" within the meaning of the Second Amendment, the Court now turns to whether LCMs can still be regulated, or outright banned.

The Attorney General has provided expert declarations supporting a historical tradition of regulating LCMs dating back to the late 19th and early 20th centuries. Mr. Sgaggio argues these are irrelevant since the only time period this Court should consider is the 77 years between the ratifications of the Second and Fourteenth Amendments.

**IV.a. Analogous Restrictions in Historical Tradition from 1791 to 1868**

The District Attorney suggests magazines are more analogous to cartouch boxes, an argument with which this court disagrees for the reasons set forth in §III. *Supra.* As previously

8

noted, cartouch boxes were used for the storing and carrying ammunition separately from the firearm by an individual.  This is as opposed to devices that are meant to assist in feeding ammunition into the chamber of a firearm or firing multiple rounds without the need to stop and reload.  No Exhibit provided by either party reveals a "historical twin" for the modern magazine, and the Court seeks the closest "historical analog" to use in its analysis. *See* <u>Bruen</u> 142 S.Ct at 2133. The Court notes the "historical analogs" existing during the early part of the relevant time period encompassing 1791 through 1868 are mostly limited to wind guns, and the occasional novelty firearm such as pepperbox pistols.[13]  These weapons did not achieve any mass production, and while several "repeating" type firearms were also invented, none were generally available to the public and were primarily designed for, and marketed to governments for military use.[14] None of these firearms were designed for civilian use for self-defense.

During the early to mid-1800s the lever action rifle and revolvers were invented and came into production.  However, with the exception of some rare novelty weapons, the maximum capacity for these firearms was generally no more than ten rounds (less for revolvers), with limited exception including the Henry Rifle and the Winchester 1873 Rifle that each held 15 rounds in their internal magazines.  However, the Henry Rifle only saw limited production in the civilian sector for a very short span of time,[15] and the Winchester 1873 was specifically designed for military use.[16]

It wasn't until the early 20th century that detachable magazines were invented,[17] and it wasn't until the 1920's following the advent of the Thompson Machine Gun that LCMs increased production.[18] Once again, these advances in technology were designed and intended for use by the military.[19]  Given the rarity of LCMs or their historical analogs between 1791 and 1868, it is

---

[13] *See generally* Declaration of Dennis Barron, Declaration of Joseph Bilby and Declaration of Robert J. Sptizer.
[14] *See generally* Declaration of Joseph Bilby.
[15] <u>Id.</u> at 21.
[16] *See* Declaration on Spitzer at ¶38 *quoting* Koller, *The Fireside Book of Guns*, 112.
[17] <u>Id.</u> at 28.
[18] *See* Declaration of Robert J. Spitzer at ¶4.
[19] *See generally* Declaration of Joseph Bilby and Declaration of Robert J. Spitzer.

9

unsurprising that there is a lack of legislation amongst the states specifically regulating that technology.

Mr. Sgaggio relies on the dissent in Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021) to support his position that LCMs have a long historical pedigree in our country. However, the dissent in Duncan v. Bonta, merely makes a conclusory statement regarding the "highlights" of LCMs in the United States, without additional analysis. Id. at 1154-115 (Bumatay, *dissenting*). The dissent relies heavily on the conclusions of David B. Kopel from *The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev 849 (2015). However, Mr. Kopel's conclusions are contradicted by Dr. Spitzer in Attorney General's Exhibit 4.[20] The Court agrees with Dr. Spitzer's analysis, and no contradictory evidence has been presented. *cf.* People v. DeBaca, 736 P.2d 25 (Colo. 1987) (Courts may not ignore uncontradicted credible evidence in the record).[21]

The Court maintains its conclusion, based on the signed declarations admitted as evidence by the Attorney General, that firearms capable of firing multiple rounds of ammunition without reloading were simply not commonplace, certainly not in the civilian sector, and therefore there was no need for specific regulations. As noted by Dr. Spitzer, for there to be a regulation of a certain firearm technology, there must first be the technology (which is generally designed for military use), and ultimately that technology must make its way into the civilian sector and pose a threat such that legislatures recognize the need to take action.[22] That chain of events did not occur until the early 20th century.

**IV.b. LCM regulation in the 19th and 20th Centuries**

After the advent of detachable magazines in the early part of the 20th century, and those magazines began to make their way into the civilian sector, legislatures across the county began

---

[20] *See* Declaration of Robert J. Spitzer at ¶¶26-27.
[21] Mr. Sgaggio submitted Exhibit 1 with his Reply Brief, the Declaration of James Curcuruto that was submtted in a Federal Civil Action. The Declaration relates to the availability and prevalence of the AR-15 Rifle, a subject that has no relevance to these proceedings.
[22] Id. at ¶43.

working on legislation to regulate those arms.  The first bans came about in 1917 with the majority enacted between 1927 and 1933.[23] In all, ten(10) state legislatures and the United States Congress (specific to the District of Columbia) limited the possession of magazines that contained between two(2) and seventeen(17) rounds of ammunition depending on the jurisdiction.[24]

That Colorado waited until 2013 to enter the fold is inconsequential to this Court.  While Colorado's law is young, it is clear that within a decade of LCM becoming widely available, the United States Congress, a quarter of all states, and Hawaii all imposed some form of ban on firearms that could fire multiple rounds without reloading.  Twenty-three states imposed some restriction on automatic weapons that had ammunition feeding capabilities.[25]  Given that a number of states and the District of Columbia (via the United States Congress) reacted relatively soon after magazines became readily available, the Court is convinced that historically there has been regulation of magazines, both detachable and fixed.

The Court recognizes the lag time between the ratification of the Second and Fourteenth Amendments, and the legislation.  However, this is not unusual where the technology sought to be regulated did not exist, nor could reasonably be foreseen when ratification occurred.  *See* Katz v. United States, 389 U.S. 347 (1967) (wiretapping phones violates the 4th Amendment); Carpenter v. United States, 585 U.S. ___ (2018), 138 S.Ct. 2206 (2018) (Applying 4th Amendment protections to Cellular GPS data);  Reno v. ACLU, 521 U.S. 844 (1997) (First Amendment protections applied to internet communications).

### IV.c.   Justifications for the LCM Ban

The Colorado Legislature enacted LCM Ban in an effort to prevent further mass casualties. As the Attorney General noted in its Brief, "the LCM Ban mandates a critical pause during otherwise uninterrupted shooting by forcing a shooter to replace a spent magazine."  The pause ultimately

---

[23] Id. at 20, Table 1.
[24] Id.

11

gives potential victims an opportunity to escape injury or death, and law enforcement an opportunity to intervene.[26] *See also* Rocky Mtn Gun Owners v. Hickenlooper, 472 P.3d 10 (Colo. App. 2018).  This purpose is consistent with the basis for the early 20th century LCM bans.  The bans were designed to reduce criminality, to protect civilian lives and because LCMs were deemed to serve no lawful purpose in civilian use, to include self-defense.[27]

Mr. Sgaggio argues that the magazine is necessary to defend himself against some unforeseen enemy.  However, as noted previously the firearm Mr. Sgaggio professes to own does not *require* an LCM, or any magazine for that matter.  Of course, to function as designed *a magazine* must be inserted into the firearm, but not necessarily a 21 round magazine.  In fact, as the Attorney General noted in its Brief, the LCM Mr. Sgaggio is alleged to have had in his possession is interchangeable with a fully-legal ten round magazine.[28]

Given that the Second Amendment is rooted in the right to bear arms in self-defense, the Court turns to whether the possession of a LCM is consistent with that right. *See* Bruen, 142 S.Ct. at 2134; As noted previously, the Heller Court noted the core of the Second Amendment is to provide a mechanism for self-defense. 554 U.S. at 576. Further, those protections do not extend to weapons designed for military use. 554 U.S. at 627.  The Court is persuaded by the historical analysis provided by the Attorney General that the historical analog firearms that could fire more than 10 rounds without reloading were designed, and used primarily by the military and not for individual self-defense. *See* Section IV.b. *supra.* Mr. Sgaggio has presented no evidence to the contrary. *See* People v. DeBaca, *supra.*

The Court finds the Attorney General has established a historical tradition of regulating military-style weapons, specifically LCMs once they are available in the civilian sector.  The Court

---

[25] Id.
[26] Attorney General's Response at p.2.
[27] *See* Declaration of Spitzer at ¶¶ 16-20.
[28] *See* Attorney General's Response at p. 8 & n. 7.

further finds the Attorney General has established that LCMs were designed and primarily used for military or offensive use, and *not* for individual self-defense.

## V. MOTION FOR BILL OF PARTICULARS

Mr. Sgaggio requested, as alternative relief, a Bill of Particulars.[29] As an initial matter, Colorado Rule Crim. P. 7(g) requires that a Bill of Particulars be filed within 14 days after arraignment "*or at such other time before or after arraignment as may be prescribed by rule or order*." [emphasis added]. This matter was arraigned in Division H on November 22, 2022. Under the rule the request for a Bill of Particulars was due no later than December 6, 2022. This Court was assigned the case and Mr. Sgaggio appeared before it on December 13, 2022, for scheduling. The Court issued a Case Management Order (CMO) on that date, and gave leave for Mr. Sgaggio to file additional Motions consistent with the CMO. The CMO sets a deadline of 28 days for the filing of all Motions. *See* CMO Paragraph 2. Thus, all motions were due no later than close of business on January 10, 2023. The instant Motion was file more than one month past the deadline set by the Court, and significantly past the deadline set by Crim. P. 7(g).

Notwithstanding, the Court has considered the Motion and the Court file. In ruling on a request for a Bill of Particulars, the Court should consider whether the requested information is necessary for the defendant to prepare his defense. People v. Whitman, 205 P.3d 371 (Colo. App. 2007). The prosecutor need not, however, disclose all evidence in detail, or explain legal theories upon which he intends to rely at trial. People v. Rubanowitz, 688 P.2d 231 (Colo. 1984). Finally, a Bill of Particulars is not necessary where the Summons sufficiently advises the defendant of the accusations. Howe v. People, 496 P.2d 1040 (Colo. 1972).

The Court, having reviewed the Summons, finds it is sufficiently detailed to fully inform Mr. Sgaggio of the charge against him, and the allegations that gave rise to that charge. This is

---

[29] *See* Motion to Dismiss at p. 16.

particularly true in light of Mr. Sgaggio's pleadings in this Matter and apparent knowledge of the charge with which he is accused.

## VI. CONCLUSION

The Court finds that magazines are "arms" for the purpose of the Second Amendment. The Court finds the Attorney General has established that C.R.S. §18-12-301, *et seq*. is consistent with the historical tradition of firearms regulation.  The Motion to Dismiss is respectfully DENIED.

The Court is not sitting in equity in this Matter, but as a criminal court.  Thus, Defendant's request for declaratory relief is respectfully denied as outside of this Court's Jurisdiction and inconsistent with this Court's Findings and Order as set forth above.

The Motion for a Bill of Particulars is DENIED.

In light of the ruling, the Court declines to address the Attorney General's additional arguments. *See* People v. Curtis, 350 P.3d 949 (Colo. App. 2014) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." (quoting PDK Lab'ys Inc. v. U.S. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)).

SO ORDERED this   7th  day of  June , 2023.

BY THE COURT:

_____
DENNIS L. MCGUIRE
COUNTY COURT JUDGE