# **Exhibit 28** to
# The Governor's Motion for Summary Judgment

## *Expert Report of James Yurgealitis*

*Gates et al. v. Polis*, No. 1:22-cv-1866-GPG-SKC (D. Colo.)

September 11, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-CV-1866-GPG-SKC

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## FRCP 26(a)(2)(B) EXPERT REPORT OF JAMES YURGEALITIS

---

Pursuant to 28 U.S.C. § 1746, I, James E. Yurgealitis, declare under penalty of perjury that the following is true and correct:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained in this report, and testify based on my personal knowledge and information.

2.    I have been asked by the Defendant to prepare an expert report for disclosure under FRCP 26(a)(2)(B) addressing the types and operation of firearms, the operation and history of large capacity magazines and lower capacity magazines, and self-defense. This report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this report. I hold all opinions expressed herein to a reasonable degree of professional certainty.

3.    I am currently Self Employed as a Legal and Forensic Consultant providing firearms related technical and public policy consulting, forensic case reviews and testing and training services to corporations, legal counsel, and the public sector.  During my previous 26-year career as a Federal Law Enforcement Officer, I have been recognized, and testified as, an expert witness

in numerous local, state and federal courts. I have toured numerous firearms and ammunition manufacturers' facilities both in the United States and overseas. I maintain a personal library of firearms and ammunition related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent / Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine years. During that time, I was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

4.      My credentials, training, background and experience are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. My credentials, training, background and experience as an expert witness are detailed on my Statement of Qualifications, a true and correct copy of which is attached as Exhibit B.

5.      I am being compensated at a rate of $400 per hour for my work and $1600 per travel + work day.

6.      My opinion or opinions as stated in this report are the result of my training, knowledge, and experience, technical, statistical, and historical research, review of the firearms regulations of the State of Colorado, as well as the Plaintiffs' pleadings in this case as submitted.

7.      During the course of my work in this case as additional research, technical or statistical materials become available or relevant they will be reviewed. As such I reserve the right to amend my report, opinion or testimony to include consideration of those materials should their relevance warrant.

8.      The litigation centers around C.R.S. § 18-12-302 (the Statute) which bans the sale, possession and transfer of large capacity magazines. The definition of "large capacity magazine" in  C.R.S. § 18-12-301(2) means a fixed or detachable magazine, box, drum, feed strip, or similar

device capable of accepting, or that is designed to be readily converted to accept, more than

fifteen rounds of ammunition.

9.   The definition also includes "(II) A fixed, tubular shotgun magazine that holds more

than twenty-eight inches of shotgun shells, including any extension device that is attached to the

magazine and holds additional shotgun shells."

10.   More simply defined a detachable firearm magazine, as defined in the statute, is a

device which facilitates continuous feeding of ammunition to a semi-automatic or fully-automatic

firearm. When empty it can readily be detached and replaced with another so that firing can

continue.  A tubular shotgun magazine is a "fixed" magazine attached, or integral, to the frame

receiver or barrel of a shotgun. Unlike a detachable magazine it, being integrated to the shotgun,

is not readily detachable without tools and the magazine itself must be reloaded when empty to

continue firing.

11.   As the issues in this case center around firearms and firearm terminology &

technology it is important to discuss different types of modern firearms and how they function.

## DISCUSSION

**I.   Firearms Terminology, Types, And Operation.**

**A.  Handguns And Long Guns.**

12.   Modern firearms as currently manufactured for civilian ownership fall into two

general types: handguns and long guns (or shoulder weapons).

**i.  Handguns.**

13.   **Handguns.** Handguns are generally defined as a firearm having a short stock (grip),

and are designed to be held, and fired, with one hand. The term "handgun" defines two distinct

types of modern firearms: the revolver and the semi-automatic pistol.

14.   **Revolver.** A revolver is a handgun designed and manufactured with a revolving cylinder to contain, chamber, and feed multiple rounds of ammunition. In a modern double action revolver, pulling the trigger rotates the cylinder bringing an unfired cartridge of ammunition in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge initiating the firing sequence as stated previously. In this type of revolver, the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired, the cylinder is unlocked from the frame and swings out to facilitate removal of expended cartridge casings and insertion of unfired cartridges. The cylinder is then closed and relocked within the frame and the handgun is again ready to fire when the trigger is pulled.

15.   **Semi-automatic pistol.** A semi-automatic pistol is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and utilizes a "detachable" or "box" magazine to contain and feed multiple rounds of ammunition (pistols with fixed internal magazines also operate in a similar fashion). In this type of handgun, generally, the box magazine is inserted into the firearm, the slide or bolt is pulled back and released which springs forward and feeds a cartridge into the chamber. When the trigger is pulled, a firing pin or striker is released which impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols, a portion of the recoil or gas pressure generated by firing the cartridge is utilized to move the slide rearward, extract and eject the expended cartridge case and chamber another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

  **ii.   Long Guns.**

16.   In terms of modern firearms manufacture, long guns are generally of two distinct types: rifles and shotguns.

17.   **Rifle.** A rifle is a firearm which is designed and intended to be fired from the shoulder.  It fires a single shot through a rifled bore for each pull of the trigger.

18.   **Shotgun.**  A shotgun is a firearm that is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non rifled) bore for each pull of the trigger.

19.   In terms of "types" of rifle there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

20.   **Single-shot rifle.**  For example, single-shot rifles fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

21.   **Pump action rifle.**  A pump action rifle requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing, the forearm is pulled backward which unlocks the bolt, extracts and ejects the fired cartridge case. Pushing the slide forward feeds an unfired cartridge from the magazine, cocks the firearm mechanism and locks the bolt for a successive shot. Pump action rifles have been manufactured with both tubular and detachable box magazines.

22.   **Bolt action rifle.**  Bolt action rifles require the operator to manually manipulate the bolt of the rifle.  After firing, the bolt is first unlocked from the chamber and then moved rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved forward which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is then again locked by the operator, it is ready to fire. Bolt action rifles usually have an internal fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt

5

until that capacity is exhausted. Bolt action rifles were generally the choice among hunters and military forces through the end of World War II.

23.    **Lever action rifle.**  A lever action rifle is similar to the bolt action rifle in that the operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the receiver of the rifle is manipulated in an up and down motion in order to unlock the bolt and move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the chamber and lock it. This action is required for each shot fired through the rifle. Generally speaking lever action rifles are usually manufactured with tubular magazines which will vary in capacity depending on the caliber of the firearm.

24.    **Semi-automatic rifle.**  A semi-automatic rifle utilizes the energy generated by the firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion of the gases generated by firing to operate the mechanism or by utilizing the recoil generated by firing much as in a semi-automatic pistol as described previously. Once loaded, the operation of this cycle of fire is not dependent on the operator to affect any portion of the process other than to pull the trigger. Semi-automatic rifles are, and have been previously, manufactured with both fixed internal magazines and a capacity to accept detachable external magazines. As such this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously, the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi-automatic M1 (Garand) .30-06 caliber rifle as standard issue. The Garand had a fixed internal magazine with an eight round capacity.

25.    Modern shotguns, as stated previously in regard to rifles, are generally classified and characterized by their operating system, (i.e., the manner in which they function, are loaded and

are reloaded). Additionally in the case of shotguns with multiple barrels they are defined by placement or orientation of those barrels ( over under, side by side etc.).

26.     **Single-shot shotguns**.  Single-shot shotguns function similarly to the single-shot rifle. They may have a hinged receiver which allows the operator to open the action at chamber area to facilitate loading and unloading of the firearm. There are also single shot models that are loaded and unloaded through a bolt action mechanism and have no additional magazine capacity.

27.     **Bolt action shotguns** Bolt action shotguns are manufactured, as stated above as single shot, or with internal, tubular or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt action rifle and require manual manipulation of the bolt by the operator to unload and reload.

28.     **Lever action shotguns.** Lever action shotguns again function in the same fashion as a similarly designed rifle. Manual manipulation of the lever is required for successive shots.

29.     **Pump action shotguns.** Pump action shotguns have the same general operating system as a similarly designed rifle. The "action" of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload and relock the bolt for firing. Pump action shotguns generally feature tubular magazines.

30.     **Semi-automatic shotguns.** Semi-automatic shotguns, as with their rifle caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and tubular, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

31.     **Break open, double barrel, and "tip up" shotguns.**  Break open, double barrel, and "tip up" shotguns have a hinged receiver which facilitates access to the rear of the chamber

for unloading and reloading. They are manufactured in single shot and double barrel variations. Double barrel variations are further delineated by the placement of their barrels. Side-by-side shotguns have two barrels situated next to one another in a horizontal arrangement. Over-and-under shotguns have two barrels superimposed upon one another in a vertical plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened, the expended shotgun shell hulls can be manually extracted although more complex designs with auto ejectors perform that function when "opened" without action by the operator.

### B.  General Firearms Definitions.

32.    In discussing modern firearms, it is important to understand how they are defined under statute, how they function and the differences between types commonly found and available to the public.

33.    Additional terms often used when discussing modern firearms are semi-automatic, full-automatic, select fire, rifling, caliber and gauge.  I define these terms as follows:

34.    **Semi-Automatic.** Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

35.    **Full-automatic.**  Full-automatic refers to a firearm that will continuously fire successive shots when the trigger is pulled, and will only stop when the trigger is released or the supply of ammunition is exhausted. Commonly referred to as a machine gun.

36.    **Select Fire.** A select fire firearm is capable of switching between and functioning in either full- or semi-automatic fire mode. Under Federal Law this type of firearm is still classified as a machine gun as it retains full-automatic capability.

37.   **Rifling**. Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "lands." The "lower" portion of this pattern are called "grooves." When a projectile (or bullet) is fired in a "rifled" firearm, it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern, the rifling imparts a spin to the projectile which improves stability and accuracy.

38.   **Caliber**. Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States, caliber is traditionally expressed in fractions of an inch. For example, a .22 caliber firearm is designed to chamber and fire a projectile which measures .22 inches (or slightly less than a quarter of an inch). A .50 caliber firearm chambers and fires a projectile which is approximately a half inch in diameter.[1]

39.   It is important to note for the purposes of this report that the caliber designation of any given ammunition cartridge usually refers only to the diameter of the projectile (bullet) and not the relative "power" of the cartridge itself (in terms of muzzle energy, effective range and muzzle velocity). For example, there is an important distinction between cartridges commonly referred to as .22 caliber and cartridges commonly referred to as .223 caliber.

40.   .22 caliber ammunition is a popular and relatively low power cartridge developed in the 1880s. It is also known as ".22 rimfire" as the primer mixture in the cartridge is seated in the rim of the cartridge and not contained in a separate primer cup in the center of the cartridge base. It is commonly used for target shooting as well as hunting small game and can be fired from both

---

[1] In Europe, and the majority of other countries utilizing the metric system, caliber has historically been expressed in millimeters (mm). Therefore a 9mm firearm is designed to chamber and fire a projectile with a diameter of 9mm. European caliber designations may also include measurement of the length of the cartridge case (9x19mm, 7.62x39mm etc.).  A number of firearm calibers widely manufactured have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example, .380 ACP caliber ammunition in the U.S. is referred to as 9x17mm caliber in Europe.

handguns and rifles chambered in that caliber. Bullet weights for .22 caliber projectiles / bullets are typically between 30-60 grains (0.08 to 0.13 ounces). Muzzle velocities are usually in the 1100-1300 feet per second (fps) range.

41.    .223 caliber ammunition by comparison is a high velocity cartridge developed in the 1950's in part for use in the original AR-15 and M-16 rifles. It is a "centerfire cartridge" as the primer is contained in a separate cup in the center of the cartridge base. Although the diameter of the projectile / bullet is only slightly greater (approximately the width of a human hair) than the .22 caliber cartridge mentioned previously, it is a vastly more powerful cartridge in terms of muzzle velocity and range. This caliber ammunition is also somewhat interchangeable with 5.56mm ammunition. Here is a side-by-side comparison of .223 (left) and .22 caliber cartridges (right) with a quarter for size reference:



42.    Common bullet weights for .223 / 5.56mm caliber projectiles are 50 to 62 grains + or— (0.11 to 0.14 ounces)—heavier than .22 caliber projectiles.  Common muzzle velocities are approximately 3,200 to 3,500 feet per second—about three times as fast as .22 rimfire caliber

projectiles.  The important point to remember is that the numeric designation of a bullet's caliber

is not the only determinant of its performance in terms of muzzle velocity, range etc.

43.   **Gauge.** Gauge is a dimensional measurement which is traditionally used to denote

the bore of a non-rifled or "smoothbore" firearm (i.e., a shotgun). Shotguns were initially designed

to fire a mass of round shot as opposed to one solid projectile, and therefore a caliber designation

is not readily applicable. Gauge refers to the number of lead spheres which will fit inside the bore

and equal one pound. For example, in a 12 gauge shotgun, you can fit 12 spheres of lead, which

are approximately 18.52mm or .73 inches in diameter, the total weight of which will equal one

pound. If the diameter of the spheres are increased, it will require less of them to equal one pound.

Therefore the smaller the "gauge" the larger the dimension of the bore. The exception to this

measurement system is the .410 gauge shotgun which is actually a caliber designation.

44.   Modern firearms operate utilizing the expanding gases generated by the rapidly

burning gunpowder contained in modem ammunition. Gunpowder (or smokeless powder) is the

propellant contained within metallic cartridges or shotshells utilized by modem firearms. A single

cartridge or shotshell is also referred to as a "round" of ammunition.   Once chambered or loaded

in a modern firearm, and the trigger is pulled, the primer at the base of the cartridge or shotshell is

struck by a firing mechanism. The primer contains a pressure sensitive explosive compound

which ignites when struck. The ignition of the primer, in turn, ignites the main powder charge

contained in the case of the cartridge or shotshell.  The main powder charge ignites and burns

rapidly in what is essentially a contained explosion.

45.   This contained explosion generates gases at enormous pressures. The generated

gases push the projectile out of the mouth of the cartridge, down the barrel of the firearm and out

of the firearm through the muzzle.

46.    More simply defined, a firearm is a weapon which utilizes the gas pressure generated by the burning gunpowder (explosive) in a modern ammunition cartridge to propel a projectile through the barrel and out of the firearm through the muzzle.

47.    All modern breech loading firearms,[2] no matter the type, operate according to a nine-step process known as the "Cycle of Fire." The Association of Firearm and Toolmark Examiners (AFTE) is a professional organization for Forensic Firearm and Toolmark Examiners which, in conjunction with the U. S. Department of Justice (USDOJ), National Institute of Justice (NIJ), has created a training program for apprentice forensic firearm and toolmark examiners.[3]  The AFTE / USDOJ training program has outlined the nine steps of the Cycle of Fire as:

1) Feeding:

Feeding refers to the process for insertion of cartridges into the chamber; the breech bolt pushes the cartridge into final position. Typically, the incoming round slides across the bolt or breech face during this caroming action. The feeding function can be manual or performed by various kinds of magazines and clips. For example, machine guns use belts of cartridges.

2) Chambering:

Chambering is the insertion of the cartridge into the chamber. If a cartridge of the incorrect length or diameter is used or if there is foreign matter in the chamber, chambering may be obstructed, causing a malfunction. Excess oil or grease in the

---

[2] A Breech Loading firearm is one in which the cartridge is loaded and fired from the breech (back) end of the barrel as opposed to a Muzzle Loader wherein the propellant / powder and bullet are loaded from the muzzle (front) end.
[3] https://projects.nfstc.org/firearms/module08/fir_m08_t04.htm.

chamber may cause overpressure, resulting in a ruptured cartridge case and potentially serious accidents.

3) Locking:

The breech bolt mechanism locks the cartridge into position in the barrel before firing. Most quality firearms are equipped with an interrupter mechanism that disconnects the trigger from the firing pin, thus making it impossible to fire until the mechanism is safely locked. This critical relationship is referred to as timing. (Blowback mechanisms involve a spring-held bolt; the mechanism is not technically locked, it is held together by spring tension and bolt inertia.)

4) Firing:

When the breech is fully locked, a pull on the trigger mechanically translates to the firing pin release. In the cocked position, the firing pin has a hammer behind it with a spring forcing it towards the primer, restrained only by a sear that is engaged by the trigger. A pull on the trigger trips the sear from the engaging notch in the hammer. The hammer, actuated by a cocked spring, drives the firing pin sharply against the percussion sensitive primer, which fires the cartridge.

5) Obturation:

Obturation occurs when powder gases under high pressure (e.g., two and one-half tons per square inch in the .30 06 Springfield cartridge) are sealed to prevent them from jetting between primer cup and cartridge case, cartridge case and primer wall, and projectile and bore.  Cartridge cases must be sufficiently flexible to expand

against the chamber wall and transmit the instantaneous powder pressure to the barrel metal that surrounds the chamber.  When the chamber pressure has returned to zero, the cartridge case must also be flexible enough to release itself from the chamber wall (even though it is now pressure form fitted to the chamber). Likewise, the primer cup has been pressure held against the side of the cartridge case and depends upon the face of the breechblock for locked support during the interval of high chamber pressure. Obturation also occurs with the projectile; bullets are made sufficiently larger than the bore diameter to extrude into the rifling grooves and seal the gases.  The sharp hammer action of the instantaneous high pressure and temperature may upset the projectile base, which enhances sealing. Cartridge cases must be sufficiently flexible to expand against the chamber wall and transmit the instantaneous power pressure to the barrel metal that surrounds the charge.  When the chamber pressure has returned to zero, the cartridge case must also be flexible enough to release itself from the chamber wall (even though it is now pressure form-fitted to the chamber). Shotgun wads perform the sealing function in smooth bore weapons.

6) Unlocking:

This is the reverse of the locking process and is frequently performed in conjunction with extraction.

7) Extraction:

Although cartridge cases do not commonly exceed their elastic limit during firing, they have a tendency to stick to the chamber after firing. After firing, cartridge

14

cases are larger in diameter than before firing… All cartridge cases are designed with a rim or groove (cannelure) at the base so that an extractor claw can grasp this edge in order to achieve extraction.

8) Ejection:

In the final stages of extraction, the cartridge case encounters a projection that is usually at right angles to the exit portal of the breech. Rotating on the fulcrum of the extractor, the case base is contacted on the opposite side by the ejector, which flips the case out of the actuating mechanism.

9) Cocking:

The hammer spring is usually cocked when the bolt of a rifle, pistol, or repeater shotgun is retracted. An exception to this is the M1917 Enfield Rifle, which cocks upon forward motion of the bolt. Exposed hammers may be cocked by manual retraction, using the thumb. The Walther series of pistols provides for manual cocking or trigger pull cocking (double action), as do most open hammer revolvers.

An animated illustration of these steps as they occur in the AR-15 & M-16 is viewable here: https://www.youtube.com/watch?v=omv85cLfmxU&t=261s

48.    The term "Large Capacity Magazine" (LCM) under the statute refers to, for practical purposes amongst most Coloradans, any detachable magazine with a capacity exceeding fifteen (15) rounds for semi-automatic handguns or rifles. It also refers to a tubular shotgun magazine capable of holding more than 28" of shotgun shells.

## OPINIONS

49.   Detachable magazines were initially developed for, and can trace their heritage to, late 19th century advancements and developments in military small arms technology.

50.   LCMs were neither initially designed, nor intended, for utilization by the civilian population / general public. They are an evolutionary development of military technology which has subsequently been adopted by manufacturers of civilian firearms.

51.    Firearms traditionally considered "sporting" or "hunting" firearms traditionally have magazine capacities which are legal under the statute (both rifles and shotguns).

52.   The operation of any firearm which utilizes an LCM is unaffected by a magazine with a capacity legal under the statute. As their function is unaffected by the number of rounds in the magazine they will operate as designed regardless of the capacity of the magazine.

53.   Detachable magazines compliant with the statute are, and have been, widely available since the mid 1990s.

54.   LCMs, or a lack thereof, are not the sole determinant in the ability of Coloradans to defend themselves either in their homes or in public. There are numerous options available which are both effective and compliant with the statute.

**II: Large Capacity Magazines**

55.   Modern semi-automatic rifles and shotguns that are designed, manufactured and marketed as "hunting rifles" or "sporting shotguns" etc., traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example the Browning BAR, a popular semi-automatic hunting rifle, has an internal magazine capacity of 4 rounds. The Remington Model 1100, a popular semi-automatic shotgun has an internal magazine capacity of 5 rounds.

56.   The operation (or cycle of fire) of any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself.

For example, firearms such as the Glock Model 17 semi-automatic pistol and AR-15 type semi-automatic rifle will function as designed whether the operator utilizes a magazine limited to 15 rounds or one of greater capacity. Generally speaking, any firearm designed to accept a detachable magazine holding more than 15 rounds will also accept a magazine with a maximum capacity of 15 rounds or fewer. This includes the vast majority of handguns and shoulder-fired firearms designed and manufactured to utilize detachable magazines.

57.    Large capacity detachable magazines  were not initially designed or intended for the civilian marketplace. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage. Various belt & clip fed medium machine gun designs by Hiram Maxim (1885) and John Browning (1890) debuted before the end of the 19th Century;[4] however, it wasn't until the advent of WWI that development and refinement of large capacity feeding devices for machineguns gained increased importance.

58.    In regard to standard issue rifles, the U.S. and other combatant nations entered, deployed, and exited WWI with bolt action rifles as standard issue to the individual soldier.

59.    By contrast, magazine fed semi-automatic pistols first appeared in the early 1890s. Numerous models designed and manufactured by Salvator Dormus, Hugo Borchardt and Paul Mauser featured both internal fixed and detachable box magazines of varying capacities although only Mauser's C96 (1896) design proved commercially viable and was manufactured until the late 1930's. Initially designed with a 10 round internal fixed magazine later variants included the ability to accept detachable magazines.[5]

60.    In addition to use of the Mauser C98 in WWI, Germany also issued the P08 (1908) "Luger" pistol with an 8 round detachable magazine. Similarly U.S. Forces fielded the Colt

---

[4] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 83-99
[5] Zhuk, A.B., The Illustrated Encyclopedia of Handguns, (Greenhill Books, 1995), PP. 207-211

Model 1911 with a 7 round detachable magazine. One exception to the "under 10" magazine capacity was the introduction of the Belgian FN "Hi-Power" (1935) 9mm pistol which featured a detachable magazine holding 13 rounds.[6]

61.   In the interwar years, a number of advancements in arms technology & design facilitated practical semi-automatic rifles for standard issue. Accordingly, the U.S. Forces in WWII were issued the Springfield Armory M-1 "Garand' rifle with an 8 round internal magazine. The U.S. also deployed the M-1 carbine in .30 caliber which featured a 15 round detachable box magazine; however, this was intended for issue to support personnel behind the front lines. It was not until the M-14 was adopted in the late 1950s that a rifle with a detachable magazine was adopted for standard issue to front line troops. The M-14 was issued with a 20 round magazine.[7]

62.   When the AR-15 (later designated M-16) was first purchased and issued to U.S. Forces in the early 1960s it was intended to be utilized, and was issued, with 20 round detachable magazines.[8]

63.   However, when the first semi first semi-automatic variants of the M-16, the Colt AR-15 SP1 Sporter, became available for sale to the public in 1964 it came supplied with two five round magazines, not the military issue 20 round magazines.

---

[6] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 115-122
[7] Hogg, Ian V. & Weeks, John S., Military Small Arms of the 20th Century, 7th Ed., (Krause Publications, 2000), P. 291
[8] Stevens, R. Blake & Ezell, Edward C., The Black Rifle (Collector Grade Publications, 2004), P. 108

18



**COLT AR-15 SPORTER SEMI-AUTOMATIC RIFLE**
**.223 CALIBER**

Colt's answer to the demand for a semi-automatic version of the AR-15 automatic rifle purchased by The United States Armed Forces. Painstaking engineering redesign efforts have resulted in a Government-approved conversion of the Colt AR-15 automatic rifle without sacrificing any performance or weight characteristics. The semi-automatic AR-15 Sporter weighs only 6.3 pounds. Its recoil is light and barrel rise minimal.

MODEL R-6000

RETAIL PRICE*
$189.50

Lightweight • Extremely accurate • Easy to handle • Straight line construction — barrel, bolt, recoil buffer unit and stock assembled in a straight line • Rapid semi-automatic fire is more controllable than with rifles of commercial design • Simple to maintain.

| CALIBER | BARREL LENGTH | OVERALL LENGTH | CAPACITY | SIGHTS | SAFETY | WEIGHT |
|---------|--------------|----------------|----------|--------|--------|--------|
| .223 | 21″ | 39″ | 5 rounds | Double tang rear peep sight adjustable for windage. Post type front sight adjustable for elevation. | Rotary safety—selector lever | Approx. 6½ lbs. |

*The suggested retail price of the Sporter is $189.50 and includes two magazines (each blocked for five rounds), sling, flash suppressor, rubber recoil pad, cleaning rod assembly, cleaning brush, and the Colt AR-15 Sporter Operation and Maintenance manual.

9

64.  "Initially, Colt simply added a five round limitation spacer to the 20-round magazine which could be installed or removed at will by simply removing the floor plate of the magazine. This was primarily intended for hunters, in compliance with the laws in most states which limit magazines in the field to a five-round capacity for hunting. With the introduction of the Colt Sporter series, the configuration of this magazine was altered by the addition of a permanent rivet in the floorplate to prevent the removal of the spacer, thus making this a magazine of dedicated

---

[9] Image source: https://thecoltar15resource.com/1964-catalog/. Last Accessed 03/27/2023

| MODEL NO. | MODEL | CALIBER | BBL LENGTH (inches) | FINISH | APPROX. WEIGHT (lbs.) | O/A LENGTH (inches) | SIGHT RADIUS (inches) | ROUNDS MAG. |
|---|---|---|---|---|---|---|---|---|
| R6600DH | AR-15A2 DELTA H-BAR w/scope and acces. | 223 Rem (5.56mm) | 20 | M | 10 | 39 | 19.75 | 5 |
| R6600 | AR-15A2 H-BAR | 223 Rem (5.56mm) | 20 | M | 8.0 | 39 | 19.75 | 5 |
| R6500 | AR-15A2 SPORTER II | 223 Rem (5.56mm) | 20 | M | 7.5 | 39 | 19.75 | 5 |
| R6420 | AR-15A2 CARBINE | 223 Rem (5.56mm) | 16 | M | 5.8 | 35 extended 32 closed | 14.5 | 5 |

Rifles

© 1986 Colt Industries Inc
Printed in U.S.A.

15

five-round capacity for hunting applications. "[10] Colt continued to provide five round magazines with their AR-15 rifles as late as 1987.[11]

65.    Postwar development of semi-automatic pistols continued after WWII; however, magazine capacities generally remained under 10 rounds. Notable examples include the Beretta Model 1951 (8 rounds), Sig Sauer P220 (1975, 7-10 rounds depending on caliber), Heckler Koch P7 (1978, 8 rounds).

66.    It was not until the early 1980s the U.S. Military sought to replace the Colt 1911, a .45 ACP caliber pistol with a seven round magazine, and standardize the sidearms (handguns) issued to U.S. Forces in a caliber common to all NATO member nations. The resultant winner of numerous competitions was the Beretta Model 92SB, a 9mm caliber pistol with a 15 round magazine. Following a few minor functional changes, the Beretta was accepted and designated the M-9.[12]

67.    During the latter half of the 1980s numerous manufacturers, both domestic and foreign, began developing and offering numerous semi-automatic models with magazine capacities equaling, or exceeding, that of the Beretta M-9.

---

[10] Bartocci, Christopher R., The Black Rifle II (Collector Grade Publications, 2004), P. 263
[11] Colt Firearms 1987 Catalog, (Colt Industries Inc., 1986), P.16
[12] Wilson, R.L., The World of Beretta, An International Legend, (Random House, 2000), PP. 227-253

68.    In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, (which included provisions also known as the Federal Assault Weapons Ban or "AWB"), which limited the maximum capacity of a detachable magazine to ten rounds.[13] As a result, numerous firearm manufacturers, as well as aftermarket magazine manufacturers, initiated production of what were colloquially termed "post ban" magazines to conform to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines."[14] The post ban magazines were modified, or retooled, versions of existing large capacity magazines in order to keep their dimensions identical and ensure that the 10-round magazines functioned identically to existing magazines of 11 rounds or more in their firearms. For example, pictured below is a 'pre ban' 10-round magazine for a Browning 9mm caliber "Hi Power" semi-automatic pistol:

---

[13] https://www.congress.gov/bill/103rd-congress/house-bill/3355/text
[14] The definition of "Large Capacity Magazine" under the Federal AWB included any magazine with a capacity of over 10 rounds where under Colorado Law it defines a magazine with a capacity of over 15 rounds.



Image source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-high-capacity

69.    And shown below is a 'post ban' magazine for the same pistol. You will note the 10-round magazine differs as a portion of the metal magazine body is replaced with a molded polymer plug. This modification effectively limits the interior volume and capacity of the magazine to 10 rounds. Manufacturers have also utilized various other methods to restrict magazine capacity, including dimpling the lower quadrant of the magazine body inwards, placing rivets in the magazine body, or thickening the walls of polymer bodied magazines to reduce capacity.



Image Source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-10-round-browning-high-power

70.    Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation, which also contained magazine capacity limitations. As a result, many manufacturers of popular semi-automatic handguns and rifles during the Federal Assault Weapons Ban continued to offer "state compliant" versions to customers in states so affected. Manufacturers such as Glock, Sig Sauer (SIG), FN USA, Beretta, and Smith & Wesson, among numerous others, offer handguns and rifles compliant with individual state regulations. Most major firearm manufacturers offer models that come "standard" with 10-round magazines.

71.    Shown here is a page from the current online catalog of FN USA (the U.S. based subsidiary of Belgian arms manufacturer Fabrique Nationale) showing the "California Compliant" version of their "Five-seveN" pistol.



Image Source: https://fnamerica.com/catalog-and-wallpapers/

72.    This is a page from Smith & Wesson's online catalog showing their AR-15 type rifle which is marketed as a "compliant" model and is sold with a 10-round capacity magazine:



Image Source: https://www.smith-wesson.com/product/m-p-15-sport-ii-compliant

73.     And a "California Compliant" Glock Model 19 9mm pistol available from

Sportsman's Warehouse:



Image Source: https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/glock-19-9mm-luger-402in-black-nitrite-pistol-101-rounds-california-compliant/p/1155366

74.     Additionally, there are numerous well respected aftermarket manufacturers who

offer 10-round magazines specifically for use in handguns that come with LCMs. Mec-Gar and

ProMag are two of many:



Image Source: https://mec-gar.com/shop/magazines/sig-sauer/sig-sauer-p229-1-9mm-10-round/



Image Source: https://promagindustries.com/fits-the-glock-model-17-19-26-9mm-10-rd-black-polymer/

75.    In regard to magazines for AR-15 type rifles Hexmag manufactures "Colorado

Compliant" 15 round magazines in multiple calibers:



Image Source: https://sentrytactical.com/sentry-hexmag-ar-15-m4-m16-magazine-series-2-15-rds/

76.    Under the Statute, C.R.S. § 18-12-301(2)(a), an LCM is also defined as:

(II) A fixed, tubular shotgun magazine that holds more than twenty-eight inches of

shotgun shells, including any extension device that is attached to the magazine and

holds additional shotgun shells; or

(III) A nontubular, detachable magazine, box, drum, feed strip, or similar

device that is capable of accepting more than eight shotgun shells when combined

with a fixed magazine.

77.    Numerous pump action and semi-automatic shotguns utilize tubular magazines which, when loaded with standard 2.75 " or 3" shotgun shells, will have a capacity of 5 to 8 rounds (depending on gauge).  In recent years however there has been a rise in the popularity of "Mini Shell" ammunition for shotguns. The cartridges are 1"- 1.25" shorter which allows for a significant increase in capacity. The Mossberg Model 590S can accommodate, with a tubular magazine under its 20" barrel, 13 'mini shells' as illustrated in the graphic here:



Image Source: https://www.guns.com/news/2021/10/25/mossberg-now-runs-mini-shells-new-590s-line

78.    Shotguns are not long range firearms. When at ATF, I qualified on a quarterly basis with agency issue pump action 12 gauge shotguns. The longest range utilized for qualification was 25 yards. At short ranges the effect of multiple 12 gauge 00 Buckshot (.32 caliber) pellets can be devastating. There are approximately 16 pellets in a 3" shell and 9 in a 'mini shell' with

muzzle velocities of approximately 1200 feet per second (FPS). For comparison the average muzzle velocity of a .32 caliber handgun bullet is 800 – 900 FPS.[15]

79.    There has also been an increase in the manufacture of shotguns utilizing detachable magazines with capacities of 10 or more 2.75" or 3" shotgun shells. This capability to instantaneously reload is significantly faster than manually loading a tubular magazine and provides an exponential increase in the number of rounds an operator can fire per minute.

80.    In my opinion the reason behind the relative scarcity of use of shotguns in mass casualty / mass shooting events has been the low capacity of tubular magazines and / or the extended amount of time needed for reloading. The advent of increased firepower available with extended tubular magazines combined with mini shells, or the use of detachable magazines with 3" shells can and may change this dynamic.

81.    Home defense and / or street / commercial robbery situations between citizens and criminals are rarely lengthy protracted shootouts with extensive exchanges of gunfire. The National Rifle Association Institute for Legislative Action (NRA ILA) regularly publishes newsclips on their "Armed Citizen" webpage highlighting examples of defensive use of firearms by citizens.[16]

82.    Claude Werner, a firearm instructor and writer, conducted a detailed statistical analysis of 482 incidents provided by the NRA ILA on their website from 1997 to 2001. He determined, from the information provided, that the average number of shots fired by an armed citizen in a defensive scenario was 2.2.[17]

---

[15] Barnes, Frank Co., Cartridges of the World, ( Krause Publications, 2003), P.274
[16] https://www.nraila.org/gun-laws/armed-citizen/
[17] https://www.defensivecarry.com/attachments/tac-5-year-w-tables-pdf.107045

83.   Lucy Allen conducted a similar statistical analysis of the "Armed Citizen" newsclips for the period January 2011 – May 2017. Her analysis revealed that the average number of shots fired in a self-defense scenario was identical to that determined by Werner: 2.2 shots.[18]

> "According to this analysis of incidents in the NRA Armed Citizen database, it is extremely rare for a person, when using firearms in self-defense, to fire more than seventeen rounds. Out of 736 incidents, there were no incidents in which the defender was reported to have fired more than 17 bullets and only two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets. Defenders fired 2.2 shots on average."

84.   I am of the opinion that an overabundance of ammunition and a "spray and pray" mentality is a poor substitute for training and competent marksmanship with your chosen self-defense firearm. In fact accurate shot placement will prove a more effective deterrent than the number of rounds in your magazine should deadly force be required.

85.   If the individual had a preference for shoulder weapons, I have recommended a pump action 12 or 20 gauge shotgun (Remington 870, Mossberg 500 etc.) loaded and stored with the "hammer dropped" on an empty chamber, safety off. The only action required to bring the shotgun from a safe unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of over penetration (as compared to rifle caliber and velocity projectiles) and little manipulation of safety mechanisms required in a high-stress situation. The loading / chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

---

[18]  Declaration of Lucy P. Allen, Delaware State Sportsmen's Assn. v. Delaware Department of Homeland Security, U.S. District Court for the District of Delaware, Case No. 1:22-cv-00951-RGA, P.5

86.    For a handgun, my first inclination is to recommend an eight shot revolver in .38 caliber or .357 Magnum (similar to S&W Model 627, Taurus Model 608, etc.) loaded with hollow point bullets. As with my rationale for recommending a pump action shotgun there are no complicated safety mechanisms to manipulate in a high stress situation, low probability of over penetration and ease of reloading with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate especially if they have less familiarity with firearms.

87.    In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone"" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, I was issued a Sig Sauer P229 in .40 S&W caliber, with a 12 round (detachable) magazine capacity as a primary duty weapon. We were also given the choice of a Sig Sauer P239 in .40 S&W (with a 7 round detachable magazine) or a five shot Smith and Wesson Model 640 revolver in .357 Magnum as a backup firearm. When off duty I carried the S&W 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that ten (10) rounds is an adequate amount of ammunition to enable me, or myself and my child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed loader or a low profile small semi-automatic pistol (Sig Sauer P236, Ruger LCP, Colt Pocketlite etc.) with a spare magazine. I have also recommended a compact 9mm caliber pistol such as the Glock Model 43X which has a ten round magazine capacity. The Model 43X can safely be carried with a round in the chamber which provides an effective capacity of 11 rounds.

88.    Generally speaking any firearm that utilizes a large capacity magazine will function with a magazine of lower capacity. I have fired dozens of handguns and rifles with both types of magazines and the capacity of those magazines had no effect on the ability of those firearms to function as designed.

I hereby declare that the above statement is true to the best of my knowledge and belief and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 14th day of April, 2023.


    /s/ James E. Yurgealitis
James E. Yurgealitis

# EXHIBIT A

## James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

_____

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the Attorney General for the Commonwealth of Massachusetts and the Center for American Progress, Washington D.C. I have provided sound policy and technical assistance for my clients to include expert testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a $1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC. Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel. Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts and ensure that lesson plans and curriculum reflected the latest technical developments in firearms manufacture, forensics and their application to federal and state law. Applied for, received and managed in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and

-1-

following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division, Baltimore, Maryland

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rossyln, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both

domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for

overseas visits to include Presidential Summit meetings, liaison with foreign host government officials toplan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

CLEARANCES:  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

TEACHING EXPERIENCE:

-   Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
-   Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
-   Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

LINKEDIN PROFILE AND ENDORSEMENTS:

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

REFERENCES:

Available upon request

# EXHIBIT B

**Professional Qualifications of James E. Yurgealitis**
**Independent Legal, Public Policy and Forensic Consultant**

I, James E. Yurgealitis, being duly sworn, depose and state:

1.)  That I was previously employed as a Senior Special Agent / Program Manager wi  the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.)  I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.)  I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.)  I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.)  I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.)  I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.)  I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.)  I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.)  I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include  published authors and recognized experts in the origin, identification and  classification of firearms and ammunition.

11.)  I have, during my tenure with ATF, personally examined in excess of five thousand firearms to determine their origin and classification and operability, and to facilitate the tracing of those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The tours were conducted by corporate historians, corporate officers, or production engineering personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

<u>I have been allowed regular access to the following reference collections:</u>
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany consisting of 10,000+ Firearms

<u>I have toured the following museums:</u>

Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria

Hungarian Military Museum, Budapest, Hungary

Springfield Armory National Historic Site, Springfield, MA, USA

United States Air Force Museum, Dayton, OH, USA

United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA

United States Military Academy Museum, West Point, NY, USA

United States Naval Academy Museum, Annapolis, MD, USA

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany

<u>Membership in Professional Organizations:</u>

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)