# Exhibit 30 to
# The Governor's Motion for Summary Judgment

*Expert Report of Jeffrey Zax*

*Gates et al. v. Polis*, No. 1:22-cv-1866-GPG-SKC (D. Colo.)

September 11, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-CV-1866-GPG-SKC

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant

---

### FRCP 26(a)(2)(B) DECLARATION OF JEFFREY S. ZAX, Ph.D.

---

Pursuant to 28 U.S.C. § 1746, I, Jeffrey S. Zax, Ph.D., declare under penalty of perjury that the following is true and correct.

I am over the age of eighteen (18) years, competent to testify to the matters contained in this Declaration, and testify based on my personal knowledge and information.

I have been asked by the Defendant to prepare an expert declaration for disclosure under FRCP 26(a)(2)(B) addressing the benefits and costs of civilian ownership of large-capacity magazines. This Declaration is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration. I hold all opinions expressed herein to a reasonable degree of professional certainty.

I am being compensated at a rate of $350 per hour for all tasks and at half that fee per hour for time spent in travel on trips that exceed 90 minutes in duration.

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -
   **I.A.** **LCMs are not classified as weapons by law enforcement authorities**. . . . . . .  - 1 -
   **I.B.** **LCMs are rarely used in legal self-defense.** . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 3 -
   **I.C.** **LCMs are never used by civilians who assist law enforcement.** . . . . . . . . . . .  - 3 -
   **I.D.** **LCMs inflict great harm on the economy.** . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 3 -
   **I.E.** **LCM bans are beneficial to the economy.** . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 3 -

II. SELF-DEFENSE DOES NOT JUSTIFY UNRESTRICTED LCM OWNERSHIP. . . . . . . . . . . . . . . . . . . . . . .  - 4 -
   **II.A.** **Colorado home invasions and self-defense.** . . . . . . . . . . . . . . . . . . . . . . . . . .  - 4 -
      II.A.1. Home invasions are rare. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 5 -
      II.A.2. Sheriffs' deputies never use LCMs in self-defense. . . . . . . . . . . . . . . .  - 19 -
   **II.B.** **Frequencies of self-defense claims are economically inefficient**. . . . . . . . . .  - 20 -
      II.B.1. Self-defensive activities impose negative externalities on targeted
             individuals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 21 -
      II.B.2. Self-defensive activities impose negative externalities on individuals not
             targeted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 22 -
   **II.C.** **Self-reports of self-defense are unreliable.** . . . . . . . . . . . . . . . . . . . . . . . . . .  - 24 -
      II.C.1 Individual reports of self-defense are unreliable. . . . . . . . . . . . . . . . .  - 24 -
      II.C.2 Survey claims regarding the frequency of firearm self-defense are not
             credible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 26 -
   **II.D.** **Self-reported self-defense is economically inefficient.** . . . . . . . . . . . . . . . .  - 33 -
      II.D.1 Many self-reported acts of firearm self-defense are disproportionate
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 33 -
      II.D.2 Some self-reported acts of firearm self-defense may be illegal. . . . .  - 36 -
      II.D.3 Self-reported victims in acts of firearm self-defense may also be aggressors
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 45 -
   **II.E** **Summary**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 46 -

III. LCMS AND PUBLIC SAFETY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 47 -
   **III.A.** **C.R.S. § 18-12-302 allows public safety officers to possess LCMs.** . . . . . . . .  - 47 -
   **III.B.** **Law enforcement officers rarely require LCMs.** . . . . . . . . . . . . . . . . . . . . . . .  - 48 -
   **III.C.** **Law enforcement rarely requires assistance from civilians with LCMs**. . . . .  - 50 -
   **III.D.** **Civilians do not need LCMs for self-defense**. . . . . . . . . . . . . . . . . . . . . . . . . .  - 52 -
   **III.E.** **Summary**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 53 -

IV. THE COST OF LCM VIOLENCE IS HIGH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 53 -
   **IV.A.** **The cost of firearm violence is high**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 54 -
      IV.A.1 Total costs to the economy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 55 -
      IV.A.2. Costs to victims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 60 -
      IV.A.3. Costs to families. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 63 -
      IV.A.4. Costs to communities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 64 -
      III.A.5. Costs in international perspective. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 64 -

**IV.B.**    **Mass shootings are disproportionately costly**. . . . . . . . . . . . . . . . . . . . . . . .  - 67 -

**IV.C.**    **Shootings involving LCMs are disproportionately costly**. . . . . . . . . . . . . . .  - 71 -

**V.**    **LCM** BANS MAY BE EFFECTIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 72 -

**V.A.**    **The limited federal LCM ban may have reduced criminal use of LCMs**. . . . .  - 73 -

**V.B.**    **LCM bans may have been associated with reduced gun homicide rates**. . .  - 78 -

**V.C.**    **Summary**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 84 -

**VI.**    **Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 85 -

**DECLARATION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  - 86 -

## I.   INTRODUCTION AND SUMMARY

Legitimate individual self-defense is an established right in the United States. At the same time, governments have an obligation to maintain public safety. Public safety is essential for the efficiency of the economy.

Firearms may be deployed in legitimate self-defense. However, the government may need to impose reasonable restrictions on firearm usage in order to fulfill the obligation to maintain public safety.

Large-capacity magazines (LCMs) are firearm accessories. C.R.S. § 18-12-302, as adopted, defines an LCM as

> "(i) a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition; (ii) a fixed, tubular shotgun magazine that holds more than twenty-eight inches of shotgun shells, including any extension device that is attached to the magazine and holds additional shotgun shells; or (iii) a nontubular, detachable magazine, box, drum, feed strip, or similar device that is capable of accepting more than eight shotgun shells when combined with a fixed magazine."

Under this bill, most sales and transfers of LCMs are illegal.

LCMs may be deployed for the purpose of self-defense. They may also be deployed for the purpose of perpetrating other types of violence. This report reviews available evidence regarding the use of large-capacity magazines (LCMs) in legitimate self-defense and the challenges that LCMs pose to public safety.

### I.A.   LCMs are not classified as weapons by law enforcement authorities

LCMs are firearm accessories.The Federal Bureau of Investigation (FBI) does not classify LCMs as weapons, themselves. Its National Incident-Based Reporting System (NIBRS) identifies 28 "weapons" for the purpose of characterizing the weapons employed in recorded instances of criminal behavior.[1] Among these weapons are 10 categories of firearm – "Firearm", "Firearm (Automatic)", "Handgun", "Handgun (Automatic)", "Rifle", "Rifle (Automatic)", "Shotgun", "Shotgun (Automatic)", "Other Firearm", and "Other Firearm (Automatic)". LCMs do not appear

---

[1] NIBRS_WEAPON_TYPE.csv, available at https://cde.ucr.cjis.gov/LATEST/webapp/#.

among these firearm categories. LCMs are also absent from the remaining categories.[2]

These 28 weapon categories accounted for all 23,711 weapons-based incidents reported in the NIBRS for Colorado in 2021.[3] However, nine of the weapon categories were involved in no incidents – "Shotgun (Automatic)", "Other Firearm (Automatic)",  "Pushed or Thrown Out Window", "Drowning", "Strangulation - Include Hanging", "Unarmed", "Lethal Cutting Instrument", "Club/Blackjack/Brass Knuckles", and "Motor Vehicle/Vessel". This indicates that the FBI list of weapon categories is comprehensive.

"Colorado Crime Statistics",[4] as maintained by the Colorado Auto Theft Prevention Authority (CATPA) of the Colorado Department of Public Safety, employs a similar system of weapons categories.[5] This system also identifies 10 types of firearms. All are similar or identical to those of the NIBRS – "Firearm (Type Not Stated)", "Firearm-Automatic (Type N...", "Handgun", "Handgun-Automatic", "Rifle", "Rifle-Automatic", "Shotgun", "Shotgun-Automatic", "Other Firearm", and "Other Firearm-Automatic". As in the NIBRS, LCMs are not represented by a firearm related category. As in the NIBRS, LCMs are also absent from the remaining 12 weapon categories.[6]

The absence of LCMs from the lists of weapon categories maintained by the FBI and by the "Colorado Crime Statistics" implies that neither the FBI nor the CATPA consider them to be weapons. Instead, they are devices that alter the performance of the various weapon types included within the broad category of "firearms".

---

[2] The other 18 "weapons" are "Knife/Cutting Instrument", "Blunt Object", "Motor Vehicle/Vessel", "Poison", "Explosives", "Fire/Incendiary Device", "Drugs/Narcotics/Sleeping Pills", "Asphyxiation", "Other", "Unknown", "Personal Weapons", "None", "Unarmed", "Lethal Cutting Instrument", "Club/Blackjack/Brass Knuckles", "Pushed or Thrown Out Window", "Drowning", and "Strangulation - Include Hanging".

[3] "Type of weapon involved by offense_04-13-2023.csv", downloaded from "Type of Weapon involved by Offense", at https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend.

[4] https://coloradocrimestats.state.co.us/tops.

[5] https://coloradocrimestats.state.co.us/public/View/dispview.aspx.

[6] These categories are "Knife/Cutting Instrument ...", "Blunt Object (Club, Hamme...", "Motor Vehicle/Vessel", "Poison", "Explosives", "Fire/Incendiary Device", "Drugs/Narcotics/Sleeping ...", "Other", "Unknown", "Personal Weapons (Hands, ...", "None", and "Asphyxiation (by Drowning...".

### I.B.     LCMs are rarely used in legal self-defense

Available evidence indicates that LCMs are essentially never necessary in legitimate self-defense. Moreover, few, if any, documented instances of firearm-assisted self-defense require the discharge of the numbers of rounds that are available in LCMs.

### I.C.     LCMs are never used by civilians who assist law enforcement

Similarly, available evidence indicates that civilian ownership of LCMs does not assist in the maintenance of public safety. Should the maintenance of public safety require firearms equipped with LCMs, these accessories are available to law enforcement officers under C.R.S. § 18-12-302. Available evidence indicates that law enforcement agencies essentially never require that civilians who provide them with assistance bear firearms that are equipped with LCMs.

### I.D.     LCMs inflict great harm on the economy

At the same time, LCMs pose substantial threats to public safety. They increase the capacity for assault. Available evidence indicates that, because of this increased capacity, individuals bearing firearms equipped with LCMs can inflict heightened numbers of injuries and fatalities.

In the United States, LCM-assisted injuries and fatalities are most visible in mass shootings. Firearms equipped with LCMs are commonly used in the mass shootings with the highest numbers of injuries and fatalities.

Firearm-related violence in general, and violence perpetrated with firearms that are equipped with LCMs in particular, inflict enormous costs on the economy of the United States.

### I.E.     LCM bans are beneficial to the economy

Available evidence indicates that bans on the sale or possession of LCMs reduce their use. This suggests that these bans also reduce the costs that are imposed on the economy by violence perpetrated with firearms that are equipped with LCMs.

Consequently, available evidence indicates that bans on the sale or possession of LCMs do not interfere with the right to legitimate self-defense. They assist in the maintenance of public safety by reducing the exposure of the public and of law enforcement to the enhanced lethality of firearms equipped with LCMs. Therefore, these bans confer large gains to the economy of the United States.

II.     SELF-DEFENSE DOES NOT JUSTIFY UNRESTRICTED LCM OWNERSHIP

Available evidence indicates that LCMs are not appropriate for self-defense. Documented instances of threats for which self-defense with a firearm equipped with an LCM would be appropriate are rare.

Home invasions are situations in which victims might reasonably invoke rights to self-defense. However, in Colorado home invasions are less frequent than many other risks that are conventionally understood to be rare: fatal car accidents, organ transplants, alcohol-related fatal car accidents and births of three or more infants.

In nearly 30% of few home invasions that do take place, the perpetrator does not display a firearm. The probability of being injured in a lightning strike is approximately the same as the probability of being a victim in a home invasion who displays a firearm.

The probability of being injured in a lightning strike is greater than the probability of being the victim of a home invasion in which the perpetrator actually discharges a firearm. Firearm discharges by both perpetrators and victims are always well below the capacity of an C.R.S. § 18-12-302-compliant LCM.

Legitimate self-defense with a firearm is legal. However, instances in which individuals self-report the use of firearms for alleged self-defense are not required to conform to the standards that are required of legal self-defense. Firearm-assisted self-defense will be claimed more often than is credible. It will also be claimed more often than is economically efficient.

Many, if not most, acts of claimed firearm-assisted self-defense are probably illegal. Consequently, self-reported firearm-assisted self-defense does not provide a legitimate rationalization for LCM ownership.


II.A.     Colorado home invasions and self-defense[7]

There appear to be no comprehensive data regarding the use of LCMs in all instances of alleged self-defense in the State of Colorado. However, informative data regarding the employment of LCMs became available through the case of *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

---

[7] This section is adapted from the "Supplemental Report of Jeffrey S. Zax", section II, "Sheriffs' Responses to Defendant's Interrogatories", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

Initially, the Sheriffs from 55 Colorado counties joined that case as co-plaintiffs. During the period in which they retained that status, the Sheriffs were required to respond to Defendant's interrogatories. Fifty-four of the Plaintiff Sheriffs, all but the Sheriff of Costilla County, responded to Defendant's interrogatories.

These interrogatories addressed the frequency and characteristics of home invasions between 1 January 2004 and the date of response, typically in August 2013. LCMs ownership was unrestricted in the State of Colorado during this period.

### II.A.1.   Home invasions are rare[8]

The responses of the 54 Sheriffs to the interrogatories in *Cooke, et al. v. Hickenlooper* demonstrate that home invasions in Colorado are extremely rare. Home invasions by armed perpetrators are rarer still. Victims are even less likely to be armed than are perpetrators. Large-capacity magazines almost never appear in home invasions. Neither perpetrator nor victim ever discharges the numbers of rounds that would encourage, much less require, the use of large-capacity magazines.

The first question of the Defendant's Interrogatories required that Sheriffs who were among the original Plaintiffs in  *Cooke, et al. v. Hickenlooper* case identify "each and every home invasion or 'robbery in the home' to which [their] department has responded since January 1, 2004". It requested that the Sheriffs

a.   "describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots",

b.   "if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot", and

c.   "if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed."

---

[8] This section is adapted from the "Supplemental Report of Jeffrey S. Zax", section II.A, "Home invasions", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

The responses of the 54 responding Plaintiff Sheriffs, compiled here, report the number of times that residents of Plaintiff Sherrifs' counties experienced home invasions, the number of home invasions in which the perpetrators of home invasions were armed, the number of home invasions in which armed perpetrators were equipped with large-capacity magazines and the number of rounds discharged by perpetrators. Similarly, the responses of the Plaintiff Sheriffs described the number of home invasions in which victims displayed firearms while being victimized, the number of home invasions in which these firearms were equipped with large-capacity magazines and the number of rounds discharged by victims.

The analysis below converts these counts into frequencies with respect to the populations in Plaintiff Sherrifs' counties. This allows comparisons of the relative frequency of home invasions and their characteristics to the relative frequencies of other uncommon events. These comparisons provide perspectives from which to assess whether home invasions and, in particular, firearm use during these invasions, are common experiences.

Presumably, if Plaintiff Sheriffs did not provide service to any portions of their counties, Plaintiff Sheriffs would have so indicated. This would be necessary to ensure that their responses to the interrogatories were interpreted correctly. In the absence of any such indication, the tables below assume that each of their responses refers to the entire county which each serves. The associated text discusses the consequences of alternative assumptions.

**Table 1**

**Home invasions in Plaintiff Sheriffs' Counties**

| Year | Number of home invasions | Population in Plaintiff Sheriff's counties | Home invasions per million population |
|---|---|---|---|
| Unknown | 100 | | |
| 2004 | 18 | 3,471,329 | 5.19 |
| 2005 | 17 | 3,522,269 | 4.83 |
| 2006 | 17 | 3,592,937 | 4.73 |
| 2007 | 34 | 3,652,360 | 9.31 |
| 2008 | 25 | 3,713,880 | 6.73 |
| 2009 | 33 | 3,769,778 | 8.75 |
| 2010 | 22 | 3,827,450 | 5.75 |
| 2011 | 17 | 3,873,284 | 4.39 |
| 2012 | 24 | 3,926,010 | 6.11 |
| 2013 | 20 | 3,981,147 | 5.02 |

Sources: Plaintiffs' responses to interrogatories yield "Number of home invasions". Home invasion data for 2013 refers only to elapsed part of current year. "Population in Plaintiff Sheriffs' Counties" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 1 presents the annual count of home invasions, as reported by the Plaintiff Sheriffs. In total, Plaintiff Sheriffs reported 327 home invasions between 1 January 2004 and August 2013. Of these, Plaintiff Sheriffs were unable to assign a date to 100, or 30.6%, despite explicit instructions to do so in Defendant's Interrogatory 1a. Consequently, the credibility of these reports must be suspect.

The 227 dated home invasions were equivalent to an average of approximately 23 home invasions per year.[9] With the 100 undated home invasions, the annual average of all reported

---

[9] This and all analogous calculations exclude data for 2013 because this year was not complete when the responses to the Interrogatories were submitted in *Cooke, et al. v. Hickenlooper*.

home invasions was approximately 33 per year.[10] For comparison purposes, in 2012, the Colorado State Lottery awarded prizes of $1,000,000 or more to 22 people, of $250,000 or more to 40 people and of $100,000 or more to 84 people.[11]

As given in Table 1, the 227 dated home invasions represent between four and 10 home invasions per million residents per year in Plaintiff Sheriffs' Counties in the years under examination. Averaged across all years, they represent 6.21 home invasions per million people per year. Including the 100 undated home invasions, the average number of home invasions per million people per year is 8.76.

---

[10] All calculations that include undated home invasions include all reports from all ten years. Reports for the year 2013 must be included, even though it is incomplete, because undated home invasions, if they actually took place, may have occurred during this year. Therefore, calculations including undated home invasions may understate the true numbers of home invasions on annualized bases because they cannot include complete data for 2013. At the same time, they may overstate true annualized values to the extent that undated reports of home invasions are not trustworthy.

[11] The list of winners and winnings was originally available at https://www.coloradolottery.com/PLAY/PLAYERS-TOOLS/WINNERS-REPORT/?CFID=4397656&CFTOKEN=70771318&jsessionid=20302b17809f08550700b695a1d776d53425. This webpage is no longer available.

**Table 2**

**Traffic fatalities in Colorado**

| Year | Total traffic fatalities | Colorado population | Total traffic fatalities per million population |
|------|------|------|------|
| 2004 | 667 | 4,608,811 | 144.72 |
| 2005 | 606 | 4,662,534 | 129.97 |
| 2006 | 535 | 4,745,660 | 112.73 |
| 2007 | 554 | 4,821,784 | 114.90 |
| 2008 | 548 | 4,901,938 | 111.79 |
| 2009 | 465 | 4,976,853 | 93.43 |
| 2010 | 448 | 5,049,717 | 88.72 |
| 2011 | 447 | 5,118,526 | 87.33 |
| 2012 | 474 | 5,192,647 | 91.28 |
| 2013 | 482 | 5,269,035 | 91.48 |

Sources:  http://www-fars.nhtsa.dot.gov/States/StatesAlcohol.aspx reports "Total traffic fatalities". "Colorado population" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 2 reports on the frequency of traffic-related fatalities in Colorado. This table provides an objective measure of a well-defined risk to which Colorado residents are subject. The comparison between these measures and those indicating the frequency of reported home invasions provides a standard by which to assess the severity of the risks associated with these invasions.

Table 2 presents the reported number of traffic fatalities in Colorado during the period from 2004 through 2013. On average, Colorado experienced 522 fatalities per year during that period. During these ten years, the rate of traffic fatalities varied between approximately 87 and 155 per million people in Colorado per year. Averaged over all ten years, the rate was approximately 106 per million people per year.

This demonstrates that traffic fatalities were approximately 18 times more frequent than were home invasions with identifiable dates. They were approximately 12 times as frequent as all reported home invasions.

If the reports of Plaintiff Sheriffs did not account for the entire counties that they served, the relative frequency of home invasions among the population served would be higher. However, the relative frequency of dated reported home invasions would still have been less than the relative frequency of traffic fatalities unless the Plaintiff Sheriffs served, on average, only 5.6% of the populations in their counties.

**Table 3**

**Organ transplants in Colorado**

| Year | All organ transplants | Colorado population | Organ transplants per million population |
|------|------|------|------|
| 2004 | 382 | 4,608,811 | 82.9 |
| 2005 | 436 | 4,662,534 | 93.5 |
| 2006 | 405 | 4,745,660 | 85.3 |
| 2007 | 399 | 4,821,784 | 82.7 |
| 2008 | 399 | 4,901,938 | 81.4 |
| 2009 | 433 | 4,976,853 | 87.0 |
| 2010 | 478 | 5,049,717 | 94.7 |
| 2011 | 484 | 5,118,526 | 94.6 |
| 2012 | 431 | 5,192,647 | 83.0 |
| 2013 | 189 | 5,269,035 | 35.9 |

Sources: "All organ transplants" is from http://optn.transplant.hrsa.gov/latestData/stateData.asp?type=state.  "Colorado population" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 3 reports the number of organ transplants that took place in Colorado during the period from 2004 through 2013. This report presents another objective measure of a well-defined risk to which Colorado residents are subject.

On average, Colorado experienced 404 organ transplants per year during this period. During these ten years, the rate of organ transplants varied between approximately 35 and 95 per million people in Colorado per year. Averaged over all ten years, the rate was approximately 81.8 per million people per year.

This demonstrates that organ transplants were approximately 13 times more frequent than

were home invasions with identifiable dates. If the reports of Plaintiff Sheriffs did not account for the entire counties that they served, the relative frequency of dated reported home invasions would still have been less than the relative frequency of organ transplants unless the Plaintiff Sheriffs served, on average, only 7.6% of the populations in their counties.

**Table 4**

**Traffic fatalities with driver BAC at .08 or above in Colorado**

| Year | Traffic fatalities, driver BAC .08 or above | Colorado population | Total traffic fatalities, driver BAC .08 or above, per million population |
|---|---|---|---|
| 2004 | 200 | 4,608,811 | 43.40 |
| 2005 | 206 | 4,662,534 | 44.18 |
| 2006 | 179 | 4,745,660 | 37.72 |
| 2007 | 167 | 4,821,784 | 34.63 |
| 2008 | 176 | 4,901,938 | 35.90 |
| 2009 | 158 | 4,976,853 | 31.75 |
| 2010 | 127 | 5,049,717 | 25.15 |
| 2011 | 161 | 5,118,526 | 31.45 |
| 2012 | 172 | 5,192,647 | 33.12 |
| 2013 | 172 | 5,269,035 | 32.64 |

Sources: http://www-fars.nhtsa.dot.gov/States/StatesAlcohol.aspx reports "Total traffic fatalities". "Colorado population" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 4 presents a third objective measure of risks. It reports the number of traffic fatalities in Colorado involving a driver with Blood Alcohol Content (BAC) at or above .08, the legal threshold for intoxication in this State. These fatalities are a subset of those tabulated in Table 2. Naturally, therefore, they were less frequent.

Nevertheless, they also occurred with much greater frequency than did home invasions. On average, 172 alcohol-related traffic fatalities occurred annually during the period from 2004 to 2012. This average was equivalent to an average of approximately 35 alcohol-related fatalities per million people per year.

In other words, alcohol-related traffic fatalities were nearly six times as frequent as were dated

home invasions. If the reports of Plaintiff Sheriffs did not account for the entire counties that they served, the relative frequency of dated reported home invasions would still have been less than the relative frequency of alcohol-related traffic fatalities unless the Plaintiff Sheriffs served, on average, only 17.8% of the populations in their counties.

**Table 5**

**Births of three or more infants in Colorado**

| Year | Births of three or more | Colorado population | Births of three or more per million population |
|------|------|------|------|
| 2004 | 114 | 4,608,811 | 24.7 |
| 2005 | 106 | 4,662,534 | 22.7 |
| 2006 | 90 | 4,745,660 | 19.0 |
| 2007 | 96 | 4,821,784 | 19.9 |
| 2008 | 96 | 4,901,938 | 19.6 |
| 2009 | 108 | 4,976,853 | 21.7 |
| 2010 | 106 | 5,049,717 | 21.0 |
| 2011 | 56 | 5,118,526 | 10.9 |
| 2012 | 36 | 5,192,647 | 6.9 |
| 2013 | 77 | 5,269,035 | 14.6 |

Sources: Various issues of the "National Vital Statistics Reports" report births of three or more infants. "Colorado population" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 5 presents a fourth objective measure of uncommon experiences. It reports the number of births in Colorado involving three or more infants. These also occurred with much greater frequency than did home invasions. On average, 88.5 births of three or more infants occurred annually during the period from 2004 to 2011. This average was equivalent to an average of approximately 17.9 births of triplets or more per million people per year.

In other words, births of triplets or more were nearly three times as frequent as were dated home invasions. If the reports of Plaintiff Sheriffs did not account for the entire counties that they served, the relative frequency of dated reported home invasions would still have been less than the relative frequency of births of three or more infants unless the Plaintiff Sheriffs served, on average, only 34.7% of the populations in their counties.

**Table 6**

**Home invasions in Plaintiff Sheriffs' Counties in which perpetrators displayed firearms**

| Year | Number of home invasions | Upper bound to number of home invasions in Plaintiff Sheriffs' counties in which perpetrator possessed firearms | Population in Plaintiff Sheriffs' Counties | Upper bound to home invasions in which perpetrator possessed firearms per million population |
|---|---|---|---|---|
| Unknown | 100 | 9 | | |
| 2004 | 18 | 13 | 3,471,329 | 3.74 |
| 2005 | 17 | 12 | 3,522,269 | 3.41 |
| 2006 | 17 | 15 | 3,592,937 | 4.17 |
| 2007 | 34 | 26 | 3,652,360 | 7.12 |
| 2008 | 25 | 16 | 3,713,880 | 4.31 |
| 2009 | 33 | 22 | 3,769,778 | 5.84 |
| 2010 | 22 | 16 | 3,827,450 | 4.18 |
| 2011 | 17 | 10 | 3,873,284 | 2.58 |
| 2012 | 24 | 17 | 3,926,010 | 4.33 |
| 2013 | 20 | 14 | 3,981,147 | 3.52 |

Sources: Plaintiffs' Responses to Interrogatories yield "Number of home invasions" and "Number of home invasions in which perpetrator possessed firearms". "Number of home invasions in which perpetrator possessed firearms" includes instances in which the number of firearms, if any, is unknown. Data for 2013 refers only to elapsed part of current year. "Population in Plaintiff Sheriffs' Counties" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 6 restricts the counts of all home invasions to only those in which perpetrators displayed firearms. This occurred in as many as 161, or 70.9%, of 227 dated home invasions.

This total is almost surely an upper bound. The Response to Interrogatories from the Sheriff of Adams County identified 71 home invasions in which a firearm was present. However, that response does not identify whether firearms were in the possession of perpetrators or victims. Table 6 assigns possession in all of these instances to the perpetrators. If the victim was in possession of a firearm in any of these home invasions, this assignment exaggerates the

- 13 -

number of home invasions in which perpetrators were armed.

Among dated home invasions in which perpetrators displayed firearms, the upper bounds varied between approximately 2.5 and seven such instances per million people per year. Averaged over all years, dated home invasions in which perpetrators displayed firearms occurred no more than 4.3 times per million people per year.

In comparison to Table 2, the average number of home invasions per million population in which perpetrators displayed firearms was no more than about four percent of the average number of traffic fatalities per million population. In comparison to Table 4, the average number of home invasions per million population in which perpetrators displayed firearms was no more than about 12 percent of the average number of alcohol-related traffic fatalities per million population. In comparison to Table 5, the average number of home invasions per million population in which perpetrators displayed firearms was no more than about 24 percent of the average number of births of three or more infants per million population.[12]

In the Plaintiff Sheriffs' Counties during this period, only two confirmed home invasions occurred in which a perpetrator displayed a firearm with a large-capacity magazine. Both took place in Mesa County. The first occurred on 9 September 2007. The second occurred on 25 November 2011.

Therefore, in 2004 through 2006 and 2008 through 2010, the rate at which residents of Plaintiff Sheriffs' Counties experienced home invasions in which the perpetrator was armed with a large-capacity magazine was zero per million people. In 2007 and 2011, this rate was less than one-third of an instance per million people.

---

[12] Home invasions in which perpetrators display firearms occured much less frequently in Colorado than did reported sightings of unidentified flying objects.

**Table 7**

**Home invasions in Plaintiff Sheriffs' Counties in which perpetrators discharged firearms**

| Year | Number of home invasions | Number of home invasions in Plaintiff Sheriffs' counties in which perpetrator discharged firearms | Population in Plaintiff Sheriffs' Counties | Home invasions in which perpetrator discharged firearms per million population |
|---|---|---|---|---|
| Unknown | 100 | 2 | | |
| 2004 | 18 | 2 | 3,471,329 | 0.58 |
| 2005 | 17 | 4 | 3,522,269 | 1.14 |
| 2006 | 17 | 2 | 3,592,937 | 0.56 |
| 2007 | 34 | 10 | 3,652,360 | 2.74 |
| 2008 | 25 | 1 | 3,713,880 | 0.27 |
| 2009 | 33 | 2 | 3,769,778 | 0.53 |
| 2010 | 22 | 8 | 3,827,450 | 2.09 |
| 2011 | 17 | 5 | 3,873,284 | 1.29 |
| 2012 | 24 | 7 | 3,926,010 | 1.78 |
| 2013 | 20 | 3 | 3,981,147 | 0.75 |

Sources: "Number of home invasions" and "Number of home invasions in which perpetrator possessed firearms" compiled from Plaintiffs' responses to interrogatories. "Number of home invasions in which perpetrator possessed firearms" includes instances in which the number of firearms, if any, is unknown. Data for 2013 refers only to elapsed part of current year. "Population in Plaintiff Sheriffs' Counties" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 7 presents the number of home invasions in which perpetrators discharged firearms. This occurred in 44, or 19.4%, of the 227 dated home invasions. Among dated home invasions, firearms discharges by perpetrators occurred at rates varying between barely one-quarter of one occurrence per million people per year to somewhat less than three per million people per year. The rate, averaged over all years, was 1.18 per million residents per year.

This rate corresponds to approximately six firearms discharges in the course of a home invasion per year in the State of Colorado as a whole. In comparison, the Colorado State Lottery awarded six prizes in excess of $2,000,000 in 2012.

In neither of the two confirmed instances in which perpetrators displayed firearms with large-

- 15 -

capacity magazines did the perpetrators discharge the entirety of a magazine. In the Mesa County home invasion of 9 September 2007 the perpetrator discharged a single round. In the Mesa County home invasion of 25 November 2011, the perpetrator discharged 3 rounds.[13]

**Table 8**

**Lightning casualties in Colorado**

| Year | Injured or killed by lightning strikes in Colorado | Colorado population | Lightning casualties per million population |
|------|------|------|------|
| 2004 | 34 | 4,608,811 | 7.38 |
| 2005 | 14 | 4,662,534 | 3.00 |
| 2006 | 21 | 4,745,660 | 4.43 |
| 2007 | 8 | 4,821,784 | 1.66 |
| 2008 | 11 | 4,901,938 | 2.24 |
| 2009 | 10 | 4,976,853 | 2.01 |
| 2010 | 5 | 5,049,717 | 0.99 |
| 2011 | 9 | 5,118,526 | 1.76 |
| 2012 | 1 | 5,192,647 | 0.19 |
| 2013 | 22 | 5,269,035 | 4.18 |

Sources: http://www.crh.noaa.gov/pub/?n=/ltg/county_stats_1.php  reports "Injured or killed by lightning strikes in Colorado".  "Population in Plaintiff Sheriffs' Counties" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 8 provides an objective measure of risks to which residents of Colorado are subject that can be compared to the risk of being the victim in a home invasion in which the perpetrator discharges a firearm. It reports that 135 injuries and fatalities due to lightning strikes occurred in Colorado during the period from 2004 through 2013. The average number of casualties was

---

[13]  In all of the 46 home invasions in which perpetrators discharged firearms, there were no confirmed instances in which a perpetrator discharged 16 rounds or more. According to the Response to Interrogatories of the Sheriff in Larimer County, a home invasion took place there on 4 April 2011 in which the perpetrator fired "numerous" rounds from four different firearms. None of the firearms was known to be equipped with a large-capacity magazine.

13.5 per year. The casualty rate varied from between nearly zero to somewhat more than four per million people per year. Over the entire period, it averaged 2.74 casualties per million people per year.

The comparison between Tables 6 and 8 demonstrates that casualties inflicted by lightning were more than half as likely as home invasions in which perpetrators displayed firearms. The comparison between Tables 7 and 8 demonstrates that, in Colorado, the risk of being injured by lighting is more than twice as the risk of being a victim of a home invasion in which perpetrators actually discharge firearms.

**Table 9**

**Home invasions in Plaintiff Sheriffs' Counties in which victims displayed firearms**

| Year | Number of home invasions | Number of home invasions in Plaintiff Sheriffs' counties in which victim possessed firearms | Population in Plaintiff Sheriffs' Counties | Home invasions in which victim possessed firearms per million population |
|---|---|---|---|---|
| Unknown | 100 | 5 | | |
| 2004 | 18 | 6 | 3,471,329 | 1.73 |
| 2005 | 17 | 8 | 3,522,269 | 2.27 |
| 2006 | 17 | 6 | 3,592,937 | 1.67 |
| 2007 | 34 | 12 | 3,652,360 | 3.29 |
| 2008 | 25 | 12 | 3,713,880 | 3.23 |
| 2009 | 33 | 12 | 3,769,778 | 3.18 |
| 2010 | 22 | 11 | 3,827,450 | 2.87 |
| 2011 | 17 | 7 | 3,873,284 | 1.81 |
| 2012 | 24 | 15 | 3,926,010 | 3.82 |
| 2013 | 20 | 12 | 3,981,147 | 3.01 |

Sources: Plaintiffs' Responses to Interrogatories yield "Number of home invasions" and "Number of home invasions in which perpetrator possessed firearms". "Number of home invasions in which perpetrator possessed firearms" includes instances in which the number of firearms, if any, is unknown. Data for 2013 refers only to elapsed part of current year. "Population in Plaintiff Sheriffs' Counties" is from "Supplemental Report of Jeffrey S. Zax" in *Cooke, et al. v. Hickenlooper* and https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

Table 9 reports the number of instances in which victims of a home invasion displayed firearms.

- 17 -

The average number of instances per year among dated home invasions across all complete years was 10.1.  This corresponded to an average rate of 2.71 instances per million people per year. In comparison to Table 8, instances in which victims of home invasions displayed firearms were almost exactly as frequent as instances in which Coloradans were injured or killed by lightning strikes.[14]

Only two confirmed home invasions occurred during this period in the Plaintiff Sheriffs' Counties in which a victim displayed a firearm with a large-capacity magazine. They occurred in Weld County on 14 September 2005 and in Larimer County on 29 November 2012.

Victims discharged firearms in no more than 19 home invasions during this period. This corresponds to less than two such instances per year, or approximately one instance per two million in population per year. There were no confirmed home invasions in which a victim discharged 16 or more rounds.[15]

In sum, this analysis of the Responses to Interrogatories from the Plaintiff Sheriffs demonstrates conclusively that home invasions were rare in Plaintiff Sheriffs' Counties. Home invasions in which perpetrators displayed firearms were rarer still.

Home invasions in which perpetrators discharged firearms were substantially less common than injuries from lightning strikes. Home invasions in which victims displayed firearms were only as common as were injuries from lightning strikes.

The ten years under study in the 55 Plaintiff Sheriffs' Counties represent, collectively, well over thirty million person-years. Within this sample, only 65 home invasions occurred in which either perpetrators or victims discharged firearms.

Although LCM ownership was unrestricted at this time, only four home invasions occurred in which a firearm was known to be equipped with a large-capacity magazine. There was not a single confirmed instance in which the number of discharges was equal or even close to the capacity of a large-capacity magazine.

---

[14] In five of the 106 home invasions in which victims displayed firearms, perpetrators stole firearms belonging to the victims.

[15] During a home invasion in El Paso County on 10 August 2004, the victim discharged "1 or more" rounds.

II.A.2.   <u>Sheriffs' deputies never use LCMs in self-defense</u>[16]

The fifth of the Defendant's Interrogatories requested that Plaintiff Sheriffs "(d)escribe every occasion since January 1, 2004 when you, or your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members." Responses from 53 Plaintiff Sheriffs, excluding that from the Sheriff of Weld County, reported a total of 15 instances of off-duty defense of self, family or home from other individuals.[17]

These reports indicate that such instances occurred approximately 1.5 times per year. A firearm was discharged in only one of these instances.

The Weld County Sheriff's Response describes responses to an employee survey addressing this question. The survey elicited approximately 200 assertions of armed self-defense.

The Sheriff's Response observes that many of these assertions "reflect an interpretation of this phrase ('otherwise used or displayed') to encompass wearing a firearm, wearing a firearm openly, or possessing a firearm in circumstances making it readily available for self-defense". In other words, these responses seem to have described instances in which individuals had been prepared to defend themselves, their families and their homes, rather than instances in which they actually did so.

Only five employees of the Weld County Sheriff's Office reported that they had actually discharged their firearms in self-defense.[18] Even so, these reports represent a much higher rate of discharge than that reported in the other 53 Plaintiff Sheriffs' Counties. The extent to which these discharges were responses to legitimate threats is an open question.

Of the five reported instances in which employees of the Weld County Sheriff discharged firearms in self-defense, the number of reported rounds exceeded four in only one instance. In that instance, the reported number of discharges was "more than 20". This is the only alleged instance in any of the 54 Plaintiff Sheriffs' Counties of off-duty defense of self, family or home

---

[16] This section is adapted from the "Supplemental Report of Jeffrey S. Zax", section II.E, "Sheriffs' Responses to Defendant's Interrogatories", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

[17] Sheriffs reported additional instances of firearm usage with respect to wild or unruly animals.

[18] These are responses to the question "Since 2004, if employed at the Weld County Sheriff's Office during the incident, how many times have you discharged a firearm in defense of your home, yourself or another?"

in which the capacity of magazines that are compliant with C.R.S. § 18-12-302 would have been exhausted.[19]

### II.B.    Frequencies of self-defense claims are economically inefficient

Self-defensive activities can be economically ineffecent. In some cases, they impose non-pecuniary externalities on the targets of self-defense, as well on individuals who are not targeted. The government has a responsibility to regulate purported self-defensive activities in order to encourage economic efficiency.

Externalities are activities that affect the well-being of others without their participation.[20] Positive externalities improve the welfare of others. Negative externalities reduce the welfare of others.

As an example, an increase in the supply of food by a particular producer will reduce the price of food. This will yield both positive and negative externalities.

The reduction in the price of food will improve the well-being of consumers. They can maintain their consumption of food at a lower level of expenditure, or increase their consumption of food without increasing their expenditure. They benefit even though they were not responsible for the increase in food supply.

In contrast, the reduction in the price of food will reduce the well-being of other producers. They will have to accept reduced revenue for the food that they supply, or increase their output in order to maintain their revenue. Their well-being is impaired even though they were not responsible for the increase in food supply.

This is an example of a pecuniary externality. Pecuniary externalities express themselves through market interactions. They are known, colloquially, as "market signals". While they may confer advantages and some and disadvantages on others, they move markets in the direction

_____

[19] The Response of the Weld County Sheriff did not identify the type of firearm employed in this instance, nor whether it was equipped with an LCM.

[20] For an introduction to this topic, see Chapter 5, "Externalities", in Public Finance, by Harvey S. Rosen and Ted Gayer, McGraw-Hill Education, 10th edition, 2014. For a more advanced discussion, see chapter 8, "Externalities", in Intermediate Public Economics, by Jean Hindriks and Gareth D. Myles, Massachusetts Institute of Technology, 2nd edition, 2013.

of economic efficiency without government intervention.[21]

Non-pecuniary externalties are externalities that are not transacted through the market. Because their value is not monetized, they are provided in quantities that are not economically efficient.

Positive non-pecuniary externalities improve the welfare of others without compensation to those who provide them. In the absence of compensation, those who provide positive non-pecuniary externalities will not recognize the benefit that their activities confer on others. Consequently, they will provide fewer positive non-pecuniary externalities than would be economically efficient. Contributions to neighborhood amenities, such as lawn maintenance, are an example.

Negative non-pecuniary externalities reduce the welfare of others without cost to those who impose them. In the absence of costs, those who impose negative non-pecuniary externalities will not bear the burden that their activities impose on others. Consequently, they will impose more negative non-pecuniary externalities than would be economically efficient. Contributions to neighborhood disamenities, such as loud noise, are an example.

In the presence of non-pecuniary externalities, economic efficiency cannot be attained through market activity alone. Collective action is required in order to ensure that the incentives to produce or restrict non-pecuniary externalities are commensurate with the value that they create or destroy. This implies that government intervention is required in order to attain economic efficiency.

## II.B.1.   Self-defensive activities impose negative externalities on targeted individuals

A societal commitment to "equal protection under the law" implies that society does not place different ex ante values on the well-being of different people. In general, economic efficiency therefore requires that interactions between individuals place approximately equivalent weight on the interests of all parties.

In general, individuals value their own well-being more than the they value the well-being of others. Consequently, they will take actions intended to protect their well-being in preference to the well-being of others. This implies that they have a tendency to impose negative non-pecuniary externalities on others.

---

[21] For a more extensive discussion, see"Public policy toward pecuniary externalities", by Randall G. Holcombe and Russell S. Sobel in the Public Finance Review, Volume 29, Number 4, 2001, pages 304-325.

When individuals consider potential acts of self-defense, they typically place primary emphasis on the value that they will themselves derive from these acts. They are less concerned with the harm that they might impose on the individual who they would target with these acts. Violence, whether or not perpetrated on the pretext of self-defense, is a specific form of negative non-pecuniary externalty.

These negative non-pecuniary externalities will be self-amplifying. When more individuals acquire firearms for ostensible self-defense, the risk that others will encounter negative non-pecuniary externalities from these firearms increases. This increases the incentive for others to acquire firearms for ostensible self-defense. In the absence of appropriate regulation, this cascade of negative non-pecuniary externalities will constitute a substantial economic distortion.

II.B.2.   Self-defensive activities impose negative externalities on individuals not targeted

The failure to properly regulate the negative non-pecuniary externalities of self-defensive firearm use ensures that firearms will be discharged at perceived threats with frequencies that are excessive, and therefore economically inefficient. This inefficiency will be increased if self-defensive firearm discharges do not hit their targets. Inaccurate discharges present risks to individuals who were not an intended target. This is an additional non-pecuniary externality.

Inaccurate discharges are almost surely common. Law enforcement officers are, presumably, relatively well-trained in firearm usage. Nevertheless, law enforcement officers regularly miss targets when they intentionally discharge firearms in the line of duty.

Donner and Popovich[22] summarize recent research regarding the accuracy of firearm discharges by law enforcement officers as follows:

> "According to previous studies, police departments rarely ever achieve a 50 percent hit rate (e.g. Geller and Scott, 1992; Copay and Charles, 2001). A study conducted on shooting accuracy in 13 large American police departments during the 1970s and 1980s found that between 22 and 42 percent of rounds fired by officers hit their intended target (Geller and Scott, 1992). Several reports have also focused on the largest US police department, New York City. OIS data revealed hit rates of 26, 31 and 23 percent in 1987, 1988 and 1990, respectively (NYPD). Data collected between 1999 and 2000 revealed a 15 percent hit rate among officers (Aveni, 2003). Between 1998 and 2006,

---

[22] Christopher M. Donner and Nicole Popovich, "Hitting (or missing) the mark: An examination of police shooting accuracy in officer-involved shooting incidents", in Policing: An International Journal, Volume 42, Number 3, 2019, pages 474-489.

the average hit rate was 18 percent (Morrison, 2006).”

White[23] concludes similarly that “(r)esearch has consistently shown that although there is substantial variation across police departments, hit rates typically dip well below 50%”. Simas, et al.[24] explicitly identify the negative non-pecuniary externalities that arise when law enforcement officers discharge firearms inaccurately: “Considering the importance of firearm proficiency and accuracy, the poor marksmanship of police officers has led to officers missing their target when engaging an armed suspect ... and has led to bystander fatalities”.[25]

Inaccurate discharges are presumably more common among individuals who do not have law enforcement training. Therefore, firearm usage among civilians presents a heightened risk of the negative non-pecuniary externalities associated with inaccurate discharge.

As an example, the response to Interrogatories in *Cooke, et al. v. Hickenlooper* from the Hinsdale County Sheriff reported a single incident, in November 1994, in which an armed citizen was recruited for assistance in a dangerous traffic stop. In that incident, the citizen discharged 17 rounds from a Beretta Model 92 9mm pistol.[26]

According to the report, one of the 17 rounds struck a tire of the vehicle in question, disabling it. The other 16 rounds failed to hit the intended target. By definition, they each hit an unintended target. Some, if not many, of these unintended targets presumably suffered damage. These damages constitute non-pecuniary externality. They are therefore economic inefficiencies, whether or not these unintended targets were human.

The purpose of LCMs must be to increase the number of discharges. Unless an individual achieves perfect accuracy, increases in the number of discharges imply increases in the number of inaccurate discharges. This increases the potential harms to unintended targets. Consequently, LCM usage increases the economic inefficiency that arises from imperfect

---

[23] Michael D. White, “Hitting the target (or not): Comparing characteristics of fatal, injurious, and noninjurious police shootings”, in <u>Police Quarterly</u>, Volume 9, Number 3, September, 2006, pages 303-330.

[24] Vini Simas, Ben Schram, Elisa F.D. Canetti, Danny Maupin and Robin Orr, “Factors influencing marksmanship in police officers: A narrative review”, in <u>International Journal of Environmental Research and Public Health</u>, Volume 19, 14236, 2022.

[25] As a recent example, police in Denver wounded six bystanders with firearm fire as they sought to subdue a single civilian who was in possession of a firearm (https://www.denverpost.com/2022/07/20/bystanders-shot-denver-police-bullet-wounds/).

[26] The report did not specify whether this firearm was equipped with an LCM.

accuracy.


**II.C.     Self-reports of self-defense are unreliable**

Individual assessments of the need for self-defensive actions do not account for the negative non-pecuniary externalities that these actions impose. Therefore, they are not reliable indicators of the frequency with which such actions are economically efficient. Individuals will consistently exaggerate threats to their well-being, compared to the assessments that would be consistent with economic efficiency.


II.C.1   Individual reports of self-defense are unreliable

Recent experience provides several notorious examples which demonstrate that self-declarations of self-defense do not ensure that a valid instance of self-defense has occurred. For example, on 26 February 2012 in Florida, George Zimmerman shot and killed Trayvon Martin.[27] Zimmerman claimed that he was acting in self-defense, and was acquitted.

If, however, Martin had survived the encounter with Zimmerman, it seems likely that Martin might have also had a plausible claim of self-defense as justification for his actions. It is possible that neither participant in this incident thought of themselves as an aggressor. Both could have understood themselves to be acting in self-defense.

On 23 February 2020 in Georgia, Travis McMichael fatally shot Ahmaud Arbery. Arbery was unarmed and fleeing from McMichael at the time. Nevertheless, when brought to trial for murder, McMichael claimed to be acting in self-defense.[28]

On 8 October 2022 in Florida, William Hale and Frank Allison became involved in a dispute while driving separate vehicles on the same road. In the course of the dispute, an object was thrown from Hale's vehicle at Allison's vehicle. Allison discharged a firearm once at Hale's vehicle. Hale then discharged the entire magazine of his firearm at the vehicle driven by Hale.

---

[27] For a representative description, see http://www.nytimes.com/2013/07/14/us/george-zimmerman-verdict-trayvon-martin.html?pagewanted=all&_r=0.

[28] For a representative description, https://web.archive.org/web/20211106085425/https://www.ajc.com/news/atlanta-news/prosecutors-no-evidence-arbery-stole-anything-before-fatal-shooting/QNEPEU76Y5H43AKG3JD2UMC5VE/

Both Hale and Allison were, presumably, self-identifying as being under threat. Both, presumably, thought of themselves as acting in self-defense. Neither was injured in the interaction. However, each struck the daughter of the other with a firearm round.[29]

In all three of these cases, the discharge of firearms imposed substantial negative non-pecuniary externalities. In the examples of Zimmerman and of the Hale and Allison, there was no individual who was clearly the aggressor. Those claiming to be acting in self-defense could arguably have been guilty of aggression, themselves. In the example of McMichael, a jury made the formal determination that McMichael was the aggressor rather than the victim.

Examples of inappropriate assessments of self-defense occur in Colorado as well. The Response of the Sheriff of Weld County to the fifth of Defendant's Interrogatories in *Cooke, et al. v. Hickenlooper*, discussed in section II.A.2, indicated that some or many reported instances of "armed self-defense" by members of the Sheriff's staff or their families would be more accurately characterized as instances of preparing to self-defend in circumstances where actual threats did not materialize.[30]

One respondent stated that "it is not possible to put a number on how many times I have used a firearm in defense of my home, as there is always a firearm accessible in the household. There have been numerous occasions that myself and my family members have used a firearm to investigate any unexplained noises or anything that alerts our canine companions to a presence in or around our home."

Neither "unexplained noises" nor "anything that alerts ... canine companions" would consistently present threats that require armed responses. Such responses would entail a risk that firearms would be discharged in the absence of such threats. These discharges would impose non-pecuniary externalities.

These externalities can be tragic. On 8 September 2013, CNN reported that a young Coloradan woman had snuck into her former home to surprise a friend who was taking care of it.[31] She deliberately made a noise with the intent of alerting her friend to the presence of a concealed

---

[29] For a representative description, see https://www.ajc.com/news/crime/georgia-florida-men-shoot-each-others-daughters-during-road-rage-sheriff-says/VK2WY5EKUFEDDFYWU4BDJVCWQU/.

[30] This discussion is adapted from the "Supplemental Report of Jeffrey S. Zax", section II.E, "Sheriffs' Responses to Defendant's Interrogatories", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

[31] For a representative description, see http://www.cnn.com/2013/09/08/justice/colorado-teen-accidental-shooting/.

individual. The friend armed himself with a firearm. The woman revealed herself with the intent to surprise the friend. The friend responded by shooting her fatally.

Another incident in Colorado further illustrates the ambiguities associated with self-identified instances of self-defense. On 12 August 2013, <u>The Denver Post</u> reported that a man had confessed to killing two teenage boys.[32] According to the report, the man shot the two after they had come to his home, demanded payments of $10,000 to each of them and threatened him with a butcher knife. Under these circumstances, the man might be construed to have engaged in firearm self-defense.

However, according to the report, "a friend of the boys told investigators that one of the boys had a cellphone video of [the man] asking the boy for sex and then touching him inappropriately." If this was the case, then at an earlier point in the extended interaction, the man had been the aggressor and at least one of the boys had been a victim. From that perspective, the boys might well have represented their visit to the man's house as an act of self-defense.

In these two Colorado incidents, individuals applying lethal force with firearms may have believed themselves to be acting in self-defense. However, in the first incident, there was, apparently, no threat and no aggressor at all. In the second incident, the alleged assailants may have equally believed that their acts were themselves self-defensive, and provoked by prior aggressive acts on the part of the individual who eventually applied lethal force.

II.C.2   <u>Survey claims regarding the frequency of firearm self-defense are not credible</u>[33]

Surveys of firearm self-defense elicit multiple individual reports of firearm self-defense. These individual reports of firearm self-defense are not reliable. Therefore, the estimates that these surveys yield regarding the frequency of firearm self-defense are not credible.

Kleck and Gertz (1995)[34] is a prominent example. They conducted an original survey of self-

---

[32] For a representative description, see http://www.denverpost.com/breakingnews/ci_23846157/adams-county-sheriff-investigates-man-who-claims-he?IADID=Search-www.denverpost.com-www.denverpost.com.

[33] This section is adapted from the "Zax Second Rebuttal", section II.C, "Problems of interpretation", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

[34] Gary Kleck and Marc Gertz (1995) "Armed resistance to crime: The prevalence and nature of self-defense with a gun", <u>The Journal of Criminal Law and Criminology</u>, Vol. 86, No. 1,

reported firearm self-defense. They summarize the survey results as indicating that "each year in the U.S. there are about 2.2 to 2.5 million DGUs [defensive gun uses] of all types by civilians against humans".

This estimate is not credible for two reasons. First, Kleck and Gertz define DGUs without regard as to whether the reported instances are appropriate. Second, the details of individual reports often indicate that the use of firearms for self-defense was disproportionate.

Kleck and Gertz define a "genuine DGU [defensive gun use]" as follows:

> "(1) the incident involved defensive action against a human rather than an animal, but not in connection with police, military, or security guard duties; (2) the incident involved actual contact with a person, rather than merely investigating suspicious circumstances, etc.; (3) the defender could state a specific crime which he thought was being committed at the time of the incident; (4) the gun was actually used in some way — at a minimum it had to be used as part of a threat against a person, either by [163] verbally referring to the gun (e.g., 'get away — I've got a gun') or by pointing it at an adversary."

This definition does not require that the alleged threat was verifiable, that the respondent's role in the alleged instance was verifiably defensive, that the armed response was appropriately proportionate, or that the respondent's possession and use of a firearm were legal. Consequently, this definition must overstate the extent of threats to which DGUs would have been potentially appropriate responses.

**Table 10**

**Assailant weapons in purported DGUs**

|  | Number | Percent |
|---|---|---|
| DGUs in which assailants were: |  |  |
| not reported to have a weapon | 102 | 52.0% |
| reported to have a weapon other than a firearm | 56 | 28.6% |
| reported to have a firearm | 38 | 19.4% |
| Total | 196 | 100.0% |

Autumn, 150-187.

This is confirmed by examination of other DGU characteristics. Kleck and Gertz identify 196 survey respondents as engaging in the use of firearms consistent with their definition of DGUs. Table 10 reports that, of them, only 94 reported that their alleged assailant carried a weapon. In other words, in 52.0% of the purported instances of self-defense, purported victims deployed a firearm for the purpose of confronting an unarmed individual.

Alleged assailants were armed with weapons that were not firearms in 56 of these 94 instances. These instances constituted 28.6% of all instances. Purported victims reported that alleged assailants were armed with some type of firearm in only 38 of 196 instances, or 19.4%. Consequently, purported victims responded to alleged assailants with presumably more lethal weaponry in more than 80% of all instances.

**Table 11**

**Fears of victimization in reported DGUs**

|  | Number | Percent |
|---|---|---|
| DGUs in which alleged victims feared victimization in: |  |  |
| Unspecified crime | 22 | 11.2% |
| Nonviolent crime | 68 | 34.7% |
| Violent crime | 106 | 54.1% |
| Total | 196 | 100.0% |

Despite the frequency with which purported victims were in possession of superior weaponry, purported victims reported substantial fears of victimization. Table 11 reports that 54.1%, or more than half of purported victims, feared that they would be victims of violent crimes.

**Table 12**

**Assailant weapons and fears of victimization in reported DGUs**

|  | Assailants not reported to have a weapon | Assailants reported to have a weapon other than a firearm | Assailants reported to have a firearm |
|---|---|---|---|
| DGUs in which alleged victims feared victimization in: |  |  |  |
| Unspecified crime | 17.7% | 3.6% | 5.3% |
| Nonviolent crime | 46.1% | 25.0% | 18.4% |
| Violent crime | 36.3% | 71.4% | 76.3% |
|  |  |  |  |
| Number of instances | 102 | 56 | 38 |

Table 12 demonstrates that, among the 102 purported victims armed with firearms who encountered unarmed alleged assailants, 36.3% feared that they would be victims of a violent crime. Among the 56 purported victims armed with firearms who encountered alleged assailants armed with weapons other than firearms, 71.4% feared that they would be victims of a violent crime.

**Table 13**

**Assailant weapons and fears of lethal victimization in reported DGUS**

| | Assailants not reported to have a weapon | Assailants reported to have a weapon other than a firearm | Assailants reported to have a firearm |
|---|---|---|---|
| Feared likelihood of death in the absence of armed self-defense: | | | |
| Almost certainly not | 36.5% | 9.8% | 8.8% |
| Probably not | 28.2% | 19.6% | 14.7% |
| Some significant chance | 35.3% | 70.6% | 76.5% |
| | | | |
| Number of instances | 85 | 51 | 34 |

Note:   Twenty-six respondents did not report whether they feared death.

According to Table 13, 35.3%, or more than one-third, of purported victims feared lethal victimization when confronted by an unarmed alleged assailant, even though the purported victim possessed a firearm. Among those confronted by alleged assailants with a weapon other than a firearm, more than 70% feared lethal victimization, even though they possessed a firearm.

These tabulations demonstrate that, in the majority of purported DGUs, the firearms that were in the possession of purported victims were more potent than any weapon possessed by alleged assailants. Nevertheless, purported victims expressed substantial fears of victimization, and even lethal victimization.

Moreover, the fear of lethal victimization was similar among purported victims confronting alleged armed assailants regardless of whether or not those alleged assailants possessed firearms. Those armed without firearms should have been substantially less dangerous than were those armed with firearms. The similarity between fears of lethal victimization suggests, at least, that those fears associated with alleged assailants armed but not with firearms were excessive.

These comparisons demonstrate that the definition of DGUs employed by Kleck and Gertz includes many instances in which the deployment of firearms for the purpose of purported self-defense was disproportionate. This is consistent with the discussion in section II.B.1 above. As

demonstrated there, individuals, because of their self-interest, will identify needs for self-defense in circumstances where self-defense would be socially inefficient.

Kleck and Gertz, themselves, implicitly impugn the credibility of reported fears regarding lethal victimization. They report that

> "If we consider only the 15.7% who believed someone almost certainly would have been killed had they not used a gun ... it yields national annual estimates of 340,000 to 400,000 DGUs [defensive gun uses] of any kind ... where defenders stated, if asked, that they believed they almost certainly saved a life by using a gun."

In 1995, the population of the United States was approximately 263,034,000 (Statistical Abstract of the United States 1996, Section 1, "Population", table No. 2, "Population", http://www.census.gov/prod/www/statistical_abstract.html). The estimates above therefore correspond to risks of confronting an assailant intent on murder that are approximately 130 to 150 per 100,000 population.

However, the actual risk of homicide in the United States in 1995 was 8.7 per 100,000 population (Statistical Abstract of the United States 1998, Section 1, "Population", table No. 138, "Deaths and Death Rates, by Selected Causes: 1990 to 1996", http://www.census.gov/prod/www/statistical_abstract.html). Therefore, the implied risk of confronting an assailant intent on murder derived from the survey of Kleck and Gertz (1995) overstated the actual risk of being murdered by factors approximately of 15 to 20.

Kleck and Gertz (1995, 176) estimate that 46.1% of their respondents "perceived some significant chance of someone being killed". This is 2.94 times as many as "believed that someone almost certainly would have been killed" (Kleck and Gertz, 1995, 177). Accordingly, this would imply that approximately 998,000 to 1,175,000 individuals encountered assailants who displayed significant intent to murder. These levels correspond to rates of approximately 380 to 450 per 100,000 populations. These rates overstate the actual risk of homicide by factors of approximately 44 to 50.

At least some assailants with lethal intent will fail to achieve their goals. Therefore, the rates at which individuals confront assailants who are intent on murder will exceed the rates at which individuals are actual victims of homicide. Nevertheless, the most conservative estimates from Kleck and Gertz (1995) of encounters with lethal threats imply that for each homicide, 14 to 19 authentic homicidal attempts are thwarted. Under their concept of "significant intent", approximately 43 to 49 authentic homicide attempts would have to fail for each actual homicide.

There is no evidence to suggest that authentic homicidal intentions rise to this level, that personal self-defense is sufficiently effective or that homicidal incompetence is sufficiently

widespread to reconcile these rates. They are simply not credible.

In sum, the number of purported victims in Kleck and Gertz (1995) who claimed to believe that they were faced with lethal threats far exceeds any reasonable estimate of the number who actually could have encountered such threats. While their alleged fears may have seemed credible, those fears were factually without foundation.

The frequency of self-defensive firearm use claimed by the respondents to the survey of Kleck and Gertz is also inconsistent with frequencies as recorded by third parties. Planty and Truman[35] (2013) demonstrate that the use of a gun in any form of self-defense is rare. They estimate that approximately 29,618,300 violent crimes occurred in the United States during the period 2007-2011, or approximately 5,923,650 per year. These counts corresponded to rates of slightly less than two incidents per 100 population per year.

During this period, victims threatened or attacked perpetrators with firearms in .8% of all reported violent crimes. This corresponds to a rate of approximately 16 people per 100,000 employing a firearm to threaten or attack a violent crime perpetrator per year.

Planty and Truman (2013) estimate that approximately 84,495,500 property crimes occurred in the United States during the period 2007-2011, or approximately 16,899,100 per year. These counts corresponded to rates of approximately 5.5 incidents per 100 population per year.

Victims threatened or attacked perpetrators of property crimes with firearms in only .1% of all reported incidents. This corresponds to a rate of approximately six people per 100,000 employing a firearm to threaten or attack a property crimes perpetrator per year.

In sum, the frequency of verifiable instances in which purported victims responded to alleged assailants with firearms was much lower than that implied by the survey results of Kleck and Gertz. This demonstrates that the frequency with which firearms are employed in self-defense cannot be reliably estimated from surveys that allow respondents to self-identify such usage.

The credibility of self-reports of self-defensive firearm use in the more recent survey of English (2022)[36] is similarly suspect, if not moreso. English identifies self-defensive firearm use as affirmative answers to the following question: "Have you ever defended yourself or your

---

[35] Michael Planty and Jennifer L. Truman, <u>Firearm Violence, 1993-2011</u>, U.S. Department of Justice, Office of Justice Programs, Washington, D.C., 2013.

[36] William English, "2021 National Firearms Survey: Updated analysis including types of firearms owned", 13 May 2022.

property with a firearm, even if it was not fired or displayed? Please do not include military service, police work, or work as a security guard."

In comparison to the survey of Kleck and Gertz, the implicit definition of self-reported self-defensive firearm employed by English does not explicitly require suspicion of a crime, does not require actual contact with another person and does not exclude encounters with animals.[37] English makes no attempt to evaluate whether reported self-defensive firearm use was appropriate or proportionate.

**II.D.   Self-reported self-defense is economically inefficient**[38]

The economic logic of Section II.C.1 demonstrates that individuals are likely to overstate their personal need for self-defense, relative to the efficient level. Section II.C.2 demonstrates that these overstatements occur in surveys that invite individuals to self-report defensive gun use.

Consequently, self-defensive actions that purported victims undertake are likely to be disproportionate to the threats that they actually encounter. This inefficiency would diminish rather than increase the overall level of public safety. This would be an especially significant risk if those actions entail the deployment of lethal force in the form of firearms.

II.D.1   Many self-reported acts of firearm self-defense are disproportionate

The individuals who are identified by Kleck and Gertz as having engaged in an authentic DGU described their responses to the threats that they perceived. These descriptions suggest that at least some of the responses were  disproportionate.

---

[37] These encounters occur with unknown frequency. English (2022, 32) several anecdotes of alleged self-defense against animals. Footnote 17 references others.

[38] This section is adapted from the "Zax Second Rebuttal", section II.C, "Problems of interpretation", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

**Table 14**

**Assailant weapons and respondent firearm use in reported DGUs**

|  | Assailants not reported to have a weapon | Assailants reported to have a weapon other than a firearm | Assailants reported to have a firearm |
|---|---|---|---|
| Respondent did not discharge firearm | 82.4% | 73.2% | 50.0% |
| Respondent discharged firearm | 17.7% | 26.8% | 50.0% |

| | | | |
|---|---|---|---|
| Number of instances | 102 | 56 | 38 |

Table 14 reports that purported victims discharged firearms in 17.7% of incidents in which alleged assailants were unarmed. They discharged firearms in 26.8% of incidents in which alleged assailants bore weapons other than firearms. While some assailants in either category may well have been dangerous, the superior force capability of firearms suggests that the need for actual discharges should have been rare.

**Table 15**

**Assailant weapons and respondent firearm use in reported DGUs**

| | Feared likelihood of death in the absence of armed self-defense: | | |
|---|---|---|---|
| | Almost certainly not | Probably not | Some significant chance |
| Respondent did not discharge firearm | 74.4% | 94.9% | 63.0% |
| Respondent discharged firearm | 25.6% | 5.1% | 37.0% |
| | | | |
| Number of instances | 39 | 39 | 92 |

Table 15 reports that respondents discharged firearms in 25.6% of instances in which they believed that they were almost certainly not at risk of death. This is only one-third less than the rate at which respondents discharged firearms in instances in which they believed that they faced some significant chance of victimization with lethal force. This suggests that the rate of discharge when faced with little risk of death was disproportionate.

The conclusions in Kleck and Gertz also imply that defensive use of firearms is disproportionate. They summarize their results as demonstrating that "(t)he best estimates of DGUs ... even if compared to the more generous estimates of gun crimes, are 4.6 times higher than the crime counts for all guns, and 4.2 times higher for handguns ... In sum, DGUs are about three to five times as common as criminal uses, even using generous estimates of gun crimes."

If self-defensive firearm use were three times as frequent as criminal firearm use, and every instance of criminal firearm use was met with self-defensive firearm use, then one-third of self-defensive firearm use would be directed at alleged assailants who, themselves, deployed firearms. This implies that two-thirds of self-defensive firearm use would be directed at alleged assailants who did not, themselves, deploy firearms. This ratio would be greater if some instances of criminal firearm use did not elicit self-defensive firearm responses.

If self-defensive firearm use were five times as frequent as criminal firearm use, and every instance of criminal firearm use was met with self-defensive firearm use, then at least four-fifths of self-defensive firearm use would be directed at alleged assailants who did not, themselves, deploy firearms.

Therefore, the calculations of Kleck and Gertz imply that at least 67%, and possibly more than 80%, of instances of purported self-defensive firearm use are directed at alleged assailants who do not possess firearms. The purported self-defensive actions in many of these instances are likely to be disproportionate.


II.D.2    Some self-reported acts of firearm self-defense may be illegal

The legal status of self-reported self-defensive actions is uncertain, even in contexts where the individual engaging in them has a credible claim to victimization. Colorado law, embodied in Colo. Rev. Stat. § 18-1-704, establishes that

> "(1) Except as provided in subsections (2) and (3) of this section, a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose."

This definition of "justified ... physical force" differs substantially from the definition of "a genuine DGU" employed by Kleck and Gertz and quoted in section II.C.2 above.

In particular, Kleck and Gertz require only that "the defender could state a specific crime which he thought was being committed at the time of the incident". This appears to admit a much broader range of circumstances than would be consistent with a "reasonable belief" of "the use or imminent use of unlawful physical force by that other person."

Table 10 reports that, in the majority of cases reported by Kleck and Gertz, the alleged assailant was apparently unarmed. In these circumstances, it may have been questionable whether the belief of impending "unlawful physical force" was reasonable.

Moreover, in Colorado

> "(2) Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and: (a) The actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury; or (b) The other person is using or reasonably appears about to use physical force against an occupant of a dwelling or business establishment while committing or attempting to commit burglary as defined in sections 18-4-202 to 18-4-204; or (c) The other person is committing or reasonably appears about to commit kidnapping as defined in section 18-3-301 or 18-3-302, robbery as defined in section 18-4-301 or 18-4-302, sexual assault as set forth in section 18-3-402, or in section

- 36 -

18-3-403 as it existed prior to July 1, 2000, or assault as defined in sections 18-3-202 and 18-3-203."

Firearms are capable of exerting "deadly physical force". Therefore, their deployment in alleged acts of self-defense could legally be subject to this higher standard. The definition of "a genuine DGU" employed by Kleck and Gertz does not limit self-defensive firearm use to the circumstances defined in this section of Colorado statute.

To the contrary, as reported in Table 11, 34.7% of those self-reporting self-defensive firearm use to Kleck and Gertz feared only "nonviolent crime". Another 11.2% feared "unspecified crime". In these instances, at least, firearm use might not have been compliant with Colorado statute.

Finally,

> "(3) Notwithstanding the provisions of subsection (1) of this section, a person is not justified in using physical force if: (a) With intent to cause bodily injury or death to another person, he provokes the use of unlawful physical force by that other person; or (b) He or she is the initial aggressor; except that his or her use of physical force upon another person under the circumstances is justifiable if he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force".

Kleck and Gertz did not interrogate their survey respondents with regard to the possibility that those self-reporting self-defensive firearm use had been the original aggressor or had provoked "the use of unlawful physical force" by the purported assailant. Consequently, it is not possible to evaluate the extent to these self-reports of self-defensive firearm use might have been in violation of these provisions. As will be discussed in section III.D.3, that possibility cannot be disregarded.

The implicit definition of self-defensive firearm use in English (2022, 11) is even less respectful of the legal requirements to justify the application of force in self-defense. His definition includes the deployment of firearms to defend property.

Threats to property are much more common than threats to person.[39] Therefore, this question invites a much larger volume of affirmative answers. However, Colorado statute does not appear to recognize a right to employ physical force for the purpose of protecting property. Consequently, many of the self-reported instances of self-defensive firearm use enumerated by English might have questionably legal protection in Colorado.

Kleck and Gertz (1995, 155), themselves, are dubious about the legality of the DGUs that they report. They explain that "As with other forms of forceful resistance, the defensive act itself, regardless of the characteristics of any weapon used, might constitute an unlawful assault or at least the [respondent]  might believe that others, including either legal authorities or the researchers, could regard it that way." Kleck and Gertz (1995) did not attempt to assess the legality of the defensive acts reported by their respondents.

The legality of self-defensive acts involving firearms is even more limited: "Resistance with a gun also involves additional elements of sensitivity. Because guns are legally regulated, a victim's possession of the weapon, either in general or at the time of the DGU, might itself be unlawful" (Kleck and Gertz, 1995, 155). Possession may be problematic "because the [respondent] had not complied with or could not be sure he had complied with all legal requirements concerning registration of the gun's acquisition or possession, permits for purchase, licensing of home possession, storage requirements, and so on." (Kleck and Gertz, 1995, 156).

The survey of Kleck and Gertz (1995) did not inquire regarding these aspects of gun ownership. Consequently, it was not possible to assess whether respondents were legally entitled to possess the firearms which they employed in alleged instances of firearm self-defense.

Moreover, even if ownership of the firearms employed in alleged instances of firearm self-defense was legal, and the individuals claiming to have engaged in firearm self-defense were legally entitled to access those firearms at the moment of the alleged instance of firearm self-defense, the possibility remains that these individuals were not legally entitled to deploy those firearms in the location where the alleged instance of firearm self-defense occurred. According to Kleck and Gertz (1995, 156): "For all but a handful of gun owners with a permit to carry a weapon in public places ... the mere possession of a gun in a place other than their home, place

---

[39] In 2021, Colorado experienced 122,250 cases of larceny, 23,404 cases of burglary, 43,295 cases of fraud, and 42,269 cases of motor vehicle threat, for a total of 231,218 crimes against property. In contrast, Colorado experiences 31,053 cases of violent crime. In other words, property crimes were more than seven times as numerous as violent crimes. In addition, Colorado experienced 4,341 cases of robbery, which could be both crimes of violence and crimes against property (https://coloradocrimestats.state.co.us/tops/report/property-crimes/colorado/2021).

of business, or in some states, their vehicle, is a crime, often a felony. In at least ten states, it is punishable by a punitively mandatory minimum prison sentence."

**Table 16**

**Locations of firearm self-defense in reported DGUs**

|  | Number | Percent |
|---|---|---|
| DGUs which took place: |  |  |
| In respondents' home | 65 | 33.2% |
| Near respondents' home | 73 | 37.2% |
| In friend's home | 7 | 3.6% |
| In a business | 16 | 8.2% |
| In a parking lot | 7 | 3.6% |
| In a school | 1 | 0.5% |
| In a public space | 13 | 6.6% |
| In some other place | 5 | 2.6% |
| No response | 9 | 4.6% |
| Total | 196 | 100.0% |

Table 16 identifies the the location in which the alleged instance of firearm self-defense reported to Kleck and Gertz took place. Only one-third of these instances occurred within respondents' homes, where their rights to employ firearms were presumably least restricted. Another 8.2% took place "(i)n a business", though not necessarily in the respondent's place of business.

The remaining 58.6% of instances took place in locations where usage of a firearm might have been illegal and perhaps even a felony. For example, 13 of the 196 instances occurred in "a public space", seven in a "parking lot" and one "in a school".

Alleged victims have personal incentives and civic responsibilities to report crimes and attempted crimes to public safety authorities. Personally, they may seek justice for the crimes or criminal attempts to which they have been subject, and protection from the possibility of further threats. As a matter of civic responsibility, reports may be important to assist police in anticipating subsequent criminal threats to others in the community, and to identify repeat offenders.

At the same time, the incentive to report is diminished, perhaps dramatically, if the defensive actions of alleged victims are themselves of uncertain legality. In this circumstance, reports to the police create the risk that the alleged victims will themselves become vulnerable to legal penalties.

**Table 17**

**Police notification DGUs involving firearm self-defense**

|  | Number | Percent |
|---|---|---|
| Were the police informed or did they find out about this incident in any way?" |  |  |
| Yes | 116 | 59.2% |
| No | 67 | 34.2% |
| Unknown | 5 | 2.6% |
| No answer | 8 | 4.1% |
| Total | 196 | 100.0% |

Table 17 reports that, In 40.8% of the DGUs identified by Kleck and Gertz, respondents neither informed police nor believed that police had learned of their instance in any other way. In the remaining incidents, respondents believed that police were aware of the instance but may not have informed the police themselves. Consequently, at least 40% of respondents, and perhaps many more failed to notify the police of the incident in which they claimed self-defense, much less their resort to a firearm in that incident. This suggests that many respondents considered their responses to be of dubious legality.

In sum, the alleged instances of firearm self-defense reported in Kleck and Gertz (1995) may have themselves been illegal. They may have violated legal standards for the application of force, legal standards for gun ownership and possession, or legal standards regarding the carrying of firearms.

Kleck and Gertz make no attempt to ascertain whether the DGUs that they identify involved illegal behavior on the part of the alleged victim.[40] However, their discussion of self-defense reports in the National Crime Victimization Survey [NCVS] implies that illegal behavior characterizes most of their alleged DGUs.

---

[40] Kleck and Gertz state (1995, 163) that they "made no effort to assess either the lawfulness or morality of the Rs' [respondents'] defensive actions."

The NCVS is conducted by the Bureau of Justice Statistics, Office of Justice Programs, U. S. Department of Justice. It is an ongoing longitudinal survey which, according to the Bureau of Justice Statistics, serves as "the nation's primary source of information on criminal victimization." (http://www.bjs.gov/index.cfm?ty=dcdetail&iid=245).

Kleck and Gertz (1995, 153) assert that "(d)ata from the NCVS imply that each year there are only about 68,000 defensive uses of guns in connection with assaults and robberies, or about 80,000 to 82,000 if one adds in uses linked with household burglaries. These figures are less than one ninth of the estimates implied by the results of at least thirteen other surveys". Eleven of these surveys yield results that, according to Kleck and Gertz (1995, 157-159) can be standardized and compared. Their assessment (1995, 159) is that "(a)ll of the eleven surveys yielded results that implied over 700,000 uses per year."

Kleck and Gertz (1995, 155) explain the discrepancy between the numbers of defensive gun uses recorded by the NCVS and those recorded by the other surveys as driven by differential willingness to disclose. In regard to the NCVS, "it is made very clear to [respondents] that they are, in effect, speaking to a law enforcement arm of the federal government, whose employees know exactly who the [respondents] and their family members are, where they live, and how they can be recontacted."

This may deter respondents from full and open disclosure because "(e)ven under the best of circumstances, reporting the use of a gun for self-protection would be an extremely sensitive and legally controversial matter" (Kleck and Gertz, 1995, 155). In fact, "In the context of a nonanonymous survey conducted by the federal government, an R [respondent] who reports a DGU may believe that he is placing himself in serious legal jeopardy" (Kleck and Gertz, 1995, 155-6).[41]

According to Kleck and Gertz (1995, 155), this jeopardy is easy to avoid. The respondent can simply decline to disclose: "Rs in the NCVS are not even asked the general self-protection question unless they already independently indicated that they had been a victim of a crime. This means that any DGUs associated with crimes the [respondents] did not want to talk about would remain hidden." Therefore, "(i)n light of all these considerations, it may be unrealistic to assume that more than a fraction of Rs who have used a gun defensively would be willing to report it to NCVS interviewers" (Kleck and Gertz, 1995, 156).

---

[41] The claim that the NCVS is "nonanonymous" is incorrect. For example, the NCVS 2001 survey instrument states that "We are conducting this survey under the Authority of Title 13, United States Code, Section 8. Section 9 of this law requires us to keep all information about you and your household strictly **confidential**. We may use this information only for statistical purposes." [emphasis in original].

In sum, Kleck and Gertz (1995) conclude that the NCVS drastically undercounts defensive gun uses because its respondents engage in strategic concealment. They conceal because they are concerned that their own actions may be of dubious legality. They fear that full disclosure may expose them to legal risks despite the explicit NCVS guarantee of confidentiality.

Kleck and Gertz (1995) believe that respondents to the 11 surveys that they summarize in their table 1 were more willing to discuss instances in which their own behavior may have been illegal. Presumably, they have the same belief about their own survey: "It was carefully designed to correct all of the known correctable or avoidable flaws of previous surveys which critics have identified." (Kleck and Gertz, 1995, 160). This implies that the excess of alleged instances of firearm self-defense in any of these surveys, in comparison to the NCVS, consists of instances where the respondents' own actions were so suspect that they would not have reported them to the NCVS, despite the NCVS's guarantee of confidentiality.

**Table 18**

**Estimated frequencies of alleged instances of firearm self-defense of dubious legality**

|  | Alleged instances of firearm self-defense | Excess over NCVS | Proportion of alleged instances that are of dubious legality |
|---|---|---|---|
| Survey: |  |  |  |
| NCVS | 70,000 | 0 | 0.0% |
| Mininum in 11 other studies, summarized in Kleck and Gertz (1995, table 1) | 700,000 | 630,000 | 90.0% |
| Kleck and Gertz (1995. table 2) | 2,500,000 | 2,430,000 | 97.2% |

Note:   Values in the first column are convenient approximations, based on the underlying estimates reported by Kleck and Gertz (1995).

Table 18 illustrates these comparisons. The NCVS reported approximately 70,000 alleged instances of firearm during the period addressed by Kleck and Gertz. The minimum number of

alleged instances of firearm self-defense reported by the 11 surveys summarized by Kleck and Gertz (1995, table 1), is approximately 700,000.

Therefore, according to the argument in Kleck and Gertz, at least 630,000 of the alleged instances reported in these surveys were of sufficiently dubious legality that they would not have been reported to the NCVS. These represent at least 90.0% of the alleged instances reported to these surveys.

Kleck and Gertz (1995, table 2), report as many as approximately 2,500,000 alleged instances of firearm self-defense. This implies that approximately 2,430,000 instances were of sufficiently dubious legality that they would not have been reported to the NCVS. These represent approximately 97.2% of the alleged instances reported to these surveys. Kleck and Gertz concur: "that virtually none of the victims who use guns defensively tell interviewers about it in the NCVS. Our estimates imply that only 3% of DGUs among NCVS Rs are reported to interviewers."

Moreover, Kleck and Gertz (1995) suspect that even among those alleged instances of firearm self-defense that are reported to the NCVS, a large proportion may themselves be illegal. They observe that "88% of the violent crimes which [respondents] reported to NCVS interviewers in 1992 were committed away from the victim's home, i.e., in a location where it would ordinarily be a crime for the victim to even possess a gun, never mind use it defensively." (Kleck and Gertz, 1995, 156). For this reason, they conclude that respondents "usually could not mention their defensive use of a gun without, in effect, confessing to a crime to a federal government employee." (Kleck and Gertz,1995, 156).

**Table 19**

**Estimated frequencies of alleged instances of firearm self-defense
of dubious legality if half of NCVS reports are of dubious legality**

| | Alleged instances of firearm self-defense | Alleged instances that are of dubious legality | Proportion of alleged instances that are of dubious legality |
|---|---|---|---|
| Survey: | | | |
| NCVS | 70,000 | 35,000 | 50.0% |
| Mininum in 11 other studies, summarized in Kleck and Gertz (1995, table 1) | 700,000 | 665,000 | 95.0% |
| Kleck and Gertz (1995. table 2) | 2,500,000 | 2,465,000 | 98.6% |

Note:   Values in the first column are convenient approximations, based on the
underlying estimates reported by Kleck and Gertz (1995).

Table 19 illustrates the possible implications. It assumes, as an example, that only 50% of the alleged instances reported to the NCVS were of dubious legality. This implies that an additional 35,000 of the alleged instances reported to the other surveys, including that of Kleck and Gertz (1995), were of dubious legality. The consequence is that, if the true number of alleged instances were 700,000, 95.0% would be of dubious legality. If, instead, it were Kleck and Gertz' (1995) estimate of 2,500,000, 98.6% would be of dubious legality.

Kleck and Gertz (1995, 169) assert that "(t)he estimates in table 2 are at best only rough approximations, which are probably too low." If so, then the alleged instances of firearm self-defense that were concealed from their survey were presumably those whose legality was most suspect. If they were also reported, the proportion of instances in which purported victims committed criminal acts would be even higher. Kleck and Gertz (1995, 173) acknowledge this bias: "our DGUs would look more consistently 'legitimate' than the entire set of all DGUs actually are".

Similarly, if a greater proportion of the alleged instances reported to the NCVS were themselves of dubious legality, the proportions of instances reported to the other surveys that were of dubious legality would increase. At the extreme, if all of the 88% of NCVS instances that,

according to Kleck and Gertz (1995, 156), took place away from the respondents home were of dubious legality, the proportions of instances that were of dubious legality in all of the other surveys would be 99% or above.

In sum, the estimate of approximately 2.5 million annual alleged instances of firearm self-defense (Kleck and Gertz, table 2) implies that 1.3% of all adults participated in an alleged instance. Kleck and Gertz (1995) estimated that at least 97% of all alleged instances of firearm self-defense entailed acts whose legality was sufficiently questionable that the individuals performing those acts refused to disclose them to an explicitly confidential government survey. Therefore, while 1.3% of all adults may have defended themselves with firearms in the course of a year, fewer than .04%, and perhaps not many more than .01%, could have been comfortable that they themselves had not committed a criminal act.

### II.D.3   Self-reported victims in acts of firearm self-defense may also be aggressors

Those who report victimization in alleged instances of firearm self-defense may also be aggressors in other instances. Jennings, Piquero and Reingle[42] review the scholarly literature that investigates the relationship between victimization and offending. They (22) identify "a consistent relationship between victimization and offending and between victims and offenders". Offenders in an earlier incident are more likely to be victims in a subsequent incident. Victims in an earlier incident are more likely to be offenders in a subsequent incident than would be individuals who have not previously been involved in an incident in either role.

Jennings, Piquero and Reingle also assert that "(t)he recognition that there is a consistent relationship between victimization and offending ... is not a recent phenomenon, as research identifying the existence of a high-risk group that experiences both victimization and offending dates back to the middle of the 20th century." They cite Patterns in Criminal Homicide, by M. E. Wolfgang (University of Pennsylvania Press, 1958) as an early contribution.[43]

---

[42] Wesley G. Jennings, Alex R. Piquero and Jennifer M. Reingle, "On the overlap between victimization and offending: A review of the literature", in Aggression and Violent Behavior, Volume 17, 2012, pages 16-26.

[43] A precursor, of historical if not of contemporary scholarly interest, is Hans von Hentig (1940). "Remarks on the interaction of perpetrator and victim", in The Journal of Criminal Law and Criminology, Volume 31, Number 3, September-October, 1940, pages 303-309.  He speculates (309): "Are we permitted to say that in some cases criminality is a self-consuming process of antisocial elements in which criminals prey on criminaloids"?

Entorf[44] (2013, 3) presents an evaluation of the literature regarding the interactions between offending and victimization that is in agreement with that of Jennings, Piquero and Reingle (2012). In particular, he concludes that "(o)ffenders are more likely than non-offenders to be victims".

Entorf's own analysis (2013, 21) suggests that "we can conclude that there is a recursive system of victimization and offending equations, with victimization depending on offending but not vice versa." English (2022, 11) acknowledges that "a majority of gun owners who have used a firearm to defend themselves have done so on more than one occasion."[45] According to Entorf, these respondents may have been aggressive participants in this recursive system on occasions not interrogated by English..

Finally, Entorf (2013, 21) concludes that "(f)irst and foremost, offending turns out as one of the most important covariates of victimization." In other words, there is a substantial likelihood that individuals reporting themselves to have been victims in a threatening or violent incident would have previously been involved in other incidents in which they were aggressors.


## II.E    Summary

This section demonstrates that home invasions in the State of Colorado are rare. Home invasions by armed perpetrators are rarer still. Victims of home invasions rarely defend themselves with firearms. When LCM ownership was unrestricted, these accessories were hardly ever deployed in home self-defense. There is no evidence to suggest that LCMs have had any practical role in self-defense in this State.

Moreover, self-defense cannot be endorsed unconditionally. The individual impulse to self-defend imposes non-negative pecuniary externalities on the rest of society. It puts the targets of self-defense at the mercy of self-interested assessments of risk. It puts others at the mercy of inaccurate discharges. In the absence of regulation, these externalities will constitute a substantial economic inefficiency.

---

[44] Horst Entorf, <u>Criminal Victims, Victimized Criminals, or Both? A Deeper Look at the Victim-Offender Overlap</u>, IZA Working Paper No. 7686, October, 2013.

[45] The evidence is Kleck and Gertz (1995, 166) is also consistent with the victimization phase of this recursive system: "our evidence indicates that repeat experiences were not uncommon, with 29.5% of DGU-involved households reporting more than one DGU within the previous five years." Kleck and Gertz also do not interrogate their respondents as to their participation in the aggressor phase of this system

Furthermore, individual self-interest will amplify perceptions of risk. It will also encourage the representation of aggression as self-defense. Consequently, self-reports will exaggerate the number of situations that require self-defensive responses.

Surveys that attempt to count instances of self-defense are contaminated by these distortions. At least some self-reported instances of self-defense will be disproportionate to the risk encountered. Many, if not most, self-reported instances of firearm self-defense will be, themselves, illegal acts. At least some of the alleged victims will, themselves, have criminal records.

Consequently, counts of self-reported instances of firearm self-defense will overstate the numbers of instances of self-defense that are legitimate contributions to the well-being of society. Those instances that do not should be discouraged, rather than encouraged, by regulation if society is to attain an efficient level of self-defense.

### III.    LCMs AND PUBLIC SAFETY

Private ownership of LCMs makes no contribution to public safety in Colorado. Law enforcement officers can legally possess LCMs. However, law enforcement officers rarely use these accessories. Sheriffs in Colorado rarely require the assistance of civilians. Citizens who provide such assistance never need LCMs.

There is no evidence to support the assertion that LCMs enable more effective self-defense. However, LCMs enhance the capacity for assault. Consequently, increased availability of LCMs is likely to impair public safety.

### III.A.    C.R.S. § 18-12-302 allows public safety officers to possess LCMs

C.R.S. § 18-12-302 declares that "except as otherwise provided in this section, on and after July 1, 2013, a person who sells, transfers, or possesses a large-capacity magazine commits a class 2 misdemeanor." Among the exceptions are "an employee of any of the following agencies who bears a firearm in the course of his or her official duties: (I) a branch of the armed forces of the United States; of (II) a Department, Agency, or political subdivision of the State of Colorado, or of any other State, or of the United States government".

This bill restricts the rights of civilians to own LCMs. However, it explicitly preserves the rights of law enforcement personnel to possess LCMs.

Consequently, this bill unambiguously provides law enforcement officers with an advantage in firearm firepower. They may continue to use high-capacity magazines, but private citizens with

whom they might have an adversarial interaction will be less likely to possess them. This advantage unambiguously increases public safety.


### III.B.    Law enforcement officers rarely require LCMs[46]

At the same time, available evidence indicates that law enforcement officials almost never require large-capacity magazines. For example, in 2011 the New York City Police Department employed 33,497 officers for the purposes of ensuring the safety of 8,244,910 residents. During that year, members of the Department discharged firearms in only 36 incidents.[47]

In other words, approximately one in one thousand New York City Police officers was involved in an incident of firearm discharge in 2011. These incidents occurred at a rate of slightly more than four per million population served.

Moreover, in 32 of these incidents police fired fewer than 16 rounds. Three officers, or approximately one in ten thousand officers, had the experience of firing 16 rounds. No officer fired more than 16 rounds.

The experience of New York City police in 2011 was typical. In 2010, officers of the New York City Police Department were involved in 33 incidents of gun fire. Discharges exceeded 15 rounds in only four of those incidents. As in 2011, only three officers fired 16 rounds and no officer fired more.[48]

Similarly, in 2009, officers of the New York City Police Department were involved in 47 incidents of gun fire. Discharges exceeded 15 in only two of those incidents. Only one officer fired eight rounds, and no officer fired more.[49]

Documented experiences in other jurisdictions are consistent with those of the New York City Police. In 2012, policemen in Milwaukee were involved in only nine incidents requiring the

---

[46] This section is adapted from "Expert Report of Jeffrey Zax, Ph.D." and "Supplemental Report of Jeffrey S. Zax", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300

[47] All statistics in this paragraph and the next three paragraphs are from New York City Police Department, Annual Firearms Discharge Report 2011, 2012.

[48] New York City Police Department, Annual Firearms Discharge Report 2010, 2011.

[49] New York City Police Department, Annual Firearms Discharge Report 2009, 2010.

discharge of firearms. They fired 33 rounds in total. Only two policemen fired more than six rounds.[50]

In 2010, officers of the Los Angeles Police Department were involved in only 40 "incidents of deliberate discharge against a human offender."  The average annual number of such incidents in 2007-2009 was 43.[51] Police in San Diego engaged in 25 such incidents during the period of 2003-2005.[52] Police in Albuquerque engaged in 37 such incidents during the period 2006-2010.[53]

In sum, officers of the New York City Police Department would have exhausted the capacity of Colorado-compliant magazines in only six instances over three years. Officers in Milwaukee may not have reached that limit at all in 2012.

The numbers of incidents in which police deliberately discharged their firearms were commensurate in Los Angeles, San Diego and Albuquerque, Even if incidents in these cities involved more discharges, the overall frequency with which police would have required the capacity of large-capacity magazines would still have been negligible.

Available evidence regarding firearm discharges by law enforcement officers in Colorado is consistent with the experiences in these cities. The second of the Defendant's Interrogatories in *Cooke, et al. v. Hickenlooper* requests details "(w)ith respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training)". Plaintiff Sheriffs reported only 62 such occasions involving people, across 54 counties and nearly 10 years.[54]

---

[50] These statistics are from Milwaukee Fire and Police Commission, <u>2012 Report on Milwaukee Police Department Firearms Discharges</u>, 29 April 2013. This source does not report the maximum number of discharges.

[51] Los Angeles Police Department, <u>2010 Use of Force Annual Report</u>, undated.

[52] OIR Group, <u>Use of Force Audit of the San Diego County Sheriff's Department: Executive Summary</u>, 25 June 2007.

[53] Police Executive Research Forum, Review of Use of Force in the Albuquerque Police Department, 23 June 2011, Washington, D.C.

[54] There were, apparently, a greater number of occasions in which Sheriff staff discharged firearms in interactions with animals. However, Plaintiff Sheriffs' responses do not provide exact counts. Plaintiff Sheriffs' responses do not consistently identify the sizes of the magazines employed in instances of discharge.

These occasions correspond to 1.68 instances per million people per year. The average number of occasions in which an official of the Plaintiff Sheriffs' discharged a firearm was approximately as many as the numbers of home invasions in which either perpetrators or victims discharged firearms, as reported in Section II.A.

### III.C.    Law enforcement rarely requires assistance from civilians with LCMs[55]

Civilians in Colorado can be asked to assist law enforcement officers. The Defendant's Interrogatories in *Cooke et al. v. Hickenlooper* requested information regarding the character and extent of such assistance. The responses from Plaintiff Sheriffs demonstrate that civilians offering such assistance would never need LCMs.

The third of the Defendant's Interrogatories in *Cooke et al. v. Hickenlooper* requested that Plaintiff Sheriffs "describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ('posse comitatus')". Forty-one Plaintiff Sheriffs reported no instances of such requests.

Ten Plaintiff Sheriffs attested to the existence of volunteer "posses", apparently standing, within their jurisdictions. In all ten counties, posse responsibilities appear to have been restricted to security at public events, traffic control, search-and-rescue, crowd control and similar activities.

It was apparently common for posse members to carry firearms. However, there were no reported incidents in which members of these posses discharged their firearms. Consequently, there were no situations in which posse members required the equivalent of the contents of an LCM.

Three Sheriff Plaintiffs reported single incidents in which armed citizens were recruited for the purpose of responding to unlawful and potentially violent activity. The Jackson County Sheriff reported a single incident in 2003 or 2004 in which an armed posse was formed in response to an instance where an inmate escaped from jail. There is no record of firearm use by this posse.

The Rio Blanco County Sheriff reported a single incident in September 2003 in which two armed citizens were enlisted in a search for two car thieves. Neither citizen discharged any firearms.

Finally, the Hinsdale County Sheriff reported a single incident, in November 1994, in which an armed citizen was recruited for assistance in a dangerous traffic stop. In that incident, described in Section II.B.2., the citizen discharged 17 rounds.

---

[55] This section is adapted from "Expert Report of Jeffrey Zax, Ph.D." and "Supplemental Report of Jeffrey S. Zax", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300

In sum, in the 54 reporting counties over a period of 40 years, there was only one confirmed instance in which a private citizen discharged a firearm in response to a request for assistance from sheriffs' personnel. In that instance, the citizen discharged two more rounds than would be available in a magazine that was compliant with C.R.S. § 18-12-302.

The fourth of the Defendant's Interrogatories requested that Plaintiff Sheriffs "describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers". Seventeen Plaintiff Sheriffs reported no such instances. Four Plaintiff Sheriffs reported the appointment of non-certified peace officers who were forbidden to carry firearms.

Four Plaintiff Sheriffs reported that they appointed non-certified peace officers but were unclear as to whether these individuals carried firearms. Twenty-nine Plaintiff Sheriffs reported the appointment of non-certified peace officers who were either allowed or required to carry firearms.

The 54 Responses did not report any instances in which non-certified peace officers discharged firearms in the course of their duties. Therefore, there was no indication in these Responses that LCMs were necessary or even helpful in the execution of these duties.

The sixth of the Defendant's Interrogatories requested that Plaintiff Sheriffs "describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters". None of the Plaintiff Sheriffs reported instances of this sort.[56]

Several sheriffs reported the use of citizen assistance in emergencies and natural disasters and observed that citizens who offered assistance may have been armed. However, in no case did sheriffs specifically request or require that assisting citizens be armed. Plaintiff Sheriffs did not report any instances in which firearms were displayed, used or discharged. Therefore, there is no evidence to suggest that citizen responses to request for assistance during emergencies and natural disasters would be impeded by the restrictions on the possession of LCMs.

The evidence provided by the Plaintiff Sheriffs confirms that civilians in Colorado occasionally assist in law enforcement. They occasionally carry firearms when they do so. However, this evidence demonstrates that civilians in Colorado never need LCMs in order to provide this assistance.

---

[56] The Sheriff of Logan County did not respond to this question.

### III.D.    Civilians do not need LCMs for self-defense

Law enforcement agents presumably encounter threats to their physical well-being that are more intense and frequent than do civilians. Yet the evidence demonstrates that they rarely, if ever, require the discharge capacities provided by LCMs. Therefore, civilians should require these capacities even less frequently.[57]

The meager direct evidence regarding the number of shots fired in self-defense is consistent with this inference. The "Armed Citizen" column of the National Rifle Association (NRA) Journal reports individual instances of self-defense. Werner[58] analyzed all such reports for 1997 through 2001. In the resulting 482 instances of self-defense, the modal number of shots fired was one. The median and average number of shots fired were, respectively, two and 2.2

Allen[59] replicated this analysis for the period 2011-2017, with almost identical results. In the 736 reported incidents, the average number of shots fired was 2.2. In sum, the typical instance of self-defense reported by the NRA involved the discharge of fewer than one-fifth of the rounds available in a HB13-1224-compliant magazine.

Moreover, these reports were neither a population nor a random sample. To the extent that they were chosen deliberately, the intent was probably to report the most dramatic incidents.

This would probably bias the results toward more violent crimes and more extensive efforts at self-defense. To the extent that this is the case, the analyses of Werner and Allen overstate the number of rounds typically discharged in an incident of self-defense.

Therefore, the typical number of rounds discharged during an incident of legitimate self-defense is likely to be less than the capacity of a firearm that is not equipped with an LCM. It is almost surely far less than the capacity of a firearm that is equipped with an LCM.

What little is known about the pattern of LCM evidence is consistent with the conclusion that LCMs are not necessary for self-defense. According to English (2022), LCM ownership is heavily

---

[57] This section is adapted from "Expert Report of Jeffrey Zax, Ph.D.", submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300

[58] Claude Werner, "Analysis of five years of armed encounters", 1 August 2013.

[59] Allen, Lucy P., Declaration of Lucy P. Allen in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, C. A. No. 1:22-cv-00951-RGA (Consolidated), United States District Court for the District of Delaware.

concentrated. Among adults in the United States, 84.4% have never owned an LCM. The few who have owned LCMs possess, on average, approximately 10.[60]

These tabulations demonstrate that most American adults have never identified a need for an LCM, whether self-defense or otherwise. Among the small segment of American adults who have acquired LCMs, the numbers of LCMs that they typically possess are far in excess of the numbers that would ordinarily be useful in an instance of legitimate firearm-assisted self-defense.

### III.E.    Summary

LCMs are legally available to law enforcement officers in the State of Colorado. Consequently, law enforcement officers are able to utilize them in order to maintain public safety.

However, law enforcement officers rarely discharge weapons. When they do, the number of discharges is almost always far fewer than the capacity of an LCM.

Law enforcement in Colorado only occasionally requires the assistance of civilians. When it does, those civilians are often unarmed.

There is no indication that civilians who are assisting law enforcement have ever been required to equip themselves with LCMs. In those instances where these civilians have been armed, they have almost never discharged their weapons. There is only one recorded instance in which a civilian assisting law enforcement discharged more than 15 rounds.

Civilian firearm discharges in reported instances self-defense almost never require more than a few rounds. Almost all reported acts of self-defense could be accomplished without the discharge capacity of LCMs.

In sum, civilians do not need LCMs in order to assist law enforcement officers for the purpose of maintaining either public safety or private safety. However, civilian access to LCMs is associated with substantial threats to both.

### IV.    THE COST OF **LCM** VIOLENCE IS HIGH

The economic costs of firearm violence in the United States are substantial. Some of these costs are direct. They begin with the medical costs associated with immediate treatments for those

---

[60] This average excludes the holdings of .2% of adults, who report the ownership of more than 100 LCMs (English, 2022, 23).

suffering injuries from firearm discharges. They continue with the costs of ongoing medical and mental health treatments for those who survive. These costs also include the mental health treatments that may be required both by those who are injured and by members of their families and communities.

Additionally, firearm violence imposes implicit, or opportunity costs. The most visible of these costs occur in the labor market. They include lost earnings from premature death or while injured, lost earnings capacity if survivors suffer any physical or mental disability, and productivity lost to employers. Opportunity costs also include the loss of capacity in any activity of private life.

Finally, firearm violence may impair the qualities of life for all affected parties. In addition to direct harms to the qualities of life for victims, their families and their communities, "the threat of gun violence reduces the quality of life for all Americans by engendering concerns about safety, raising taxes, and limiting choices about where to live, work, travel, and attend school."[61]

"Quality of life" is not a commodity. Therefore, it does not have a market-established "price". Nevertheless, it has an important value. That value may be difficult to estimate precisely, but the extent to which it is diminished by firearm violence is probably large.

Incidents in which shooters deploy LCMs contribute disproportionately to all forms of these costs. The numbers of rounds fired and the numbers of individuals injured in these incidents  are typically greater than in incidents in which LCMs are not deployed. Therefore, the direct medical and mental health costs associated with incidents in which LCMs are employed are also high.

Incidents in which shooters deploy LCMs also occupy a prominent position in public awareness. They provoke a widespread sense of vulnerability. Consequently, the implicit costs of individual, family and community trauma associated with these incidents are especially high.


## IV.A.   The cost of firearm violence is high

The externality of firearm violence imposes substantial costs on the American economy. These costs, in aggregate, are large relative to the size of that economy. Individually, they can exceed available resources and recur for multiple years.

Thorough estimates of the costs of firearm violence at any level of aggregation must account for the intangible costs associated with the loss of life, the significant loss of life functions, the increase in physical and mental health costs, and the value of emotional suffering. Estimates

---

[61] Philip J. Cook and Jens Ludwig, "The costs of gun violence against children", The Future of Children, Vol. 12, Issue 2, Summer, 2002, pages 86-99.

that account for all of these costs are difficult to construct. The techniques available to do so differ for individuals and for the economy as a whole.

Economy-wide estimates of the costs of firearm-related violence rely on generic estimates of the willingness-to-pay for safety across the entire population and of the value of an anonymous life. In contrast, each individual can be associated with the specific harms that they have suffered from their personal experience of firearm-related violence. In principle, a monetary cost can be imputed to each of these harms, and combined to assess the total burden that each affected individual bears.

IV.A.1   Total costs to the economy

Firearm violence imposes many tangible and intangible costs on the economy. Estimates of these costs vary because of differences in data, chronology and technique. However, all estimates agree that these costs are substantial.

The cost of medical treatment required by victims of firearm-related violence is one example of these tangible costs. One estimate of the annual "cost of initial hospitalization for firearm-related injuries" over the period from 2006 through 2014 was $735 million.[62] This estimate did not include the costs associated with patients who were treated for firearm-related injuries in emergency departments but who were not admitted to a hospital, or readmission costs for those who had to return to a hospital.

A second estimate valued expenses for initial emergency department and inpatient care for those injured or killed in firearm-related incidents at slightly more than $1 billion in each of 2016 and 2017.[63] This estimate did not include "the costs of physicians providing hospital care".

---

[62] Sarabeth A. Spitzer, Kristan L. Staudenmayer, Lakshika Tennakoon, David A. Spain, and Thomas G. Weiser, "Hospitalizations for firearm injuries in the United States, 2006-2014", American Journal of Public Health, Vol. 107, No. 5, May, 2017, pages 770-774.

[63] Firearm Injuries: Health Care Service Needs and Costs, United States Government Accountability Office Report to Congressional Requesters, June, 2021.

The most comprehensive estimates all assess the direct costs of medical care at approximately $2.8 billion per year. These estimates apply to 2006 through 2014[64], 2010[65], and 2019[66].

Another example of the tangible costs imposed on American society by firearm-related violence is the burden this violence places on law enforcement and the legal system. This burden appears be greater than that on the medical system.

An estimate of the police and criminal justice costs associated with firearm injury in 2010 was $4.9 billion.[67] An estimate of the cost of police responses and investigations, court administration staff and processes, and incarceration associated with firearm-related injuries in 2019 was $11.0 billion.[68] The cost of "processing the 'extra' murder cases resulting from the higher fatality rate in gun assaults is approximately $2.4 billion per year".[69]

Together, the additional costs of providing medical care and of engaging public safety and criminal justice constitute most of the direct, tangible costs of firearm-related violence. An estimate for the total of these costs in 2010 was $8.4 billion.[70] In 2019, it was $14.4 billion.[71]

As high as these tangible costs are, the intangible costs of firearm-related violence are much greater. The most familiar among them are the wages and productivity that are forgone because those injured in this violence are not able to regain their pre-injury productivity at work. An

---

[64] Faiz Gani, Joseph V. Sakran and Joseph K. Canner, "Emergency department visits for firearm-related injuries in the United States, 2006-14", Health Affairs, Vol. 36, No. 19, 2017, pages 1729-1738.

[65] Children's Safety Network, National Injury and Violence Prevention Resource Center, The Cost of Gun Violence, https://www.childrenssafetynetwork.org/sites/default/files/TheCostofGunViolence.pdf.

[66] Everytown for Gun Safety, The Economic Cost of Gun Violence, 19 July 2022.

[67] Children's Safety Network, ibid.

[68] Everytown for Gun Safety, ibid.

[69] Cook and Ludwig, ibid.

[70] Children's Safety Network, ibid.

[71] Everytown for Gun Safety, Methodologial Note for the Economic Cost of Gun Violence, 19 July 2022.

estimate of these losses for 2010 was $52.5 billion.[72] An estimate for the losses in 2019 was $54.3 billion.[73]

In 2010, the estimated total of direct costs of firearm-related violence and the forgone wages and productivity was $60.8 billion. This represented $578,473 for each of the 105,177 individuals killed or wounded by firearm-related violence.[74]

This estimate is of roughly the same magnitude as an analogous estimate for 2013. Approximately 41,000 firearm-related deaths occurred in that year. The estimated "combined medical and work-loss costs" associated with all firearm-related deaths were approximately $44.1 billion.[75] The estimated costs associated with all firearm-related injuries were approximately an additional $1.7 billion.[76]  The total was, therefore, $45.8 billion.

Estimated direct costs, foregone wages and foregone productivity associated with firearm-related violence in 2019 were $67.7 billion. This represents $588,696 in costs for each of the approximately 115,000 individuals who were injured or killed by firearms in that year.[77]

As large as medical and work-loss costs have been, the intangible opportunity costs associated with lives lost to firearm-related fatalities and quality of life lost to firearm-related injuries has been much larger. Two procedures are available for estimating these costs. Contingent Valuation (CV) queries individuals directly about the value that they would place on these losses for the purpose of estimating the aggregate willingness-to-pay (WTP). The Value of a Statistical Life (VSL) infers the value assigned to changes in mortality risks from observable market transactions.

---

[72] Children's Safety Network, ibid.

[73] Everytown for Gun Safety, ibid.

[74] Children's Safety Network, ibid.

[75] Curtis Florence, Thomas Simon, Tamara Haegerich, Feijun Luo, and Chao Zhou, "Estimated lifetime medical and work-loss costs of fatal injuries – United States, 2013", Morbidity and Mortality Weekly Report, Vol. 63, No. 38, 2015, pages 1o74-1077.

[76] Curtis Florence, Tamara Haegerich, Thomas Simon, Chao Zhou, and Feijun Luo, "Estimated lifetime medical and work-loss costs emergency department-treated non fatal injuries – United States, 2013", Mordity and Mortality Weekly Report, Vol. 63, No. 38, 2015, pages 1078-1082.

[77] Everytown for Gun Safety, ibid.

CV infers values for goods or experiences that are not ordinarily exchanged in the market. It does so by asking people to estimate the value that they would place on these goods or services in hypothetical transactions.[78] In 1998, Cook and Ludwig employed this procedure to estimate the value of gun safety.

Cook and Ludwig surveyed a nationally representative sample of 1,200 American adults. Each respondent was asked whether they would be willing to increase their own taxes in order to reduce gun injuries by 30%. The sample was split into thirds, each of which was asked to consider a different tax increase.

Four hundred respondents were asked if they would be willing to pay an additional $50 in taxes for this purpose. Of them, 75.8% agreed. Four hundred respondents were asked if they would be willing to pay an additional $100 in taxes, to which 68.5% agreed. Finally, 400 respondents were asked if they would be willing to pay an additional $200 in taxes, to which 63.6% agreed.

These responses, extrapolated statistically so as to apply to the entire population, imply that "the average American household would pay $239 more per year in taxes to fund such a program." Therefore, the collective WTP for a 30% reduction in firearm-related injuries would be approximately $24.5 billion. This implies a collective value on all of firearm-related injuries of approximately $82 billion.

With the addition of direct costs, Cook and Ludwig estimated that "(t)he total costs of gun violence to society are approximately $100 billion per year".[79] This was probably an underestimate, for two reasons. First, the survey question did not inquire about WTP for reductions in firearms-related fatalities. Second, respondents might have hoped that other taxpayers would agree to pay for this program, and so understated their own WTP. Nevertheless, this estimated loss was approximately 1.1% of GDP in that year.

The VSL procedure begins by observing the values of expenditures that are associated with changes in safety.[80] These values can be observed, for example, in the increased compensation that workers require in return for performing more dangerous jobs. They can also be observed in the expenditures that people are willing to incur in order to acquire safety equipment.

---

[78] Cook and Ludwig, ibid. provide a brief introduction. "Contingent valuation", by Richard T. Carson and W. Michael Hanemann, in the Handbook of Environmental Economics, Vol. 2, edited by K.-G. Maier and J.R. Vincent, Elsevier, offers a more thorough explanation.

[79] Cook and Ludwig, ibid.

[80] Section 3.2, "Valuing mortality risk reductions", in  Guidelines for Regulatory Impact Analysis, 2016, Office of the Assistant Secretary for Planning and Evaluation, Department of Health & Human Services, offers a more thorough explanation. See also Cook and Ludwig, ibid.

The VSL calculation then extrapolates this value in order to estimate the value that would be experienced to the definitive preservation of life. This calculation yields a range of values, depending on the risks upon which it is based.

For the year 2019, Guidlines for Regulatory Impact Analysis, 2016 identifies the low end of this range, the "Low VSL estimate", as $4.7 million per life. The "High VSL Estimate" is $15.2 million. The "Central VSL estimate" for this year is $10.0 million.

The central VSL estimate allows for a simple estimate of the cost of firearm-related deaths in the United States. There were 39,740 recorded deaths associated with the use of firearms in 2018, 39,707 in 2019, 45,222 in 2020 and 48,830 in 2021.[81] At $10 million for each life, these lost lives alone imposed an annual cost on the American economy of between just less than $400 billion to nearly $500 billion.

The Economic Cost of Gun Violence presents a more sophisticated calculation. It removes the estimated losses associated with the loss of work compensation and productivity, because they have been accounted for separately. It also places a value on the losses suffered by those who were injured in firearm-related incidents.

With these adjustments, Everytown for Gun Safety estimates that the loss in quality of life associated with firearm-related injuries and deaths in 2019 would have been approximately $489 billion. Together with the direct and other opportunity costs, the total cost of firearm-related injuries and death to the economy was approximately$557 billion. This represents 2.6% of Gross Domestic Product (GDP).

Children's Safety Network assigns a value to the lost quality of life associated with firearm-related violence in 2010. That value is $113.3 billion. Together with the other costs that it estimates, this yields a total estimated cost of firearm-related gun violence of $174.1 billion. This would have represented approximately 1.2% of GDP in that year. This is substantial, though noticeably less than the estimate of Everytown for Gun Safety.

However, Children's Safety Network does not identify the methodology that it used to construct its estimates. It assigns a value of $98.0 billion to the quality of life lost for the 31,672 firearm-related fatalities in 2010. This implies a VSL of only approximately $3.1 million.

---

[81] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 2018-2021 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 2018-2021, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10-expanded.html on Mar 23, 2023 1:46:14 AM

At the more conventional VSL value of $10 million per lost life, these fatalities alone would impose a loss of $316.7 billion, or 2.1% of GDP in 2010. This suggests that the discrepancy between the Everytown for Gun Safety estimate of annual total costs associated with firearm-related violence and that of the Children's Safety Network may be explained by the choice of an unusually low VSL by the latter.

Despite their magnitudes, all of these estimates almost surely understate the true cost of firearm-related violence. They do not account for the costs of precautionary actions taken for the purpose of avoiding exposure. They ignore the psychological burden that firearm-related violence, and, in particular, LCM-related violence, imposes on the population at large. These costs are borne even by individuals who have not, themselves, participated in instances of firearms-related violence.

IV.A.2.  Costs to victims

Individuals who have survived firearms-related violence experience a wide range of physical and mental harms in the first year following their injuries. Initial evidence suggests that these harms can continue to impair the lives of victims for six years or more.

Post-Traumatic Stress Disorder (PTSD) is a common consequence of victimization in firearm-related violence. Of 100,704 individuals who were treated in hospitals for firearm related injuries, approximately 6.7% were readmitted into hospitals within six months of the injury with symptoms of PTSD.[82] Of 63 victims of moderate-to-severe firearm injuries, interviewed six to 12 months following the shooting, half screened positive for PTSD. They were significantly more likely to do so than were 255 matched survivors of motor vehicle crash survivors with similar physical injuries.[83]

Victims of firearm-related violence suffer from many other harms. Among the 100,704 individuals who were treated in hospitals for firearm related injuries, another 6.7% were readmitted into hospitals within six months of the injury with symptoms other than PTSD.[84]

---

[82] Bellal Joseph, Kamil Hanna, Rachael A. Callcut, Jamie J. Coleman, Joseph V. Sakran, and Leigh A. Neumayer, "The hidden burden of mental health outcomes following firearm-related injuries", Annals of Surgery, Vol. 270, No. 4, October, 2019, pages 593-599.

[83] Juan Pablo Herrera-Escobar, Elzerie de Jager, Justin Conrad McCarty, Stuart Lipsitz, Adil H. Haider, Ali Salim, and Deepika Nehra, "Patient-reported outcomes at 6 to 12 months among survivors of firearm injury in the United States", Annals of Surgery, Vol. 274, No. 6, December, pages e1247-e1251.

[84] Joseph, et al., ibid.

A study of 2,178 youths who had survived firearm wounds demonstrated that one-quarter displayed new mental health disorders in the year following injury. "The most common new diagnosis categories were trauma disorders, substance abuse, and disruptive disorders."[85]

Often, victims suffer from multiple harms. Of the 63 victims of moderate-to-severe firearm injuries, two-thirds reported daily pain, nearly 60% had not returned to work, and almost 40% "reported a new functional limitation in an activity of daily living". They were significantly more likely to experience daily pain and have "significantly worse physical and mental health-related quality of life" than were the 255 matched survivors of motor vehicle crash survivors with similar physical injuries.[86]

A comparison of 6,498 survivors of injuries inflicted by firearm violence to 32,490 control participants found that, in the year following injury, survivors had "a 40% increase in pain diagnoses, a 51% increase in psychiatric disorders, and an 85% increase in substance use disorders after firearm injury relative to control participants". These conditions were accompanied by the experience of increased pain and more frequent resort to psychiatric medications.[87]

A study of 531 injury patients found that 20% had clinical levels of one or more of anxiety, depression, PTSD, pain or negative functional outcomes six to 12 months following trauma treatment. These disorders may not only be long-lasting, but self-reinforcing:

> "Beyond the obvious physical manifestations of injury, late and long-term consequences of trauma include impairment in social functioning, psychological disturbances, social isolation, destruction of families, and lack of productivity. This is a complex interplay of effects, as the psychosocial effects of traumatic injury likely negatively influence social reintegration and return to productivity, creating a potentially vicious cycle."[88]

---

[85] Elizabeth R. Oddo, Lizmarie Maldonado, Ashley B. Hink, Annie N. Simpson, and Annie L. Andrews, "Increase in mental health diagnoses among youth with nonfatal firearm injuries", Academic Pediatrics, Vol. 21, No. 7, September-October, 201 pages 1203-1208.

[86] Juan Pablo Herrera-Escobar, Elzerie de Jager, Justin Conrad McCarty, Stuart Lipsitz, Adil H. Haider, Ali Salim, and Deepika Nehra, ibid.

[87] Zirui Song, Jose Zubizarreta, Mia Giuriato, Erica Paulos, and Katherine Koh, "Changes in health care spending, use, and clinical outcomes after nonfatal firearm injuries among survivors and family members", Annals of Internal Medicine, Vol. 175, No. 6, June 2022, pages 795-803.

[88] Juan P. Herrera-Escobar, Anupamaa J. Seshadri, Ewelina Stanek, Kaye Lu, Kelsey Han, Sabrina Sanchez, Haytham M. A. Kaafarani, Ali Salim, Nomi C. Levy-Carrick, and Deepika Nehra,

Consequently, the costs of these disorders can accumulate over many years. They will almost surely exceed the estimates that can be derived from studies of short-term effects.

This expectation is supported by a study of 183 young adults who had survived firearm wounds for, typically, six years. It revealed that these victims experienced consistently diminished global physical health and global mental health. Nearly half "had a positive screen for probable PTSD". These results "suggest that the lasting effects of firearm injury reach far beyond mortality and economic burden. Survivors of GSWs [gun shot wounds] may have negative outcomes for years after injury."[89]

A comprehensive review of the medical research addressing survivors of firearm injuries concluded that "(m)ost studies reported worse long-term outcomes for firearm injury survivors when compared both to similarly injured motor vehicle collision survivors and to the United States general population". Up to a quarter of survivors were readmitted to hospital within six months of injury. Over the same time span, more than half of survivors exhibited symptoms of PTSD. "Studies also reported high rates of reduced mental health composite scores, lower employment and return to work rates, poor social functioning, increased alcohol and substance abuse."[90]

Only one of these studies reports explicit economic costs. Song, et al. report that survivors of firearm injuries inflicted from 2008 through 2018 experienced increased spending on medical care of approximately $2,500 per month during the year following injury.[91] In comparison,

---

"Mental health burden after injury: It's about more than just Posttraumatic Stress Disorder", Annals of Surgery, Vol. 274, No. 6, December, 2021, pages. e1162-e1169.

[89] Michael A. Vella, Alexander Warshauer, Gabriella Tortorello, Joseph Fernandez-Moore, Joseph Giaolone, Bofeng Chen, Alexander Cabulong, Kristen Chrelman, Carrie Sims, C. William Schwab, Patrick M. Reilly, Meghan Lane-Fall, and Mark J. Seamon, "Long-term functional, psychological, emotional, and social outcomes in survivors of firearm injuries", JAMA Surgery, Vol. 155, No. 1, 2020, pages 51-59.

[90] Claudia P. Orlas, Arielle Thomas, Juan P. Herrera-Escobar, Michelle A. Price, Adil H. Haider, and Eileen M. Bulger, "Long-term outcomes of firearm injury survivors in the United States: The National Trauma Research Action Plan Scoping Review", Annals of Surgery, Vol. 274, No. 6, December, 2021, pages 962-970.

[91] Song, et al., ibid.

personal monthly income per capita in 2013 was approximately $3,700.[92] The average costs of medical care alone were equivalent to two-thirds of average monthly income.

At the same time, this estimate does not include the many personal costs experienced by these survivors. It does not assign a monetary value to the pain, PTSD, other psychiatric disorders, or substance use disorders that these survivors experienced. Consequently, it must be a substantial underestimate.

In general, research regarding the harms that survivors of firearm violence endure seems to measure these harms only in terms of incidence and duration. In principle, methods such as CV and VSL could be adapted to translate these measures into equivalent monetary values. These translations would almost surely reveal extensive costs.

IV.A.3.  Costs to families

Family members of those who are injured or killed by firearm-related violence may also incur costs. Among those costs would be the loss of financial support from injured relatives and efforts required to support these relatives financially and emotionally. There appear to be no systematic estimates of these costs.

Family members of those who are injured or killed by firearm-related violence may not, themselves, be at heightened risk for increases in direct medical costs. However, they could experience notable risks of confronting mental health challenges. "(E)xposure to assaultive violence, or learning that a close friend or loved one has faced such exposure, is associated with an increased incidence of a range of negative mental health outcomes, among them posttraumatic stress disorder (PTSD) and major depression (MD)"[93]

However, limited evidence is available in this regard. In a comparison of 12,489 family members of survivors of firearm-related violence to 62,445 control participants, family members of survivors experienced increases in psychiatric disorders that were 12% greater than the increases experienced by the control participants.[94]

---

[92] U.S. Bureau of Economic Analysis, Personal income per capita [A792RC0Q052SBEA], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/A792RC0Q052SBEA, March 24, 2023.

[93] Lowe, Sarah R. and Sandra Galea, "The mental health consequences of mass shootings", Trauma, Violence & Abuse, Vol. 18, No. 1, 2017, pages 62-82.

[94] Song, et al., ibid.

IV.A.4.  Costs to communities

Communities in which firearm-related violence takes place can suffer explicit economic losses. As an example, owner-occupied dwelling units in the catchment area for Columbine High School lost 10.1% of their value in the year following the massacre at that school.[95]

As discussed in section IV.B below, fears of firearm-related violence are widespread. They can be exacerbated by actual instances of that violence. These fears may give rise to generalized stress and more specific mental health conditions among the members of victims' communities beyond the victims' families. The costs of bearing and treating any such conditions that arise are also attributable to firearm-related violence.

III.A.5.  Costs in international perspective

Firearm violence occurs throughout the world. However, the level of firearm violence is high in the United States, in comparison to the levels that prevail in other developed countries.

Table 20 presents this comparison. It includes all countries in the Organization for Economic Co-operation and Development (OECD ) with Gross Domestic Product (GDP) per capita in 2016 above $20,000.[96] It presents the age-standardized mortality rate from homicide by firearm per 100,000 capita from the same year.[97]

The risk of firearm-related homicide in the United States was 4.0 per 100,000 population. That risk was much greater than in any other country at similar levels of economic development.

The next highest risk was in Chile, where the firearm-related homicide rate was 1.6 per 100,000 population. This rate was only 40% of that in the U.S. Moreover, GDP per capita in Chile was also only 40% of the American level.

---

[95] Patrick J. Gourley, "Social stigma and asset value", in Three Essays in Applied Microeconometrics, Ph.D. dissertation at the University of Colorado Boulder, 2016.

[96] OECD, https://www.oecd-ilibrary.org/economics/data/oecd-national-accounts-statistics/national-accounts-at-a-glance_data-00369-en. The omitted countries are Columbia, Costa Rica and Mexico.

[97] The Global Burden of Disease 2016 Injury Collaborators, "Global Mortality From Firearms, 1990-2016: Supplement", JAMA, Vol. 320, No. 8, 2018.

The rate of firearm homicides in Canada was .5 per 100,000, or one-eighth of the rate in the United States. If the rate of firearm-related violence in the U.S. was equivalent to that in Canada, the costs of firearm-related violence to the American economy would be much less.

Section IV.A.1 above presented various estimates of these costs in the U.S. The most comprehensive were in a range around one-half trillion dollars. If these costs could have been reduced to one-eighth of their actual level, they would have been in a range around $60 billion instead. This would have represented a savings of over $400 billion.

GDP per capita in the U.S. in 2016 was $57,593. The rates of firearm-related homicide in all other OECD countries with GDP per capita equal to $50,000 or more were .2 per 100,000 or less. These rates were one-twentieth or less of the rate in the U.S.

Consequently, the costs of firearm-related violence in other countries at similar levels of economic development were much less than those in the United States. If the rate of firearm-related violence in the U.S. could have been reduced to the levels observed in Australia, the Netherlands, Sweden or Switzerland, the attendant costs would have been approximately $2.5 billion. If the rate of firearm-related violence in the U.S. could have been reduced to the levels observed in Austria, Denmark, Germany, Iceland or Norway, the attendant costs would have been approximately $1.3 billion. Reductions of this magnitude would have represented savings of approximately one-half of one trillion dollars.

**Table 20**

**Firearm homicide mortality rates in OECD countries, 2016**

| OECD country | Age-standardized mortality rate from homicide by firearm per 100,000 capita, 2016 | GDP per capita, 2016 |
|---|---|---|
| United States | 4.0 | $57,593 |
| Chile | 1.6 | $23,385 |
| Turkiye | 1.3 | $26,696 |
| Israel | 1.0 | $38,220 |
| Canada | 0.5 | $46,472 |
| Lithuania | 0.5 | $30,925 |
| Estonia | 0.4 | $31,310 |
| Greece | 0.4 | $27,512 |
| Italy | 0.4 | $40,267 |
| Latvia | 0.4 | $26,724 |
| Portugal | 0.4 | $31,608 |
| Slovak Republic | 0.4 | $29,738 |
| Belgium | 0.3 | $48,599 |
| France | 0.3 | $42,856 |
| Australia | 0.2 | $50,137 |
| Czech Republic | 0.2 | $36,101 |
| Finland | 0.2 | $44,934 |
| Ireland | 0.2 | $71,633 |
| Luxembourg | 0.2 | $112,955 |
| Netherlands | 0.2 | $52,289 |
| Slovenia | 0.2 | $33,943 |
| Sweden | 0.2 | $50,430 |
| Switzerland | 0.2 | $67,351 |
| Austria | 0.1 | $52,665 |
| Denmark | 0.1 | $51,967 |
| Germany | 0.1 | $50,579 |
| Hungary | 0.1 | $27,942 |
| Iceland | 0.1 | $53,487 |
| New Zealand | 0.1 | $39,697 |
| Norway | 0.1 | $59,263 |
| Poland | 0.1 | $27,831 |
| Spain | 0.1 | $37,333 |
| United Kingdom | 0.1 | $44,231 |
| Japan | 0.0 | $40,643 |
| South Korea | 0.0 | $39,575 |

**IV.B.    Mass shootings are disproportionately costly**

Mass shootings are relatively rare. However, the social cost that they impose is extensive. Apart from the numerous victims, their families, friends and communities experience extensive and long-lasting trauma. In an internet search for "Columbine", nine of the first 11 results are about the massacre that took place at Columbine High School in Littleton, Colorado, 24 years ago. The 15 deaths there are much more prominent in the public consciousness than are the 15, 150 or even 1,500 most recent deaths in Colorado from motor vehicle accidents.

Everytown Research & Policy defines "mass shootings" as instances of firearm-related violence in which at least four people were killed apart from the shooter. Between 2009 and 2020, 240 of these shootings occurred.

In these shootings,  1,363 victims were killed and 947 victims were wounded. The total number of victims was 2,310.[98] The numbers of family members who may have been affected by these mass shootings could number in the tens of thousands.

All victims and their families would represent less than .1% of the American population. However, the costs associated with firearms-related violence extend well beyond victims and their families.

Mental health challenges associated with mass shootings are apparently widespread. In 2019, 71% of all adults reported that mass shootings were a "significant source of stress".[99] More specifically,

> "(t)he research to date provides evidence that these events [mass shootings] can have mental health consequences for victims and members of affected communities, leading to increases in PTSS [post-traumatic stress symptoms], depression, and other psychological symptoms. The few studies on remote samples further suggest that these events can have at least short-term psychological effects, for example, increased fears and declines in perceived safety, on persons living far outside of the affected communities."[100]

---

[98] Everytown Research & Policy, https://everytownresearch.org/maps/mass-shootings-in-america/. At least 17 of these instances involved only an LCM-assisted handgun.

[99] American Psychological Association, Stress in America 2019. https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting.

[100] Lowe and Galea, ibid.

The possibility of encountering extreme firearms-related violence reduces the well-being of millions of individuals who have not yet experienced firearms-related violence, themselves. On three recent occasions, the Gallup poll asked adult respondents the question "How worried are you that you or someone in your family will become a victim of a mass shooting?" Table 21 records the responses.[101]

**Table 21**

**Americans' Level of Worry About Being a Victim of Mass Shooting**

|                    | Very worried | Somewhat worried | Not too worried | Not worried at all |
|--------------------|--------------|------------------|-----------------|--------------------|
| August 1, 2019     | 19%          | 29%              | 27%             | 25%                |
| October 1, 2017    | 10%          | 29%              | 34%             | 26%                |
| December 1, 2015   | 11%          | 27%              | 35%             | 27%                |

If the August 2019 polling results applied to the 2020 U.S. adult population of 258.3 million[102], they would imply that 49.1 million adults were "very worried" about being victimized in a mass shooting. Another 74.9 million adults were "somewhat worried" about being victimized in a mass shooting. This demonstrates that the costs of mass shootings go well beyond the victims.

An illustrative example in the tradition of CV analysis suggests some magnitudes for these costs. If those who were "very worried" about being victimized in a mass shooting were willing to pay an annual fee of $100 in order to be completely protected from mass shootings, their collective WTP would be $4.9 billion. This would estimate the cost of their fears to society.

If those who were "somewhat worried" were willing to pay an annual fee of $50 for this protection, their collective WTP would be $3.7 billion. If, in addition, the 69.7 million people who were not too worried were willing to pay an annual fee of $25, the collective WTP would increase by $1.7 billion.

In total, these WTP responses would yield a collective cost of $10.3 billion. If individual willingness-to-pay was greater than these suggestive quantities, the collective cost would be greater as well.

---

[101] Gallup, https://news.gallup.com/poll/266681/nearly-half-fear-victim-mass-shooting.aspx.

[102] U.S. Bureau of the Census, ibid.

Table 21 may understate the fears that are engendered by mass shootings across the population of the United States. In August 2019, the Harris Poll also conducted a survey regarding these fears, on behalf of the American Psychological Association (APA).[103]

In the responses to this survey, 32% of adults reported that " they cannot go anywhere without worrying about being a victim of a mass shooting". This fear would seem to be at least as intense as the feeling of being "very worried", assessed by the Gallup poll. Applied to the 2020 population, this estimate implies that 82.7 million adults worry persistently about being victimized by a mass shooting.

Another third of adults reported that "fear prevents them from going to certain places or events". Again, this fear would seem to be at least as intense as the feeling of being "somewhat worried", assessed by the Gallup poll. It would afflict 85.2 million adults in 2020.

The illustrative CV exercise above, applied to the results of the Gallup poll, would assign a WTP for safety from mass shootings of $12.5 billion. This would be nearly 50% greater than the illustrative WTP assigned to those who responded as "very worried" or "somewhat worried" to the Gallup poll.[104]

A similar exercise can be applied to youths. In 2018, 25% of youths aged 13 to 17 reported that they were "very worried about the possibility of a shooting happening at their school." Another 32% reported that they were "somewhat worried".[105]

The population of 12 to 17 year-olds in the United States in 2018 was approximately 25.0 million.[106] If the fears reported by 13 to 17 year-olds also applied to 12 year-olds, approximately

---

[103] American Psychological Association, https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting.

[104] In response to the APA poll, "nearly one-quarter (24%) of adults report changing how they live their lives because of fear of a mass shooting". In principle, an alternative valuation of the costs of these fears could be constructed by measuring the costs of these alterations in life practices, and by valuing the reduction in life satisfaction that they entail. However, public reports of this poll do not provide the necessary data.

[105] Pew Research Center, https://www.pewresearch.org/fact-tank/2018/04/18/a-majority-of-u-s-teens-fear-a-shooting-could-happen-at-their-school-and-most-parents-share-their-concern/.

[106] ChildStats Forum on Child and Family Statistics, https://www.childstats.gov/americaschildren/tables/pop1.asp, derived from statistics provide by the U.S. Bureau of the Census.

6.3 million American youths were very worried, and 8 million were somewhat worried about becoming victims of mass shootings in their schools.

If the youths who were "very worried", or their parents, were prepared to pay $100 per student in order to eliminate mass shootings in schools, the collective WTP for this group would be $630 million. If the youths who were "somewhat worried", or their parents, were prepared to pay $50 per student in order to eliminate mass shootings in schools, the collective WTP for this group would be $400 million. In sum, this exercise would value the fears of youths regarding the possibility of victimization in a school mass shooting at over one billion dollars.

Actual WTP expressions would probably exceed those employed in these illustrative examples. They would have to  incorporate the costs of substantial mental health burdens imposed on students by exposure to mass shootings in schools.

A student recently described these costs as they arose from a false report of a shooter at Denver East High School on 19 September 2022:

> "Everyone was crying. ... While writing this I look back on all of my texts from that day. My friend had written, 'I saw a girl sitting up against a tree on the ground with an absolutely blank expression on her face. My teachers tried to talk to her or at least get her to blink. I could see her mental damage and it made me cry again. I can't believe this happened.' We are children, children whose lives are forever changed from this day. To us, this was a shooting, just without the shots."[107]

As the student testifies, these costs were imposed merely by the threat of firearm-related violence. Actual firearm-related violence would be more costly.

Among 2,263 high school students, "concerns about school violence or shootings were associated with clinically significant generalized anxiety symptoms ... and panic symptoms ... at the 6-month follow-up".[108] These clinically significant mental health conditions impose costs of treatment and suffering that may far exceed $100.

---

[107] Testimony of Anna Cripe in front of the Senate Judiciary Committee of the Colorado State Assembly in support of SB23-249, 10 April 2023, https://sg001-harmony.sliq.net/00327/Harmony/en/PowerBrowser/PowerBrowserV2/2023041 4/41/14528#info_.

[108] Kira E. Riehm, Ramin Mojtabai, Leslie Adams, Evan A. Krueger, Delvon T. Mattingly, Paul S. Nestadt, and Adam M. Leventhal, "Adolescents' concerns about school violence or shootings and association with depressive, anxiety, and panic symptoms", JAMA Network Open, Vol. 4, No. 11, 2021.

School shootings may even impose permanent losses of future income on students. An analysis of the effects of these shootings on students in Texas found that "school shootings increase absenteeism and grade repetition; reduce high school graduation, college enrollment, and college completion; and reduce employment and earnings at ages 24–26."[109] All of these consequences are associated with additional costs that individual students must bear.

Mass shootings also impose costs on school systems. Cabral, et al "further find school-level increases in the number of leadership staff and reductions in retention among teachers and teaching support staff in the years following a shooting." They conclude that "(t)he adverse impacts of shootings span student characteristics, suggesting that the economic costs of school shootings are universal."

### IV.C.  Shootings involving LCMs are disproportionately costly

Available descriptive evidence indicates that LCMs are disproportionately deployed in the most horrific mass shootings. Of the 22 mass shootings involving 10 or more fatalities between 1990 and 2022, only two occurred which were not LCM-assisted. In two additional incidents, an LCM with a capacity greater than 10 rounds but less than 15 rounds was deployed.[110]

In the remaining 18 incidents, including 13 of the 14 with the largest number of fatalities, LCMs with capacities in excess of 15 rounds were deployed.[111] In contrast, among the 29 mass shootings with six fatalities, only seven were LCM-assisted.

LCM-assisted mass shootings are, consequently, deadlier than mass shootings in which LCMs are not deployed. Among mass shootings in which six or more deaths occurred among victims, the average number of fatalities among those shootings in which an LCM was not deployed was 7.7. The average number of fatalities in LCM-assisted mass shootings was 12.5.[112]

Among mass shootings "in which four or more people are shot and killed, excluding the shooter" from 2009 through 2020, 42 were LCM-assisted. The average number of fatalities in these

---

[109] Marika Cabral, Bokyung Kim, Maya Rossin-Slater, Molly Schnell, and Hannes Schwandt, Trauma at School: The Impacts of Shootings on Students' Human Capital and Ecnoomic Outcomes, NBER Working Paper 28311, May, 2022.

[110] Louis Klarevas, "Klarevas Data Set 1990-2022.xlsx".

[111] Klarevas, ibid.

[112] Klarevas, ibid.

incidents was 10.0. An additional 16.9 individuals were wounded, on average, in these incidents.[113]

In the 198 mass shootings with four or more fatalities that were not LCM-assisted, the average number of fatalities was 4.8. The average number of wounded victims was 1.2.[114]

These statistics demonstrate that LCM-assisted mass shootings are more dangerous than are mass shootings in which LCMs are not deployed. Moreover, they are more salient.

Among mass-shootings with four or more fatalities, 76% of LCM-assisted or assault weapon mass shootings occurred in public. Only 44% of mass shootings involving a handgun occurred in public.[115]

Fears of victimization in mass shootings are concentrated on the possibility of encountering this experience in public places. "When asked which places they are stressed about the possibility of a mass shooting occurring, adults most commonly say a public event (53%), mall (50%), school or university (42%) or movie theater (38%)".[116] Mass shootings in these locations are most likely to be accomplished with the assistance of LCMs.

Therefore, LCM-assisted mass shootings are more lethal and more prominent than are other mass shootings. Consequently, they bear a disproportionate responsibility for the harms that are inflicted on individuals and society through these tragedies.


## V.   LCM BANS MAY BE EFFECTIVE

Evidence submitted in *Cooke, et al. v. Hickenlooper* and in *Rocky Mountain Gun Owners, et al. v. Hickenlooper* suggests that LCM bans may reduce the frequency with which LCMs are encountered by law enforcement. They may also be associated with reductions in rates of gun homicide.

---

[113] Everytown Research & Policy, ibid.

[114] Everytown Research & Policy, ibid.

[115] Everytown Research & Policy, ibid.

[116] American Psychological Association, ibid.

**V.A.    The limited federal LCM ban may have reduced criminal use of LCMs**[117]

The federal Violent Crime Control and Law Enforcement Act of 1994, enacted on 13 September 1994[118], included limited restrictions on the possession of large-capacity magazines, defined as magazines with capacities in excess of ten rounds. These restrictions became effective upon enactment of the bill and expired ten years later.

In 1993, the State Police in the State of Virginia created the Criminal Firearms Clearinghouse (CFC). The CFC maintains a database that records characteristics of all firearms confiscated by any law enforcement agency in the State because of use or suspected use in a crime.[119]

These records yield annual estimates from 1993 to 2010 of the share of all confiscated firearms that were equipped with magazines whose capacities exceeded 10 rounds.[120] The analysis here employs data from only the 18 years through 2010 because database reporting standards appear to have changed dramatically in 2011.

---

[117] This section is adapted from the "Zax Second Rebuttal", section III.C, submitted in *Cooke, et al. v. Hickenlooper*, U.S. District Court Case No. 13-CV-001300.

[118] Title XI, Subtitle A, Section 110103. See https://www.govtrack.us/congress/bills/103/hr3355

[119] "Virginia Code § 52-25.1, the Criminal Firearms Clearinghouse (CFC) serves as a central repository of information regarding all firearms seized, forfeited, found or otherwise coming into the possession of any state or local law-enforcement agency of the Commonwealth of Virginia which are believed to have been used in the commission of a crime. The database is maintained for law enforcement purposes only." (http://www.vsp.state.va.us/Firearms_Clearinghouse.shtm).

[120] The records begin on 1 July 1993. Consequently, the estimate for 1993 reflects only the last half of that year.

**Table 22**

**Regression equation estimating contributions of trend and limited Federal ban to proportion of firearms confiscated in Virginia equipped with magazines with capacity greater than 10 rounds**

| Explanatory variables | Estimated coefficient | t-statistic | Significance level |
|---|---|---|---|
| Trend | −0.827 | 2.39 | 5% |
| Trend squared | 0.065 | 3.43 | 1% |
| Ban | 3.194 | 2.17 | 10% |
| Trend during ban | 0.975 | 1.62 | 15% |
| Trend during ban, squared | −0.175 | 3.43 | 1% |
| Constant | 14.931 | 14.42 | 0.01% |
| | | | |
| $R^2$ | 0.902 | | |
| Adjusted $R^2$ | 0.861 | | |
| F-statistic | 22.090 | | 0.01% |

Note:   Sample consists of 18 annual observations representing the years 1993 through 2010.

Table 22 presents a regression analysis in which the share of confiscated firearms is the dependent variable. The regression analysis statistically apportions variation in this dependent variable to an underlying secular quadratic trend, to a change in levels during the ban, a quadratic trend during the ban and an unexplained remainder.

According to table 22, the explanatory variables in this regression explain approximately 90% of the year-to-year variation in the proportion of confiscated firearms equipped with LCMs. Only the effect of the quadratic component of the ban fails to achieve statistical significance at 10% or better.[121] All of the other explanatory variables are significantly associated with this proportion.

---

[121] Statistical significance at the 10% level or better is conventionally understood as noteworthy in samples that are as small as that analyzed here.

**Table 23**

**Estimated contributions of trend and Federal ban to percentage of firearms confiscated in Virginia equipped with magazines with capacity greater than 10 rounds**

| Year | Baseline percentage | Contribution of trend | Contribution of ban | Total estimated percentage | Actual percentage |
|------|------|------|------|------|------|
| 1993 | 14.93% | −0.76% |  | 14.17% | 13.41% |
| 1994 | 14.93% | −1.39% |  | 13.54% | 14.52% |
| 1995 | 14.93% | −1.90% | 3.99% | 17.03% | 17.21% |
| 1996 | 14.93% | −2.27% | 4.44% | 17.10% | 16.18% |
| 1997 | 14.93% | −2.51% | 4.54% | 16.96% | 17.53% |
| 1998 | 14.93% | −2.62% | 4.29% | 16.60% | 17.29% |
| 1999 | 14.93% | −2.60% | 3.68% | 16.01% | 15.88% |
| 2000 | 14.93% | −2.45% | 2.73% | 15.21% | 15.17% |
| 2001 | 14.93% | −2.17% | 1.43% | 14.18% | 13.66% |
| 2002 | 14.93% | −1.77% | −0.23% | 12.94% | 13.02% |
| 2003 | 14.93% | −1.23% | −2.24% | 11.47% | 11.29% |
| 2004 | 14.93% | −0.56% | −4.59% | 9.78% | 10.05% |
| 2005 | 14.93% | 0.24% |  | 15.17% | 12.98% |
| 2006 | 14.93% | 1.17% |  | 16.10% | 16.63% |
| 2007 | 14.93% | 2.23% |  | 17.16% | 18.07% |
| 2008 | 14.93% | 3.42% |  | 18.35% | 19.56% |
| 2009 | 14.93% | 4.74% |  | 19.67% | 20.57% |
| 2010 | 14.93% | 6.19% |  | 21.12% | 19.56% |

Note: The "baseline percentage" is the constant from the regression of table 23. The "contribution of trend" is equal to [−.8272×trend+.0651×(trend squared)], where the trend takes on the value of one for 1993 and increments by one for each successive year. The "contribution of ban" is equal to [3.1938+.9745×(trend during ban)+(−.1753)×(trend during ban squared)] where the trend during ban takes on the value of one for 1995 and increments by one for each successive year through 2004, and the value of zero for the other sample years.

Table 23 presents the implications of this regression. The first column of this table identifies the year represented by each observation. The final column reports the actual proportion of confiscated weapons that was equipped with LCMs in each year. Each of the intervening columns identifies the estimated contribution of the explanatory variables to the proportion of confiscated firearms equipped with LCMS.

The estimated constant in this regression of 14.9% consitutes the baseline proportion of firearms equipped with LCMs among all confiscated firearms for the entire period. That proportion is indicated in the second column of table 23.

The third column of table 23 reports the contribution of the linear and quadratic trends that were present throughout the period. The linear component of this trend had a negative effect on the proportion of confiscated firearms equipped with LCMs, significant at better than 5%. The quadratic component of this trend had a positive effect, significant at better than 1%.

Together, these two effects imply that the proportion of confiscated firearms equipped with LCMs was trending downwards at the beginning of the period under analysis, under the dominant influence of the negative linear component. However, the positive quadratic component of the secular trend had the effect of slowing and then reversing this reduction. This predicts that, In the absence of any other influences, the proportion of firearms equipped with LCMs would have eventually increased continuously.

Table 23 demonstrates the implications of these effect. The combined effect of the secular linear and quadratic trends reached its lower limit in 1998. In that year, the secular trend reduced this proportion by 2.62 percentage points below its baseline value of 14.93%.

Starting in 2005, the secular trend began to increase the proportion of confiscated firearms equipped with LCMs above its baseline value. By 2010, the end of the period, the trend was responsible for increasing this proportion by 6.19 percentage points. Extrapolating to 2011, the effect of this secular trend would have been to increase this proportion by 7.77 percentage points.

However, the proportion of confiscated firearms equipped with LCMs was also significantly affected by the limited federal LCM ban. First, the limited ban had the effect of increasing this proportion by 3.19 percentage points throughout the period during which it was in effect, with 10% significance. In effect, the limited ban established a new baseline proportion that was 3.19 percentage points higher than the baseline proportion prevailing in the absence of the limited ban.

The increase in the baseline proportion may have been attributable to the change in the legal status of these magazines. In the absence of the limited ban, they would have been confiscated

only if they were attached to a firearm suspected of criminal involvement. During the limited ban, possession of these magazines under some circumstances would, itself, have been illegal.

The proportion of confiscated firearms equipped with LCMs was also determined by a quadratic trend that was operative only during the limited ban.  The linear component of this trend had a positive effect on the proportion of confiscated firearms equipped with LCMs, marginally significant at better than 15%. The quadratic component of this trend had a negative effect, significant at better than 1%.

Together, these two effects imply that the proportion of confiscated firearms equipped with LCMs began to trend upward at the beginning of the limited ban period, as a consequence of the dominant influence of the positive linear component. As the period continued, the influence of the negative quadratic component increased, eventually reversing the trend and reducing the proportion of confiscated firearms equipped with LCMs.

Presumably, the initial increase in the proportion of LCM-equipped firearms among all confiscated firearms occurred because the possession of the LCM accessory became illegal. That proportion then declined for two reasons. Confiscations would have reduced the number of available LCMs. Owners of the remaining LCMs would have become more cautious about exposing their accessories to the threat of confiscation.

The fourth column of table 23 reports the combined influence of the change in baseline, the change in the linear component of the trend and the change in the quadratic component of the trend that occurred during the limited ban. It demonstrates that the combined effect of the two trend components reached its peak in 1997. In that year, the total contribution of the limited ban, including the new baseline effect, raised the proportion by 4.54 percentage points over what it would have been in the absence of the ban.

Subsequent to 1997, the negative quadratic component of the limited ban trend became more influential, reducing the contribution of the limited ban to the proportion of confiscated firearms equipped with LCMs. By 2000 this reduction had reversed the positive component of the limited ban trend and some of the new limited ban baseline. Consequently, in that year, the limited ban raised this proportion, in total, by only 2.73 percentage points above what it would have been in the absence of the limited ban.

The influence of the negative quadratic limited ban trend continued to grow through the rest of the period during which the limited ban was in effect. As a result, by 2002 the net effect of the limited ban was to reduce the proportion of confiscated firearms by slightly less than one-quarter of one percentage point below the level it would have attained in the absence of the limited ban. In 2004, the limited ban's last year, it reduced this proportion by 4.59 percentage

points compared to the level it would have attained in the absence of the limited ban, to 9.78%.[122]

The regression of table 22 predicts that, had the limited ban continued to be in effect, it would have imposed successively greater reductions in the percentage of firearms confiscated in Virginia that were equipped with magazines with capacities greater than 10 rounds in each subsequent year. For example, had the limited ban been in effect in 2005, this percentage would have been 7.30 percentage points lower, at 7.88%, than it actually was.

These results demonstrate that, as experience with the limited federal LCM ban evolved, the proportion of firearms equipped with LCMs confiscated for purposes of law enforcement eventually began to decline consistently and strongly. They imply that even limited bans on LCMs reduce the frequency with which these accessories are employed in criminal behavior.

**V.B.    LCM bans may have been associated with reduced gun homicide rates**[123]

Presumably, the intention of LCM bans is increase public safety, rather than simply restrict the use of a particular firearm accessory. Limited evidence suggests that these bans may achieve this goal.

---

[122] As given in table 22, the positive linear component of the trend ban was of marginal statistical significance. A recompilation of Table 23, omitting its contribution, yields results that are qualitatively unchanged.

[123] This section is adapted from the "Rebuttal to Large Capacity Magazines and Homicides, by Carlisle E. Moody", sections III and IV, submitted in *Rocky Mountain Gun Owners, et al., v. Hickenlooper*, Denver District Court Case No. 2013CV33879.

**Table 24**

**Regression equation estimating determinants of the
natural logarithm of gun homicides per 10,000 capita Virginia**

| Explanatory variables | Estimated coefficient | t-statistic | Significance level |
|---|---|---|---|
| 1993 | −0.036 | 0.18 | |
| Trend, 1994-2004 | -0.048 | 4.49 | 1% |
| % of confiscated firearms equipped with LCMs, 1994-2004 | -0.010 | 1.02 | |
| Trend, 2005-2012 | -0.025 | 0.92 | |
| % of confiscated firearms equipped with LCMs, 2005-2012 | −0.025 | 2.12 | 10% |
| Constant | 1.864 | 10.31 | <0.0001% |
| $R^2$ | 0.878 | | |
| Adjusted $R^2$ | 0.834 | | |
| F-statistic | 22.110 | | <.0001% |

Additional evidence from Virginia is consistent with the proposition that the limited federal ban on LCMs was associated with a reduction in rates of gun homicides. Table 24 presents a regression analysis whose purpose is to explore the evolution of gun homicide rates per 10,000 capita in the State of Virginia from 1993 through 2012. The regression divides this period into three sub-periods.

The first sub-period is 1993. This is the year before the limited federal ban on LCMs went into effect. This year is represented by its own intercept.[124]

The coefficient for this intercept is statistically insignificant. This demonstrates that the gun homicide rate in Virginia during this year did not differ significantly from the baseline rate.

---

[124] No other effect can be estimated for this year because it constitutes only one observation.

The sub-period of the limited ban, from 1994 through 2004, is characterized by two variables. First, a trend variable captures any linear pattern of change in the gun homicide rate over this period. Second, a variable measuring the proportion of confiscated firearms that were equipped with LCMs in each year during this period captures any effects around the trend of the composition of firearms in criminal use on gun homicide rates.

The coefficient for the trend variable is negative and statistically significant. This implies that the rate of gun homicides in Virginia declined consistently through this period.

The coefficient for the proportion of confiscated firearms that were equipped with LCMs is not statistically significant. This implies that variations in the composition of firearms in criminal use did not alter the declining trend in gun homicides over this period.

The sub-period following the limited ban, from 2005-2012, is also characterized by a trend variable for the period and a variable measuring the proportion of confiscated firearms that were equipped with LCMs in each year during this period. The coefficient for this trend variable is statistically insignificant. This implies that there was no consistent trend in Virginia gun homicides during this period.

In contrast, the coefficient for the proportion of confiscated firearms that were equipped with LCMs is negative and statistically significant. This implies that, during this sub-period, gun homicides in Virginia declined when law enforcement agencies confiscated more firearms equipped with LCMs.

These results suggest that the cumulative effects of all of the provisions of the federal Violent Crime Control and Law Enforcement Act of 1994, including the limited LCM ban, were significantly associated with a continuing reduction in gun homicides in Virginia throughout the period in which the ban was enforced.

When that Act expired, its effects disappeared. Instead, the gun homicide rate became responsive to the specific composition of firearms deployed in criminal activity. It was higher in years in which fewer LCMs were confiscated.

**Table 25**

**Regression equation estimating determinants of the**
**natural logarithm of gun homicides per 10,000 capita in Colorado**

| Explanatory variables | Estimated coefficient | t-statistic | Significance level |
|---|---|---|---|
| Trend, 1977-1993 | −0.015 | 1.51 | |
| Constant, 1994-2004 | -0.216 | 1.71 | 10% |
| Trend, 1994-2004 | -0.023 | 1.51 | |
| Constant, 2005-2012 | -0.504 | 3.50 | 1% |
| Trend, 2005-2012 | −0.015 | 0.63 | |
| Constant, 2013-2015 | -0.796 | 3.14 | 1% |
| Trend, 2013-2015 | 0.111 | 0.99 | |
| Constant | 1.328 | 18.03 | <0.0001% |
| $R^2$ | 0.667 | | |
| Adjusted $R^2$ | 0.592 | | |
| F-statistic | 8.880 | | <.0001% |

An analogous analysis of the experience in the State of Colorado suggests that the limited federal LCM ban and the later Colorado LCM ban were both associated with improvements in public safety. Table 25 examines the analysis of gun homicide rates per 10,000 capita in the State of Colorado from 1977 through 2015, inclusive.

This period spans four important sub-periods. The first sub-period is from before the limited federal LCM ban, 1977 through 1993. The second is the sub-period in which the limited federal LCM ban was in force, 1994 through 2004. The third is the sub-period between the expiry of the limited federal LCM ban and the adoption of the Colorado LCM ban, 2004-2012. The final sub-period is 2013-2015, in which the Colorado ban on large capacity magazines was in force.

The gun homicide rate in Colorado was distinctive in each of these sub-period. The constants for each are negative and statistically significant. This indicates that the base level for the gun

homicide rate in each of these sub-periods was lower than it was during the initial period, from 1977 through 1993.

Moreover, the intercept for the sub-period during which the Colorado ban on large capacity magazines was in force is the largest of the three in magnitude. This demonstrates that the base level for the gun homicide rate during this sub-period was lower than in any of the other three sub-periods.

In this regression, the differences between the intercepts for each of the three later sub-periods are jointly significant at nearly the 5% level.[125] This demonstrates that gun homicide rates in Colorado were statistically different in the four sub-periods of 1977-1993, 1994-2004, 2004-2013 and 2013-2015. In particular, the base level for this rate was lowest during the last sub-period, in which the Colorado ban on large capacity magazines was in effect.

The regression of table 25 estimates a negative intercept for the sub-period during which the limited federal ban LCMs was in effect, with significance just better than 10%. It also estimates a negative trend for this sub-period, with significance of slightly less than 10%. The intercept and trend for this period are jointly significant at better than 1%.[126]

These results suggest that the effects of the limited federal ban on LCMs were complicated. It is likely that individual estimates of the unique base level and the unique trend for this period do not both attain the conventional levels of statistical significance because the sample is too small to identify them precisely.

---

[125] Formally, the F-statistic for the joint test of the hypotheses that the intercept for 1994-2004 is equal to that for 2005-2012, and that the intercept for 2005-2012 is equal to that for 2013-2015, is 3.25 with 2 and 31 degrees of freedom. The p-value for this statistic is .0522.

[126] Formally, the F-statistic for the joint test of the hypotheses that the intercept for 1994-2004 is equal to zero and the trend for 1994-2004 is equal to zero is 9.22, with 2 and 31 degrees of freedom. The p-value for this statistic is .0007

**Table 26**

**Regression equation estimating determinants of the
natural logarithm of gun homicides per 10,000 capita in Colorado**

| Explanatory variables | Estimated coefficient | t-statistic | Significance level |
|---|---|---|---|
| Trend, 1977-1993 | −0.009 | 1.24 | |
| Trend, 1994-2004 | -0.414 | 3.83 | 1% |
| Constant, 2005-2012 | -0.430 | 3.04 | 1% |
| Trend, 2005-2012 | −0.015 | 0.61 | |
| Constant, 2013-2015 | -0.722 | 2.81 | 1% |
| Trend, 2013-2015 | 0.111 | 0.96 | |
| Constant | 1.255 | 20.37 | <0.0001% |
| $R^2$ | 0.636 | | |
| Adjusted $R^2$ | 0.568 | | |
| F-statistic | 9.310 | | <.0001% |

This is demonstrated in table 26. This table presents a re-estimation of the regression in table 25. This re-estimation omits the unique intercept for the sub-period during which the limited federal LCM ban was in effect. This sub-period is represented only by a unique trend. This specification focuses the information in the sample regarding this sub-period on the estimation of this trend, rather than dispersing it across the estimation of both a trend and a unique base level.

In this regression, the sub-period during which the Colorado ban on large capacity magazines was in effect again has a significant intercept that is larger in magnitude than that for the period from 2005-2012. This again demonstrates that the base level for the gun homicide rate in Colorado has been lower since the ban on large capacity magazines was adopted than in any other sub-period.

Moreover, the coefficient for the trend for the sub-period during which the federal ban on assault weapons was in effect moves from nearly statistically significant in table 25 to strongly statistically significant in table 26. It is significant at better than 1%.

The coefficient for this trend is negative. This indicates that the gun homicide rate in Colorado and its natural logarithm declined significantly during the sub-period in which the limited federal LCM ban was in effect. There was no significant trend in this rate or its natural logarithm during any of the other sub-periods.

Tables 25 and 26 together demonstrate that, first, the base level of gun homicides in Colorado was significantly lower during the sub-period since the adoption of the Colorado LCM ban than in any other sub-period. Together, they suggest that gun homicides in Colorado were also reduced during the sub-period during which the federal ban on assault weapons was in effect. Table 26 further suggests that the effect of this ban was more likely to have been a continuous reduction in the gun homicide rate during the sub-period in which it was in effect, rather than a fixed reduction in its base level during this entire sub-period.


**V.C.    Summary**

Available evidence indicates that LCMs became less common among firearms confiscated by law enforcement officers in the State of Virginia during the period in with the limited federal ban on LCMs was in force. This suggests that utilization of LCMs in criminal activity declined.

Moreover, available evidence indicates that the gun homicide rate in Virginia was lower during this same period. This suggests that the reduction in LCM utilization may have improved public safety.

Evidence from Colorado, over a longer period of time, is consistent with the experience in Virginia. That evidence indicates that gun homicide rates were lower during both the period in which the limited federal LCM ban was in place and during the first years of the Colorado LCM ban.

These results are noteworthy because both the limited federal LCM ban and the Colorado LCM ban were of restricted scope. The federal ban essentially prohibited domestic production of LCMs. This, on its own, would have ended growth in the stock of LCMs available to American civilians.

However, the limited federal ban did not restrict the purchase of LCMs produced in other countries. On their own, these imports would have continued growth in the stock of LCMs available to American civilians.

In sum, the limited federal LCM ban almost surely reduced the growth in the stock of available LCMs. However, it possible that this stock continued to grow during the period of the ban, nevertheless.

Similarly, the Colorado LCM ban prohibited the introduction of new LCMs into the State. This almost surely reduced growth in the stock of LCMs available to Colorado civilians. However, imports from other States were still possible, even if illegal. Consequently, that stock may still have grown, even if at slower rates.

Neither the limited federal LCM ban nor the Colorado ban reduced the stock of LCMs available to civilians. It is possible that this stock continued to grow through imports, whether legal or illegal, under both bans.

Therefore, the effects of either the limited federal LCM ban or the Colorado LCM ban on public safety could have been small. Evidence of any positive effects of either ban on public safety suggests that public safety may improve impressively in response to even minor reductions in the accessibility of LCMs.


## VI.   CONCLUSION

LCMs are accesories to firearms. Available evidence indicates that they are rarely, if ever, deployed by civilians in legal self-defense or when assisting law enforcement.

Self-reported instances of firearm-assisted self-defense fail to account adequately for the economic interests of others. They also identify actions taken with firearms as self-defensive that are not consistent with legal definitions of self-defense. Consequently, individuals invoke firearm-assisted self-defense more frequently than is economically efficient.

The costs of firearm-related violence to the economy of the United States and to the economy of the State of Colorado are high and almost surely underestimated. These costs are exacerbated in firearms-related incidents in which LCMs are deployed. Consequently, the benefits that LCMs confer on the economy are much smaller than the costs that they impose.

Limited bans on LCM sales and possession appear to reduce the prevalence of LCMs in firearm-related violence below the levels that would be experienced in the absence of these bans. They are therefore an effective device for the purpose of limiting the costs that LCMs impose on the economy.

**DECLARATION**

I hereby declare that the above statement is true to the best of my knowledge and belief and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 14th day of April, 2023.

_____

Jeffrey S. Zax

13 January 2023

<span style="font-variant: small-caps">Curriculum Vitae</span>

# Jeffrey S. Zax

| | |
|---|---|
| University of Colorado at Boulder | Phone: (303) 492-8268 |
| Dept. of Economics | FAX: (303) 492-8960 |
| Campus Box 256 | email: zax@colorado.edu |
| Boulder, Colorado | website: http://www.colorado.edu/Economics/Zax/ |
| 80309-0256 | |

## Appointments

Department of Economics, University of Colorado at Boulder:
Associate Chair, Undergraduate Program, August 2006-July 2018, August 2019 to present
Professor, August 1996 to present
Associate Professor, August 1990 through August 1996

Department of Economics, The Graduate School and University Center, City University of New York:
Associate Professor, September 1989 through August 1991
Assistant Professor, March 1985 through August 1989

Department of Economics, Queens College, City University of New York:
Associate Professor, September 1989 through August 1991
Assistant Professor, January 1984 through August 1989
Lecturer, September 1983 through January 1984

## Education

Ph.D. June, 1984 in Economics, Harvard University

B.A. June, 1976 Magna Cum Laude in Economics, Harvard University

## Papers in Refereed Journals

Zax, Jeffrey S. and Yin He (2016) "The Law of One Price in Chinese factor markets", <u>The Singapore Economic Review</u>, Vol. 61, No. 4, September.

Zax, Jeffrey S. (2013) "Single regression estimates of voting choices when turnout is unknown", <u>Statistics, Politics, and Policy</u>, Vol. 4, Issue 1, 1-20, degruyter.com/view/j/spp.2013.4.issue-1/2151-7509.1051/2151-7509.1051.xml?format=INT .

Lynch, Devon and Jeffrey S. Zax (2011) "Incidence and substitution in Enterprise Zone Programs: The case of Colorado", <u>Public Finance Review</u>, Vol. 39, No. 2, March, 226-255.

Zax, Jeffrey S. (2005) "The statistical properties and empirical performance of double regression", <u>Political Analysis</u>, Vol. 13, No. 1, January, 57-76.

Mocan, H. Naci, Erdal Tekin and Jeffrey S. Zax (2004) "Demand for medical care in urban China", <u>World Development</u>, Vol. 32, No. 2, February, 289-304.

Li, Haizheng and Jeffrey S. Zax (2003) "Labor supply in urban China", <u>Journal of Comparative Economics</u>, Vol. 31, No. 4, December, 795-817.

Rees, Daniel I., Jeffrey S. Zax and Joshua Herries (2003) "Interdependence in worker productivity", <u>Journal of Applied Econometrics</u>, Vol. 18, No. 5, September/October, 585-604.

Zax, Jeffrey S.  (2003) "Residential location theory and the measurement of segregation", <u>Annales d'Economie et de Statistique</u>, Special issue on Discrimination and Unequal Outcomes, Nos. 71/72, July/December, 189-219.

Zax, Jeffrey S. and Daniel I. Rees (2002) "IQ, academic performance, environment and earnings", <u>The Review of Economics and Statistics</u>, Vol. 84, No. 4, November, 600-616.

Zax, Jeffrey S. (2002) "Comment on 'Estimating the extent of racially polarized voting in multicandidate contests' by Bernard Grofman and Michael Migalski", <u>Sociological Methods & Research</u>, Vol. 31, No. 1, August, 73-84.

Lynch, Jim and Jeffrey S. Zax (2000) "The rewards to running: Prize structure and performance in professional road racing", <u>Journal of Sports Economics</u>, Vol. 1, No. 4, November, 323-340.

Zax, Jeffrey S. (1997) "Latent demand for urban housing in the People's Republic of China", <u>Journal of Urban Economics</u>, Vol. 42, No. 3, November, 377-401.

Zax, Jeffrey S. and John F. Kain (1996) "Moving to the Suburbs: Do Relocating Companies Leave Their Black Employees Behind?", <u>Journal of Labor Economics</u>, Vol. 14, No. 3, July, 472-504.

Zax, Jeffrey S. and Mark S. Skidmore (1994) "Property Tax Rate Changes and the Rate of Development", <u>Journal of Urban Economics</u>, Vol. 36, No. 3, November, 314-332.

Zax, Jeffrey S. (1994) "When is a Move a Migration?", <u>Regional Science and Urban Economics</u>, Vol. 24, No. 3, June, 341-360.

Zax, Jeffrey S. (1991) "The Substitution Between Moves and Quits", <u>The Economic Journal</u>, Vol. 101, No. 409, November, 1510-1521.

Zax, Jeffrey S. (1991) "Compensation for Commutes in Labor and Housing Markets", <u>Journal of Urban Economics</u>, Vol. 30, No. 2, September, 192-207.

Ichniowski, Casey and Jeffrey S. Zax (1991) "Right to Work Laws, Free Riders and Unionization in the Local Public Sector", <u>Journal of Labor Economics</u>, Vol. 9, No. 3, July, 255-275.

Zax, Jeffrey S. and Casey Ichniowski (1991) "Excludability and the Effects of Free Riders: Right-to-Work Laws and Local Public Sector Unionization", <u>Public Finance Quarterly</u>, Vol. 19, No. 3, July, 293-315.

Zax, Jeffrey S. and John F. Kain (1991) "Commutes, Quits and Moves", Journal of Urban Economics, Vol. 29, No. 2, March, 153-165.

Zax, Jeffrey S. (1990) "Race and Commutes", Journal of Urban Economics, Vol. 28, No. 3, November, 336-348.

Zax, Jeffrey S. (1990) "Reform City Councils and Municipal Employees", Public Choice, Vol. 64, No. 2, February, 167-177.

Zax, Jeffrey S. (1990) "Election Methods, Black and Hispanic Council Membership", Social Science Quarterly, Vol. 71, No. 2, June, 339-355.

Zax, Jeffrey S. and Ichniowski, Casey (1990) "Bargaining Laws and Unionization in the Local Public Sector", Industrial and Labor Relations Review, Vol. 43, No. 4, April, 447-462.

Ichniowski, Casey and Jeffrey S. Zax (1990) "Today's Associations, Tomorrow's Unions", Industrial and Labor Relations Review, Vol. 43, No. 2, January, 191-208.

Zax, Jeffrey S. (1989) "Initiatives and Government Expenditures", Public Choice, Vol. 63, No. 3, December, 267-277.

Zax, Jeffrey S. (1989) "Quits and Race", Journal of Human Resources, Vol. 24, No. 3, Summer, 469-493.

Zax, Jeffrey S. (1989) "Is There a Leviathan in Your Neighborhood?", The American Economic Review, Vol. 79, No. 3, June, 560-567.

Zax, Jeffrey S. (1989) "Employment and Local Public Sector Unions", Industrial Relations, Vol. 28, No. 1, Winter, 21-31.

Zax, Jeffrey S. (1988) "Fringe Benefits, Tax Exemptions and Implicit Subsidies", Journal of Public Economics, Vol. 37, No. 2, November, 171-183.

Zax, Jeffrey S. (1988) "Wages, Nonwage Compensation and Municipal Unions", Industrial Relations, Vol. 27, No. 3, Fall, 301-317.


**Papers on Refereed Websites:**

Zax, Jeffrey S. (2010) "Comment on 'EI extended model and the fear of ecological fallacy', by Baodong Liu", at Sociological Methods and Research website: http://smrjournal.wordpress.com/2010/04/21/comment-on-ei-extended-model-and-the-fear-of-ecological-fallacy-by-baodong-liu-sociological-methods-research-vol-36-no-1-3-25-2007/#more-61


**Papers in Edited Volumes**

Zax, Jeffrey S. (2008) "Interjurisdictional competition under U.S. fiscal federalism: Commentary", in Fiscal Decentralization and Land Policies: Proceedings of the 2007 Land Policies Conference, Ingram, Gregory K, and Yu-Hung Hong, eds., Lincoln Institute of Land Policy, Cambridge, 238-241.

Zax, Jeffrey S. (2007) "Efficiency in China's urban labor markets", Chapter 10 in <u>Urbanization in China: Critical Issues in an Era of Rapid Growth</u>, Song, Yan and Chengri Ding, eds., Lincoln Institute of Land Policy, Cambridge, 209-234.

Zax, Jeffrey S. (2003) "Housing reform in urban China", in <u>How Far Across the River? Chinese Policy Reform at the Millenium</u>, Hope, Nicholas C., Dennis Tao Yang and Mu Yang Li, editors, Stanford University Press, Palo Alto, 313-350.

Zax, Jeffrey S. (2000) "The evolution of entrepreneurial activity in urban China, 1988-1995", in <u>China's Labor Market and Problems of Employment</u>, Wang, Yuguo and Aimin Chen, editors, The Southwest University of Finance and Economics Press , Chengdu, China, 481-500 (Chinese).

Yang, Guifang Lynn, and Jeffrey S. Zax (2000) "Gender-linked income differences in transitional urban China", in <u>China's Labor Market and Problems of Employment</u>, Wang, Yuguo and Aimin Chen, editors, The Southwest University of Finance and Economics Press, Chengdu, China, 566-584 (Chinese).

Li, Haizheng, and Jeffrey S. Zax (2000) "Economic transition and labor supply in urban China", in <u>China's Labor Market and Problems of Employment</u>, Wang, Yuguo and Aimin Chen, editors, The Southwest University of Finance and Economics Press , Chengdu, China, 217-233 (Chinese).

Zax, Jeffrey S. (1998) "Immigration, race and space", in <u>Help or Hindrance? The Economic Implications of Immigration for African Americans</u>, Daniel S. Hamermesh and Frank D. Bean, eds., Russell Sage Foundation, 222-252.

Zax, Jeffrey S. (1988) "The Effects of Jurisdiction Types and Numbers on Local Public Finance", in <u>Fiscal Federalism: Quantitative Studies</u>, Harvey S. Rosen, ed., National Bureau of Economic Research and the University of Chicago Press, 79-103.

Zax, Jeffrey S. and Casey Ichniowski (1988) "The Effects of Public Sector Unions on Payroll, Employment and Municipal Budgets", in <u>When Public Sector Workers Unionize</u>, Richard B. Freeman and Casey Ichniowski, eds., National Bureau of Economic Research and the University of Chicago Press, 323-361.

Freeman, Richard B., Casey Ichniowski and Jeffrey S. Zax (1988) "Collective Organization in the Public Sector", in <u>When Public Sector Workers Unionize</u>, Richard B. Freeman and Casey Ichniowski, eds., National Bureau of Economic Research and the University of Chicago Press, 365-398.

## Published Book Reviews

Zax, Jeffrey S. (2003) "Review of <u>Urban Inequality: Evidence from Four Cities</u>", edited by Alice O'Connor, Chris Tilley and Lawrence D. Bobo, <u>Journal of Economic Literature</u>, Vol. 41, No. 1, March, 238.

## Papers Under Journal Review

**Working Papers**

"Spatial disequilibrium, provincial and individual inequality in urban China", January 2020.

"Alphabetism: The effects of surname initial and the risk of being otherwise undistinguished", with Alexander S. Cauley, November 2018.

"Sixty years after Goodman's identity: Its unrecognized implications for regression-based inference", October 2018.

"The effects of IQ, high school effort and high school appearance on employment, income, marriage, spouse's income and fertility at age 35", with Daniel I. Rees, June 2014.

"Minimum standards of living, income and positional concerns in mid-reform urban China", with Kirby Rattenbury, January 2013.

"Housing allocations, welfare and inequality in early and mid-reform urban China", February 2012.

"The effects of congestion on the propensities to telecommute and to commute off-peak", with Ryan Hall, November 2010

"The economic effects of comparable worth policies", with Kristyn N. Ulrich, June 2008.

"Comment on 'Bloc voting, polarization, and the Panethnic Hypothesis: The case of Little Saigon', by Christian Collet", October 2007.

"Levels and changes in residential segregation, measured correctly", with John Gardner, October 2004.

"Do households vote with their feet?", with Valeriy D. Gauzhstein, July 2004.

"Commodification of urban Chinese housing in mid-reform", July 2004.

Lynch, James G. and Jeffrey S. Zax, "The effects of prizes on contestant selection and performance: The case of Arabian horse racing", November 2003.

"Permanent, transitory and life-cycle inequality", October 2002.

"Marriage, divorce, income and military marriage incentives", with David W. Flueck, April 2002.

"Economic transition and the labor market in China" with Haizheng Li, March 2002.

"Demand, supply and race in small business credit markets", December 2001.

"Bank credit and minority-owned small businesses in metropolitan Denver", November 2000.

"Gender-linked income differences in transitional urban China" with Guifang Lynn Yang, June 1999.

"The evolution of entrepreneurial activity in urban China, 1988-1995", May 1999.

"ERISA, pension diversification and the welfare of workers and retirees", with Mehmet M. Tutuncu, February 1998.

"Fertility behavior and the absence of 'missing females' in urban China", with Kathleen Greer Rossman, September 1997.

"Compensation for holding up half the sky? Gender-based income differences in urban China" with Lynn Yang, October 1996.

"Investment in education in urban China", May 1996.

"Analysis of client treatments for Colorado Child Welfare Service", with Margaret Irish, February 1996.

"Involvement and reinvolvement: Child abuse and neglect in Colorado", with Natalie Mullis, February 1996.

"Human capital in a workers' paradise: Returns to education in urban China", August 1995.

"Maltreatment case loads and county characteristics in Colorado", with Margaret Irish, May 1995.

"The stability of jobs in the local public sector", with Jonathan S. Leonard, April 1995.

"When should economics majors take the introductory statistics course?", with Douglas L. Jeavons and Larry D. Singell, January 1994.

"The effects of nonwage compensation on measured income distribution, income tax progressivity and returns to education", October 1993.

"Optimal worker portfolios: Pensions, ESOPs and anti-ESOPs", with Mehmet M. Tutuncu, May 1992.

"The effects of political voice on union formation among municipal employees", November 1990.

"Progressive taxation and regressive subsidies: Income tax exemptions and nonwage compensation", November 1989.

"The economic effects of function numbers in local government tiers", July 1988.

**Textbook**

Introductory Econometrics: Intuition, Proof and Practice, (2011), Stanford University Press, Palo Alto, CA.

Solutions to Introductory Econometrics: Intuition, Proof and Practice, (2011), http://www.sup.org/econometrics/.

**Service as Editor and Referee**

Editorial Board member, <u>Journal of Urban Management</u>, April 2010-present.

Coeditor, <u>Chinese Economic Review</u>, January 2005-February 2010.

Recipient, 2009 'Excellence in Refereeing Award", <u>American Economic Review</u>.

Referee for Journals: <u>The American Economic Review</u>, <u>The American Economic Review: Insights</u>, <u>Asian Economic Journal</u>, <u>Asia-Pacific Journal of Regional Science</u>, <u>Cambridge Journal of Regions, Economy and Society</u>, <u>Comparative Economic Studies</u>, <u>Contemporary Policy Issues</u>, <u>Economic Inquiry</u>, <u>Economic Journal</u>, <u>Economic Modeling</u>, <u>Economica</u>, <u>Economics Letters</u>, <u>Economics of Governance</u>, <u>Economics of Transition</u>, <u>Environment and Planning B: Urban Analysis and City Science</u>, <u>European Economic Review</u>, <u>Fiscal Studies</u>, <u>Health Economics</u>, <u>International Economic Review</u>, <u>Industrial and Labor Relations Review</u>, <u>Industrial Relations</u>, <u>International Journal of Business and Economics</u>, <u>Journal of Applied Econometrics</u>, <u>Journal of Comparative Economics</u>, <u>Journal of Demographic Economics</u>, <u>Journal of Development Economics</u>, <u>Journal of Housing Economics</u>, <u>Journal of Human Resources</u>, <u>Journal of Industrial Relations</u>, <u>Journal of Labor Economics</u>, <u>Journal of Law and Economics</u>, <u>Journal of Law, Economics, and Organization</u>, <u>Journal of Management Science and Engineering</u>, <u>Journal of Policy Analysis & Management</u>, <u>Journal of Political Economy</u>, <u>Journal of Public Economics</u>, <u>The Journal of Real Estate Finance and Economics</u>, <u>Journal of Regional Science</u>, <u>Journal of Sports Economics</u>, <u>Journal of the European Economic Association</u>, <u>Journal of Theoretical Politics</u>, <u>Journal of Urban Economics</u>, <u>Labour Economics: An International Journal</u>, <u>National Tax Journal</u>, <u>New Palgrave Dictionary of Economics</u>, <u>Papers in Regional Science</u>, <u>Public Choice</u>, <u>Public Finance Review</u>, <u>Publius</u>, <u>Regional Science and Urban Economics</u>, <u>Regional Science Perspectives</u>, <u>Research in Labor Economics</u>, <u>Review of Economics and Statistics</u>, <u>Review of Income and Wealth</u>, <u>Social Science Quarterly</u>, <u>Sociological Methods & Research</u>, <u>Southern Economic Journal</u>, <u>Urban Affairs Review</u>, <u>Urban Geography</u> , <u>Urban Studies</u>, and the <u>World Bank Economic Review</u>, August 1990 to present.

Referee for Foundations: CERGE-EI, National Science Foundation, Russell Sage Foundation, Research Grants Council of Hong Kong, August 1990 to present.

Referee for book publishers: Oxford University Press, Pearson Education, August 1990 to present.

**Professional Memberships**

American Economic Association, Association for Public Policy Analysis and Management, Chinese Economists Society, International Association for Research in Income and Wealth, Midwest Economics Association, North American Regional Science Council, Society for the Study of Economic Inequality, Society of Labor Economists, Southern Economic Association, Urban Economics Association, Western Economics Association International

**Grants**

Co-Principal Investigator, "Caseload Characteristics and Evaluation of Specific Colorado Works Programs", Colorado Department of Human Services, 6/1/2011-11/30/2012.

Principal Investigator, "Colorado Department of Transportation Safety Program Problem ID", Colorado Department of Transportation, 6/1/2009-9/30/2009.

Principal Investigator, "Colorado Department of Transportation Safety Program Problem ID", Colorado Department of Transportation, 6/1/2008-9/30/2008.

Principal Investigator, "Colorado Department of Transportation Safety Program Problem ID", Colorado Department of Transportation, 6/26/2007-6/15/2008.

Principal Investigator, "Colorado Department of Transportation Safety Program Problem ID", Colorado Department of Transportation, 6/16/2006-6/15/2007.

Principal Investigator, "Colorado Department of Transportation Safety Program Problem ID and Annual Report", Colorado Department of Transportation, 6/16/2005-6/30/2006.

Principal Investigator, "Colorado Department of Transportation Safety Program Problem ID and Annual Report", Colorado Department of Transportation, 12/8/2004-6/30/2005.

Principal Investigator, "Colorado Department of Transportation Safety Program Annual Report", Colorado Department of Transportation, 11/5/2003-6/30/2004.

Principal Investigator, "Election Cycles, Balanced Budget Requirements and Tax Limitations in State Governments", Council on Research and Creative Work, University of Colorado, 7/1/1991-6/30/1992.

Principal Investigator, "Nonwage Compensation and Enterprise Performance", PSC-CUNY Award #668406, 7/1/1988-6/30/1989.

Principal Investigator, Social Science Research Council Dissertation Fellowship, no. SS-25-83-04, 12/1/1982-2/29/1984.

## Awards and Honors

Biography included in Who's Who in Economics, 4th Edition.

Biography included in Marquis Who's Who in America, 57th and 58th editions.

Biography included in Marquis Who's Who in American Education, 6th edition.

Biography included in Marquis Who's Who in the East, 23rd edition.

Biography included in Marquis Who's Who in Finance and Business, 35th edition.

Stanford Calderwood Teaching Excellence Award from the Department of Economics at the University of Colorado at Boulder, May 2000.

Stanford Calderwood Teaching Excellence Award from the Department of Economics at the University of Colorado at Boulder, April 1993.

Fulbright Lecturer at the University of Ghana, Legon, Ghana, January-April 1990.

**Additional Professional Experience**

Consultant to the Attorney General of Colorado regarding the minority set-asides in State grant programs, March 2021-April 2021.

Consultant to the Attorney General of Colorado regarding the economic character of Colorado's Hospital Provider Fee, March 2018-June 2018.

Consultant to the City of Eastpointe, Michigan, regarding statistical analysis of voting patterns, October 2017-March 2018.

Consultant to the Attorney General of Colorado regarding the effects of restrictions on possession of large-capacity magazines for firearms, February-May 2017.

Consultant to the Attorney General of Colorado regarding the effects of ballot secrecy on the integrity of the electoral system, October-November 2016.

Consultant to the Attorney General of Colorado regarding the effects of state tax and expenditure limitations on state government behavior, September 2014.

Consultant to the Attorney General of Colorado regarding the effects of restrictions on possession of large-capacity magazines for firearms, July 2013-April 2014.

Consultant to the Attorney General of Colorado regarding ethnic composition of inactive voters, July 2012-December 2012.

Consultant to the Attorney General of Arkansas regarding the statistical analysis of voting patterns, March-May 2012.

Consultant to the Attorney General of Colorado regarding compensation and incentives for petition-gatherers, August 2010-May 2012.

Consultant to the Attorney General of Colorado regarding training and work opportunities for disabled inmates, April 2009-October 2010.

Consultant to the Attorney General of Colorado regarding predatory lending practices, February 2009-February 2010.

Consultant to the Attorney General of Arizona regarding the statistical analysis of voting patterns, February-July 2008.

Consultant to the City of Euclid, Ohio, regarding the statistical analysis of voting patterns, March through August 2007.

Consultant to the Colorado Gaming Association, March 2007.

Consultant to the World Bank, May-June 2005.

Consultant to the Attorney of Adams County, April-May 2004.

Consultant to the Attorney General of South Dakota regarding the statistical analysis of voting patterns, March 2002-June 2005.

Consultant to the State of Wyoming Legislative Service Office regarding labor market issues in the educational sector, July 2002-November 2002.

Consultant to the Mountain States Legal Foundation regarding the statistical analysis of voting patterns, April 2002-June 2002.

Consultant to the City of Valdez, Alaska, regarding economic integration and racial block voting, October 2001-December 2001.

Expert witness for the Attorney General, the State of Montana, regarding racial and ethnic block voting, July 2001-November 2001.

Consultant to the Attorney General of South Dakota regarding the statistical analysis of voting patterns, May 2000-October 2000.

Consultant to Attorney General of Colorado regarding the effects of parental notification on adolescent abortions, September 1999-June 2000.

Consultant to Sycare regarding evaluation of community mental health center performance, April 1999-October 1999.

Consultant to BBC Research & Consulting and the State of Colorado Workforce Coordinating Council regarding evaluation of State-sponsored training programs, June 1998- September 1998.

Consultant to the City Attorney of the City and County of Denver regarding the provision of bank credit to small minority-owned businesses, September 1997-August 1998.

Consultant to the Attorney General of Colorado regarding the effects of ballot position on voting behavior, March 1997-May 1998.

Consultant to the Attorney General of Montana regarding racial and ethnic block voting, November 1996-August 1998.

Consultant to BBC Research & Consulting and the State of Colorado Economic Development Commission regarding the State's strategic plan for economic development, September 1996-February 1997.

Consultant to the Attorney General of Michigan regarding variations in impacts of pollutants across ethnic groups, July 1996-May 1997.

Consultant to the Forward Estes Park Foundation regarding local economic development issues, May 1996-September 1996.

Consultant to the Department of Health Care Policy and Financing, Office of Public and Private Initiatives, the State of Colorado, regarding the evaluation of hospital performance, March 1996-August 1996.

-10-

Consultant to the Department of Human Services, Office of Self Sufficiency Programs, the State of Colorado, regarding the evaluation of microentrepreneur training programs, January-September 1996 and January-August 1997.

International Scholar appointment with the Asian Development Bank, 1995-1997.

Principal contractor to the Piton Foundation for statistical analysis of child abuse incidence and treatment in Colorado, September 1994-February 1996.

Consultant to the Attorney General of Colorado regarding racial block voting in state legislative elections, October 1993-June 1994.

Instructor in Introductory Mathematics for Economists, at the Economics Institute, Boulder, Colorado, August 1993.

Principal Investigator, review of econometric literature regarding the economic implications of health care reform for the Office of the Governor of the State of Colorado, April- July 1993.

Instructor in Masters' level Mathematics for Economists at the Economics Institute, Boulder, Colorado, March-May 1993.

Consultant to the Official Unsecured Creditors' Committee of Castle Pines North Metropolitan District, Colorado, regarding the effects of property tax rate increases on the rate of residential development, June 1992-May 1993.

Advisor to the Cost and Quality Study of Early Care and Education project, at the University of Colorado at Denver Department of Economics, Spring 1992-Fall 1994.

Instructor in Intermediate Microeconomics at the Economics Institute, Boulder, Colorado, May 1992.

Instructor in Intermediate Microeconomics and Introductory Mathematics for Economists, for the Economics Institute's program at the Ministry of Finance, Jakarta, Indonesia, May 1991.

Consultant to the Del Valle School District, Texas, regarding the effects of different districting schemes on minority membership of the School Board, October 1990-February 1991.

Instructor in applied econometric analysis, Institute of Economics, Chinese Academy of Social Sciences, Beijing, People's Republic of China, December 1988 and June 1990.

-11-

# History of Expert Participation Through Deposition or Testimony

Jeffrey S. Zax, Ph.D.

2 April 2018

**United States of America v. City of Eastpointe, et al.**, United States District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 4:17-cv-10079.

    Deposition:    19 March 2018

**Rocky Mountain Gun Owners, et al. v. John W. Hickenlooper, Governor of the State of Colorado**,  Denver District Court Case No. 2013CV33879.

    Deposition:    27 March 2017        Testimony:    4 May 2017

**Hill et al. v. Williams et al.** and **Harlos, et al. v. Morrissey, et al.**, United States District Court for the District of Colorado, Civil Action No. 16-cv-02627-CMA.

                                  Testimony:    2 November 2016

**Colorado Outfitters Association, et al. v. John W. Hickenlooper, Governor of the State of Colorado**, United States District Court for the District of Colorado, Civil Action No. 13-CV-1300-MSK-MJW.

    Deposition:    31 October 2013      Testimony:    9 April 2014
                       19 March 2014

**Future Mae Jeffers, et al. v. Arkansas Board of Apportionment**, United States District Court for the Eastern District of Arkansas, Case No. 2:12-cv-00016.

    Deposition:    3 April 2012         Testimony:    9-10 May 2012

**Independence Institute, et al., v. Buescher.**, United States District Court for the District of Colorado, Civil Action No. 10-CV-00609-PAB-MEH.

    Deposition:    22 March 2011        Testimony:    24 May 2012

- 1 -

**Jesse Montezz, et al., v. Bill Owens, et al.**, United States District Court for the District of Colorado, Civil Action No. 92-CV-00870-JLK.

Testimony:     25 October 2010

**Maria M. Gonzalez, et al., v. State of Arizona, et al.**, United States District Court for the District of Arizona, No. CV06-01268 PHX ROS, No. CV06-1362 PCT ROS (Cons) and No. CV06-1575 PCT ROS (Cons)

Deposition:    12 March 2008          Testimony:     17-18 July 2008

**The United States of America v. City of Euclid, Ohio and Cuyahoga County Board of Elections, Hazeltine,** United States District Court for the Northern District of Ohio, Eastern Division, Civil Action No. 1:06-CV-01652

Deposition:    25 May 2007           Testimony:     14 August 2007

**Bone Shirt, et al. v. Hazeltine, et al.,** United States Federal District Court for the District of South Dakota, Central Division, Civil Action No. 01-3032-KES (D.S.D.)

Deposition:    19 May 2003           Testimony:     26 April 2004
               26 January 2004

**Planned Parenthood of the Rocky Mountains, Inc., et al., v. William Owens, et al.**, United States District Court for the District of Colorado, Civil Action No. 99-WM-60.

Deposition:    11 February 2000
               24 February 2000
               1 June 2000

**Libertarian Party of Colorado, et al. v. Victoria Buckley**, United States District Court for the District of Colorado, Civil Action No. 96-WM-1983.

Testimony:     26 May 1998

- 2 -

**Earl Old Person, et al. v. Mike Cooney, et al.**, United States District Court for the District of Montana, Great Falls Division, Civ. No. CV-96-004-GF-PGH.

|  | Deposition: | 4 June 1997 | Testimony: | 26 March 1998 |
|---|---|---|---|---|
|  |  | 22 August 2001 |  | 6 November 2001 |

**NAACP-Flint Chapter v. Engler**, Circuit Court for Genesee County, State of Michigan, No. 95-38228.

|  | Deposition: | 7 February 1997 | Testimony: | 30 April 1997 |
|---|---|---|---|---|
|  |  | 21 April 1997 |  |  |

**Jennie Sanchez, et al. v. State of Colorado, et al.**, United States District Court for the District of Colorado, Civil Action No. 93-S-963.

|  | Deposition: | 30 December 1993 | Testimony: | 24 March 1994 |
|---|---|---|---|---|

**Central Bank v. Castle Pines North, et al.**, District Court, County of Douglas, State of Colorado, Case No. 92-CV-4433.

|  | Depositions: | 17 March 1993 |
|---|---|---|
|  |  | 12 April 1993 |

**Enrique G. Lopez, Jr., et al. v. Del Valle Independent School District, et al.**, 261st District Court of Travis County, State of Texas.

|  | Depositions: | 13 November 1990 | Testimony: | 5 February 1991 |
|---|---|---|---|---|
|  |  | 8 January 1991 |  |  |