## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-1866-GPG-SKC**

BENJAMIN GATES,
TRAVIS SWARTZ
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs Benjamin Gates ("Gates"), Travis Swartz ("Swartz"), Karl Honegger ("Honegger"), and National Foundation for Gun Rights, Inc. ("NFGR") submit the following Motion for Summary Judgment.

## I. INTRODUCTION

Plaintiffs bring this Second Amendment challenge to Colorado's magazine ban codified at C.R.S. § 18-12-301 *et seq*., pursuant to the standard set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Challenges to arms bans such as this one are prime candidates for pre-trial resolution, because, as the Ninth Circuit recently held, such challenges involve issues of so-called "legislative facts" (i.e., facts that have relevance to legal reasoning and the

lawmaking process such as the formulation of a legal principle or ruling by a judge or court) rather than "adjudicative facts" (i.e., the facts of the particular case). *Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023) (remanding for entry of summary judgment for Second Amendment plaintiffs). Indeed, each of the three major Supreme Court cases dealing with Second Amendment issues in recent years was decided on a bare motion to dismiss record. *See D.C. v. Heller*, 554 U.S. 570, 576 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); and *Bruen*, 142 S. Ct. at 2125.

In *Bruen*, the Court held that the framework for resolution of a Second Amendment case has two steps: (1) does the plain text of the Second Amendment cover a plaintiff's conduct? (2) If so, has the government demonstrated that its ban is consistent with the Nation's historical tradition of firearm regulation? *Id.*, 142 S. Ct. 2129-30. In this case, the plain text of the Second Amendment covers Plaintiffs' conduct in seeking to acquire and possess bearable arms. None of the historical regulations advanced by the State is analogous to its ban of an arm commonly possessed by law-abiding citizens for lawful purposes. As in *Heller* and *Bruen*, the Court can easily make these determinations without a trial based on the summary judgment record assembled by the parties. Accordingly, Plaintiffs respectfully move the Court to enter summary judgment in their favor.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      The Statute

1.      C.R.S. § 18-12-301 *et seq*. shall be referred to herein as the "Magazine Ban."

2.     Pursuant to C.R.S. § 18-12-301(2)(a), "large-capacity magazine" means:

(I) A fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition;

(II) A fixed, tubular shotgun magazine that holds more than twenty-eight inches of shotgun shells, including any extension device that is attached to the magazine and holds additional shotgun shells; or

(III) A nontubular, detachable magazine, box, drum, feed strip, or similar device that is capable of accepting more than eight shotgun shells when combined with a fixed magazine.

3.     A person who sells, transfers, or possesses a "large-capacity magazine" commits a misdemeanor or a felony depending on the circumstances. C.R.S. § 18-12-302(1)(a).

4.     A person may possess a "large capacity magazine" if he or she owned it on July 1, 2013 and maintained continuous possession of it. C.R.S. § 18-12-302(2)(a).

5.     For purposes of this motion, "Grandfathered Magazine" means a magazine the possession of which is lawful pursuant to the provisions of C.R.S. § 18-12-302(2)(a).

6.     In this motion Plaintiffs will use the statutory term "large capacity magazine" or "LCM" to refer to the magazines banned by the Magazine Ban. That said, the statutory term is a tendentious political term, not an accurate descriptive term. Gates Declaration ¶ 17. Many magazines banned by the statute are in fact standard capacity magazines. *Id*.

**B.     Standing**

7.     Plaintiff Gates is a law-abiding citizen, and he possesses and uses numerous firearms for a variety of lawful purposes, including self-defense. Gates Declaration ¶¶ 3, 6-7.

8.     Since 2013 Gates has purchased approximately 50 firearms, many of which come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds. Gates Dec. ¶ 10. For each such firearm, he would have purchased a standard capacity magazine with a capacity in excess of 15 rounds but for the fact that the Magazine Ban made doing so unlawful. *Id.*

9.     Gates has frequently purchased firearms in the past. Gates Dec. ¶ 11. On average, Gates purchases approximately five firearms per year. *Id.* Gates will certainly continue to frequently purchase firearms in the coming months and years. *Id.*

10.     Many firearms Gates will purchase in the coming months and years come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds, and but for his fear of criminal prosecution under the Magazine Ban, he would purchase such standard capacity magazines when he purchases these firearms. Gates Dec. ¶ 12.

11.     Gates owns some Grandfathered Magazines. Gates Dec. ¶ 13. Some of these magazines have become worn through use in the last 10-plus years, and he would immediately replace them but for his fear of criminal prosecution under the Magazine Ban if he were to do so. *Id.*

12.     Gates would also certainly purchase additional LCMs but for his fear of criminal prosecution under the Magazine Ban if he were to do so. Gates Dec. ¶ 14.

13.     Plaintiff Swartz is a law-abiding citizen, and he possesses and uses numerous firearms for a variety of lawful purposes including self-defense. Swartz Declaration ¶¶ 3, 5-6.

14.     Since 2013 Swartz has purchased approximately 20 firearms, many of which come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds. Swartz Dec. ¶ 9. For each such firearm, he would have purchased a standard capacity magazine with a capacity in excess of 15 rounds but for the fact that the Magazine Ban made doing so unlawful. *Id*.

15.     Swartz has frequently purchased firearms in the past. Swartz Dec. ¶ 10. On average, he purchases approximately two to three firearms per year. *Id*. He will certainly continue to frequently purchase firearms in the coming months and years. *Id*.

16.     Many firearms Swartz will purchase in the coming months and years come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds, and but for his fear of criminal prosecution under the Magazine Ban, he would purchase such standard capacity magazines when he purchases these firearms. Swartz Dec. ¶ 11.

17.     Swartz owns some Grandfathered Magazines. Swartz Dec. ¶ 12. Some of these magazines have become worn through use in the last 10-plus years, and he

would immediately replace them but for his fear of criminal prosecution under the Magazine Ban if he were to do so. *Id*.

18.     Swartz would also certainly immediately purchase additional LCMs but for his fear of criminal prosecution under the Magazine Ban if he were to do so. Swartz Dec. ¶ 13.

19.     Plaintiff Honegger is a law-abiding citizen, and he possesses and uses firearms for a variety of lawful purposes, including self-defense. Honegger Declaration ¶¶ 2, 4, 5.

20.     Honegger has never at any time owned an LCM. Honegger Dec. ¶ 7.

21.     Honegger would certainly immediately purchase an LCM but for his fear of criminal prosecution under the Magazine Ban if he were to do so. Honegger Dec. ¶ 8.

22.     In particular, if the Magazine Ban were repealed or enjoined, he would buy a 6.5 Creedmoor rifle with a 20-round magazine or a Glock handgun that accepts a 25- or 30-round magazine. Honegger Dec. ¶ 9. He would also immediately purchase a 17-round magazine for one of the handguns he currently owns. *Id*.

23.     Gates, Swartz and Honegger do not currently have a definite plan to acquire any LCMs because they know the Magazine Ban is enforced and they fear prosecution if they were to acquire LCMs or transfer any Grandfathered Magazine. Gates Dec. ¶ 15; Swartz Dec. ¶ 14; Honegger Dec. ¶ 8. That said, if the Magazine Ban were repealed or enjoined, they would immediately acquire LCMs. *Id*.

24.     Hannah Hill is a law-abiding citizen and the Executive Director of NFGR. Hill Declaration ¶¶ 3, 5.

25.     NFGR has members who would acquire LCMs if the Magazine Ban were repealed or enjoined. Hill Dec. ¶ 6. For example, Hill is a member of NFGR, and if she could legally do so, she would immediately go out and acquire a 30-round magazine for her AR-15. *Id*. Plaintiff Gates is also a member of NFGR who would acquire LCMs if he were legally able to do so. Gates Dec. ¶¶ 4, 15.

26.     NFGR is a Second Amendment advocacy organization, and it regularly funds challenges to statutes and regulations that burden Second Amendment rights. Hill Dec. ¶ 8. Thus, the interests NFGR seeks to protect in this action are germane to its purpose. *Id*.

## C.     The Defendant

27.     The State does not dispute that Governor Polis is a proper defendant in this action, and "for the purpose of defending the LCM Ban against Plaintiffs' Second Amendment challenge here, which seeks only declaratory and injunctive relief … the Governor [has agreed] to waive his sovereign immunity and consent[ed] to be sued in this Court in only this case, in only his official capacity, and only for prospective relief." Answer, ECF 43 p.2, n.1.

## D.     Magazines Are Arms

28.     Plaintiffs have designated Mark Passamaneck as an expert regarding two topics: (1) an estimate of the number of magazines with a capacity in excess of 15 rounds in the United States; and (2) the operation and durability of these magazines. Mr. Passamaneck's qualifications are set forth in paragraph 2 of his attached declaration.

29.     Without a magazine, the operation of a semi-automatic firearm as a semi-automatic firearm is impossible. Passamaneck Declaration ¶ 3.

30.     A magazine is not merely a box in which ammunition is stored; rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id.*

31.     The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id.*

32.     If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id.*

33.     Thus, without a magazine as a designed dynamic component, semi-automatic firearms would not exist. *Id.*

34.     It may be technically possible to fire a semi-automatic weapon without a magazine by manually opening the action each time the weapon is fired and manually inserting a single round into the chamber, but, by definition, this turns the firearm into a single-shot firearm and renders semi-automatic fire impossible, which in turn makes it impossible to operate the firearm as designed. Passamaneck Dec. ¶ 4.

**E.     LCMs Are in Common Use**

35.     The case of *Colorado Outfitters Assoc. v. Hickenlooper*, Case No. 13-cv-1300, United States District Court for the District of Colorado, shall be referred to in this Statement of Undisputed Material Facts as "*COA.*"

36.     The case of *Rocky Mountain Gunowners v. Hickenlooper*, Case No. 2013CV33879, District Court for the City and County of Denver, shall be referred to in this Statement of Undisputed Material Facts as "*RMGO.*"

37.     In *COA*, Governor Hickenlooper was sued in his official capacity. *Cooke v. Hickenlooper*, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016).

38.     In *RMGO*, Governor Hickenlooper was sued in his official capacity. *Rocky Mountain Gun Owners v. Polis,* 2020 CO 66, 467 P.3d 314.

39.     A suit against a state official in his or her official capacity is no different than a suit against the State itself.

40.     "For litigation purposes, the Governor is the embodiment of the state." *Ainscough v. Owens*, 90 P.3d at 858.

41.     Defendant admits that the parties to *COA*, including the State of Colorado, entered into the stipulations attached as Exhibit 1 for purposes of the trial to the court in that case. Answer ¶ 12.

42.     Defendant admits that the parties to *RMGO*, including the State of Colorado, entered into the stipulations attached as Exhibit 2 for purposes of the trial to the court in that case. Answer ¶ 13.

43.     The stipulations in Exhibit 1 shall be referred to as "*COA* Stip. ___."

44.     The stipulations in Exhibit 2 shall be referred to as "*RMGO* Stip. ___."

45.     The facts set forth in paragraphs 43 through 58 cannot be genuinely disputed by the State given that they are so obviously true that the State stipulated to them in one or both *COA* and *RMGO*.

46.     More than 300,000,000 firearms are lawfully owned in the United States. *COA* Stip. 10.

47.     A significant percentage of firearms privately owned are semi-automatic, most of which utilize a detachable box magazine. *COA* Stip. 10.

48.     The number of lawfully owned semi-automatic firearms in the United States that utilize an LCM is in the tens of millions. *COA* Stip. 10; *RMGO* Stip. 6.

49.     Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. *COA* Stip. 12.

50.     In states without laws regulating magazine capacity, AR-15 platform rifles are usually sold at retail with a detachable box magazine capable of holding up to 30 rounds, and the majority of owners of AR-15 platform rifles use magazines with a capacity of 20 and/or 30 rounds. *COA* Stip. 15; *RMGO* Stip. 10.

51.     Semi-automatic firearms equipped with LCMs are used for multiple lawful purposes, including recreational target shooting, competition shooting, and collecting, and are kept for home defense and defense outside the home. *COA* Stip. 19.

52.     Semi-automatic pistols and rifles cannot function as designed without a magazine. *COA* Stip. 20; *RMGO* Stip. 14.

10

53.     Semi-automatic firearms are designed to discharge a bullet for each pull of the trigger, automatically extract and eject the spent cartridge case from the firing chamber, re-cock the firing mechanism, and load a new cartridge into the firing chamber so it can be fired again with another pull of the trigger. *COA* Stip. 20; *RMGO* 15.

54.     Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15 rounds; for example the Glock 17, which is one of the most popular handguns sold in the United States. *COA* Stip. 22; *RMGO* Stip. 17.

55.     The number of LCMs in the United States is in the tens of millions. *COA* Stip 25.

56.     The number of LCMs in the State of Colorado alone is in the millions. *COA* Stip. 26; *RMGO* Stip. 20.

57.     Prior to the effective date of the Magazine Ban, LCMs were not unusual in Colorado. *RMGO* Stip. 21.

58.     Firearm magazines can become non-operational due to normal wear and tear or other damage. *COA* Stip. 30.

59.     Through December 2016 there were 41 prosecutions under the Magazine Ban. *RMGO* Stip. 29. From January 1, 2017 to January 31, 2023, there were 729 more. Exhibit 3. Thus, through January 31, 2023, there were 770 such prosecutions.

60.     The Industry Intelligence Report published by the National Shooting Sports Foundation ("NSSF") is a nationally recognized trade report for the firearms industry and shall be referred to herein as the NSSF Report. Passamaneck Dec. ¶ 5.

11

61.    The data reported in the NSSF report is highly reliable. Passamaneck Dec. ¶ 6.

62.    The 2020 NSSF Report states that as of 2018, there were at least 79 million LCMs in the United States. Passamaneck Dec. ¶ 8.

63.    The 2020 NSSF Report estimate is a very conservative estimate of the total number of LCMs in the United States, but there cannot be any doubt that – as the State previously stipulated – the number is at least in the tens of millions and probably as many as 350 million. Passamaneck Dec. ¶ 9.

## III. PLAINTIFFS HAVE STANDING

### A.    The Individual Plaintiffs Have Standing

To establish standing under Article III of the Constitution, a plaintiff must show three elements: (1) he has suffered an "injury in fact"; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022) (internal citations and quotation marks omitted). Defendant cannot reasonably argue that Plaintiffs have failed to establish causation and redressability. The Magazine Ban prohibits them from acquiring the Banned Magazines. There is obviously a causal connection between the injury they allege and the existence of the statute. *See Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 978 (10th Cir. 2020). Moreover, there is no dispute that enjoining the enforcement of the Magazine Ban redresses Plaintiffs' injuries by removing the alleged violation of their Second Amendment rights. *Id.*

12

Since the existence of the second and third elements of standing cannot reasonably be disputed, Plaintiffs will focus their discussion on the first element, i.e., "injury in fact."

In a pre-enforcement challenge such as this case, a plaintiff can establish injury sufficient to bring a constitutional challenge to a law by (1) showing an intention to engage in a course of conduct that is (2) arguably affected with a constitutional interest, but is (3) proscribed by statute, and (4) there exists a credible threat of prosecution thereunder. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (internal citation and quotation marks omitted).

### 1. Plaintiffs Intend to Engage in the Proscribed Conduct

Plaintiffs have submitted declarations in support of their standing. For purposes of this motion for summary judgment, the specific facts set forth in those declarations must be "taken to be true." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023) (internal citation and quotation marks omitted).

Plaintiffs Gates, Swartz, and Honegger are law-abiding citizens who own firearms for a variety of lawful purposes. UMF 7, 13, 19.[1] Gates and Swartz have purchased several firearms since the Magazine Ban went into effect. UMF 8, 14. Many of those firearms come standard with an LCM in states that do not have magazine bans. *Id*. Gates and Swartz would have purchased LCMs along with those firearms but for the fact that the Magazine Ban made doing so unlawful. *Id*.

---

[1] "UMF" refers to the above "Statement of Undisputed Material Facts." Such facts will be referred to by paragraph number. For example, paragraph 1 of the Statement of Undisputed Material Facts will be referred to as "UMF 1."

Gates and Swartz have frequently purchased firearms in the past, and they will certainly continue to do so in the coming months and years. UMF 9, 15. Many of the firearms Gates and Swartz will purchase in the coming months and years come standard with LCMs in states that do not have magazine bans. UMF 10, 16. But for their fear of criminal prosecution under the Magazine Ban, Gates and Swartz would purchase LCMs when they purchase those firearms. *Id.*

Gates and Swartz own Grandfathered Magazines. UMF 11, 17. Some of those magazines have become worn through use over the last 10-plus years. *Id.* They would immediately replace those worn Grandfathered Magazines but for their fear of criminal prosecution under the Magazine Ban.

Honegger has never at any time owned an LCM. UMF 20. He would certainly immediately purchase an LCM but for his fear of criminal prosecution under the Magazine Ban if he were to do so. UMF 21. In particular, if the Magazine Ban were repealed or enjoined, he would buy a 6.5 Creedmoor rifle with a 20-round magazine or a Glock handgun that accepts a 25- or 30-round magazine. UMF 22. He would also immediately purchase a 17-round magazine for one of the handguns he currently owns. *Id.*

Gates, Swartz, and Honegger do not currently have a definite plan to acquire any LCMs because they know the Magazine Ban is enforced and they fear prosecution if they were to acquire LCMs or transfer any Grandfathered Magazine. UMF 23. That said, if the Magazine Ban were repealed or enjoined, they would immediately acquire LCMs. *Id.*

14

Plaintiffs are not required to have a definite plan to break the law to demonstrate they intend to engage in the proscribed conduct. Courts do not require plaintiffs to "risk actual prosecution before challenging an allegedly unconstitutional" statute. *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016) (cleaned up). Instead, a plaintiff in a suit for prospective relief can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of conduct affected by the challenged government action; (2) evidence that they have a present desire, though no specific plans, to engage in the conduct; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced. *Peck v. McCann*, 43 F.4th 1116, 1129–30 (10th Cir. 2022) (internal citation and quotation marks omitted). *Peck* arose in the First Amendment context but after *Bruen* that is a distinction that makes no difference. In *Bruen*, the Court held that the constitutional right to bear arms "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.*, 142 S. Ct. at 2156 (citation and quotation marks omitted). The Court specifically held that the Second Amendment is directly analogous to the First Amendment and imposes similar burdens on the government. *Id.*, 142 S. Ct. at 2130.[2]

---

[2] *See also Ezell v. City of Chicago*, 651 F.3d 684, 702–03, 706 (7th Cir.2011) ("Both *Heller* and *McDonald* suggest that First Amendment analogies are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." (internal citation omitted)).

Applying the *Peck* framework to this case, the government cannot plausibly dispute that in the past Plaintiffs have engaged in the type of conduct affected by the Magazine Ban. They have purchased numerous firearms that come standard with LCMs, and because of the Magazine Ban they have not acquired the LCMs that normally would have come with these firearms. Nor is there any reasonable dispute that they presently desire to purchase LCMs and would immediately do so but for the prohibitions of the Magazine Ban. Finally, because they have frequently engaged in such conduct in the past, their assertion that they will engage in the conduct in the future is plausible, as is their claim that they do not presently intend to break the law because they fear prosecution. As the Ninth Circuit recently held in a Second Amendment arms ban case, this is sufficient to show the requisite injury. *Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023) ("exact dates and times are not necessary;" it is sufficient that plaintiffs affirmatively intend to possess the banned arms if criminal prohibition is invalidated).

### 2. Plaintiffs' Conduct is Arguably Affected with a Constitutional Interest

The Second Amendment protects the right of law-abiding citizens to keep and bear commonly possessed "arms" for lawful purposes. *Bruen*, 142 S. Ct. 2111, 2122 (2022) (*citing D.C. v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)). To establish standing it is necessary only to demonstrate that it is "arguable" that a constitutional right has been abridged. *Peck*, 43 F.4th at 1129.

16

The standing inquiry must not be conflated with evaluation of the merits. "For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014) (*quoting Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc)). "Rather, we must assume for purposes of the standing inquiry that each claim is legally valid." *Id*. Courts have held that detachable magazines are "arms" protected by the Second Amendment. *See, e.g., Barnett v. Raoul*, 2023 WL 3160285, at *8, *10 (S.D. Ill. Apr. 28, 2023). Since a court has actually held that LCMs are constitutionally protected, for standing purposes it is at least arguable that they are protected.

Defendant has previously argued that Plaintiffs Gates and Swartz do not have standing because they already possess "multiple" Grandfathered Magazines. *See* Resp. to Mot. Prel. Inj., ECF 30, 2-3. The government's reasoning appears to be that Gates and Swartz are not injured because it has determined they have enough magazines. There are two problems with this argument. First, the government seems to be assuming that the Second Amendment does not protect a citizen's right to possess arms in numbers beyond some arbitrary unspecified threshold it has determined for unspecified reasons is "enough." Defendant has not cited any authority supporting his assumption, and Plaintiffs are aware of none.

Moreover, Defendant's argument that Gates and Swartz have enough magazines surely confuses the severity of an injury with the existence of an injury.

17

For standing to exist, an injury need not be severe. Indeed, it can be a "trifle." In *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669 (1973), the Court held that injury in fact serves to distinguish a person with a direct stake in the outcome of a litigation "**even though small** from a person with a mere interest in the problem." *Id.*, 412 U.S. at 690, n.14 (internal quotation marks omitted; emphasis added). The Court noted that it has allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine, or a $1.50 poll tax. *Id.* Thus, "an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *Id.* (internal quotation marks omitted). As the Tenth Circuit has held, there is no requirement "that an injury must meet some threshold of pervasiveness to satisfy Article III." *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch.* Dist. RE-1, 859 F.3d 1243, 1248 (10th Cir. 2017). It may be the case that Person A who holds some Grandfathered Magazines has been injured less by the Magazine Ban than Person B who never had any. But the degree of injury is irrelevant for the standing analysis. So long as it is even arguable that Person A has a right to acquire even one additional LCM, injury has been established.

### 3. Plaintiffs' Conduct is Proscribed by the Magazine Ban

Defendant cannot dispute that the Magazine Ban makes it a criminal offense for the Plaintiffs to acquire or transfer Banned Magazines.

18

### 4.      There Exists a Credible Threat of Prosecution

As noted above, a plaintiff need not risk actual prosecution. *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007). Instead, standing exists if there is "an objectively justified fear of real consequences." *Peck*, 43 F.4th at 1132 (citation and internal quotation marks omitted). The Tenth Circuit has identified three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement. *Id*. Here, as in *Peck*, standing exists because factors (1) and (3) weigh in favor of Plaintiffs.[3] Factor 1 exists because there have been 770 prosecutions under the Magazine Ban in the ten years since it was enacted. UMF 59. In *Teter v. Lopez*, 76 F.4th 938, 945 (9th Cir. 2023), the court held that a mere 30 prosecutions for possessing a banned arm is "good evidence" that future enforcement is likely. Surely several hundred prosecutions is even better evidence. Factor 3 exists because the Governor has never asserted that the Magazine Ban is moribund or will not continue to be vigorously enforced in the future as it has in the past.  Indeed, the Governor asserted just the opposite when he insisted the public interest would be harmed if the State were preliminary restrained from continuing its enforcement of the Magazine Ban. ECF 30, p.24.

---

[3] Also as in *Peck*, only prosecutors can bring charges. But this factor, standing alone, does not preclude standing so long as the other two factors are met. *Peck*, 43 F.4th at 1132.

**B.**     **Individual Standing Has Been Found to Exist in Similar Cases**

In *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253 (D. Colo. Aug. 7, 2023), the plaintiffs brought a Second Amendment challenge to a Colorado statute that criminalized the acquisition of arms for adults 18 to 20 years old. Last month, this Court held that the individual plaintiffs had standing because they would acquire the arms but for the prohibition of the statute and there was "no evidence of an assurance that the statute will not be enforced" against them. *Id*. at *7 (citation omitted). Similarly, in *Barnett v. Raoul*, 2023 WL 3160285, at *2 (S.D. Ill. Apr. 28, 2023), the court held the plaintiffs had standing to bring a Second Amendment challenge to Illinois' magazine ban. *See also Bevis v. City of Naperville, Illinois*, 2023 WL 2077392, at *5 (N.D. Ill. Feb. 17, 2023) (same); *Sullivan v. Ferguson*, 636 F. Supp. 3d 1276, 1286 (W.D. Wash. 2022) (standing to challenge Washington's magazine ban); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (standing to challenge ammunition ban); and *Teter v. Lopez*, 76 F.4th 938, 947 (9th Cir. 2023).

**C.     NFGR Has Standing**

An association may bring claims on behalf of its members so long as (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *N. New Mexico Stockman's Ass'n v. United States Fish &*

*Wildlife Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022) (internal citations and quotation marks omitted).

NFGR has members who would acquire LCMs if the Magazine Ban were repealed or enjoined. For example, Hannah Hill is a member of NFGR, and if she could legally do so she would immediately go out and acquire a 30-round magazine for her AR-15. UF. 25. NFGR is a Second Amendment advocacy organization, and it regularly funds challenges to statutes and regulations that burden Second Amendment rights. UF 26. Thus, the interests NFGR seeks to protect are germane to its purpose. The parties in this case are seeking prospective declaratory and injunctive relief. Compl. ¶¶ 22-23. Thus, the individual participation of NFGR's members is not necessary. Accordingly, NFGR has associational standing.

Even if there were some question regarding NFGR's associational standing, there is no need for the Court to address NFGR's standing separately from that of the individual Plaintiffs. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," and the Court may proceed to the merits without determining the other Plaintiffs' standing. *Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1153 (10th Cir. 2022) (*quoting Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)); *see also Campbell v. Buckley*, 203 F.3d 738, 740 n.1 (10th Cir. 2000) ("Because the individual plaintiffs ... have standing, and because ... [they] jointly raise the same substantive arguments on appeal, ... there is no need to address the standing of the [other] plaintiffs.").

21

### D.   *Colorado Outfitters* is Distinguishable

Defendant has cited *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016),[4] in support of his standing arguments, but that case is clearly distinguishable. The Tenth Circuit's standing analysis with respect to the challenge to the Magazine Ban (as opposed to the other challenged statute) was extremely narrow. While there were literally dozens of plaintiffs, only one (Women for Concealed Carry) preserved the issue of standing for appeal. *Id.*, 823 F.3d at 550. The Court held that single plaintiff did not have standing because the member who testified to support standing did not herself have standing. *Id.* at 551. That member testified that her Grandfathered Magazines might "eventually" wear out or that it was "possible" that she could lose them. *Id.* The court held that such "some day" speculations were insufficient to establish an injury-in-fact. *Id.*

The standing evidence Plaintiffs have adduced in this case is in stark contrast to the evidence the Tenth Circuit rejected in *Colorado Outfitters*. All three individual Plaintiffs have testified they would "immediately" acquire LCMs if the statute were repealed or enjoined. Unlike the plaintiffs in *Colorado Outfitters* who testified her LCMs might someday wear out, Gates and Swartz testified that some of their Grandfathered Magazines have already worn out and need to be replaced. Honegger has never had an LCM and would immediately acquire at least one if he could. These

---

[4] The district court decision, *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050 (D. Colo. 2014), *vacated and remanded*, 823 F.3d 537 (10th Cir. 2016), also discussed the standing issue. But that decision was vacated and therefore "lacks precedential value." *Peoples v. CCA Det. Centers*, 449 F.3d 1097, 1099 (10th Cir. 2006).

are as far from the "some day" evidence rejected in *Colorado Outfitters* as it is possible to be, and thus that case is not relevant to the standing issue here. *Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023) (stated desire to immediately purchase replacement "is no mere some day intention").

## E.   Summary:  Plaintiffs Have Standing

For the foregoing reasons, there is no genuine dispute concerning the material facts supporting Plaintiffs' standing, and those facts are sufficient to establish their standing to bring their constitutional challenge to the Magazine Ban.

## IV. STANDARD OF REVIEW

## A.   Summary Judgment Standard

Summary judgment must be granted if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 920–21 (10th Cir. 2022) (cleaned up); Fed. R. Civ. P. 56(a). The fact that the State has previously stipulated to literally all of the facts necessary to establish Plaintiffs' prima facie case is significant. Defendant has asserted that he intends to dispute those facts in this case. Sched. Ord., ECF 37, p. 5. But to dispute a fact, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (quoting *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005)).

The relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury. *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Therefore, to establish a triable issue of fact on, for example, the prevalence of LCMs in the United States, the State would need to do more than merely deny Plaintiff's evidence that tens of millions (if not hundreds of millions) are owned by Americans. It would need to submit affirmative evidence that would rebut that fact. It will obviously not be able to do that, which is doubtless why it stipulated to these facts previously.

## B.    Standard for Permanent Injunction

For a party to obtain summary judgment for a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).  The requirements for obtaining a permanent injunction are "remarkably similar" to those for obtaining a preliminary injunction. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 908 (10th Cir.) (*citing Prairie Band Potawatomi Nation, supra*). The only difference between the two is that a permanent injunction requires showing actual success on the merits; whereas a preliminary injunction requires showing a substantial likelihood of success on the merits. *Id*.

24

## V.      PLAINTIFFS SUCCEED ON THE MERITS

### A.      Legal Framework for Second Amendment Claims

*Bruen* states that the appropriate test for applying the Second Amendment is: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.*, 142 S. Ct. at 2129-30 (internal citation and quotation omitted).

### B.      The Plain Text of the Second Amendment Covers Plaintiffs' Conduct

In *Bruen*, the issue under the first step was "whether the plain text of the Second Amendment protects … carrying handguns publicly for self-defense." *Id.* at 2134. In answering this question, *Bruen* analyzed only the "Second Amendment's text," applying ordinary interpretive principles. *Id.* at 2134–35. Because the word "bear" naturally encompasses public carry, the Court concluded that the conduct at issue (public carry) was protected by the plain text of the Second Amendment. *Id.* at 2143.

In this case, Plaintiffs desire to acquire and possess the banned LCMs. Thus, the first issue is whether the plain text of the Second Amendment covers this conduct. The plain text provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Court held that a handgun was an

25

"arm" within the meaning of the Second Amendment. 554 U.S. at 581, 628–29, 128 S.Ct. 2783. In reaching that conclusion, the Court began by noting that, as a general matter, the "18th-century meaning" of the term "arms" is "no different from the meaning today." *Id*. at 581. Then, as now, the Court explained, the term generally referred to "[w]eapons of offence, or armour of defence." *Id*. (cleaned up). The Court further noted that all relevant sources of the original public meaning of "arms" agreed that "all firearms constituted 'arms'" within the then-understood meaning of that term. *Id*. And, just as the scope of protection afforded by other constitutional rights extends to modern variants, so too the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582.

All four Court of Appeals decisions that have considered the matter of whether LCMs are "arms" within the meaning of the Second Amendment have concluded they are. *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen* ("*ANJRPC*"); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020);[5] and *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).

In *ANJRPC*, the Third Circuit addressed "the question [of] whether a magazine is an arm under the Second Amendment" and concluded "[t]he answer is

---

[5] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), a*nd on reh'g en banc sub nom. Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895, 213 L. Ed. 2d 1109 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

26

yes." *Id*. at 116. It reasoned that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Id*.

A panel of the Fourth Circuit in *Kolbe* reasoned that because the Second Amendment plainly covers firearms, "there must also be an ancillary right to possess the magazines necessary to render those firearms operable." 813 F.3d at 175. The panel found "strong historical support" for the notion that magazines constitute "arms" because "magazines and the rounds they contain are used to strike at another and inflict damages" and early American provisions protecting gun rights "suggest[ ] 'arms' should be read to protect all those items necessary to use the weapons effectively." *Id*. at 175 (citation omitted).

In *Duncan*, a panel of the Ninth Circuit considered the constitutionality of California's ban on LCM possession and concluded at the outset that "[f]irearm magazines are 'arms' under the Second Amendment." 970 F.3d at 1146. The Ninth Circuit reasoned that "[w]ithout a magazine, many weapons would be useless" and therefore "there must be some corollary ... right to possess the magazines necessary to render those firearms operable." *Id*. *Duncan* quoted the fourth case, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).

After *Bruen*, lower courts have held the same. *See Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) (magazine is arm); *Barnett v. Raoul*, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) (same); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL

27

2655150, at *7 (D. Del. Mar. 27, 2023) (same); and *Hanson v. D.C.*, 2023 WL 3019777, at *6 (D.D.C. Apr. 20, 2023) (same).

These holdings that magazines are arms make perfect sense. The right to keep and bear arms protects those things necessary for its exercise. *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). For example, in *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), the court held that the right to possess firearms implies a corresponding right to possess the components necessary to use them (specifically ammunition). As firearms expert Mark Passamaneck states, without a detachable magazine, operation of a semi-automatic firearm as a semi-automatic firearm is impossible. UMF 29. A magazine is not merely a box in which ammunition is stored. UMF 30. Rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id*. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. UMF 31. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. UMF 32. Thus, without magazines as a designed dynamic component, semi-automatic firearms would not exist. UMF 33.[6] This is the reason the Third Circuit held that magazines are "arms" in *ANJRPC*.

---

[6] It may be technically possible to fire a semi-automatic weapon without a magazine by manually opening the action each time the weapon is fired and manually inserting a single round into the chamber. Passamaneck, UMF 34. But, by definition, this turns the firearm into a single-shot

Two lower courts have held that magazines are not arms. *See Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. 2022); and *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, *9 (D. Or. 2022). But as the district court stated in *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023), these cases were wrongly decided because they ignore that under *Bruen*, a modern instrument that facilitates armed self-defense is an arm entitled to the prima facie protection of the Second Amendment.

In *Ocean State* the court held that both ammunition and "parts" of weapons (such as triggers and magazines) are not arms as the word is used in the Second Amendment and therefore are completely devoid of constitutional protection. *Id*. at *13. With all due respect, this conclusion is obviously wrong. If *Ocean State* were correct, the State could completely disarm the People of Colorado by rendering all firearms useless. How? According to *Ocean State*, the State could make the possession of ammunition illegal. Moreover, while it could not make possession of an assembled firearm illegal, it could outlaw possession of each of its constituent parts. An interpretation of the Second Amendment that would effectively nullify the right to keep and bear firearms is obviously inconsistent with *Bruen*.

The court's analysis in *Oregon Firearms* fares no better. There, the court specifically acknowledged that "magazines in general are necessary to the use of firearms for self-defense." *Id*., at *9. But then the court stated that since large

---

firearm and renders semi-automatic fire impossible, which in turn makes it impossible to operate the firearm as designed. *Id*.

capacity magazines specifically are not necessary to use a firearm, they are not covered by the plain text of the Second Amendment. *Id*. This makes no sense. If a magazine of a certain size is an arm covered by the plain text, how does increasing the capacity of that magazine by one round (and thus tipping it into the LCM category) make it not an arm? The *Oregon Firearms* court's confusion results from confusing the first step of the *Bruen* test (text) with the second step (history).  Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that the State cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the State can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," it can ban them (though, as discussed below, it cannot make such a demonstration).

In summary, a magazine of some size is necessary to make the Second Amendment right to fire a semi-automatic firearm effective. Therefore, magazines, in general, constitute bearable arms that are prima facie protected by the Second Amendment under step one (text) of the *Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under step two (history) of that test.

## C.    History and Tradition Support Banning Only Weapons that Are Unusual in Society at Large

Plaintiffs have carried their burden of showing their conduct is covered by the plain text of the Second Amendment. The burden now shifts to the State to "justify

its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. In the context of a weapons ban, *Heller* held that a law absolutely banning a weapon commonly possessed by law-abiding citizens for lawful purposes is categorically unconstitutional. *Heller*, 554 U.S. at 631-32. The Court reached this conclusion because no regulation in the Founding era "remotely burden[ed] the right to self-defense as an absolute ban on a commonly possessed firearm. *Bruen*, 142 S. Ct. at 2128 (citing *Heller*, 554 U.S. at 631-32).

Thus, under *Heller* and *Bruen*, the government cannot ban a weapon that is commonly possessed for lawful purposes. It follows that the government may absolutely ban a weapon *only* if it is not commonly possessed by law-abiding citizens for lawful purposes. In *Heller*, the Court identified two categories of weapons that meet this criterion: (1) dangerous and *unusual* weapons, and (2) sophisticated military arms that are highly *unusual* in society at large, such as machine guns, bombers, and tanks. *Id.* 554 U.S. at 627. In this case, the State may justify its absolute ban of LCMs only if it demonstrates that LCMs fall into one of these categories. Accordingly, while Plaintiffs have no obligation to demonstrate that LCMs are in common use to carry their burden under *Bruen's* first step, if they do make such a showing it will be impossible for the State to carry its burden under *Bruen's* second step. This is so because if Plaintiffs make this showing, it will be impossible for the State to demonstrate that its absolute ban falls into either of the categories where such bans are constitutionally permitted.

**D.      The State May Not Shift its Burden onto Plaintiffs**

The State may argue that because *Heller* and *Bruen* held the Second Amendment protects only weapons that are in common use, Plaintiffs have the burden of proving LCMs are in common use to establish they are protected. This is a misreading of those cases. It is true that in *Bruen* the Court noted that *Heller* held that the Second Amendment protects only weapons in common use. *See Bruen*, 142 S. Ct. at 2143 (*quoting Heller*, 554 U.S. at 627). But the Court was careful to note that *Heller* reached this conclusion because under the Nation's history and tradition of firearms regulation weapons in common use are protected and the two categories of unusual weapons discussed above are not. The Court wrote:

> [In *Heller*,] we found it 'fairly supported by the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'

*Id.*, 142 S. Ct. at 2128 (*quoting Heller*, 554 U.S. at 627) (emphasis added).

The Court also wrote:

> Drawing from this *historical tradition*, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that are 'highly unusual in society at large.'

*Id.*, 142 S. Ct. at 2143 (*quoting Heller*, 554 U.S. at 627) (emphasis added).

Thus, in both passages where the Court noted that the Second Amendment protects only weapons that are in common use, it stated this is the case because that restriction is supported by the *historical tradition*. Accordingly, whether an arm is in common use or, conversely, falls into one of the unprotected categories is

addressed at the second *Bruen* step (history and tradition). The Ninth Circuit addressed this issue in *Teter* where it rejected Hawaii's argument that dangerous and unusual weapons are not "arms." The court wrote: "*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added) (cleaned up). It did not say that dangerous and unusual weapons are not *arms*. Thus, whether butterfly knives are "dangerous and unusual" is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis." *Teter*, 76 F.4th at 949–50 (emphasis in original).

The State's argument confuses the difference between (1) conduct prima facie protected by the text and (2) the subset of that conduct that may be regulated consistent with the Nation's history and traditions. This distinction is not unique to the Second Amendment. For example, on its face, the First Amendment prohibits all laws abridging freedom of speech. But that seemingly absolute guarantee sometimes yields to a regulation that is consistent with the Nation's history and tradition of speech regulation. Thus, a law proscribing "true threats" does not violate the right to free speech because the Nation's "historical and traditional" regulation of speech has countenanced such laws from "1791 to the present." *Counterman v. Colorado*, 143 S. Ct. 2106, 2113–14 (2023). A "true threat" is not protected by the First Amendment, but no one would argue that because it is unprotected it is not "speech" in the first instance.

Similarly, the plain text of the Second Amendment extends to all "arms." Nevertheless, a prohibition on a "dangerous and unusual" weapon (such as a short-barreled shotgun) does not violate the Second Amendment because laws banning such weapons existed in 1791 and have been in place ever since. *Heller*, 554 U.S. at 627. A short-barreled shotgun is not protected by the Second Amendment, but no one would argue that because it is unprotected it is not a bearable arm in the first instance.

In summary, the LCMs banned by the Colorado statute are bearable arms, and the plain text of the Second Amendment extends, prima facie, to protect them. The State is free to argue that its arms ban is consistent with the Nation's history and tradition of firearm regulation. But there is no reasonable argument that the LCMs are not "arms" covered by the plain text in the first instance.

## E.   Common Use is Determined by Whether an Arm is Commonly Possessed by Law-Abiding Citizens

Whether an arm is in common use is determined by whether it is commonly possessed by law-abiding citizens for lawful purposes. In *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015), Justice Thomas, joined by Justice Scalia, put the matter as follows: "Roughly five million Americans own AR-style semiautomatic rifles … The overwhelming majority of citizens who own and use such rifles do so for lawful purposes … Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Id*. (Thomas, J., and Scalia, J., dissenting from denial of certiorari)

34

(emphasis added). Thus, "all that is needed" for Plaintiffs to show that they have a right under the Second Amendment to keep LCMs is to evidence that LCMs are owned in the millions. Plaintiffs have shown this. Indeed, the State has previously stipulated that LCMs are owned in the tens of millions (UMF 55), several times more than the threshold identified by Justice Thomas.

More recently, in *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *8 (D. Del. Mar. 27, 2023), the court applied identical reasoning to determine whether LCMs (in that case defined as those having a capacity over 17 rounds) are in common use. The court wrote: "There are currently tens of millions of rifle magazines that are lawfully possessed in the United States with capacities of more than seventeen rounds, including magazines for the AR-15 rifle … The AR-15 platform is capable of accepting standard magazines of 20 or 30 rounds and is typically sold with 30-round magazines … This is enough to show that LCMs are in common use for self-defense." *Id*. at *8 (internal citations and quotation marks omitted; cleaned up). These facts are hardly controversial. Again, the State has previously stipulated to all of the facts relied upon by this court in finding that LCMs are in common use. UMF 50, 55.

Numerous other courts have come to a similar conclusion. *See, e.g., Barnett v. Raoul*, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023) (tens of millions of LCMs possessed sufficient to find common use); *Fyock*, *supra*, 779 F.3d at 998; *ANJRPC, supra*, 910 F.3d at 116; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,

804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the … large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000").

## F.   LCMs Are in Common Use

In *Colorado Outfitters* and/or *RMGO*, the State stipulated as follows:

- More than 300,000,000 firearms are lawfully owned in the United States. UMF 46.

- A significant percentage of firearms privately owned are semi-automatic, most of which utilize a detachable box magazine. UMF 47.

- The number of lawfully owned semi-automatic firearms in the United States that utilize an LCM is in the tens of millions. UMF 48.

- Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. UMF 49.

- In states without laws regulating magazine capacity, AR-15 platform rifles are usually sold at retail with a detachable box magazine capable of holding up to 30 rounds, and the majority of owners of AR-15 platform rifles use magazines with a capacity of 20 and/or 30 rounds. UMF 50.

- Semi-automatic firearms equipped with LCMs are used for multiple lawful purposes, including recreational target shooting, competition shooting, and collecting, and are kept for home defense and defense outside the home. UMF 51.

- Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15; for example the Glock 17, which is one of the most popular handguns sold in the United States. UMF 54.

- **The number of LCMs in the United States is in the tens of millions**. UMF 55. (emphasis added).

- **The number of LCMs in the State of Colorado alone is in the millions**. UMF 56. (emphasis added).

- Prior to the effective date of the Magazine Ban, LCMs were not unusual in Colorado. UMF 57.

In this case, the State has not made the same stipulations that it made in *Colorado Outfitters* and *RMGO*. Moreover, the State has filed a motion requesting the Court to issue an order declaring that its previous stipulations are not conclusively binding on it. *See* State's Motion dated October 13, 2022 (ECF 29). But even if the State's previous stipulations are not conclusively binding on it, they are nevertheless evidence in this case. This is because nothing prohibits a party from pointing to statements in a prior case as evidence supporting a subsequent case. *Bohnenkamp v. Hog Slat, Inc.*, 549 F. Supp. 3d 937, 946 n.7 (N.D. Iowa 2021).

"Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017) (internal citations and quotation marks omitted). Such admissions are binding in the entirety of the case in which they were made. *Id.* In contrast, ordinary "evidentiary admissions" can be controverted or explained by a party. *Id.* Such admissions include judicial admissions in another case. *Id.*, *quoting* 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 7026 (Kenneth W. Graham, Jr. & Michael H. Graham eds., 4th ed. 2014). Thus, a judicial admission in a case would be an evidentiary admission in a subsequent case. *Id.* Such is the case here. The stipulations the State made in *Colorado Outfitters* and *RMGO* were judicial admissions in those cases, and they are ordinary evidentiary admissions in this case.

In addition to the State's previous stipulations, Plaintiffs have submitted the testimony of firearms industry expert Mark Passamaneck. Mr. Passamaneck testified that the Industry Intelligence Report published by the National Shooting Sports Foundation ("NSSF Report") is a nationally recognized trade report, and the data reported in the NSSF Report is highly reliable. UMF 60, 61. Numerous courts have relied on NSSF Reports in reaching conclusions about the number of firearms and/or magazines in circulation, including the same NSSF Report relied upon by Mr. Passamaneck. *See Barnett v. Raoul*, 2023 WL 3160285, at *10 (S.D. Ill. Apr.

38

28, 2023) (citing NSSF Report for number of arms in circulation); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *6 (D. Del. Mar. 27, 2023) (same); *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021), *vacated and remanded on other grounds*, 2022 WL 3095986 (9th Cir. 2022) (same); *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 256 (3d Cir. 2020), *cert. granted, judgment vacated on other grounds* 142 S. Ct. 2894 (2022) (Matey, J. dissenting) (same); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014) (same); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 786 (D. Md. 2014) (same); and *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 364 (W.D.N.Y. 2013) (same).

The 2020 NSSF Report states that as of 2018, there were at least 79 million LCMs in the United States. UMF 62. This is a very conservative estimate of the total number of LCMs in the United States, but there cannot be any doubt that – as the State has previously stipulated – the number of LCMs is at least in the tens of millions and probably in the hundreds of millions. UMF 63.

Again, none of the facts regarding the prevalence of LCMs is the least bit controversial. Surely the State will not suggest that there is a genuine issue regarding facts to which it stipulated in two previous cases. Any such suggestion would founder on the shoals of the holdings of several courts that there are in fact

tens of millions of LCMs[7] in the United States. *See, e.g., Duncan, supra*, 970 F.3d at 1142 (estimating 115 million); *Kolbe, supra*, 813 F.3d at 174 (estimating 75 million); *ANJRPC, supra*, 910 F.3d at 116 (estimating "millions"); and *Barnett v. Raoul*, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023) (estimating over 500 million). And as set forth above, courts have held based on these numbers that the magazines are in common use.

## G.   Summary: LCMs Are Protected by the Second Amendment

The *Bruen* test has two steps: [1] "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

1. Magazines are essential to the operation of all semi-automatic firearms. Therefore, they are instruments that facilitate self-defense and are entitled to the prima facie protection of the Second Amendment. They are thus presumptively protected by the Constitution under step one.

2. It will be impossible for the government to carry its burden under step two (history and tradition). It cannot demonstrate that LCMs fall into either of the two categories of "unusual" arms that under the Nation's history and tradition may be subjected to an absolute ban, i.e. (1) dangerous and *unusual* weapons, and (2)

---

[7] The definition of LCM varies somewhat in the states that ban them, but even taking this factor into account there can be little doubt that the State's previous stipulation that LCMs as defined in the Colorado statute exist in the tens of millions is accuate.

sophisticated military arms that are highly *unusual* in society at large, such as machine guns, bombers, and tanks. It is beyond dispute that LCMs are owned in the tens of millions. Therefore, under no reasonable interpretation of the word can they be considered "unusual."

In summary, LCMs are extremely common, and the State has previously stipulated that they are used for multiple lawful purposes, including recreational target shooting, competition shooting, and collecting, and are kept for home defense and defense outside the home. The material facts are not genuinely disputed, and Plaintiffs have shown they will succeed on the merits as a matter of law.

## VI.   THE REMAINING INJUNCTION FACTORS FAVOR PLAINTIFFS

### A.   Plaintiffs Have Suffered Irreparable Harm

Plaintiffs have established that they will prevail on the merits of their claim that the Magazine Ban violates the Second Amendment. Violation of constitutional rights per se constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury). Only days ago, the Ninth Circuit applied the *Elrod* principle in the Second Amendment context. *Baird v. Bonta,* 2023 WL 5763345, at *3 (9th Cir. Sept. 7, 2023). In *Baird*, the court held that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Id*., at *9. Moreover, such a likelihood, "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id*. *See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying

principle in Second Amendment context); and *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."); and *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

## B. The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief

Finally, the balance of harms and public interest factors[8] favor injunctive relief. A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in his favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023) (internal citation and quotation marks omitted; cleaned up). In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id.* "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id.* (internal

---

[8] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

Defendant has argued that the Magazine Ban should not be enjoined for "public safety" reasons. Plaintiffs disagree that the Magazine Ban has any measurable effect on public safety. But even if it did, that fact would be irrelevant under *Bruen*. Indeed, the government's argument is in effect a backdoor means-end test of the type rejected by *Bruen*. 142 S. Ct. at 2129 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. 2126. *Bruen's* rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation. Moreover, "[w]hile the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (cleaned up) (*citing Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).

## VII.   Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to enter summary judgment in their favor and enter an order permanently enjoining enforcement of C.R.S. § 18-12-301 *et seq*.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington