**Exhibit A** to
The Governor's Unopposed Motion to File a
Redacted Version of the Governor's Motion for
Summary Judgment

*Redacted Version of the Governor's Motion for
Summary Judgment*

*Gates et al. v. Polis*, No. 1:22-cv-1866-GPG-SKC (D. Colo.)

September 13, 2023

[Redacted Version of the Governor's Motion for Summary Judgment]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-1866-GPG-SKC

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor for the State of Colorado,

      Defendant.

---

## THE GOVERNOR'S MOTION FOR SUMMARY JUDGMENT

---

[Redacted Version of the Governor's Motion for Summary Judgment]

## INTRODUCTION

Shortly after midnight on July 20, 2012, a single person entered a movie complex in Aurora, Colorado and proceeded to a theater packed with roughly 400 moviegoers. He then left through an exit door, which he propped open, and reentered a short while later bearing three firearms, including a semi-automatic rifle equipped with a 100-round magazine. Over the next 90 seconds, he fired nearly 80 bullets into the crowded theater, only pausing and switching weapons when his rifle jammed after firing more than 50 rounds. By the time the shooting stopped, 70 Coloradans had been shot, including 12 fatally. The Aurora Theater Massacre was the deadliest shooting in Colorado since the Columbine High School Massacre on April 20, 1999, (13 dead, using 28-, 32-, and 52-round magazines). *See* Ex. 21 (Decl. of J. Nowlan, Aurora Theater Massacre survivor); Ex. 22 (audio of 911 call from inside Aurora theater); Ex. 23 (Expert report of S. McGraw); Ex. 47 (Decl. of S. Granillo, Columbine shooting survivor).[1]

For most of our Nation's history, the idea that a single gunman could wreak so much havoc in such a short time was unimaginable. But as large-capacity magazines ("LCMs") began to circulate among civilians, they became the accessory of choice for mass shooters. And as mass shooters began to use LCMs, both the incidence of and the carnage caused by mass shootings proliferated. On the heels of the Aurora Theater Massacre, a single gunman in Newtown, Connecticut used 30-round magazines to kill 26 people, including 20 children under the age of 7, during the Sandy Hook Elementary School massacre. Ex. 23. Over the next several years, mass

---

[1] Based on conferral, the Governor expects Plaintiffs to file a motion for summary judgment with exhibits. So the Court can distinguish Plaintiffs' exhibits from the Governor's, the Governor begins his exhibits at 20. *Cf.* Gallagher Civ. Pretrial and Trial Proc. III(G)(3)(a) (suggesting similar method for trial exhibits).

[Redacted Version of the Governor's Motion for Summary Judgment]

shootings in Las Vegas, Nevada (60 dead, using 100-round magazines), Sutherland Springs, Texas (26 dead, using 30-round magazines), Orlando, Florida (49 dead, using 30-round magazines), and elsewhere continued to destroy lives and devastate communities. *Id.* Just last year, in Uvalde, Texas, a single gunman used 30-round magazines to kill 21 people, including 19 children under the age of 12 in the Robb Elementary School massacre. *Id.*

In the wake of the Aurora Theater Massacre, the Colorado General Assembly exercised its police power to protect the public health, safety, and welfare by enacting §§ 18-12-301, *et seq.*, C.R.S. ("LCM Ban"). On paper, the LCM Ban prohibits, on and after July 1, 2013, the sale, transfer, or possession of LCMs, which it defines as magazines capable of accepting more than fifteen rounds of ammunition. § 18-12-301(2). But in practice, during real-life mass shootings when the stakes could not be higher, the LCM Ban mandates a critical pause during otherwise uninterrupted shooting by forcing a shooter to replace a spent magazine every 15 rounds. This pause gives human targets the chance to flee, hide, or fight, and gives law enforcement officers the chance to disarm the shooter before more humans are murdered or injured. This pause saves lives—since 1990, states with LCM bans experienced a 48% decrease in the rate of high-fatality mass shootings involving LCMs, and a 63% decrease in the number of fatalities. SUMF ¶ 60.

In this action, three individuals and a non-membership organization challenge the LCM Ban under the Second Amendment. But after months of fact and expert discovery, Plaintiffs failed to build an evidentiary record that supports their claim. Instead, the undisputed record fully supports a grant of summary judgment in the Governor's favor for two reasons.

*First*, Plaintiffs cannot show that LCMs fall within the plain text of the Second Amendment. That Amendment protects the right to keep and carry "Arms," but 16-plus round

[Redacted Version of the Governor's Motion for Summary Judgment]

magazines are accessories, not arms. And even if an LCM were an "arm," it would still fall outside the Second Amendment, which "protects only the carrying of weapons that are those 'in common use'" for self-defense. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2143 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 (2008)); *see also Bruen*, 142 S. Ct. at 2132 (the definition of "Arms" "covers modern instruments that facilitate armed self-defense"). LCMs are not commonly used for self-defense, and are "dangerous and unusual," and thus not afforded constitutional protection. *Id*. at 2128 (quoting *Heller*, 554 U.S. at 627).

*Second*, even if Plaintiffs carry their threshold burden of proving LCMs fall within the Second Amendment's zone of protection, the LCM Ban is consistent with our Nation's history and tradition of regulating weapons of war once they enter the civilian market and cause great public harm. Throughout history—from the founding through the 20th century—the federal and state governments have restricted access to weapons that pose a significant threat to civilians. The LCM Ban imposes no burden on armed self-defense, and the undisputed record shows that it reduces mass shooting fatalities by giving potential victims the chance to flee, hide, or fight when the shooter pauses to reload.

Plaintiffs brought this challenge under the mistaken assumption that *Bruen* offers a way to overturn a common-sense regulation that has been helping keep Coloradans safe for more than a decade. But since *Bruen*, the vast majority of courts to consider challenges to magazine capacity laws have upheld those laws. Because the evidentiary record built by the parties here is clear and undisputed, this Court should do the same.

[Redacted Version of the Governor's Motion for Summary Judgment]

## LEGAL STANDARD

### I.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show the absence of a genuine fact issue. *See Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). If the movant makes this showing, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* at 1518. Where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

Because Plaintiffs bring a facial challenge, Am. Compl. (D. 38) ¶ 22, they "bear a heavy burden." *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quotations omitted). "Facial challenges to statutes are generally disfavored as 'facial invalidation is, manifestly, strong medicine that has been employed by the [Supreme] Court sparingly and only as a last resort.'" *Id.* (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)).

### II.   Second Amendment Standard

#### A.   Second Amendment Background

"A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This Amendment

[Redacted Version of the Governor's Motion for Summary Judgment]

guarantees "the individual right to possess and carry weapons *in case of confrontation*." *Heller*, 554 U.S. at 592 (emphasis added); *see also Bruen*, 142 S. Ct. at 2122 (the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense"). But it does not protect "the right of citizens to carry arms for *any sort* of confrontation" because the rights guaranteed by the Second Amendment are "not unlimited." *Heller*, 554 U.S. at 595, 626; *see also Bruen*, 142 S. Ct. 2128 (reiterating limits of Second Amendment protections discussed in *Heller*); *id.* at 2157 (Alito, J., concurring) (noting that *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns"); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (citation omitted)). The "*central component*" of the right enshrined in this Amendment is "individual self-defense." *McDonald*, 561 U.S. at 767 (quotations omitted).

In *Bruen*, the Supreme Court established the framework for assessing the constitutionality of firearm regulations. First, a plaintiff must prove[2] that "the Second Amendment's plain text" covers the conduct proscribed by the regulation—here, possession of a 16-plus round magazine acquired after July 1, 2013. *Bruen*, 142 S. Ct. at 2126. This involves determining, as a factual

---

[2] In contrast to the history and tradition standard, for which *Bruen* lodges the burden with the government, the Court did not discuss allocation of the burden for the threshold inquiry. 142 S. Ct. at 2126. Accordingly, the "default rule" prevails, in which Plaintiffs "bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). Indeed, most courts have lodged *Bruen*'s initial burden with civil plaintiffs. *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB, 2023 WL 5017253, at *10 (D. Colo. Aug. 7, 2023); *accord Ocean State Tactical, LLC v. Rhode Island*, -- F. Supp. 3d --, 2022 WL 17721175, at *12 (D.R.I. 2022) ("[I]t is [the plaintiffs'] burden to show that large-capacity magazines fall within the purview of the Second Amendment[.]").

[Redacted Version of the Governor's Motion for Summary Judgment]

matter, whether LCMs are "arms," as used in the Second Amendment, and if so, whether they are "in common use today for self-defense," *id.* at 2134 (quotations omitted), or if they are the type of "dangerous and unusual" weapons that fall outside the Second Amendment, *id.* at 2128.

If Plaintiffs satisfy their burden on this threshold inquiry, the burden shifts to the government, which must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. This historical inquiry involves "reasoning by analogy," *id.* at 2132, specifically an assessment of "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133. Courts must ask (a) whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did, and (b) whether it is "comparably justified." *Id.* *Bruen*'s test does not ask the Court to independently research and examine history. Instead, the Court is "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 2130 n.6; *see also id.* ("In our adversarial system of adjudication, we follow the principle of party presentation[.]" (quotation omitted)).

*Bruen* cautioned that the Second Amendment does not protect the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quotation omitted). Indeed, Justice Alito, writing for himself, and Justice Kavanaugh, joined by Chief Justice Roberts, underscored the "limits of the Court's decision." *id.* at 2157 (Alito, J., concurring); *id.* at 2161 (Kavanaugh, J., concurring). States may regulate certain "dangerous and unusual" arms, *Heller*, 554 U.S. at 627, such as sawed-off shotguns, *id.* at 622–23, or machine guns, *id.* at 624 (calling the idea that federal restrictions on machine guns might be unconstitutional "startling"). And States have latitude to impose reasonable regulations based on

6

[Redacted Version of the Governor's Motion for Summary Judgment]

unique factors present in their jurisdictions. *McDonald*, 561 U.S. at 785 ("State and local

experimentation with reasonable firearms regulations will continue under the Second

Amendment."); *id.* (the Second Amendment "limits (but by no means eliminates) [States'] ability

to devise solutions to social problems that suit local needs and values").

**B. Post-*Bruen* cases addressing LCM restrictions have near-universally upheld those regulations.**

After *Bruen*, many states and local jurisdictions have faced challenges to magazine

capacity limitations. Several themes have emerged.

*First*, in nearly every case, courts have upheld the LCM prohibition. *See, e.g.*, *Nat'l Ass'n*

*for Gun Rights v. Lamont ("Connecticut")*, -- F. Supp. 3d --, 2023 WL 4975979, at *2 (D. Conn.

2023); *Ore. Firearms Fed'n v. Kotek ("Oregon")*, -- F. Supp. 3d --, 2023 WL 4541027, at *1 (D.

Ore. 2023);[3] *Herrera v. Raoul ("Ill. Herrera")*, -- F. Supp. 3d --, 2023 WL 3074799, at *1 (N.D.

Ill. 2023); *Hanson v. Dist. of Columbia ("Dist. of Columbia")*, -- F. Supp. 3d --, 2023 WL

3019777, at *1 (D.D.C. 2023); *Del. State Sportsmen's Assoc., Inc. v. Del. Dep't of Safety &*

*Homeland Sec. ("Delaware")*, -- F. Supp. 3d --, 2023 WL 2655150, at *8 (D. Del. 2023); *Bevis*

*v. City of Naperville, Ill. ("Naperville")*, -- F. Supp. 3d --, 2023 WL 2077392, at *1 (N.D. Ill.

2023), *mot. for inj. pending appeal denied sub nom*, No. 23-1353 (7th Cir. April 18, 2023), *app.*

*for inj. pending appeal denied sub nom.*, No. 22A948 (U.S. May 17, 2023); *Ocean State*

*Tactical, LLC v. Rhode Island ("Rhode Island")*, -- F. Supp. 3d --, 2022 WL 17721175, at *2

(D.R.I. 2022). And earlier this year, a state court upheld the very law challenged here under an

---

[3] Although most of these cases were decided on a preliminary injunction posture, *Oregon* was
decided after a weeklong trial on the merits.

[Redacted Version of the Governor's Motion for Summary Judgment]

intensive *Bruen* analysis. *People v. Sgaggio*, Order re. Defendant's February 21, 2023, Motion to Dismiss, No. 2022M005894 (El Paso Cnty. Cnty. Ct. June 8, 2023) (attached as Ex. 24).[4]

     *Second*, these courts have applied the two-step framework. *See, e.g.*, *Oregon*, 2023 WL 4541027, at *5 ("*Bruen* creates a new two-step analysis for assessing the constitutionality of firearms regulations.); *accord Dist. of Columbia*, 2023 WL 3019777, at *4–5; *Rhode Island*, 2022 WL 17721175, at *12–13; *Delaware.*, 2023 WL 2655150, at *3; *Ill. Herrera*, 2023 WL 3074799, at *5; *Naperville*, 2023 WL 2077392, at *9; *Connecticut*, 2023 WL 4975979, at *11.

     *Third*, these courts have upheld LCM limitations at different stages of the *Bruen* inquiry. Some held that LCMs are accessories, not arms. *See, e.g.*, *Rhode Island*, 2022 WL 17721175, at *13. Others held that LCMs are not covered by the Second Amendment because they are not commonly used for self-defense, *see, e.g.*, *Dist. of Columbia*, 2023 WL 3019777 at *12, or are dangerous and unusual, *see, e.g.*, *Connecticut*, 2023 WL 4975979, at *25–26. And some courts held that LCMs do fall within the Second Amendment but may be banned consistent with the Nation's history and tradition of firearm regulation. *See, e.g.*, *Delaware*, 2023 WL 2655150 at *13. Those courts have relied on *Bruen*'s language that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced [historical]

---

[4] To the Governor's knowledge, *Barnett v. Raoul*, -- F. Supp. 3d --, 2023 WL 3160285, at *1 (S.D. Ill. 2023), is the only case where a court conducted a merits analysis at a preliminary stage and held that an LCM ban was unconstitutional. The Seventh Circuit stayed that decision pending appeal. *Herrera v. Raoul*, No. 23-1793, D. 23 (7th Cir. May 12, 2023). *See also Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 1:22-cv-01223-CNS-MEH, 2022 WL 4098998, at *1–2 (D. Colo. Aug. 30, 2022) (granting TRO that defendant "d[id] not contest"); *Rocky Mountain Gun Owners v. Town of Superior*, No. 1:22-cv-01685-RM-NRN, D. at 18 at 10 (D. Colo. July 22, 2022) (granting TRO "without hearing from Defendants"), *case dismissed without prejudice*, D. 53 (Oct. 12, 2022).

[Redacted Version of the Governor's Motion for Summary Judgment]

approach." *Bruen*, 142 S. Ct. at 2132; *see, e.g.*, *Oregon*, 2023 WL 4541027, at *37–38; *Dist. of Columbia*, 2023 WL 3019777, at *13; *Connecticut*, 2023 WL 4975979, at *29.

Notably, the only court to have addressed an LCM prohibition after a full trial on the merits upheld the regulation at all stages of the *Bruen* inquiry. *Oregon*, 2023 WL 4541027, at *1 (holding that: 1) LCMs are not bearable arms, 2) LCMs are not commonly used for self-defense, 3) LCMs are dangerous and unusual, and 4) Oregon's LCM ban is consistent with the Nation's history and tradition of firearm regulation).

*Finally*, courts addressing LCM prohibitions under *Bruen* have hewed to the evidentiary record compiled by the parties, and have applied the rules of evidence to that record. For example, in the Oregon case, the district court refused to consider non-record evidence offered by Plaintiffs relating to "factual questions that this Court must answer, including the commonality of LCMs, their use by ordinary citizens, and the relevancy of certain historical firearms regulations." *Oregon*, 2023 WL 4541027 at *3 n.2. Distinguishing pre-*Bruen* cases, the court held that "it is the function of the trial court to receive evidence and testimony that has been tested through the adversarial process," and that doing so "helps the fact-finder ascertain the truth and minimize the risk of error, by subjecting witnesses to cross-examination on potential bias and credibility, and by excluding evidence that is irrelevant, prejudicial, or lacking indicia of reliability." *Id.* (quotations omitted). *Cf. United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001) (reversing district court under extra-judicial source doctrine, because district court conducted its own factual inquiry, and "[w]hen a judge receives information that does not enter the record, the reliability of that information may not be tested through the adversary process.").

[Redacted Version of the Governor's Motion for Summary Judgment]

## ARGUMENT

Plaintiffs made the strategic choice not to develop an evidentiary record. Their only disclosed fact witnesses are the Plaintiffs. They served a single expert report, from Mark Passamaneck, much of which is subject to exclusion for the reasons stated in the Governor's Motion to Exclude (D. 56). Plaintiffs did not depose any of the many fact and expert witnesses disclosed by the Governor. They only identified as documents they may use to support their claims: "any document attached or referred to in any pleading," and "any document disclosed by any other party." Ex. 25 (Pls.' Initial Disclosures.).

Because of Plaintiffs' tactical choices, the evidentiary record developed by the Governor in this case is wholly undisputed. In contrast to Plaintiffs, the Governor identified seven expert witnesses (serving a total of nine initial and rebuttal reports), whose opinions have never been challenged under Fed. R. Evid. 702, or impugned by any rebuttal report filed by Plaintiffs. The Governor also disclosed six lay witnesses, all of whom will offer unrebutted testimony about their personal experiences, including during mass shooting events. Even Plaintiffs' one shred of record evidence, the Passamaneck Report, does not dispute any material fact included in any expert report proffered by the Governor.

Consistent with the Court's practice standards, the Governor includes a Statement of Undisputed Material Facts, each of which is accompanied by "a specific reference to material *in the record* that establishes that fact." Gallagher Civ. Practice Standard 7.1D(b)(1) (emphasis added). But even this list is not exhaustive, because every fact in the evidentiary record compiled by the Governor is unrebutted by any contrary fact established by Plaintiffs.

[Redacted Version of the Governor's Motion for Summary Judgment]

The undisputed record shows that the LCM Ban is a common-sense regulation that does not trigger the Second Amendment's protections. And even if it did, it is nonetheless consistent with the Nation's history and tradition of weapons regulation. Because this record is undisputed, the Court should enter summary judgment for the Governor.

## I.      Large-capacity magazines fall outside the Second Amendment.

To prevail on the merits, Plaintiffs must first show that LCMs fall within the ambit of the Second Amendment. This initial factual inquiry requires Plaintiffs to prove three separate conditions. First, "Plaintiffs must show that the statute[] at issue regulate[s] weapons that fall under the Second Amendment's definition of 'bearable arms.'" *Delaware*, 2023 WL 2655150, at *4. Second, "Plaintiffs must also show that the statute[] at issue regulates" "bearable arms that are 'in "common use" for self-defense today.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2143). And third, because "the Second Amendment does not create a right to keep and carry 'dangerous and unusual weapons,'" Plaintiffs must prove that LCMs are not such weapons, though the final inquiry "shares considerable overlap with the 'in common use' requirement." *Id.* (quoting *Heller*, 554 U.S. at 627). Plaintiffs fail to meet their burden at each step.

### A.   Sixteen-plus round magazines fall outside the plain language of "Arms" as used in the Second Amendment

Under *Bruen*, the threshold question in this challenge is "whether the plain text of the Second Amendment protects" Plaintiffs' desire to possess LCMs. 142 S. Ct. at 2134. Because 16-plus round magazines are neither "Arms" nor a necessary component of an arm, they fall outside the plain text of the right secured by the Second Amendment.

The Second Amendment protects the right to "keep and bear *Arms*." U.S. Const. amend. II (emphasis added). "Arms," as used in this amendment, refers to weapons. *Heller*, 554 U.S. at

[Redacted Version of the Governor's Motion for Summary Judgment]

581; *see also id.* (noting that the 1773 edition of 1 Dictionary of the English Language 106 (4th ed.) (reprinted in 1978) defines "Arms" as "[w]eapons of offence, or armour of defence"). In *Heller*, the Court relied on "written documents of the founding period" to establish the scope of the word "Arms" in the Second Amendment. 554 U.S. at 582. Those same texts reveal that the founding generation did not consider "Arms" to encompass accessories, then known as "accoutrements," such as "ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields." Ex. 26 (Expert report of D. Baron.) ¶ 9;[5] *see also Rhode Island*, 2022 WL 17721175, at *13 ("find[ing] credible," Prof. Baron's opinion that "there was a clear distinction between 'Arms' and 'accoutrements' from the founding era through the period following ratification of the Fourteenth Amendment"). Instead, "there is virtually no lexical data . . . showing that 'arms' includes 'accoutrements,' 'cartridge boxes,' 'cartouch boxes', 'magazines,' or any other parts of weapons." Ex. 26 ¶ 71. "Ammunition containers," like LCMs, are therefore not protected under the plain language of the Second Amendment.

Firearms from the founding era that could fire multiple rounds before being reloaded (known as "repeating" firearms) utilized internal magazines. *See* Ex. 27 (Expert report of J. Bilby) at 9–13. "The advent of *detachable* magazines that could be used to rapidly reload a firearm came in the early 20th century." *Id.* at 28 (emphasis added); *see also* Ex. 28 (Expert report of J. Yurgealitis) ¶¶ 57–62 (tracing the history of detachable magazines).

Although many firearms today rely on detachable magazines, none require a 16-round magazine to function correctly. SUMF ¶ 17; *see also* Ex. 28 ¶ 88 ("[A]ny firearm that utilizes a

---

[5] As one example, in a letter to John Hancock, George Washington distinguished between "Arms" and "pouches [of ammunition] and Other necessary Accoutrements." Ex. 26 ¶ 28(d).

[Redacted Version of the Governor's Motion for Summary Judgment]

large capacity magazine will function with a magazine of lower capacity."); *Oregon*, 2023 WL 4541027, at *9 ("Magazine capacity is not a determining factor in the operability of a firearm."). Many manufacturers market multiple versions of their firearms and magazines, including versions that comply with the LCM Ban, and "numerous well respected aftermarket manufacturers . . . offer 10-round magazines specifically for use in handguns that come with LCMs." Ex. 28 ¶¶ 62–80 (compiling Colorado-compliant magazines for popular firearms).

Plaintiffs bear the burden of proving that 16-plus round magazines are "Arms" as that term is used in the Second Amendment. *See Delaware*, 2023 WL 2655150, at *4. They have not met this burden because they failed to muster any affirmative evidence on this threshold inquiry, or to rebut the Governor's affirmative evidence that an LCM is an accessory, not an arm, and a 16-plus round magazine is not necessary for any firearm to operate. ▮▮▮▮▮▮▮▮▮▮▮ and any firearms they wish to obtain in the future, operate with 15-round-or-fewer magazines. SUMF ¶¶ 17, ▮. The undisputed facts show that LCMs fall outside the Second Amendment and therefore the Governor is entitled to summary judgment as a matter of law.

**B.  Plaintiffs have not established that LCMs are commonly used for self-defense, and the Governor has established that they are not.**

**1.  Plaintiffs failed to produce evidence that LCMs are commonly used, let alone commonly used for self-defense.**

Even if LCMs are "arms," they still fall outside the Second Amendment because they are not commonly used for self-defense. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one . . . requires a textual analysis . . . determining whether . . . the weapon at issue is 'in common use today for self-defense.'" (quoting *Bruen*, 142 S. Ct. at 2134–35)). Post-*Bruen* courts adjudicating LCM prohibitions have consistently held that the commonality inquiry

[Redacted Version of the Governor's Motion for Summary Judgment]

must be connected to use for self-defense. *See, e.g.*, *Oregon*, 2023 WL 4541027, at *28 ("[C]ommon use must be related to self-defense."); *Rhode Island*, 2022 WL 17721175, at *15 (noting that the plaintiffs "argue[d] vociferously that LCMs were 'in common use', but their argument [wa]s untethered from the concept of self-defense" (citations omitted)).

Plaintiffs likewise produced no evidence to carry their burden on this prong. The closest they come is evidence from a proffered expert, Mark Passamaneck, whose testimony on this subject should be excluded for the reasons outlined in the Governor's Motion to Strike (D. 56). *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1178 (D. Colo. 2018) (addressing motions to exclude prior to considering motion for summary judgment). Passamaneck lacks the knowledge, skill, experience, training, or education to render an expert opinion as to the commonality of LCMs, and even if he did, the methodology underlying his expert opinion is inherently unreliable.

But if the Court does consider Passamaneck's opinion, neither that opinion nor any other evidence in the undisputed record shows that LCMs are commonly used for self-defense.

*First*, all of Plaintiffs' evidence relates to ownership or production, not use. The relevant question is not how many LCMs are owned or produced, but instead "how many Americans actually own and *use* [LCMs] for self-defense." *Connecticut*, 2023 WL 4975979, at *21 (emphasis added); *see also Bruen*, 142 S. Ct. at 2134 (framing threshold inquiry as whether the weapon in question is "in common use today for self-defense" (internal quotation marks omitted)). If ownership or production alone were the pertinent inquiry, that would "allow[] the firearms industry to control the bounds of the Second Amendment because of the firearm industry's economic interest in the increased sale of firearms." *Oregon*, 2023 WL 4541027, at

[Redacted Version of the Governor's Motion for Summary Judgment]

*28; *accord Connecticut*, 2023 WL 4975979, at *13 (holding that *Bruen* "abograte[d]" a pre-*Bruen* Second Circuit decision that "treated common use as a solely statistical question").

> *Second*, even if ownership were relevant, Plaintiffs' evidence is too general to establish that LCMs are even commonly owned. Many of Passamaneck's statistics relate to AR-15s, a type of firearm not at issue in this litigation, and ownership of which, according to Passamaneck himself, tells one "nothing" about the capacity of the magazine that accompanies that weapon. Ex. 29 (Depo. Tr. of M. Passamaneck) at 72:9–73:6. As for the magazine-related statistics Passamaneck used to reach his opinions on LCM-ownership, he does not know whether those are ownership statistics or records of historical production. *Id.* at 139:8–140:15; 150:20–24.[6] Finally, Passamaneck's topline number probably includes magazines owned by the military and law enforcement, neither of which is relevant to whether LCMs are commonly-owned by average civilians. *Id.* at 151:17–23.

### 2. The record shows that LCMs are not commonly used for self-defense.

> In contrast, the undisputed material facts show that LCMs are not commonly used for self-defense. SUMF ¶ 9; *see also Dist. of Columbia*, 2023 WL 3019777, at *8–9 (summarizing pre-*Bruen* cases that held that LCMs were "most useful for military service," not for individual self-defense). "Home defense and / or street / commercial robbery situations between citizens and criminals are rarely protracted shootouts with extensive exchanges of gunfire." Ex. 28 ¶ 81.

---

[6] The closest Passamaneck comes to any statistic involving LCMs is a citation to a "2018 NSSF Magazine Chart." Ex. 45 (Expert report of M. Passamaneck) at 2. But Passamaneck did not know whether that chart was showing cumulative possession or possession in a given year, Ex. 29 at 139:8–140:15. He also thought that "there is something missing" from the chart. *Id.* at 140:20–21. And in Oregon, the district court concluded that this NSSF report "is entitled to little weight." *Oregon*, 2023 WL 4541027, at *11, *27.

[Redacted Version of the Governor's Motion for Summary Judgment]

Instead, an average of just 2.2 shots are fired by armed citizens in defensive scenarios. SUMF ¶ 45;[7] Ex. 30 (Expert report of J. Zax) at 4 ("Documented instances of threats for which self-defense with a firearm equipped with an LCM would be appropriate are rare."). According to the FBI, even law enforcement officers responding to an attack typically only fire between three and nine rounds. SUMF ¶ 11.

Not only are instances of civilian self-defense in which LCMs actually were used virtually nonexistent, but experts generally do not recommend firearms equipped with LCMs for self-defense. "In terms of a carry handgun," one expert is "of the opinion that ten (10) rounds is an adequate amount of ammunition," and "most often recommend[s]" firearms equipped with Colorado-compliant magazines. Ex. 28 ¶ 87. █████████████████████████ ██████████████████████████████████ ███████████████████████

As other courts have concluded, "the features unique to LCMs—the ability to shoot more than ten bullets without reloading—are not 'commonly used . . . for self-defense'" *Oregon*, 2023 WL 4541027, at *12 (quoting *Bruen*, 142 S. Ct. at 2138). "In the absence of persuasive evidence that . . . LCMs . . . are commonly used or are particularly suited for self-defense, Plaintiffs have failed to carry their burden." *Connecticut*, 2023 WL 4975979, at *22. Here, Plaintiffs failed to offer evidence that LCMs are commonly used for self-defense. This alone forecloses their claim and justifies an award of summary judgment to the Governor.

---

[7] Other courts have cited positively to this statistic. *See Oregon*, 2023 WL 4541027, at *12, *32; *Connecticut*, 2023 WL 4975979, at *21; *Dist. of Columbia*, 2023 WL 3019777, at *11.

[Redacted Version of the Governor's Motion for Summary Judgment]

**C.  LCMs are "dangerous and unusual" weapons not protected by the Second Amendment.**

Finally, even if the Court finds that LCMs are arms, not accessories, and that LCMs are commonly used for self-defense, summary judgment in the Governor's favor is still appropriate because LCMs would be "dangerous and unusual" arms that lack Second Amendment protection. In *Heller*, the Court held that the "Arms" within the scope of the Second Amendment are those "in common use at the time." 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). The Court justified this construction with reference to founding-era sources regulating "dangerous and unusual weapons." *Id.* (quoting 4 Blackstone 148–49 (1769)). And in *Bruen*, the Court held that "dangerous and unusual" arms are not protected by the Second Amendment. 142 S. Ct. at 2143 (noting that "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,'" so "the Second Amendment protects only the carrying of weapons that are those in common use at the time" (quotations omitted)).[8]

Although "all firearms are 'dangerous' in the sense that they are lethal," the "'unusual'" requirement "impl[ies] that there must be some level of lethality or capacity for injury beyond societally accepted norms that makes it especially dangerous." *Connecticut*, 2023 WL 4975979, at *16. So, the purpose of the "dangerous and unusual" inquiry "is to determine whether the firearm's character is such that it is commonly used and typically possessed for self-defense, or instead for the purpose of causing unlawful or excessive harm or fatalities." *Id.*

---

[8] Whether weapons are "'in common use at the time,' as opposed to those that 'are highly unusual in society at large,'" is not subject to the history and tradition analysis. *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). *Bruen* rejected that the definition of "common use" or "dangerous and unusual weapons" was fixed in time. *See id.* (noting that handguns might have been considered dangerous in the 1690s, but are in common use for self-defense today).

[Redacted Version of the Governor's Motion for Summary Judgment]

Firearms equipped with LCMs are unusually dangerous. The use of an LCM in a high-fatality mass shooting increases the death toll by 54%. SUMF ¶ 56. LCMs dramatically increase the fatality-rate of these events by eliminating or reducing the number of life-saving pauses that take place when a shooter goes to reload a spent magazine. Ex. 32 (Expert report of L. Klarevas) ¶ 15. *See also Naperville*, 2023 WL 2077932, at *15 (citing Klarevas). And even when LCMs don't succeed in killing their human targets, they inflict grievous wounds that cause lifelong disabilities. Ex. 21 ¶¶ 21–33; Ex. 47 ¶¶ 29–38.

LCMs are also unusual in that they are superfluous to the operation of the firearms they accessorize. Plaintiffs' own expert admits that "[n]o weapon requires a 16 plus round magazine to operate." Ex. 29 at 40:6–8. And any firearm that can take an LCM—█████████████████ ███████—can also operate with a Colorado-compliant magazine. SUMF ¶¶ 17, ██.

As *Bruen* reiterated, "the right secured by the Second Amendment is not unlimited." 142 S. Ct. at 2128 (quotations omitted). That right does not extend to accessories like LCMs that are not commonly used in self-defense, that fall outside the plain text of the Second Amendment, and that dramatically increase the lethality of mass shooting events.

## II.     The LCM Ban is consistent with the Nation's history and tradition of firearm regulation.

If Plaintiffs meet their burden on *Bruen*'s threshold question, including all three inquiries, their challenge still fails because the undisputed material facts show the LCM Ban "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[9] *Id.* at

---

[9] From this point forward, the Governor assumes for the sake of argument that LCMs are "arms" or "weapons," but to be clear he does not concede that they are either and maintains that Plaintiffs fail to satisfy *Bruen*'s threshold inquiry for the reasons set forth above.

[Redacted Version of the Governor's Motion for Summary Judgment]

2127. The analysis required at this stage is not as simple as asking whether a given regulation existed at the founding. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Therefore, determining whether magazine-capacity restrictions are consistent with the Nation's history and tradition of firearm regulation requires a more "nuanced approach" than simply looking for an analog from the founding or Reconstruction eras. *Id.*

Put simply, legislators at the founding and during Reconstruction were not faced with the challenges posed by LCMs and mass shootings. On the technological side, "[s]ingle-shot, muzzle-loaded firearms were the ubiquitous guns from the time of America's initial settlement by Europeans until the latter part of the nineteenth century." Ex. 31 (Expert report of B. Spitzer) ¶ 28. For the founding generation, repeating firearms were "curiosities more than serious firearms," Ex. 27 at 4, and posed no widespread danger to civilians sufficient to warrant a regulatory response. *See also id.* at 9–13 (detailing some repeating firearms at the founding and their limited availability). "[T]he idea of an available, affordable, reliable, multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s," and even then, it had no market "either from the government or the public." Ex. 31 ¶ 37. Even so, the Colt revolver had a five-shot capacity, well short of the 15-round limitation in Colorado. SUMF ¶ 26.

As to societal concerns, the LCM Ban was enacted in response to a growing threat from mass shootings. SUMF ¶ 21. "[T]here is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948." Ex. 32 ¶ 16. Such events occurred sporadically between 1949 and

19

[Redacted Version of the Governor's Motion for Summary Judgment]

1979, increasing in frequency in the early-1980s, before falling in part in connection with the 1994 federal assault weapons ban. *Id.* ¶¶ 17–18. But after the federal assault weapons ban expired in 2004, "mass shooting violence increased substantially." *Id.* ¶ 19. From 1949 through 2004, there were a total of 10 double-digit-fatality mass shootings, an average of one every 5.6 years. *Id.* Since 2004, the rate of such incidents has exploded six-fold. *Id.* The regulatory challenges faced by modern legislators would have been unimaginable to the founding generation and those who governed during Reconstruction.

Under *Bruen*'s "nuanced approach" for "modern regulations that were unimaginable at the founding," courts must engage in "reasoning by analogy." 142 S. Ct. at 2132. In doing so, at least two metrics are relevant: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry" under the Second Amendment. *Id.* (quoting *McDonald*, 561 U.S. at 767). And "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original).

**A. Governments have consistently regulated weapons once they circulate within the civilian population and present a grave danger to their citizens.**

Throughout history—dating back to the common law, through the founding, as well as Reconstruction, the early 20th century, and through today—"Arms" have consistently been subject to regulation. As to specific firearms or accessories, this tradition follows a familiar pattern. First, a weapon is invented and developed, and usually first marketed to and used by the military. Second, after some time, it enters the civilian market, often when soldiers return home

[Redacted Version of the Governor's Motion for Summary Judgment]

from military service. Third, it becomes readily available to civilians, some of whom misuse it to cause great harm to the public. Fourth, governments take steps to address that harm. *See, e.g.*, *Delaware*, 2023 WL 2655150, at *12 ("[T]he historical record . . . when viewed as a whole, illustrates a pattern: Firearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality." (quotations omitted)); *See also* SUMF ¶ 43. This is the Nation's tradition, and the LCM Ban fits squarely within it.

*Bruen* confirmed that, although historical regulations from pre-founding England and the colonies could not justify "broad prohibitions on all forms of public carry," there was a history and tradition of prohibitions on "bearing arms in a way that spreads 'fear' or 'terror' among the people." 142 S. Ct at 2145. *See also* Ex. 31 ¶ 64 (calling "the widespread enactment of concealed carry laws" the "public policy remedy" to an "emergent crime problem" in the 17th through 20th centuries). Nor were these regulations limited to the manner of carry; many directly regulated "the carrying of dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2143.

This tradition of regulation continued through the founding era. In the country's early decades, states regulated clubs and other blunt weapons, Ex. 31 ¶¶ 56–63, long-bladed offensive knives, *id*. ¶¶ 46–55, and "trap guns," which were firearms "rigged in such a way as to fire when the owner need not be present.," *id.*, ¶¶ 65–68. At one point, spanning the Reconstruction era, nearly every state regulated "Bowie Knives" or other particularly dangerous and unusual knives, either through bans on possession or through special taxation. SUMF ¶ 31.[10]

---

[10] Even today, Colorado continues this tradition of prohibiting similar weapons, including trap guns. *See* §§ 18-12-102, 106, C.R.S..

[Redacted Version of the Governor's Motion for Summary Judgment]

The history and regulation of repeating firearms fits within this historical tradition. In the founding era, repeating firearms were exceedingly rare. SUMF ¶ 24; *accord Oregon*, 2023 WL 4541027, at *17 ("[R]epeating firearms were viewed more as curiosities than as weapons for self-defense."); *Dist. of Columbia*, 2023 WL 3019777, at *13 ("[S]uch weapons amounted to little more than experimental curiosities." (quotations omitted)). For the most part, they never even entered the marketplace. SUMF ¶ 24; *see also* Ex. 26 ¶¶ 55–64 (surveying early American newspapers for rare mentions of repeating firearms); *Oregon*, 2023 WL 4541027, at *16–17 ("While repeating firearms existed prior to the ratification of the Second Amendment, these firearms were exceedingly rare, particularly within the general populace.").

Overall, "limitations imposed by the flintlock system, complicated production, lack of industrial technology and capacity, fragility, and cost led to limited production by individual gunsmiths and made [founding era repeating firearms] curiosities more than practical alternatives to contemporary firearms," such as a single shot musket. Ex. 27 at 9. Linguistic data from the era "shows that the terms 'magazine gun,' 'magazine wind gun,' and 'magazine air gun' are extremely rare, occurring a mere three times in the corpora, along with nine instances of repeater air guns that do not include the word 'magazine.'" Ex. 26 ¶ 64. "In contrast, there are approximately 1,200 references to the single-shot 'air gun'" during the same time period. *Id.* The relative lack of regulation for these firearms makes sense; because they were not available in the civilian marketplace, there was no need for the government to regulate them. *See also* Ex. 40 (Decl. of Sen. T. Sullivan) ¶ 8 (noting that legislatures do not regulate hypothetical problems).

Repeating firearms such as the Henry and Spencer rifles were slightly more prevalent during the Reconstruction era, but not among the civilian population. As a threshold matter,

[Redacted Version of the Governor's Motion for Summary Judgment]

neither the Henry (fifteen rounds), nor the Spencer (seven rounds) would have been regulated under Colorado's statute. SUMF ¶ 25. And neither is analogous to modern LCMs. For both guns, reloading the non-detachable magazines would take about a minute. *Id.*

Henrys and Spencers were initially produced for use in the Civil War, and neither circulated widely in the civilian population after the war. *Id.* Although Henry rifles "were available for purchase by discharged soldiers at the end of" the Civil War, "[m]ost . . . were either carried west by settlers for self-defense or kept as souvenirs of service" and "were not, to [the expert's] knowledge, . . . used in mass shootings of civilians." Ex. 27 at 21. Both rifles were "occasionally used in self-defense," but "a survey of newspapers revealed no mass shootings [using] either" firearm, at least among civilians. *Id.* at 25; *see also* Ex. 32, ¶ 16 (no double-digit fatality mass shootings between 1776 and 1948).

The lack of regulation of Henrys and Spencers during the Civil War and Reconstruction, and their occasional use for personal self-defense, does not disrupt the Nation's tradition of regulating dangerous weapons of war *when misused by civilians*. Because Reconstruction era repeating firearms were not commonly misused by civilians, there was no need for the federal and state governments to regulate them. *See generally McCullen v. Coakley*, 573 U.S. 464–481 (2014) ("States adopt laws to address the problems that confront them. The [Constitution] does not require States to regulate for problems that do not exist.").[11]

---

[11] Using *Bruen*'s "nuanced approach," 142 S. Ct. at 2132, other courts have held explicitly that the absence of founding and Reconstruction era laws regulating magazine capacity does not mean such laws are invalid today. *See Dist. of Columbia*, 2023 WL 3019777, at *16 (noting that "semiautomatic and high-capacity weapons" were not regulated before the 1920s and 1930s because such weapons "were *not* technologically feasible and commercially available in meaningfully quantities until the early 1900s"); *Connecticut*, 2023 WL 4975979, at *32 (same).

[Redacted Version of the Governor's Motion for Summary Judgment]

As threats to public safety shifted over time, so too did the country's regulations. World War I saw the "development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull." Ex. 31 ¶ 3. The most notable of these was the Thompson submachine gun, or "Tommy gun." *Id.*  ¶ 4. After the war, when these unusually dangerous machine guns became readily available to civilians and civilians misused them to cause public harm, at least 32 States enacted anti-machine gun laws. SUMF ¶ 38. Even the federal government placed significant restrictions on machine guns nationwide, SUMF ¶ 41, and banned them altogether in the District of Columbia, SUMF ¶ 32. *See Dist. of Columbia*, 2023 WL 3019777, at *15–17 (relying on Tommy gun regulations to conclude an LCM ban is comparably justified).

Many of these laws also regulated the number of bullets those weapons could fire without reloading. Between 1917 and 1934, 23 States imposed restrictions on the number of rounds a firearm could fire without reloading." SUMF ¶ 42. These laws not only reflect a tradition of limiting magazine capacity, but they also demonstrate the Nation's tradition of firearm regulation, namely that when a weapon of war begins to circulate widely and cause public harm, States move to regulate it. Colorado's LCM Ban fits into this history and tradition.

Although this era of regulation occurred after Reconstruction, "in an appropriate case, 20th century history that is not contradicted by earlier evidence can illuminate a modern-day regulation's constitutional vitality." *Dist. of Columbia*, 2023 WL 3019777, at *16. Because *Heller* approved of early-20th century regulations on machine guns, 554 U.S. at 624, those regulations must be consistent with the Nation's history of firearm regulation. And given the similarities between past efforts to regulate machine guns and modern LCM limitations, the

24

[Redacted Version of the Governor's Motion for Summary Judgment]

LCM Ban must also be consistent with the Nation's history and tradition. *See Dist. of Columbia*, 2023 WL 3019777, at \*16; *see also Oregon*, 2023 WL 4541027, at \*44 ("Historical evidence that post-dates the adoption of the Fourteenth Amendment, according to the Supreme Court, can be used to confirm earlier historical traditions, but cannot be used as evidence to contradict or override those traditions."); *Delaware*, 2023 WL 2655150, at \*12 ("The analogous twentieth-century regulations do not depart from this pattern, and, indeed, reinforce it.").

**B. The LCM Ban imposes comparable burdens on the right to armed self-defense to those imposed by historical regulations.**

Because "individual self-defense is the *central component* of the Second Amendment right," the Supreme Court has invalidated complete prohibitions on the possession of handguns, which it characterized as "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; *see also Bruen*, 142 S. Ct. at 2143. By categorically prohibiting persons from possessing "the most preferred firearm in the nation to keep and use for protection," *Heller*, 554 U.S. at 628 (quotations omitted)—or, in the case of *Bruen*, requiring citizens to demonstrate a special justification for such weapons—those regulations impermissibly intruded on "the core lawful purpose" of the Second Amendment, *id.* at 630; *see also Bruen*, 142 S. Ct. at 2156. Colorado's LCM Ban imposes no such burden.

The undisputed material facts show that LCMs are not commonly used for self-defense.[12] Instead, the record demonstrates that the average number of rounds used when firing a firearm in

---

[12] The Courts of Appeals that have considered LCM restrictions have reached similar conclusions. *See Duncan v. Bonta*, 19 F. 4th 1087, 1105 (9th Cir. 2021) ("[T]he record here, as in other cases, does not disclose whether the added benefit of [an LCM]—being able to fire more than ten bullets in rapid succession—has ever been realized in self-defense in the home."), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *& vacated and remanded*, No. 19-55376,

[Redacted Version of the Governor's Motion for Summary Judgment]

self-defense is 2.2 rounds, that firearm experts do not recommend LCMs for self-defense, and that documented instances of threats where self-defense with a firearm equipped with an LCM would be appropriate are rare. Ex. 30 at 52; Ex. 28 ¶¶ 81–87.; *see also Delaware*, 2023 WL 2655150, at *12 ("Defendants have shown that LCMs with more than 17 rounds are unnecessary for self-defense, as individuals in self-defense situations rarely fire even 10 rounds, and the record does not reflect that any firearms require LCMs to operate." (quotations omitted)). ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

In *Heller*, the Supreme Court labeled "startling" the idea that "restrictions on machine guns . . . might be unconstitutional," 554 U.S. at 624, and strongly suggested that "weapons that are most useful in military service—M-16 rifles and the like—may be banned," *id.* at 627. Thus, even if this Court finds that LCMs are "arms" protected by the Second Amendment, on a spectrum from handguns—which are "the quintessential self-defense weapon," *id.* at 629—to "weapons that are most useful in military service" like machine guns, *id.* at 627, LCMs belong with the latter. *See Dist. of Columbia*, 2023 WL 3019777, at *12 (LCMs "are most useful in military service[.]"). And like restrictions on machine guns, the LCM Ban does not substantially burden the core Second Amendment right to lawful self-defense.

---

2022 WL 4393577 (9th Cir. Sept. 23, 2022); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 118 (3d Cir. 2018) ("The record here demonstrates that [LCMs] are not well-suited for self-defense."); *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc) (noting the "scant evidence . . . [that] LCMs are possessed, or even suitable, for self-protection"); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) (there is no evidence that LCMS "are well-suited to or preferred for the purpose of self-defense or sport").

[Redacted Version of the Governor's Motion for Summary Judgment]

**C. The LCM Ban is as justified as other historical regulations.**

**1. States and the federal government have consistently passed laws to stop lethal arms-related violence, and the LCM Ban is similarly aimed at reducing mass shooting deaths.**

From the founding, through the present, States have responded to armed violence by imposing regulations intended to limit lethality, as detailed above at pages 20–25. This tradition includes the practice of restricting clubs and other blunt weapons, Ex. 31 ¶¶ 56–63, long-bladed offensive knives, *id.* ¶¶ 46–55, and "trap guns," "because of the likelihood that innocent persons could be injured or killed, and also because such devices represented an arbitrary and excessive meting out of private, vigilante-type 'justice,'" *id.* ¶ 66. And further, as discussed above at pages 24–25, the federal government regulated "automatic and semi-automatic weapons in the 1920s and 1930s," due to "the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time." *Id.* ¶ 20.

Although gun violence and efforts to legislate gun violence have existed for centuries, modern mass shootings are a more recent phenomenon. The number of people killed in high-fatality mass shootings has risen by 260% since the 1990s, a rate 13-times greater than population growth over the same period. SUMF ¶ 51. And the past two years each saw seven mass shootings across the country, the highest figures since at least 1990. SUMF ¶ 53. In total, the seven deadliest acts of intentional criminal violence in the United States since the 9/11 terrorist attacks on the World Trade Center have been mass shootings, SUMF ¶ 52.

[Redacted Version of the Governor's Motion for Summary Judgment]

LCMs are increasingly misused to perpetrate horrific, high-fatality mass shooting events. *See* Ex. 32 ¶ 13. Six of the seven deadliest mass shootings in history involved LCMs,[13] SUMF ¶ 54, which also act as a "force multiplier[]" during a mass shooting event, Ex. 32 ¶ 15. LCMs have been used in 56% of all mass shootings since 1990, but 83% of all mass shootings resulting in more than 10 deaths, and 89% of shootings resulting in more than 15 deaths. SUMF ¶ 54. *See also Dist. of Columbia*, 2023 WL 3019777, at *14 (citing similar statistics to show how LCMs "implicate unprecedented societal concerns" (quotations omitted)).

The rising misuse of LCMs is consistent with their relatively recent availability in the civilian marketplace. AR-15 style rifles were first issued to the U.S. Armed Forces in the early 1920s, equipped with a 20-round detachable magazine. SUMF ¶ 57. But when the first civilian variant of this firearm entered the market in 1964, it came with two 5-round magazines. *Id.* After World War II, civilian firearms were generally sold with magazine capacities of less than 15 rounds. SUMF ¶ 58. That lasted until the late-1980s, when firearms manufacturers began developing and offering semi-automatic weapons with magazine capacities exceeding 15 rounds. *Id.* Congress stepped in and limited the maximum capacity of a detachable magazine to ten rounds in 1994. H.R. 4296, 103rd Congress, § 4 (1994). After the federal ban expired and the increased misuse of LCMs by civilians became apparent (most prominently in Colorado with the

---

[13] These six events are the Mandalay Bay shooting in Las Vegas, Nevada in October 2017 (60 killed); the Pulse shooting in Orlando, Florida in October 2016 (49 killed); Sandy Hook Elementary shooting in Newtown, Connecticut in December 2012 (27 killed); the First Baptist Church shooting in Sutherland Springs, Texas in November 2017 (25 killed); the El Paso Walmart shooting in El Paso, Texas in August 2019 (22 killed); and the Robb Elementary School shooting in Uvalde, Texas, in May 2022 (22 killed). Ex. 32 ¶ 14; Ex. 23 at 5–8.

[Redacted Version of the Governor's Motion for Summary Judgment]

Aurora Theater Massacre), Colorado joined the long tradition of governments prohibiting accessories of war that pose a significant threat to civilians. SUMF ¶ 21.

Like the historic regulations described above, Colorado's LCM Ban is justified by the government's interest in reducing civilian deaths. And the undisputed evidence in this record shows that LCM bans actually work to reduce deaths by mass shooting. Between 1990 and 2022, states where LCMs were limited experienced a 48% decrease in the rate of high-fatality mass shootings involving LCMs. SUMF ¶ 60. Those same states saw a 63% decrease in the rate of deaths. *Id.* Restrictions on LCMs decrease lethal mass shootings and are comparably justified to other historical regulations "enacted in response to pressing public safety concerns regarding weapons determined to be dangerous." *Delaware*, 2023 WL 2655150, at *13.

### 2. The LCM Ban is justified by Colorado's interest in restricting activity that spreads fear amongst its population.

Even beyond the consistent efforts to regulate lethality, Colorado's LCM ban is also consistent with historical firearm regulations that target activity that "spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. The historic tradition of regulating fear- and terror-spreading activity is deeply rooted, from the Statute of Northampton in England in the 1600s, *id.* at 2141, through the promulgation of State statutes in the U.S. near the founding, *id.* at 2143–45. Most analogous to the LCM Ban is the widespread movement to ban fully-automatic machine guns in the 1920s and 30s in response to their use in organized crime. Ex. 31 ¶¶ 6–12. As the "Tommy gun" began to circulate within the criminal population, "[r]eports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality," led both States and Congress to enact anti-machine gun laws. *Id.* ¶ 12. "These regulations functionally limited

[Redacted Version of the Governor's Motion for Summary Judgment]

magazine capacity, because they prevented individuals from possessing firearms that could fire over a certain number of rounds without reloading." *Oregon*, 2023 WL 4541027, at *25.

The LCM Ban likewise was passed in direct response to a spate of high-casualty mass shootings involving LCMs including inside Colorado. The devastation caused by these shootings incites significant fear among the public. In 2019, 71% of adults in the United States believed that mass shootings were a significant source of stress. SUMF ¶ 61. That same year, roughly half of U.S. adults—representing nearly 125 million people—were "very worried" or "somewhat worried" that they, or someone in their family, would become a victim of a mass shooting. SUMF ¶ 62. The percentages were even higher among children aged 13 to 17 asked if they were "worried about the possibility of a shooting happening at their school." SUMF ¶ 63; *see also* Exs. 21 ¶¶ 22–33 & 47 ¶¶ 29–38 (describing ongoing trauma of mass shooting survivors).

The history and tradition of firearm restriction in America reflects a consistent regulatory response to weapons causing such widespread fear. After a growing number of mass shootings involving LCMs provoked terror in its people, the Colorado General Assembly enacted the LCM Ban to legislate a life-saving "pause" during active shooter events, *i.e.*, the interruption in otherwise sustained shooting that occurs when a shooter is forced to replace a spent magazine. There are multiple examples of such a pause saving lives. *See* Ex. 32 ¶ 30. The primary objective of Colorado's LCM Ban is to force more critical pauses to occur, each of which saves more lives. *See also Oregon*, 2023 WL 4541027, at *14 (explaining how the pause works in theory and practice); *Ill. Herrera*, 2023 WL 3074799, at *7 (noting that the local and statewide legislative bodies in Illinois "responded to 'dramatic technological changes' and 'unprecedented

[Redacted Version of the Governor's Motion for Summary Judgment]

societal concerns' of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate them").

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon,* 546 U.S. 243, 270 (2006) (quotation omitted)); *see also United States v. Morrison,* 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"). And "it can hardly be argued that seeking to reduce the lethality of mass shootings and to contain their rippling, traumatic effects does not relate to the public health, safety, or welfare." *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 329 (Colo. 2020) (upholding the LCM Ban under the Colorado Constitution).

The pause in shooting created by the LCM Ban returns modern day firearms' capacities to a period when multi-round firearms were not, and could not, be used to inflict mass civilian casualties. It is comparably justified to historical regulations, and consistent with the Nation's history and tradition of firearm regulation. In sum, Plaintiffs, who have not put forward a single expert on the historical inquiry, "produce no evidence or data to undermine [the Governor's] core premise, which is that governments have been passing regulations targeting specific types or characteristics of weapons that have proved problematic or dangerous since the time of the founding, demonstrating a longstanding tradition of the government exercising its power to regulate new and dangerous weapon technology." *Connecticut*, 2023 WL 4975979, at *32.

[Redacted Version of the Governor's Motion for Summary Judgment]

**III.    Each Plaintiff lacks standing, warranting dismissal under Fed. R. Civ. P. 12(b)(1).**

Regardless of whether the Governor is entitled to summary judgment, this action should also be dismissed because Plaintiffs lack standing. Because standing "is an essential and unchanging part of the case-or-controversy requirement of Article III[,] . . . any party . . . can raise the issue of standing for the first time at any stage of the litigation." *Defs. of Wildlife v. Everson*, 984 F.3d 918, 945 (10th Cir. 2020) (quotations omitted).

To establish standing, Plaintiffs must "prove that [they have] suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). "To satisfy the first of these three elements, a plaintiff must offer something more than the hypothetical possibility of injury. The alleged injury must be concrete, particularized, and actual or imminent." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (dismissing previous challenge to the LCM Ban for lack of standing).

In the specific context of the LCM Ban, a plaintiff who possesses LCMs lawfully acquired before the Ban went into effect cannot establish standing to challenge the Ban on the basis that their lawfully owned LCMs will "eventually . . . wear out" and need to be replaced. *Id.* at 551. Such injuries are insufficiently concrete to support pre-enforcement standing. And in all events, speculative injuries that "some day" a plaintiff might want to acquire an LCM do not suffice. *Id.*; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

[Redacted Version of the Governor's Motion for Summary Judgment]

### A. NFGR cannot satisfy the prerequisites for associational standing.

The National Foundation for Gun Rights ("NFGR") does not allege that it has been injured by the LCM Ban. Am. Compl. (D. 38) ¶ 2. Instead, NFGR—which refers to itself as a "membership" organization—invokes associational standing on behalf of "NFGR members." *Id.* But, in fact, NFGR is not a membership organization. Under its Articles of Incorporation, NFGR is expressly prohibited from having members. SUMF ¶ 67.

For a non-membership organization to invoke associational standing, the persons whose interests the organization seeks to advance must possess "the indicia of membership in the organization." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344–45 (1977); *Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) (holding that where, as here, "an organization [] has no members," it must prove that it is "the functional equivalent of a traditional membership organization"). To make this determination, courts consider whether the putative members elect the leadership of the organization, serve as part of the organization, and "finance its activities, including the costs of [the] lawsuit." *Hunt*, 432 U.S. at 344.

*Sierra Club v. Cripple Creek & Victory Gold Min. Co.*, No. 00-CV-02325-MSK-MEH, 2006 WL 2882491, at *10 (D. Colo. Apr. 13, 2006), is instructive. There, like here, the "Mineral Policy Center's" articles of incorporation prohibited it from having members. Nonetheless, it alleged associational standing. The court concluded the Center lacked standing, especially because the "so-called 'members' of the Mineral Policy Center lack the right to serve as, or elect, officers and directors, and they exercise no control over the Mineral Policy Center." *Id.*

So too here. NFGR admits that its putative members have "no formal legal control" over its actions. SUMF ¶ 68. The Board controls the organization, and selects its own replacements as

[Redacted Version of the Governor's Motion for Summary Judgment]

well as the organization's officers. SUMF ¶ 69. These putative "members," then, "do not enjoy

the essential prerequisites of membership." *Sierra Club*, 2006 WL 2882491, at *10.

The requirement that an organization bear some indicia of a membership organization

before advancing the interests of third-parties is not an aesthetic requirement. It ensures that an

organization cannot invoke the interests of individual third-parties to advance goals those

individuals may not support. The "indicia of membership" factors are levers of control—they

enable the individual third-parties to ensure their interests are adequately represented. Where

none of those levers exist, associational standing is inappropriate.

**B.  Plaintiffs Gates and Swartz** ████████████████████
████████████████ **are suffering no injury from the LCM Ban.**

In *Colorado Outfitters*, one plaintiff lawfully owned two 30-round magazines and three

17-round magazines. 823 F.3d at 549. Nonetheless, she testified that she was injured by the LCM

ban because "eventually" her LCMs would wear out. *Id.* The Tenth Circuit rejected this

argument, concluding that "[s]uch 'some day' speculations are insufficient to establish an injury-

in-fact for purposes of Article III standing." *Id.*



[Redacted Version of the Governor's Motion for Summary Judgment]

**C.  Plaintiff Honegger has not alleged sufficiently concrete plans to satisfy the requirements for pre-enforcement standing.**



There is further proof that Honegger lacks the type of "concrete plans" to obtain an LCM necessary to establish standing here. Earlier this year, while the Colorado legislature considered a bill to ban the purchase of assault weapons, NFGR asked Honegger whether he owned any weapons that would be covered by the purchase ban, whether he wanted to own any, and whether he would join a lawsuit challenging the proposed ban and express concrete plans to purchase such weapons. SUMF ¶ 76. Honegger responded that he did not own an assault weapon, but "would like to own [one] in the future," and was willing to join the lawsuit. *Id.*

Honegger's willingness to indicate an interest in assault weapon ownership that is not reflective of any "concrete or imminent" plans is proof that his identical interest in LCM ownership is too speculative to support an "actual or imminent" injury. *Lujan*, 504 U.S. at 564. Particularly when viewed against the backdrop of having never expressed interest in LCM

35

[Redacted Version of the Governor's Motion for Summary Judgment]

ownership prior to filing this lawsuit. Honegger lacks the type of "concrete plans" to purchase an LCM necessary to satisfy standing.

Accordingly, because each plaintiff lacks standing, the Court lacks subject matter jurisdiction over this challenge, and it should be dismissed.

## CONCLUSION

The Governor is entitled to summary judgment on Plaintiffs' claim or is entitled to dismissal of Plaintiffs' claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   Facts Relevant to the Plain Text Analysis

1.      In written documents from the founding period, the word "arms" often appeared separate from the word "accoutrements," which referred to "ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields." Ex. 26 ¶ 9.

2.      There is no "lexical data" from the founding era that suggests the founding generation considered the word "arms" to include "accoutrements," "cartridge boxes," "cartouch boxes," "magazines," or any other parts of weapons. Ex. 26 ¶ 71.

3.      During the founding and Reconstruction eras, "arms" was used as a general term for weapons, like swords, knives, rifles, and pistols, but did not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields. Nor, during those periods, was "arms" used to refer to parts of a weapon, for example the trigger of a gun, the hilt of a sword, or the cartridge box or magazine that held the bullets. Ex. 26 ¶ 9.

4.      When the founding and Reconstruction generations did refer to equipment like cartridge cases or boxes, scabbards, and flints, they did so using phrases like: "arms and

[Redacted Version of the Governor's Motion for Summary Judgment]

ammunition," "arms and accoutrements," or "arms, ammunition, and accoutrements." Ex. 26 ¶ 10.

5.      Before the 1920s, bullets were primarily stored in "cartridge boxes," sometimes called "cartouch boxes," and were considered part of the general category of military accoutrements, not arms. Ex. 26 ¶¶ 24–25.

6.      Repeating firearms from the founding era utilized internal magazines, not detachable magazines. Ex. 27 at 9–13.

7.      Detachable magazines that could be used to rapidly reload a firearm were developed in the early 20th century. Ex. 27 at 28. *See also* Ex. 28 ¶¶ 57–62.

8.      Many manufacturers market multiple versions of their firearms, including versions that comply with the LCM Ban. Aftermarket manufacturers offer 10-round magazines for handguns that come with LCMs in other states. Ex. 28 ¶¶ 62–80.

## II.    Facts Relevant to the Common Use for Self-Defense Analysis

9.      16-plus round magazines are not commonly used for self-defense. Ex. 30 at 3–4; Ex. 28 at 81–83.

10.     Documented instances of threats where self-defense with a firearm equipped with an LCM would be appropriate are rare. Ex. 30 at 3–4.

11.     According to the FBI's uniform crime report, officers using a firearm to fend off an attack typically fire between three and nine rounds. Ex. 23 at 21.

12.     Home defense, street defense, and commercial robbery situations between citizens and criminals are rarely protracted shootouts with extensive exchanges of gunfire. Ex. 28 ¶ 81.

[Redacted Version of the Governor's Motion for Summary Judgment]

13.     Home invasions in Colorado are rare. During home invasions in Colorado, neither the perpetrator nor the victim ever discharges the number of rounds that would encourage, much less require, the use of large-capacity magazines. Ex. 30 at 5.



15.     Modern semi-automatic rifles and shotguns that are designed, manufactured, and marketed as "hunting rifles" or "sporting shotguns" traditionally have an internal magazine capacity of less than 10 rounds. Ex. 28 ¶ 55.

16.     Just 15.3% of adult Americans have ever owned a magazine with a capacity greater than 10 rounds. Ex. 34 (Rebuttal report of J. Zax) at 3.

## III.    Facts Relevant to the Dangerous and Unusual Analysis

17.     Magazines of sixteen rounds or more are not necessary for any firearm to operate. Any firearm that can accept an LCM can also operate with a Colorado-compliant magazine. Ex. 28 ¶ 52; Ex. 35 (Rebuttal report of J. Yurgealitis) ¶ 17; Ex. 29 at 40:6–8.



19.     In almost all cases, any firearm designed to accept a detachable magazine holding more than 15 rounds will also accept a magazine with a maximum capacity of 15 rounds or fewer. Ex. 28 ¶ 56.

[Redacted Version of the Governor's Motion for Summary Judgment]

████  ██████████████████████████████████████

████████████████████████████████████████████

## IV.    Facts Relevant to the History and Tradition Analysis

21.    The LCM ban was enacted in response to a growing number of mass shootings both in Colorado and across the country. Ex. 39 (Decl. of Sen. R. Fields) ¶¶ 5, 6.

22.    In general, legislatures respond to threats. Legislatures do not regulate items once they are invented; they regulate items once those items pose a threat to their constituents. Ex. 40 ¶ 8.

23.    Until the late-19th century, single-shot, muzzle-loading firearms were the preeminent firearms in America. Ex. 31 ¶ 28.

24.    During the founding era, repeating firearms were rare, barely entered the civilian marketplace, and posed no widespread danger to civilians. Ex. 27 at 4, 9–13; Ex. 31 ¶¶ 28–32.

25.    Both the Spencer and Henry rifles were initially produced for use in the Civil War, and neither circulated widely in the civilian population until after the war. The Henry Rifle had a 15-round capacity, and the Spencer had a 7-round capacity. Each took about a minute to reload. Ex. 27 at 18–25.

26.    The first "available, affordable" multi-shot firearm to arrive in America was the Colt revolver, which had a five-shot capacity. It did not arrive in America until the 1830s, and had no market "either from the government or the public." Ex. 31 ¶ 37; Ex. 27 at 15.

27.    The first mass shooting resulting in double-digit fatalities did not occur in the United States until 1949. Ex. 32 ¶ 16.

[Redacted Version of the Governor's Motion for Summary Judgment]

28.     None of the repeating rifles available at the founding or during the civil war were used to commit a mass shooting of civilians. Ex. 27 at 16, 21, 25, and 27.

29.     From 1949 through 2004, the United States experienced 10 double-digit-fatality mass shootings. Ex. 32 ¶ 19.

30.     From 2004 to April 3, 2023, the United States has suffered 20 double-digit-fatality mass shootings. Ex. 32 ¶ 19.

31.     Between 1830 and 1900 every state except New Hampshire, plus the District of Columbia, regulated or heavily taxed Bowie knives or similar fighting knives. Ex. 31 ¶ 53. *See also* Exs. C and E to Ex. 31.

32.      From the founding through the late-nineteenth century, every state in the Nation at one time or another regulated clubs or other blunt objects such as bludgeons, billy clubs, or slungshots. Ex. 31 ¶ 56. *See also* Exs. C and E to Ex. 31.

33.     From the colonial period through the start of the Revolution, homicide rates were low. And when homicides did occur, guns were seldom used. Ex. 31 ¶ 64.

34.     Between 1771 and the early-1890s, at least 16 states enacted anti-trap gun laws. Ex. 31 ¶ 68. *See also* Exs. B and F to Ex. 31.

35.     The fully-automatic machine gun, defined as able to fire a continuous stream of bullets with a single trigger pull, first entered circulation during World War I. Ex. 31 ¶ 3.

36.     After the war, these machine guns matriculated into the civilian population. Sales accelerated in the mid-1920s. Ex. 31 ¶¶ 4–6.

37.     Beginning in 1926, criminal use of machine guns received widespread and extensive attention in newspapers across the country. Ex. 31 ¶ 10.

[Redacted Version of the Governor's Motion for Summary Judgment]

38.     Between 1925 and 1934, at least 32 states enacted anti-machine gun laws. Ex. 31 ¶ 13. *See also* Exs. B and D to Ex. 31.

39.     In 1923, the National Conference of Commissioners on Uniform State Laws issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading." Ex. 31 ¶ 13.

40.     In 1932, the United States Congress banned in the District of Columbia "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Ex. 31 ¶ 14.

41.     In 1934, the United States Congress enacted the National Firearms Act, which imposed a series of strict requirements on the purchase of fully automatic weapons, including a registration system and a substantial tax. Ex. 31 ¶ 15.

42.     Between 1917 and 1934, 23 states—representing approximately 58% of the American population at that time—imposed limits on the number of rounds a firearm could fire without reloading. Ex. 31 ¶¶ 22, 24.

43.     The Nation's history of weapons regulation follows a familiar path: First, a new weapon is invented. Second, that weapon may be patented. Third, the weapon is developed with a focus on military applications. Fourth, some of the military-designed weapons spread to, or are adapted for, civilian markets and use. And fifth, "if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes." Ex. 31 ¶ 25.

44.     Large capacity detachable magazines were not initially designed or intended for the civilian marketplace. Ex. 28 ¶ 50.

[Redacted Version of the Governor's Motion for Summary Judgment]

**V.    Facts Relevant to the Comparable Burden Analysis**

45.    Studies show that the average number of rounds used when firing a firearm in self-defense is 2.2 rounds. Ex. 30 at 52; Ex. 28 ¶¶ 82–83.

46.    Weapons with more than 15 rounds of ammunition are not recommended for self-defense. Ex. 28 ¶¶ 84–87.

**VI.    Facts Relevant to the Comparable Justifications Analysis**

48.    Armed with an LCM, it took the shooter in the Aurora Theater Massacre roughly two minutes to shoot 70 people, killing 12. Ex. 23 at 15.

49.    During the 2011 mass shooting in Phoenix, AZ, in which six people were killed and 13 wounded, the gunman was wrestled to the ground by unarmed bystanders while attempting to reload. Ex. 23 at 16.

50.    According to the FBI, out of 277 active shooter situations from 2000 to 2018, 11.5% were halted by unarmed civilians, and 3.1% were halted by armed civilians. Ex. 23 at 18.

51.    260% more people were killed in high-fatality mass shootings in the 2010s than in the 1990s, a figure that outpaced the rise in national population by a factor of 13. Ex. 32 ¶ 12.

52.    The seven deadliest acts of intentional criminal violence since 9/11 have all been mass shootings. Ex. 32 ¶ 12.

53.    Both 2021 and 2022 saw seven mass shootings in the United States, the two highest figures since at least 1990. Ex. C to Ex. 32.

[Redacted Version of the Governor's Motion for Summary Judgment]

54.     Six of the seven deadliest mass shootings in United States history involved LCMs. LCMs have been used in 56% of all mass shootings since 1990, but 83% of all mass shootings resulting in more than 10 deaths, and 89% of mass shootings resulting in more than 15 deaths. Ex. 32 ¶¶ 13–14.

55.     82% of high-fatality mass shootings, and 85% of all high-fatality mass shooting deaths, since 2020 have involved LCMs. Ex. 32 ¶ 13.

56.     Since 1990, the use of LCMs in high-fatality mass shootings has resulted in a 54% increase in the average fatalities per incident. Ex. 32 ¶ 15.

57.     AR-15 style rifles were first issued to the U.S. Armed Forces in the early 1960s, and came with a 20-round detachable magazine. When the first civilian variant of this firearm entered the market in 1964, it came supplied with two five-round magazines. Ex. 28 ¶¶ 62–63.

58.     It was not until the late-1980s that manufacturers began offering civilians semi-automatic firearms with magazine capacities equaling or exceeding 15 rounds. Ex. 28 ¶¶ 65–67.

59.     Between 1990 and 2022, accounting for population, states with magazine capacity limitations experienced a 51% decrease in high-fatality mass shooting incidents altogether, and a 62% decrease in high-fatality mass shooting fatality rates. Ex. 32 ¶ 35.

60.     Between 1990 and 2022, accounting for population, states with magazine capacity limitations experienced a 48% decrease in the rate of high-fatality mass shootings involving LCMs specifically, and a 63% decrease in the rate of deaths from such incidents. Ex. 32 ¶ 36.

61.     In a 2019 survey, 71% of adults reported that mass shootings were a "significant source of stress." Ex. 30 at 67.

43

[Redacted Version of the Governor's Motion for Summary Judgment]

62.     In a 2019 Gallup poll, 48% of adults responded that they were "very worried" or "somewhat worried" that they or someone in their family would become a victim of a mass shooting. Ex. 30 at 68.

63.     In a 2018 survey, 25% of youths aged 13 to 17 reported that they were "very worried about the possibility of a shooting happening at their school," with 32% reporting that they were "somewhat worried." Ex. 30 at 69.

64.     Combining estimates of the loss in quality of life associated with firearm-related injuries and deaths, as well as the direct and other opportunity costs, it is estimated that the total cost of firearm-related gun violence in 2019 was approximately $557 billion. Ex. 30 at 59.

65.     Based on a study out of Virginia, the federal Violence Crime Control and Law Enforcement Act of 1994, which included an LCM ban, significantly reduced gun homicides during the period in which the law was in effect. Ex. 30 at 80.

66.     Data suggests that between 2013 and 2015 Colorado's LCM ban correlated with a reduction in the level of gun homicides in Colorado. Ex. 30 at 82.

**VII.    Facts Relevant to Standing**

67.     According to its Articles of Incorporation, NFGR "shall have no members." Ex. 41 (Docs. Produced by Pls.) at Plaint001.

68.     The people NFGR "considers" to be its members "have no formal legal control" over its actions. Ex. 46 (NFGR Interrogatory Responses) at 1–2.

69.     NFGR is managed by a Board of Directors. The directors are elected by the directors then in office, who also select NFGR's officers. Ex. 41 at Plaint001–005.

[Redacted Version of the Governor's Motion for Summary Judgment]



76.      In March 2023, the General Assembly considered a bill to ban the purchase of Assault Weapons. That month, NFGR asked Honegger whether he a) owned a weapon covered by proposed bill's definition of "assault weapons," and b) whether he would like to be a plaintiff in a challenge to that proposed bill. Honegger responded: "I don't have, have owned or plan to purchase while the litigation goes on a firearm that meets the description in the current proposed law. I would like to own in the future[.]" Ex. 41 at Plaint052–54.

[Redacted Version of the Governor's Motion for Summary Judgment]

DATED: September 11, 2023

PHILIP J. WEISER
Attorney General

*s/* Peter G. Baumann
*LEEANN MORRILL**
First Assistant Attorney General
*EMILY B. BUCKLEY**
Senior Assistant Attorney General
*PETER G. BAUMANN**
Senior Assistant Attorney General
*DANIEL R. MAGALOTTI**
Assistant Attorney General Fellow
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: leeann.morrill@coag.gov
　　　emily.buckley@coag.gov
　　　peter.baumann@coag.gov
　　　daniel.magalotti@coag.gov
*Attorneys for Defendant Governor*
　*Jared S. Polis*
*Counsel of Record

[Redacted Version of the Governor's Motion for Summary Judgment]

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2023, I served a true and complete copy of the foregoing **THE GOVERNOR'S MOTION FOR SUMMARY JUDGMENT,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Eric Paul Apjoke
Shaun Pearman
Pearman Law Firm, P.C.
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
eric@pearmanlawfirm.com
shaun@pearmanlawfirm.com

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

s/ Peter G. Baumann
*Peter G. Baumann*