## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| BENJAMIN GATES, ET AL., | |
| Plaintiffs, | Civil Action No. 1:22-cv-01866-GPG-SKC |
| v. | |
| JARED S. POLIS, in his official capacity as Governor for the State of Colorado | |
| Defendant. | |

**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*Of Counsel:*

Daniel Weltz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

# TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICI ................................................................. 1

INTRODUCTION ..................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.   *BRUEN* ESTABLISHES A TWO-STEP FRAMEWORK FOR EVALUATING
     SECOND AMENDMENT CHALLENGES TO FIREARMS REGULATIONS. ............. 3

     A.   The Court Does Not Reach the Second Prong of the *Bruen* Analysis
          Unless a Plaintiff First Establishes That a Challenged Regulation Burdens
          "Armed Self-Defense." ........................................................................... 3

     B.   If the Second Prong of the *Bruen* Analysis Applies, the Court Must Assess
          Whether Modern and Historical Regulations Impose a "Comparable
          Burden" on Armed Self-Defense and Whether That Burden Is
          "Comparably Justified." ......................................................................... 5

     C.   The Second Prong of the *Bruen* Analysis Requires a "More Nuanced
          Approach" to Historical Analogues Where There Have Been "Dramatic
          Technological Changes," Including in Firearms. .................................... 6

II.  CASE LAW ESTABLISHES THAT RESTRICTIONS ON LCMS DO NOT
     BURDEN THE RIGHT OF "ARMED SELF DEFENSE" UNDER THE FIRST
     PRONG OF THE *BRUEN* TEST ....................................................................... 7

III. CASE LAW ESTABLISHES THAT RESTRICTIONS ON LCMS ARE
     "RELEVANTLY SIMILAR" TO HISTORICAL ANALOGUES UNDER THE
     SECOND PRONG OF THE *BRUEN* TEST ......................................................... 10

IV.  CASE LAW ESTABLISHES THAT LCMS REFLECT A "DRAMATIC
     TECHNOLOGICAL CHANGE" IN WEAPONRY THAT REQUIRES A MORE
     NUANCED APPROACH TO HISTORICAL ANALOGUES UNDER THE
     SECOND PRONG OF THE *BRUEN* TEST ......................................................... 11

V.   CASE LAW ESTABLISHES THAT LCM RESTRICTIONS ARE
     CONSISTENT WITH 20TH CENTURY LAWS REGULATING FIREARMS
     CAPABLE OF FIRING REPEATEDLY WITHOUT RELOADING. ........................... 15

CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
  910 F.3d 106 (3d Cir. 2018)......................................................................................9

*Bevis v. City of Naperville*,
  No. 22-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ...............................11, 15

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*,
  No. 22-cv-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ................... *passim*

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................... *passim*

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) ..............................................................8, 9

*Hanson v. District of Columbia*,
  No. 22-cv-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023)........................ *passim*

*Herrera v. Raoul*,
  No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023)...................12, 13, 14

*Kolbe v. O'Malley*,
  42 F. Supp. 3d 768 (D. Md. 2014)...........................................................9

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)........................................................................4

*Nat'l Ass'n for Gun Rights v. Lamont*,
  No. 3:22-cv-1118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)................... *passim*

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022).................................................................... *passim*

*Ocean State Tactical, LLC v. State of Rhode Island*,
  No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022).....................2, 7, 9, 10

*Oregon Firearms Fed'n v. Kotek*,
  No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023) ..................... *passim*

*Rocky Mountain Gun Owners v. Polis*,
  467 P.3d 314 (Colo. 2020).................................................................8

*State v. Misch*,
    214 Vt. 309 (2021)....................................................................................................9

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019)......................................................................................8

**Statutes**

C.R.S. § 18-12-301 *et seq.* ........................................................................... *passim*

## IDENTITY AND INTERESTS OF AMICI

*Amici curiae* are national gun violence prevention organizations.  Numerous courts have cited their amicus briefs on issues involving firearms regulations and constitutional principles affecting gun policy.  Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy and political action.  Giffords Law Center to Prevent Gun Violence, a national organization founded more than 30 years ago, promotes and defends the laws and policies proven to reduce gun violence.  March For Our Lives is a youth-led non-profit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies.[1]

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2133 (2022), the Supreme Court established a two-part test for evaluating Plaintiffs' Second Amendment challenge to C.R.S. § 18-12-301 *et seq.* (the "Challenged Law").  Under the first prong of the *Bruen* test, Plaintiffs must demonstrate that the Challenged Law impinges on the "right to armed self-defense" recognized by the Supreme Court in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).  Where, as here, Plaintiffs cannot demonstrate that large-capacity magazines ("LCMs") are commonly used for armed self-defense, their constitutional challenge is foreclosed under *Bruen*.  The Court need not address historical analogues under the second prong of the *Bruen* test and the burden never shifts to the government to demonstrate that the

---

[1] No party or counsel to any party in this matter authored this brief in part or in whole, no party or counsel to any party in this matter contributed money intended to fund the preparation or submission of this brief, and no person other than *amici* contributed money intended to fund the preparation or submission of this brief.

1

Challenged Law is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  *See* Part I, *infra*.

The case law in multiple state courts and federal circuits establishes, under the first prong of the *Bruen* test, that restrictions on LCMs do not impinge on Plaintiffs' Second Amendment rights because LCMs are not meaningfully used for "armed self-defense."  *See* Part II, *infra*.  The case law also establishes, under *Bruen*'s second prong, that restrictions on LCMs are "relevantly similar" to historical analogues from the 18th and 19th century.  *See* Part III, *infra*.  Further, under *Bruen*'s more "nuanced approach" to historical analogues, which applies when (as here) there have been "dramatic technological changes" in weaponry, the case law recognizes that LCM restrictions are analogous to laws enacted in the 20th century—that is, when weapons capable of firing repeatedly without reloading began to become widely available to private citizens.  *See* Parts IV & V, *infra*.

The case law also holds that bans on LCMs are constitutional because (i) LCMs are not necessary for firearm use and are therefore not subject to constitutional protection as "arms" under the Second Amendment,[2] and (ii) "'weapons that are most useful in military service' fall outside of Second Amendment protection," *Hanson v. District of Columbia*, No. 22-cv-2256, 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023) (quoting *Heller*, 554 U.S. at 627).  This brief does not address these separate bars to Plaintiffs' claims.

---

[2] *See Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *25–26 (D. Or. July 14, 2023), *appeal docketed*, No. 23-35479 (9th Cir. July 17, 2023); *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022)*, appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

## ARGUMENT

I.     ***BRUEN* ESTABLISHES A TWO-STEP FRAMEWORK FOR EVALUATING SECOND AMENDMENT CHALLENGES TO FIREARMS REGULATIONS.**

In *Bruen*, the Supreme Court set forth a two-part methodology for analyzing Second Amendment claims:

> [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2129–30.  Under this framework, a plaintiff must establish, ***first***, that the Second Amendment "presumptively protects" the conduct at issue.  *Id.*  Only then does the burden shift to the government to establish, ***second***, that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.

### A.     The Court Does Not Reach the Second Prong of the *Bruen* Analysis Unless a Plaintiff First Establishes That a Challenged Regulation Burdens "Armed Self-Defense."

*Bruen* defines the Second Amendment as "protect[ing] an individual right to keep and bear arms ***for self-defense***."  142 S. Ct. at 2125.[3]  The Court's analysis in *Bruen* thus revolved around the "individual right to ***armed self-defense***," *id*. at 2128, and "whether modern and historical regulations impose a comparable burden on the right of ***armed self-defense***."  *Id*. at 2133.  And it held that the Second Amendment is limited to "modern instruments that ***facilitate armed self-defense***."  *Id*. at 2132.

Like *Bruen*, *Heller* defines the Second Amendment right based on lawful self-defense.  *Heller* found that analogous state constitutional provisions "secured an individual right to bear

---

[3] All emphases added unless otherwise noted.

arms *for defensive purposes*," *id*. at 602, that "the understanding in the post-Civil War Congress [was] that the Second Amendment protected an individual right to use arms *for self-defense*," *id*. at 616, that "the inherent right *of self-defense* has been central to the Second Amendment right," *id*. at 628, and that handguns were constitutionally protected because they were the "*quintessential self-defense weapon*," *id*. at 629.   *See also McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ("In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home *for the purpose of self-defense*.").

As Justice Alito made explicit in *Bruen*:  "All that we decide in this case is that the Second Amendment protects the rights of law-abiding people to carry a gun outside the home *for self-defense*."  *Id*. at 2159 (Alito, J., concurring).  Regulations that do not burden the right of armed self-defense therefore do not fall within the plain text of the Second Amendment, as construed by *Bruen* and *Heller*.

For this reason, if a challenged regulation does not burden the "right of armed self-defense," the Second Amendment inquiry under *Bruen* is at an end.  The second step of the *Bruen* test—"whether modern and historical regulations impose a comparable burden on the right *of armed self-defense* and whether that burden is comparably justified," *id*. at 2133—applies only if a plaintiff first demonstrates that the challenged regulation burdens "the right of armed self-defense."  In other words, the second prong of the *Bruen* analysis—which requires the government to demonstrate that a challenged regulation is "relevantly similar" to historical firearms regulations, *id*., and "consistent with the Nation's historical tradition of firearm regulation," *id*. at 2130—only applies *after* a plaintiff first establishes that the challenged regulation burdens the "right of armed self-defense" articulated in *Bruen* and *Heller*.

Here, Plaintiffs have not demonstrated and cannot establish that the Challenged Law burdens the "right to armed self-defense." *See* Part II, *infra* (collecting cases establishing that LCMs do not burden the right to armed self-defense). For that reason, the Challenged Law is constitutional under the first prong of the *Bruen* test, with no need to engage in the historical analysis of *Bruen*'s second prong. The burden never shifts to the government to demonstrate that the Challenged Law "is consistent with the Nation's historical tradition of firearm regulation" where Plaintiffs have failed to show that LCMs are "presumptively protect[ed]" by the Second Amendment as articulated in *Bruen* and *Heller*. *See* 142 S. Ct. at 2130.

B.     **If the Second Prong of the *Bruen* Analysis Applies, the Court Must Assess Whether Modern and Historical Regulations Impose a "Comparable Burden" on Armed Self-Defense and Whether That Burden Is "Comparably Justified."**

*Bruen* noted that the historical analyses in *Heller* and *Bruen* were "relatively simple" because they involved "an absolute ban" on the possession of handguns for armed self-defense. *Bruen*, 142 S. Ct. at 2132. But *Bruen* also acknowledged that many cases would involve more nuance than a law "broadly prohibiting the public carry of commonly used firearms for self-defense." *Id*. at 2138. In these cases, *Bruen* instructed courts to reason by analogy to determine whether a challenged regulation is "relevantly similar" to historical analogues based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133.

Courts engaging in this analogical inquiry under *Bruen* must consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2133. The analogical reasoning contemplated by *Bruen* "requires only that the government identify a well-established and representative historical ***analogue***, not a historical ***twin***. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. (emphases in original).

5

The relevant period for historical analysis centers around the ratification of the Second Amendment in 1791 and the Fourteenth Amendment in 1868. *See id*. at 2136. Earlier and later dates nevertheless remain constitutionally relevant to the analysis. *See id*. at 2135–36, 2145. Historical law and practice before 1791 may shed light on the public understanding of the Second Amendment when it was ratified, and historical analogues through the 21st century may "settle" the meaning of the Second Amendment, *id.* at 2136, provided they do not "contradict[] earlier evidence." *Id*. at 2154 n.28.

*Bruen* found, based on the historical tradition of firearms regulation, that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id*. at 2138. "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). And the case law applying *Bruen* establishes that LCM restrictions are "relevantly similar" to the country's 18th and 19th century history of firearms regulations. *See* Part III, *infra*.

### C. The Second Prong of the *Bruen* Analysis Requires a "More Nuanced Approach" to Historical Analogues Where There Have Been "Dramatic Technological Changes," Including in Firearms.

Under the second prong of *Bruen*, when courts are confronted with "unprecedented societal concerns or dramatic technological changes," they must adopt a "more nuanced approach" to historical analysis. 142 S. Ct. at 2132. That nuanced approach must account for the fact that the Constitution is "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs" and must be applied "to circumstances beyond those the Founders specifically anticipated." *Id*. (citation omitted). As *Bruen* recognized, "[t]he regulatory challenges

posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*.

Thus, under the *Bruen* framework, the case law has recognized that weapons not in widespread circulation until after ratification of the Fourteenth Amendment in 1868, and long after ratification of the Second Amendment in 1791, represent the sort of "dramatic technological change" that require a "more nuanced approach" to evaluating the proper historical analogues. *See* Part IV, *infra*. In particular, the cases recognize that LCM restrictions are analogous to early 20th century laws, when civilians began to gain widespread access to firearms capable of firing repeatedly without reloading. *See* Part V, *infra*. As the case law establishes, it would be meaningless to search for specific restrictions on LCMs during the Founding or Antebellum Eras, when the technology did not exist in its current form and virtually no citizens legally possessed firearms capable of firing repeatedly without reloading. *See* Part IV, *infra*.

## II. CASE LAW ESTABLISHES THAT RESTRICTIONS ON LCMS DO NOT BURDEN THE RIGHT OF "ARMED SELF DEFENSE" UNDER THE FIRST PRONG OF THE *BRUEN* TEST.

Courts evaluating LCM restrictions since *Bruen* have confirmed that weapons not commonly used for self-defense are not protected by the plain text of the Second Amendment. For example, a federal district court recently held that the "critical question" is whether LCMs "are commonly used or are useful specifically ***for self-defense***." *Hanson*, 2023 WL 3019777, at *7 (emphasis in original) (quotations and citations omitted).

Similarly, another federal district court held that "whether the LCM Ban unduly impairs the right of an individual to ***engage in self-defense*** . . . is the primary focus of the Second Amendment analysis," *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *7, 11 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023), while another held that "the Second Amendment extends only to bearable arms that are 'in

"common use" *for self-defense* today,'" *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, No. 22-cv-951-RGA, 2023 WL 2655150, at *4–5 (D. Del. Mar. 27, 2023), *appeal docketed*, No. 23-1633 (3d Cir. Apr. 7, 2023) (quoting *Bruen*, 142 S. Ct. at 2143). *See also Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-cv-1118, 2023 WL 4975979, at *16 (D. Conn. Aug. 3, 2023), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023) ("[A] weapon must be both possessed for the purpose of and actually used *for self-defense* in order to fall within the Second Amendment's protection."); *Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *11 (D. Or. July 14, 2023), *appeal docketed*, No. 23-35479 (9th Cir. July 17, 2023) ("Under *Bruen*, a court must consider whether a regulated firearm or firearm accessory is 'in common use today *for self-defense*.'" (quoting *Bruen*, 142 S. Ct. at 2134)).

Further, the case law establishes that LCM restrictions do not burden the "right to armed self-defense" because the ability to fire more than ten or fifteen rounds without reloading has been empirically shown to be unnecessary for lawful self-defense.

For example, the Colorado Supreme Court wrote in 2020, that it could find no case in which "a person fired even five shots in self-defense, let alone ten, fifteen, or more." *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020) (quotations and citation omitted). The First Circuit in 2019, found that "not one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired." *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

Similarly, the Ninth Circuit in 2021, found that "[t]he use of more than ten bullets in defense of the home is '*rare*,' or *non-existent*." *Duncan v. Bonta*, 19 F.4th 1087, 1104–05 (9th Cir. 2021) (citations omitted), *cert. granted, judgment vacated*, 142 S. Ct. 2895, *and vacated and*

*remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022).  *See also Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey,* 910 F.3d 106, 121 n.25 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (the record "reflects that most homeowners only use two to three rounds of ammunition in self-defense"); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. 2014) ("Maryland law enforcement officials are unaware of any Marylander . . . needing to fire more than ten rounds, to protect himself."); *State v. Misch*, 214 Vt. 309, 356–57 (2021), *reargument denied* (Mar. 29, 2021) ("[I]t appears from the available data that . . . the large-capacity magazine [] is ***almost never used for self-defense***.").

These decisions predate *Bruen*, but courts evaluating LCM restrictions since *Bruen* have reached the same conclusion: LCMs are empirically unnecessary for self-defense, and therefore are not protected by the Second Amendment under the standards articulated in *Bruen*.   For example, a federal district court recently held that "the Second Amendment's plain text does not cover LCMs" because "Plaintiffs have not shown that LCMs are commonly employed for self-defense," while "Defendants have produced credible evidence showing that they are not."  *Kotek*, 2023 WL 4541027, at *33–34.   Similarly, another federal district court held recently that "Plaintiffs' proposed ownership of . . . LCMs is not protected by the Second Amendment because they have not demonstrated that the specific . . . LCMs in the Challenged Statutes are commonly sought out, purchased, and used for self-defense."  *Lamont*, 2023 WL 4975979, at *2.  *See also Hanson*, 2023 WL 3019777, at *12 ("[T]he Second Amendment does not cover LCMs because they are not typically possessed for self-defense."); *Kotek*, 2023 WL 4541027, at *12 ("[I]t is exceedingly rare (far less than 1 percent) for an individual to fire more than ten shots in self-defense" and therefore LCMs "are not 'commonly used . . . for self-defense.'" (quoting *Bruen*, 142 S. Ct. at 2138)); *Ocean State Tactical, LLC*, 2022 WL 17721175, at *14 ("There is simply no

credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not.").

In short, the case law establishes that LCMs are not in common use for self-defense today. Accordingly, a restriction on LCMs does not burden the "right of armed self-defense" recognized in *Bruen* and *Heller*. This defeats Plaintiffs' Second Amendment challenge under the first prong of the *Bruen* test. The Court need not even consider the question of historical analogues under the second prong of *Bruen*.

### III. CASE LAW ESTABLISHES THAT RESTRICTIONS ON LCMS ARE "RELEVANTLY SIMILAR" TO HISTORICAL ANALOGUES UNDER THE SECOND PRONG OF THE *BRUEN* TEST.

Even were the second prong of *Bruen* applicable here, courts since *Bruen* have overwhelmingly concluded that laws banning LCMs are consistent with the nation's historical tradition of firearms regulation because LCM bans "impose a comparable burden on the right of armed self-defense" and that burden is "comparably justified." *Bruen*, 142 S. Ct. at 2133. For example, a federal district court recently concluded that 19th century restrictions on Bowie knives, trap guns and the concealed carry of blunt objects, pistols and revolvers were "relevantly similar" to Oregon's ban on LCMs with a capacity of more than ten rounds, because Oregon's ban "impose[d] a minimal burden on the right to armed self-defense" and analogous historical laws imposed "a similar, if not greater, burden." *Kotek*, 2023 WL 4541027, at *39–46. The court also held that the historical laws were "comparably justified to" Oregon's LCM ban, which was "passed in response [to] a rise in mass shootings involving LCM-equipped firearms" and was intended "to restrict a feature of a firearm that makes it particularly dangerous to public safety." *Id.* at *43.

Similarly, another federal district court recently held that 19th century restrictions on Bowie knives, "melee weapons" and concealed carry were "relevantly similar" to Delaware's LCM ban. *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *11–13. The court

concluded that "the burden that the challenged regulations impose[d]" on self-defense was "slight" and "comparably justified" because the modern regulations at issue were enacted in response "to a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons." *Id*. at *12–13.

Another federal district court recently held that historical restrictions on new and dangerous weapons technology, concealed carry and gunpowder regulations were "relevantly similar" to Connecticut's LCM ban. *Lamont*, 2023 WL 4975979, at *31–32. With respect to the historical concealed carry regulations, the court rejected the plaintiffs' argument in that case that "concealed weapon prohibitions may never be an analogue for other types of restrictions," reasoning:

> [C]oncealed carry statutes were part of a broader tradition of targeting specific dangers posed by the characteristics and unlawful use of particular weapons, and . . . those regulations were considered constitutional because they left available sufficient avenues of carrying firearms for self-defense. The Challenged Statutes do the same; they are tailored to address problems of mass shootings and mass casualties that employ the firearms at issue with increasing frequency, and still leave open alternative avenues for exercis[ing] the Second Amendment right to self-defense . . . .

*Id*. at *33. *See also Bevis v. City of Naperville*, No. 22-4775, 2023 WL 2077392, at *10–16 (N.D. Ill. Feb. 17, 2023), *appeal docketed* (7th Cir. Feb. 23, 2023) (holding that 18th and 19th century restrictions on Bowie knives, other "particularly dangerous weapons," concealed carry and trap guns were "relevantly similar" to Illinois' LCM ban).

## IV. CASE LAW ESTABLISHES THAT LCMS REFLECT A "DRAMATIC TECHNOLOGICAL CHANGE" IN WEAPONRY THAT REQUIRES A MORE NUANCED APPROACH TO HISTORICAL ANALOGUES UNDER THE SECOND PRONG OF THE *BRUEN* TEST.

As noted above, *Bruen* instructed courts to adopt a "more nuanced approach" when faced with "dramatic technological changes" in firearms. 142 S. Ct. at 2132. Courts considering the issue since *Bruen* have consistently held that modern LCMs represent precisely this kind of

11

dramatic technological change.  *See Kotek*, 2023 WL 4541027, at *38; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10; *Hanson*, 2023 WL 3019777, at *13; *Lamont*, 2023 WL 4975979, at *29; *Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799, at *7 (N.D. Ill. Apr. 25, 2023), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023).

In particular, in evaluating the constitutionality of LCM bans since *Bruen*, multiple courts have found that civilians did not have widespread access during the Founding Era to firearms capable of firing more than ten rounds without reloading.  *See Kotek*, 2023 WL 4541027, at *37 ("The evidence presented at trial overwhelmingly shows that large-capacity repeating firearms . . . were extremely rare at the adoption of the Second Amendment."); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10 ("Although multi-shot or repeating firearms existed in America during the colonial and founding eras, they were rare and viewed as curiosities." (quotations omitted)); *Hanson*, 2023 WL 3019777, at *13 ("[A]lthough some multi-shot firearms existed before the Founding era, they were experimental, designed for military use, rare, defective, or some combination of these features" (quotations omitted)).

Courts have determined that such firearms were not widely available to civilians in the United States prior to at least the late 19th or early 20th century.  *See Kotek*, 2023 WL 4541027, at *38 (citing expert testimony that "large-capacity firearms accounted for less than 0.002 percent of firearms in the United States at the time of the Fourteenth Amendment"); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10 ("It was only after World War I when semi-automatic and fully automatic long guns began to circulate appreciably in society." (quotations omitted)); *Hanson*, 2023 WL 3019777, at *16 ("[S]emiautomatic and high-capacity weapons were not technologically feasible and commercially available in meaningful quantities until the early

1900s."); *Lamont*, 2023 WL 4975979, at *24 ("LCMs were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s.").

Courts have also held that modern repeating firearms bear no resemblance to predecessors from the Founding or Antebellum eras. *See Kotek*, 2023 WL 4541027, at *39; *Lamont*, 2023 WL 4975979, at *29; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10. For example, a federal district court recently concluded that "modern-day LCMs represent a dramatic technological change from the Founding and Reconstruction-era firearms based on at least two key metrics: the time and effort involved in reloading and the time involved in shooting the firearm's rounds." *Kotek*, 2023 WL 4541027, at *38.

Courts applying the *Bruen* test have also concluded that these dramatic technological changes have led to unprecedented societal concerns around mass shootings because modern LCMs, coupled with advances in firearm technology, pose a risk of far greater carnage than was imaginable during the Founding or Antebellum eras. *See Kotek*, 2023 WL 4541027, at *36–37; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10; *Hanson*, 2023 WL 3019777, at *13–14; *Lamont*, 2023 WL 4975979, at *27–29; *Herrera*, 2023 WL 3074799, at *7. As one court recently noted, "[i]t was only in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time that the character of mass murder began to change." *Lamont*, 2023 WL 4975979, at *28 (quotation and citations omitted). As a result of these dramatic technological changes, the court found that "[h]igh-fatality mass shooting violence is on the rise and poses a significant—and growing—threat to American public safety." *Id*. at *28 (quotation and citations omitted); *see also Delaware State Sportsmen's Ass'n*,

2023 WL 2655150, at *10 (pointing to historical evidence suggesting that mass shootings involving LCMs result in more fatalities and injuries).

The case law overwhelmingly recognizes that modern firearms are far more deadly than historical weapons. *See Kotek*, 2023 WL 4541027, at *39; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10–11; *Hanson*, 2023 WL 3019777, at *14; *Lamont*, 2023 WL 4975979, at *28–29. For example, one federal district court recently noted that, during the 2007 Virginia Tech shooting, the gunman "fired 174 rounds in around nine to ten minutes using an LCM." *Kotek*, 2023 WL 4541027, at *39. These dramatic technological changes led one court to conclude that "mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem" resulting in a "level of casualties and injuries from firearm violence previously unseen in American history and [which have] been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *Lamont*, 2023 WL 4975979, at *29.

In short, courts have repeatedly recognized that LCMs represent a "dramatic technological change" in weaponry that require a more "nuanced approach" under the *Bruen* test. *See Kotek*, 2023 WL 4541027, at *38; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10; *Hanson*, 2023 WL 3019777, at *13; *Lamont*, 2023 WL 4975979, at *29; *Herrera*, 2023 WL 3074799, at *7. Although this "does not automatically dictate that Defendants' regulation will be upheld, it does mean that the absence of regulations of semiautomatic firearms at the time of the Founding is not dispositive evidence." *Lamont*, 2023 WL 4975979, at *29. After all, as one court recently noted, "it would make no sense to divine constitutional significance from non-existent legislation concerning non-existent problems." *Hanson*, 2023 WL 3019777, at *16.

## V.   CASE LAW ESTABLISHES THAT LCM RESTRICTIONS ARE CONSISTENT WITH 20TH CENTURY LAWS REGULATING FIREARMS CAPABLE OF FIRING REPEATEDLY WITHOUT RELOADING.

Under the more "nuanced approach" required by *Bruen*, courts have widely recognized that LCM restrictions are particularly analogous to laws enacted once firearms capable of firing repeatedly without reloading began to become widely available to civilians in the early 20th century.  At that time, Congress and a majority of states responded by passing laws limiting access to these weapons.  *See Kotek*, 2023 WL 4541027, at *24–25; *Hanson*, 2023 WL 3019777, at *15–16; *Lamont*, 2023 WL 4975979, at *31; *Bevis*, 2023 WL 2077392, at *12.   "Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s . . . these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time."  *Hanson*, 2023 WL 3019777, at *15 (quotations and citations omitted); *see also Kotek*, 2023 WL 4541027, at *24–25 ("Between 1925 and 1934, at least thirty-two states enacted laws restricting or, in many instances, prohibiting the possession of a fully-automatic firearm" and "[a]t least six states, plus the District of Columbia, enacted restrictions on semi-automatic weapons capable of firing a certain number of rounds without reloading.").

In 1934, Congress enacted the National Firearms Act, restricting civilian access to fully automatic weapons capable of firing repeatedly without reloading.   *See Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *11.  These early 20th century regulations establish that firearms capable of firing repeatedly without reloading "were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality."  *Id*. at *12; *see also Hanson*, 2023 WL 3019777, at *15 (early 20th century regulations on firearms capable of firing repeatedly without reloading "show[] that the states confronted the public safety issues of their time with vigor; indeed, these regulations were

15

at the time obviously uncontroversial from a constitutional perspective" (citations and quotations omitted)).

Courts have consistently held that LCM bans are "relevantly similar" to these early 20th century laws restricting weapons capable of firing repeatedly without reloading because they "impose a comparable burden on the right of armed self-defense and [] that burden is comparably justified," *Bruen*, 142 S. Ct. at 2133. *See Hanson*, 2023 WL 3019777, at *15; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *11–12; *Kotek*, 2023 WL 4541027, at *45. Like these historical analogues, courts have found that LCM bans do not meaningfully burden armed self-defense. *See* Part II, *supra. See also Hanson*, 2023 WL 3019777, at *15 (The District's LCM ban "is similar to the Prohibition-era regulations in that the burden it places on an individual's right of self-defense is relatively light."); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *12–14 (holding that any burden imposed by Delaware's LCM ban "is slight" and is "comparable" to that imposed by 20th century restrictions on firearms capable of firing repeatedly without reloading).

Courts have also held that LCM bans have a "comparabl[e] justifi[cation]" to these early 20th century laws, *Bruen*, 142 S. Ct. at 2132–33, because both address the growing threat of mass violence using firearms. *See Hanson*, 2023 WL 3019777, at *15; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *13; *Kotek*, 2023 WL 4541027, at *45. An individual bearing arms in 1791 or 1868 was, as a technological matter, unable to commit mass murder with a gun in a matter of seconds, and that situation radically changed only relatively recently. *See* Part IV, *supra*. As one court reasoned in upholding the District of Columbia's LCM ban, "[j]ust as states and the District enacted sweeping laws restricting possession of high-capacity weapons in an attempt to reduce violence during the Prohibition era, so can the District now." *Hanson*, 2023 WL 3019777,

16

at *15.  *See also Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *13 ("The modern regulations at issue, like the historical regulations discussed by Defendants, were enacted in response to . . . a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons."); *Kotek*, 2023 WL 4541027, at *45 (similar).

## CONCLUSION

*Bruen* established a two-part methodology for evaluating Second Amendment claims. Under this framework, because the Challenged Law does not burden the "right to self-defense" articulated in *Bruen* and *Heller*, Plaintiffs' Second Amendment challenge is defeated under the first prong of *Bruen* without any need to consider historical analogues—as the case law establishes. Further, the Challenged Law is "consistent with the Nation's historical tradition of firearm regulation" under *Bruen*'s second prong, 142 S. Ct. at 2130, because the case law establishes that the Law is "relevantly similar" to (i) 18th and 19th century laws that imposed restrictions on firearms without burdening "the right of armed self-defense," and to (ii) 20th century laws regulating firearms that can fire repeatedly without reloading, under the more "nuanced approach" to historical analogues that *Bruen* calls for when, as here, there has been "dramatic technological change" in weaponry.

Dated:  September 18, 2023

Respectfully submitted,

*Of Counsel:*

/s/ Timothy C. Hester
_____

Daniel Weltz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com

Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

*Counsel for Amici Curiae*

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2023, an electronic copy of the foregoing *Amicus Curiae* Brief was filed with the Clerk of Court for the United States District Court for the District of Colorado using the Court's *CM-ECF* system and was served electronically by the Notice of Docket Activity upon registered *CM-ECF* participants.

Dated: September 18, 2023                    Respectfully submitted,

                                             /s/ Timothy C. Hester
                                             Timothy C. Hester
                                             COVINGTON & BURLING LLP
                                             One CityCenter
                                             850 Tenth Street, NW
                                             Washington, DC 20001
                                             (202) 662-6000
                                             thester@cov.com