## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-1866-GPG-SKC**

BENJAMIN GATES,
TRAVIS SWARTZ
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

    Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

    Defendant.

---

## RESPONSE TO THE GOVERNOR'S
## MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs submit the following response to the Governor's Motion for Summary Judgment (ECF 73; "Def. Mot.").

## INTRODUCTION

From the very first page of its motion, the State requests the Court to ignore the Supreme Court's plain holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The State says that its Magazine Ban[1] causes criminals to pause while they replace a spent magazine. Def. Mot. 1-2. The State then asserts that it has an important governmental interest in causing this pause,

---

[1] C.R.S. § 18-12-301 *et seq.*

and therefore the Court should uphold its arms ban. *Id*.[2] But the means-end argument advanced by the State is precisely what the Supreme Court held a government may *not* do in a Second Amendment case. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The State cannot make this demonstration for the reasons set forth in *D.C. v. Heller*, 554 U.S. 570 (2008), which held there is no historical tradition of banning a weapon in common use by law-abiding citizens for lawful purposes, and therefore a statute banning a weapon in common use is categorically unconstitutional. 554 U.S. at 629. LCMs[3] are owned by millions of Americans for lawful purposes. "[T]his fact alone entitles such magazines to Second Amendment protection." *Duncan v. Bonta*, 2023 WL 6180472, at *12 (S.D. Cal. Sept. 22, 2023). And Colorado's Magazine Ban should be enjoined for the same reasons California's magazine ban was enjoined in *Duncan*.

The State makes much of the fact that Plaintiffs have chosen to develop a relatively simple record. Def. Mot. 10. It is true that Plaintiffs have developed a simple record because a record that shows the single fact that LCMs are owned by

---

[2] And it repeats this refrain throughout its motion. See, e.g. Def. Mot. 29 (The Magazine Ban "is justified by the government's interest in reducing civilian deaths.").

[3] Plaintiffs will use the statutory term "large capacity magazine" or "LCM" to refer to the magazines banned by the Magazine Ban. That said, the statutory term is a tendentious political term, not an accurate descriptive term. *See* Plaintiffs' Motion for Summary Judgment 3. Many magazines banned by the statute are in fact standard capacity magazines. *Id.*

millions of Americans is all that is necessary for them to prevail. "[*A]ll that is needed* for citizens to have a right under the Second Amendment to keep" LCMs is for Americans to possess millions of them for lawful purposes. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., and Scalia, J., dissenting from denial of certiorari). There is no genuine dispute that this is the case. Indeed, the State has stipulated to this fact in two previous cases. *See* Plaintiffs' Motion for Summary Judgment (ECF 76; "Plt. Mot"), p. 10, ¶¶ 46-51. That is why the Court should grant Plaintiffs' motion for summary judgment and deny the State's motion.

In contrast to the simple record developed by Plaintiffs, the State has submitted hundreds of pages of expert reports in support of the interest-balancing scrutiny it urges the Court to employ. But as the Supreme Court noted in *Bruen*, the history of Second Amendment litigation in the ten years after *McDonald*[4] taught it that federal courts used interest balancing not as a means of enforcing the Second Amendment, but as a means of avoiding enforcing it. *Bruen*, 142 S. Ct. at 2131. Undoubtedly, after *McDonald* inferior courts deferred to the government because powerful emotional appeals such as the one with which the State begins its motion are difficult to resist. And that was the very reason the Supreme Court took interest balancing, which involves "difficult empirical judgments" about "the costs and benefits of firearms restrictions," off the table in Second Amendment cases. *Bruen*, 142 S. Ct. at 2130. Instead, in a Second Amendment challenge (1) the plain text and

---

[4] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).

(2) the Nation's historical tradition of regulation are all that matters. 142 S. Ct. at 2129-30. It follows that the expert reports the State submitted to support its interest-balancing theory are irrelevant to the resolution of this case, and Plaintiffs will not get into the interest-balancing weeds in this brief.

Plaintiffs do not dispute that mass shootings are horrible (though thankfully they remain exceedingly rare and account for only a fraction of 1% of firearm homicides[5]). But a law aimed at a few mad men with guns that also makes criminals out of responsible, law-abiding people who want larger magazines to protect themselves is not consistent with the Second Amendment. *Duncan* at *35. The text, history, and tradition of the Second Amendment support laws against the misuse of firearms, but they do not support disarming law-abiding citizens. *Id*. Freedom entails risk, but as the Court noted in *McDonald,* the "right to keep and bear arms … is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." 561 U.S. at 783. Nevertheless, the Court has never refrained from enforcing a right "on the ground that the right at issue has disputed public safety implications." *Id*. The adoption of the Second Amendment was a freedom calculus decided long ago by our

---

[5] There were 10,258 firearm homicides in the United States in 2019. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI (available at https://bit.ly/31WmQ1V). According to Dr. Klarevas, there were 51 mass shooting deaths that year. Ex. 31, 48. Thus, 0.49% of firearm homicides occurred in mass shootings.

first citizens who cherished individual freedom – with its associated risks – more than security. *Id.*

In summary, under *Heller's* simple rule,[6] the State's absolute ban on a weapon owned by millions of Americans is categorically unconstitutional. For that reason, the Court should grant Plaintiffs' motion for summary judgment and deny the State's.

## ARGUMENT

## I.   *Bruen* Step 1: Plaintiffs' Conduct is Covered by the "Plain Text"

### A.   Plaintiffs Easily Satisfy the Plain Text Step

The *Bruen* test has two steps: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30 (internal citation and quotation omitted). For the reasons stated in their motion, Plaintiffs' desire to acquire, keep and bear LCMs is covered by the plain text of the Second Amendment. *See* Plt. Mot. 25-30. Plaintiffs have easily satisfied step one of the *Bruen* test.

### B.   Magazines are "Arms"

Relying on the "corpus linguistics" analysis of Professor Baron, the State argues that a detachable magazine is a mere box for holding ammunition, not an

---

[6] Why *Heller's* simple rule and not *Bruen's* simple rule? *Bruen* did not in any way supplant *Heller*; it reiterated it. *Bruen*, 142 S. Ct. at 2129-30. And *Heller* established the simple rule that an absolute ban on a commonly possessed weapon is categorically unconstitutional. 554 U.S. at 629.

arm. Professor Baron submitted this same sort of analysis in *Heller*, which the Court rejected out of hand, characterizing it as "worthy of the Mad Hatter." 554 U.S. at 589. Nothing has changed. As discussed in Plaintiffs' motion for summary judgment, numerous courts, including every court of appeals that has considered the matter, have concluded that magazines are "arms" for purposes of Second Amendment analysis. Plt. Mot. 26-28.[7] More recently, in *Duncan*, the court held that because a magazine is an essential component without which a semiautomatic firearm would be useless for self-defense, it falls within the meaning of "arms." *Id.*, at *9. *See also Hanson v. D.C.*, 2023 WL 3019777, at *7 (D.D.C. Apr. 20, 2023) ("The District's logic, by contrast, would allow it to ban all magazines (not just LCMs) — a result even the District does not endorse here — because a firearm technically does not require any magazine to operate; one could simply fire the single bullet in the firearm's chamber. The Court will therefore follow the persuasive reasoning of [the courts of appeals] in concluding that LCMs are 'arms' within the meaning of the Second Amendment."); and *Barnett v. Raoul*, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) (The Seventh Circuit has recognized the Second Amendment as extending to corollaries to the meaningful exercise of the core right to possess firearms for self-defense, and it is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm.).

---

[7] Plaintiffs note that the Magazine Ban is codified in Article 12 of Title 18 "Offenses Relating to Firearms and Weapons." This would not make sense if magazines were not integral components of firearms.

6

The State admits that "many firearms today rely on detachable magazines." Def. Mot. 12. This essentially concedes Plaintiffs' argument that magazines are integral components of semiautomatic firearms. But the State nevertheless insists that magazines with a capacity great than 15 rounds are not protected by the Second Amendment because firearms will operate with lower-capacity magazines. Def.Mot. 13. What the State seems to be really saying is that a magazine may be a protected arm, but only the State has the right to pick the number of rounds a citizen may have in it. *Duncan* at *8. This is incorrect because the Supreme Court has not described protected arms in subdivided categories. *Id*. For example, in *Heller* the Court did not distinguish between semiautomatic pistols and revolvers when it held handguns are protected. *Id*. Nor did the Court classify protected handguns according to the number of rounds they could hold. *Id*. *Heller* never hinted that typically possessed arms can be subcategorized and subjected to "*judicial ad hoc constitutional determinations*." *Id*. (emphasis added). Thus, both firearms and their magazines are "arms" covered by the text of the Second Amendment. *Id*. "This is not even a close call." *Id*. (*quoting Barnett v. Raoul*, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023)).[8]

Using his corpus linguistics approach, Professor Baron nevertheless insists that the Second Amendment does not protect ammunition, magazines, or parts of

---

[8] Instead of being considered in isolation, the better view is to consider magazines to be components of a gun. *Duncan* at *9, n.75 (*citing United States v. Gonzalez*, 792 F.3d 534, 537 (5th Cir. 2015) (Magazines come within federal statute regulating arms because a magazine is useful only when used in conjunction with a firearm; "its sole purpose is to load cartridges into the breech so that they can be fired . . .")). [Note: The citation in the opinion appears to have been cut off.]

weapons such as triggers. Ex. 28, ¶ 9. His conclusions are once again "worthy of the Mad Hatter." While "neither magazines, nor rounds of ammunition, nor triggers, nor barrels are specifically mentioned in the Second Amendment, without a right to keep and bear triggers, or barrels, or ammunition and the magazines that hold ammunition, the Second Amendment right would be meaningless." *Duncan* at *7 (cleaned up).

Professor Baron's argument obviously proves too much. If he were correct and no magazine (whatever the capacity) is covered by the plain text, the State could lawfully ban *all* magazines. If the State can do this, it can require all semiautomatic weapons to be converted to single shot weapons by banning the magazines that make semiautomatic fire possible. An interpretation that allows the State to effectively ban the most popular firearms in America[9] cannot be reconciled with *Heller*.[10]

### C.     The "Common Use" Inquiry is not Part of the Plain Text Step

As the phrase "plain text" implies, the issue at this step is the plain meaning of the constitutional text. *See D.C. v. Heller*, 554 U.S. 570, 584 (2008) ("At the time of the founding, as now, to 'bear' meant to 'carry.'"); and *Bruen*, 142 S. Ct. at 2134-35 (the definition of "bear" encompasses public carry and the "plain text thus

---

[9] *Renna v. Bonta*, 2023 WL 2846937, at *7 (S.D. Cal. Apr. 3, 2023) (semiautomatic firearms most popular firearms in America).

[10] The same could be said of Professor Baron's opinion that the State can lawfully ban ammunition and firearm parts because they are not covered by the plain text. Even a cursory reading of *Heller* and *Bruen* forecloses any conclusion that the State could effectively disarm all of its citizens by banning ammunition and gun parts.

presumptively guarantees petitioners … a right to 'bear' arms in public for self-defense"). It should be obvious that an analysis of the text is not an empirical inquiry. The text extends, prima facie, to all "bearable arms" such as the magazines at issue in this case. *Heller*, 554 U.S. at 582. It would seem, therefore, that if plaintiffs' conduct is keeping or bearing a bearable arm, the plain text ipso facto covers that conduct and no further inquiry is necessary under step one.

The State has a different view and insists that the plain text step has an empirical element.[11] Def. Mot., 16. This is wrong because, as *Bruen* made clear, the "common use" inquiry arises under the history and tradition step:

> Drawing from this *historical tradition*, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that are 'highly unusual in society at large.'

*Id.*, 142 S. Ct. at 2143 (*quoting Heller*, 554 U.S. at 627) (emphasis added).

Thus, the Court held that as between (a) arms in common use and (b) arms that are highly unusual, under the *historical tradition* only the former are protected by the Second Amendment. This is true because regulations from the Founding era did "not remotely burden the right of self-defense as much as an absolute ban" on a weapon in common use. *Id.*, 554 U.S. at 632.[12] The Court has never held that only arms in common use are "arms" within the meaning of the

---

[11] An "empirical textual analysis" would seem to be a contradiction in terms, but the State insists this is part of the test.
[12] *See also Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023) (*Heller* did not say unusual weapons are not arms; it said the historical tradition supports a prohibition on carrying them).

plain text in the first place. Indeed, the Court held just the opposite when it stated the Second Amendment extends, prima facie, to "all [] bearable arms." *Heller*, 554 U.S. at 582 (emphasis added).

In summary, the plain text of the Second Amendment extends to all bearable arms, but historical tradition allows the government to ban some bearable arms. For example, a prohibition on a "dangerous and unusual" firearm does not violate the Second Amendment because laws banning such weapons existed since the Founding era and have been in place ever since. *Id.*, 554 U.S. at 627. A dangerous and unusual firearm is not protected by the Second Amendment, but no one would argue that because it is unprotected it is not a bearable arm in the first instance.

This distinction is not unique to the Second Amendment. For example, on its face, the First Amendment prohibits all laws abridging freedom of speech. But a law proscribing "true threats" does not violate the right to free speech because the Nation's "historical and traditional" regulation of speech has countenanced such laws from "1791 to the present." *Counterman v. Colorado*, 143 S. Ct. 2106, 2113–14 (2023). Thus, while a "true threat" is not protected by the First Amendment, no one would argue that it is not speech in the first instance. *Bruen* held that this same First Amendment conceptual framework applies in Second Amendment cases. 142 S. Ct. at 2130.

Thus, under *Bruen*, if a plaintiff shows she desires to possess a bearable arm, the plain text step is satisfied, and the Constitution presumptively protects the

plaintiff's conduct. The burden then shifts to the government to defend its law by demonstrating that the arm is in the category of "unusual" arms that may be banned. *See Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023). If the government fails to show the weapon is "unusual," the law banning it must be declared unconstitutional. Plaintiffs do not have the burden of showing that the arm is in common use under step one.

### D.   Summary

In summary, all detachable magazines are "arms" covered by the plain text of the Second Amendment. Plaintiffs' proposed conduct is to keep and bear detachable magazines. Therefore, their conduct is presumptively protected by the Constitution.

## II.   *Bruen* Step 2: The Government Cannot Demonstrate that its Regulation is Consistent With the Nation's Historical Tradition of Firearm Regulation

### A.   An Absolute Ban of a Weapon in Common Use is Categorically Unconstitutional

Plaintiffs have demonstrated that their proposed conduct is covered by the plain text of the Second Amendment. The burden now shifts to the State to demonstrate that the Magazine Ban is consistent with the Nation's historical tradition of firearm regulation. As discussed above, a Second Amendment plaintiff is not required to show that a weapon is in common use at the plain text step. To be sure, however, the plaintiff will usually want to introduce such evidence because if a plaintiff shows that the banned arm is in common use, it will be impossible for the government to meet its burden under the historical tradition step. This is true

because if a plaintiff shows a weapon is in common use, it necessarily means the government will not be able to show the arm is in the category of "unusual" arms that have traditionally been banned under the Nation's history of firearms regulation. This is *Heller's* central holding. 554 U.S. at 632 (No Founding-era regulation "remotely burden[ed] the right of self-defense as much as an absolute ban" on a weapon in common use.).

## B.     LCMs Are in Common Use

In their motion for summary judgment, Plaintiffs demonstrated that millions of LCMs are owned by American citizens. Plt. Mot. 36-40. The State does not dispute this. Indeed, as noted in Plaintiffs' motion, the State has stipulated to this fact in two previous cases. In addition, in *Duncan*, the court found that "[f]or handguns, the most popular sizes [of magazines] range up to 17 rounds; the most popular size for rifles is 30 rounds." *Duncan* at *2. Thus, "[i]t is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms." *Duncan* at *16, n. 121 (*citing* Kopel, *supra*, *The History of Firearm Magazines*, at 874). It follows that the Magazine Ban is categorically unconstitutional under *Heller's* simple rule.

## C.     Plaintiffs Are Not Required to Submit Studies of "Actual Use" of LCMs

As noted above, the State has never disputed that millions of LCMs are held by law-abiding citizens. Instead, it argues that these millions of LCMs are not "used" for self-defense, by which it means actually fired in self-defense. Def. Mot. 15-16. To

support its argument, the State relies on the "concocted statistic"[13] that an average of only 2.2 rounds are fired in an average self-defense situation. Def. Mot. 16. Because more than 15 rounds are not fired for self-defense in the average situation, the argument goes, magazines holding more than 15 rounds are not used or needed for self-defense. *Id.*

This is a "crabbed" reading of the Supreme Court's Second Amendment precedents. *Duncan* at *10. The Supreme Court has used several phrases to describe the kinds of firearms that are protected by the Constitution, but common to all is the notion that to be protected, an arm needs only to be regarded as typically possessed or carried, or commonly kept, by citizens to be ready for use if needed. *Id.* The Court has never held that the actual firing of a gun is part of the test. *Id.* Rather, *McDonald* noted that because the Second Amendment protects the right to keep and bear arms for defense of the home, in *Heller* the Court "struck down a District of Columbia law that banned the *possession* of handguns in the home." *McDonald*, 561 U.S. 749-50 (emphasis added). The purpose for which the handguns were possessed, not their actual use, was what mattered. *Duncan* at *10. By focusing exclusively on the single word "used," the State mistakenly treats the Supreme Court's opinions like statutes to be construed rather than descriptions of principles to be employed. This is mistaken "[b]ecause 'opinions, unlike statutes, are not usually written with the knowledge or expectation that each and every word may be the subject of

---

[13] In *Duncan*, the court discussed the 2.2 round statistic and found that the study upon which it is based is "incomprehensible" and "unreliable" and declined to give it any weight, characterizing the statistic as "concocted." *Id* at *12-116

searching analysis,' we do not follow statutory canons of construction with their focus on 'textual precision' when interpreting judicial opinions." *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 770 (9th Cir. 2023) (citations omitted).

That the State's interpretation of *Heller* is mistaken is revealed by the fact that it would lead to absurd results. Consider a homeowner who displays a handgun with a 17-round magazine to scare away a home invader but does not fire it. In the State's view the homeowner did not "use" the 17-round magazine because no shots were fired. Nothing in *Heller, McDonald,* or *Bruen* suggests the Court intended such a conclusion.

The Supreme Court has acknowledged that "the word 'use' poses some interpretational difficulties because of the different meanings attributable to it. Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.'" *Bailey v. United States*, 516 U.S. 137, 143 (1996) (emphasis in original). Thus, context, rather than a laser-like focus on individual words, is key to understanding a judicial opinion. *Muscarello v. United States*, 524 U.S. 125, 144 (1998).

Considering the words "use" or "used" in context, the State's interpretation of *Heller* is far removed from the meaning indicated by the Supreme Court. *Duncan* at *11. *Heller* considered merely the simple possession of handguns in the home. Focusing on the right to possess a usable arm, the Court wrote: "We consider whether a District of Columbia prohibition on the *possession* of usable handguns in

the home violates the Second Amendment to the Constitution." 554 U.S. at 573 (emphasis added). There was no discussion of whether handguns were actually fired. There were no statistical surveys of shots fired in self-defense. Instead, the Court held that weapons "typically *possessed* by law-abiding citizens for lawful purposes," are protected. 554 U.S. at 625 (emphasis added). In his dissent, Justice Breyer agreed that typical possession was the test established by the Court. *Id*., 554 U.S. at 720 (Breyer, J., dissenting) ("The majority says [the Second] Amendment protects those weapons 'typically possessed by law-abiding citizens for lawful purposes.'"). Frequency of firing was never mentioned, much less made a part of the test.

In *McDonald*, the Court wrote "the right was also valued because the *possession* of firearms was thought to be essential for self-defense." 561 U.S. at 787 (emphasis added). The right applies to handguns because they are the most *preferred* firearm in the nation to keep and use for protection of one's home and family. *Id*., at 767. The focus was on citizens' subjective preference, not some unspecified objective metric of actual firing in self-defense as the State would have it.

In *Bruen*, the Court wrote: "Drawing from this historical tradition, we explained [] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id*., 142 S. Ct. at 2143. *Bruen* contrasts common weapons against unusual weapons. The focus remains on commonality, not the frequency of actual discharge in self-defense scenarios, and thus the Second Amendment protects

15

weapons commonly or typically subjectively chosen by citizens to keep in case of confrontation. *Duncan* at *11.

In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the concurring Justices explained that, "[t]he more relevant statistic is that 'hundreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully *possess* them in 45 States." 577 U.S. at 420[14] (emphasis added). As discussed above, LCMs are owned and possessed by millions of Americans to meet a subjective need for self-defense. This fact alone entitles such magazines to Second Amendment protection. *Duncan* at *12. "When a magazine is commonly owned by Americans with the subjective intention of using it for self-defense, it is enough to say that it is in common use (or typically used) for self-defense, as the Supreme Court employs the phrase in its opinions." *Id.*

As *Duncan* explained:

Probably the vast majority of Americans that own magazines of 11 rounds or more keep them and use them for self-defense in the same way that a driver puts on and uses a seat belt in the case of a collision. Though collisions rarely happen, the seat belt is used for protection and to be ready for the unexpected collision. A reserve canopy is being used on a parachute jump, although it is not deployed, in case the main parachute fails. A cell phone in one's pocket is being used when waiting for a telephone call or in the event one needs to make a call. In the same way, a firearm kept on one's nightstand is used for self-defense even when the night is quiet. It is kept and used in case of confrontation. A person may happily live a lifetime without needing to fire their gun in self-defense. But that is not to say that such a person does not use their gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired.

*Duncan* at *12.

---

[14] Significantly, Ms. Caetano did not actually fire her stun gun. Rather, she "used" her stun gun by standing her ground and displaying it. 577 U.S. at 413.

### D.  The State's "Suitability" Analysis is Backdoor Interest Balancing

The State argues that LCMs are not protected by the Second Amendment because its experts say they are not "suitable" for self-defense, Def. Mot. 16. But the State's argument is "a stealth return to the interest balancing test rejected by *Heller* and *Bruen*." *Duncan* at *3. The State attempts to justify its ban not by demonstrating that it is consistent with the Nation's history and tradition of firearm regulation but by arguing that lower capacity magazines are more "suitable" for self-defense. But this argument is based on exactly the sort of empirical interest balancing test expressly forbidden by *Bruen*, 142 S. Ct. at 2130, and should be rejected.

## III.  LCMs are Not "Dangerous and Unusual"

*Heller* created a binary between weapons in common use that may not be banned and "dangerous and unusual" weapons that may be banned. *Id.*, 554 U.S. at 627. Thus, as the Ninth Circuit recently held, the government may defend its law by demonstrating that the banned arm is "dangerous and unusual." *Teter*, 76 F.4th at 949-50. As Justice Alito observed in *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016), however, this is "a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (emphasis in the original). Thus, "the relative dangerousness of a weapon is irrelevant" if it is commonly used for lawful purposes. *Id*.

17

In *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979 (D. Conn. Aug. 3, 2023), the district court disagreed with Justice Alito. That court held that any weapon that has "some level of lethality or capacity for injury beyond societally accepted norms" qualifies as dangerous and unusual. *Id.*, at *16. This is manifest error. If constitutional protection hangs on a reviewing court's assessment of "socially accepted norms," the Second Amendment is rendered meaningless. Indeed, the Connecticut court's decision appears to be in defiance of *Bruen's* admonition forbidding inferior courts from making "empirical judgments regarding firearm regulations." 142 S. Ct. at 2131. The State cites *Lamont* and argues LCMs may be banned because they are dangerous. Def. Mot. 18. But because that case was manifestly erroneous, it does not support the State's argument, and the State's argument is meritless.

## IV.  The State's "Dangerous and Unusual" Argument Founders on the Shoals of the Summary Judgment Standard

As discussed above, the State may attempt to satisfy its burden under *Bruen's* historical tradition step by demonstrating that LCMs are dangerous *and* unusual. The State cannot demonstrate that an arm that is owned by millions of American citizens is in any sense "unusual." Thus, summary judgment for the State is precluded because it cannot show that there is no genuine factual issue as to whether LCMS are unusual.

## V.      This is Not a "Nuanced" Case

The State argues that under *Bruen* the historical inquiry in this case is "nuanced." Def. Mot. 19. This is wrong. Like *Heller*, this is a "straightforward" case. The passage in *Bruen* to which the State alludes states in full: "While the historical analogies here and in *Heller* are *relatively simple to draw*, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 142 S. Ct. at 2132 (emphasis added). Why was the historical analysis in *Heller* "relatively simple"? *Bruen* itself answered that question: "*Heller* itself exemplifies this kind of straightforward historical inquiry." 142 S. Ct. at 2131. The District's regulation "totally ban[ned] handgun possession" and regulations from the Founding era did "not remotely burden the right of self-defense" as much as an absolute ban of a commonly possessed arm. 142 S. Ct. at 2128, 2131. The same is true here. The State has banned magazines owned by millions of American for lawful purposes. The historical inquiry is straightforward because no Founding-era regulation remotely burdened the right to self-defense as much as the State's absolute ban.

## VI.     None of the Laws Listed by the State Come Close to Being Analogous to the Magazine Ban

### A.      Introduction

As discussed above, the Magazine Ban falls under *Heller's* simple rule. There are no Founding-era laws that are "remotely" analogous to a ban on a weapon commonly possessed for lawful purposes. In other words, when it comes to bans on

commonly possessed arms, the Supreme Court has already done the historical work. There are no analogous Founding-era laws, and the ban is therefore categorically unconstitutional. The Court could end its analysis here.

Despite *Heller's* simple rule, however, the State offers a list of several laws that it argues really are analogous to its absolute ban of a commonly possessed arm. In this section, Plaintiffs will demonstrate why the State is wrong. As in *Heller*, the laws it advances are not "remotely" analogous to its ban.

The State offers the declaration of Robert Spitzer (Ex. 31) in an attempt to carry its burden of demonstrating historical laws that are analogous to its arms ban. Dr. Spitzer also worked for the State of California in *Duncan*, and the State offers to the Court much the same list of laws that were rejected as relevant historical analogues in that case. Judge Benitez engaged in a months-long painstaking analysis of each and every one of the 316 laws submitted for review by the State of California. *Duncan* at *22. Plaintiffs respectfully suggest that the Court would benefit from a detailed review of his exhaustive analysis. The following sections contain a summary of Judge Benitez's work.

### B.   There Were *Zero* Prohibitions on Possessing Firearms in the Founding Era

The history and tradition of the United States evinces widespread gun ownership and expertise. "[T]hose who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so." *Bruen*, 142 S. Ct. at 2146.

> Before, during, and after the Revolution, *no state banned any type of arm, ammunition, or accessory.* Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787. Instead, the discussions about arms during the ratification of the Constitution and the Bill of Rights centered on ensuring that the people had enough firepower to resist a tyrannical government. There is no evidence that any of the Founders were concerned about individuals having too much firepower. After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.

David B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900*, 50 Journal of Legislation, Vol. 50, No. 2, 45-46 (2024) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197) (emphasis added).

The history and tradition of the northern states was to leave firearm ownership and use completely unregulated. *Duncan*, at *26. From the time of the adoption of the Second Amendment to the time of the adoption of the Fourteenth Amendment, there were *zero* state gun laws in Pennsylvania, New York, Connecticut, Rhode Island, Vermont, New Hampshire, Michigan, Wisconsin, Minnesota, Iowa, Nebraska, Kansas, Missouri, or the District of Columbia. In Massachusetts and Maine there were only surety statutes. *Id.* In New Jersey there was a sentencing enhancement for carrying a pistol while committing a burglary. Thus, in this half of the nation, keeping and bearing firearms was done freely without government interference. *Id.*

Among the southern states, there were many laws restricting firearms for slaves, African-Americans, and Indians. *Id.* Setting aside that obviously unconstitutional tradition, among the southern states firearm ownership was

largely unregulated for at least the first 50 years after 1791. *Id*. Like the northern states, from 1791 to 1868 there were *zero* state gun laws in Delaware, North Carolina, South Carolina, Mississippi, Florida, West Virginia, and Texas. *Id*.

The few laws in other southern states that did exist concerned mainly carrying a pistol with the intent to assault another and carrying a pistol in a concealed manner. *Id*. Tennessee enacted the first firearm regulation in the southern states in 1801 in the form of a surety law – a law that was dismissed by *Bruen*. 142 S. Ct. at 2144-45. A decade later in 1811, Maryland passed the second firearm regulation in the south. *Duncan* at *26. The Maryland law was a sentencing enhancement for carrying a pistol with the intent to assault another, not a prohibition on possession. *Id*. In 1813, Louisiana passed the first law prohibiting the *carrying of a concealed* gun. *Id*. *Bruen* noticed that a Louisiana court found the prohibition on concealed carry constitutional only because it permitted open carrying of a firearm. 142 S. Ct. at 2146. Kentucky passed a prohibition on carrying a concealed pistol that same year which was struck down as unconstitutional a short time later. *Duncan* at *27. The only other firearm regulation in the south during this time period was Georgia's 1816 law prohibiting the carrying of a pistol with intent to assault another person. *Id*.

Around 50 years after the Second Amendment, four southern states passed their first firearm regulations in the form of concealed carry prohibitions. *Id*. Arkansas and Georgia banned carrying a pistol concealed in 1837. *Id*. The constitutionality of the Georgia law was upheld because open carry was

unregulated. *Nunn v. State*, 1 Ga. 243, 251 (1846). In 1838, Virginia prohibited carrying a pistol concealed, as did Alabama in 1839. *Id*. In 1856, Tennessee passed a firearm law affecting only minors. *Id*. In 1868, Florida prohibited carrying secretly "arms of any kind whatever" and the outright carrying of a pistol or other arm or weapon, though this law was never subjected to judicial review. *Id*. Significantly, the first restriction on a dangerous and unusual firearm did not occur until 1868, the year the Fourteenth Amendment was adopted, when Alabama prohibited carrying a "rifle walking cane." *Id*. In summary, the history and tradition of the southern states was to leave firearm ownership and use mostly unregulated with a handful of states enacting prohibitions on carrying pistols in public in a concealed manner and Maryland and Georgia making it a crime to carry a firearm with the intent to assault another person. *Id*.[15] Again, with the single exception of the "rifle walking cane," none of these laws prohibited ownership or possession of any firearm.

In light of this history, *Bruen* concluded that "[n]one of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." 142 S. Ct. at 2150. The same can be said about Colorado's Magazine Ban. *cf. Duncan* at *29. None of these historical limitations on methods of using or carrying arms remotely approaches Colorado's complete ban on mere possession of magazines able to hold

---

[15] The State lists laws from cities and territories, but *Bruen* held that such laws are not useful in analyzing the historical tradition. 142 S. Ct. at 2154.

more than 15 rounds even within the confines of one's home for the purpose of self-defense. *Id*. None operated to prevent law-abiding citizens from possessing as much ammunition as they thought best. *Id*.

### C. The Regulation of the *Use* of Knives, Clubs, and Trap Guns is Not Analogous to an Absolute Ban on Magazines

The State cannot point to a single law in the Founding-era that banned possession of *any* firearm.[16] Because the State cannot find a historic ban on the possession of firearms, it points to historic regulations of weapons such as bladed weapons, melee weapons, blunt weapons, or leaded weapons. Def. Mot. 21. But these regulations are not analogous to its absolute ban. In *Bruen*, the Court wrote that in assessing whether a historic regulation is relevantly similar to a present regulation, Courts should examine "*how and why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-33 (emphasis added).  The vast majority of the nineteenth-century knife and club regulations advanced by Professor Spitzer prohibited concealed carry.[17] In other words, the "how" of the regulations was to regulate the *manner of use* of these weapons, not to prohibit their possession altogether as the State does with the Magazine Ban. *See* David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited September 28, 2023). After an exhaustive review of all nineteenth-century state and

---

[16] As discussed above, the first law banning possession of an arm did not come until nearly a century later when Florida passed its rifle walking cane law. That law was really a species of concealed carry prohibition rather than an arms ban. After all, a citizen could freely possess any rifle that was not disguised as a cane.

[17] A couple of the regulations imposed taxes on weapons. A tax is obviously not analogous to a ban.

territorial statutes, Professor Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, *no state prohibited possession of Bowie knives.*" *Id.* (emphasis added).

It should go without saying that regulating the manner of use of a weapon is not analogous to prohibiting the mere possession or any use of the weapon altogether. In *Bruen*, the Court acknowledged the existence of prohibitions on concealed carry. But it held that none of these historical limitations on the manner of use was analogous to New York's law that operated to prohibit carry altogether. 142 S. Ct. at 2150. Similarly, none of the laws prohibiting concealed carry of weapons such as knives and clubs is analogous to Colorado's law that prohibits the possession of LCMs altogether.

Moreover, the "why" of prohibitions on concealed carry is not similar to the "why" of the Magazine Ban. The "why" of a concealed carry law was to prevent unfair surprise attacks by a person who appeared to be unarmed. *Duncan* at *31. These laws were held to be constitutional only to the extent they allowed the same weapon to be carried openly. *Bruen*, 142 S. Ct. at 2150. The Magazine Ban, by contrast, prohibits carrying magazines in any manner and also prohibits simple possession in the home for self-defense. Thus, the burden imposed by the Magazine Ban is not analogous to the burden created by concealed carry restrictions. *Duncan* at *31.

Finally, the Supreme Court did not look to laws regulating knives and clubs when reviewing a restriction about guns in *Bruen*. Three different times *Bruen*

repeats the specific phrase "firearm regulation": (1) "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of *firearm regulation*." 142 S. Ct. at 2126 (emphasis added). (2) "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of *firearm regulation*." *Id*. at 2130 (emphasis added). (3) "[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of *firearm regulation*." *Id*. at 2135 (emphasis added). In contrast, the *Bruen* majority opinion did not mention knives and clubs at all. Thus, it is clear that the Court did not consider regulation of knives and clubs and other melee weapons to be analogous to firearms regulations. As Kopel and Greenlee state:

> Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms. Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers. Prohibitory laws for these blades are fewer than the number of bans on carrying handguns, and *Bruen* found the handgun laws insufficient to establish a tradition constricting the Second Amendment.

Kopel and Greenlee, *This History of Bans on Types of Arms Before 1900*, *supra*, at 191.

Professor Spitzer's final category is "Trap guns," which were devices rigged to fire without the presence of a person. Again, these laws regulated the manner of use of a weapon as a trap, not its possession, and are therefore not analogous to an absolute ban. In other words, the weapons themselves were not banned. The laws merely prohibited using the weapons to set a trap.

**D.     The Fact that Magazines Did Not Exist in the Founding Era is Not Relevant to the Analysis**

Multi-shot firearms have existed for centuries. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 852 (2015). Even the State admits that multi-shot firearms were available as early as the 1830s with the first Colt revolvers. Def. Mot. 19. It also admits that multi-shot Henry and Spencer rifles became prevalent after Reconstruction. Def. Mot. 22. The Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name, the Model 1866. Kopel, *supra*, *The History of Firearm Magazines and Magazine Prohibitions*, at 855. With seventeen rounds in the magazine and one in the chamber, the M1866 could fire eighteen rounds in nine seconds. *Id*. The gun was a particularly big seller in the American West, with over 170,000 produced. *Id*. Despite the existence of multi-shot weapons going back to the Founding era and beyond, there were no bans on ammunition capacity during the Founding era or even during Reconstruction.[18]

The State admits all of this. Def. Mot. 23, n. 11 (acknowledging the absence of Founding-era and Reconstruction laws). But instead of conceding the matter, it

---

[18] Plaintiffs do not concede that laws from the Reconstruction era are relevant to the Second Amendment inquiry. Indeed, they are not because they are too late. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id*., 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Second Amendment was adopted in 1791. 1868 is far too late to be relevant to the meaning of the text. There is no need for the Court to determine this issue in this case, however, because, like *Bruen*, there are no analogous laws in either period.

argues that it should be relieved of its responsibility to identify a historically analogous regulation because modern magazines did not exist in the Founding era. Def. Mot. 19. This is incorrect. It is true that *Bruen* stated that cases implicating "dramatic technological changes" may require a more nuanced approach to the search for historical analogues. 142 S. Ct. at 2132. But nothing in *Bruen* even hints at the possibility that technological change relieves the State of identifying analogues to its regulation altogether. Indeed, *Bruen* held just the opposite:

> We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' 554 U.S. at 582, 128 S.Ct. 2783. 'Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' *Ibid.* (citations omitted). Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

142 S. Ct. at 2132

Thus, the fact that magazines did not exist in the Founding era does not mean they are not protected by the Second Amendment. Indeed, the State's argument that magazines are unprotected is squarely foreclosed by *Heller* because the modern semiautomatic handguns the Court held are protected in that case are the product of exactly the same technological innovation that produced modern magazines. Indeed, the development of modern detachable magazines is what made the development of modern semiautomatic handguns possible in the first place. In *Heller*, the Court held that D.C.'s ban on modern handguns was unconstitutional.

554 U.S. at 629. If a ban on modern semiautomatic handguns is unconstitutional, it follows that a ban on the modern magazines that make those handguns possible is also unconstitutional.

Significantly, the State does not actually argue that it has the power to ban magazines *per se* because they did not exist in the Founding era or Reconstruction. Again, it concedes that magazines of some size are constitutionally protected because they are necessary for many firearms to operate. Def. Mot. 12. This undercuts the State's argument. The State admits it cannot ban small capacity magazines even though they are the product of the same "technological changes" as the larger capacity magazines it wants to ban. It follows that the State is not seeking to ban magazines as such because they represent an advance in technology. Instead, it is seeking to limit ammunition capacity. It is not difficult to imagine a historical law limiting ammunition capacity, such as a law prohibiting citizens from carrying more than 15 rounds of ammunition. But no such laws existed. "There is no American history or tradition of regulating firearms based on the number of rounds they can shoot, or of regulating the amount of ammunition that can be kept and carried." *Duncan* at *35. Indeed, as set forth in the next section, the best analogue that can be drawn from historical gun laws are the early militia equipment regulations that required all able-bodied citizens to equip themselves with a gun and a minimum amount of ammunition in excess of 15 rounds. *Id*. In other words, the Nation's history of firearm regulation demonstrates the exact opposite of limiting capacity.

29

**E.     The Early Militia Laws Completely Foreclose the Possibility That the State Will Find an Analogous Founding-Era Regulation**

During the Founding era, both the federal and state governments enacted laws for the formation and maintenance of citizen militias. Examples of these statutes are described in *United States v. Miller*, 307 U.S. 174, 180-81 (1939). These laws did not restrict firing capacity. They did just the opposite by mandating a *minimum* firing capacity, i.e., the laws required citizens to arm themselves with a minimum quantity of bullets and gunpowder. For example, Congress passed the Militia Act in 1792. 1 Stat. 271, 2 Cong. Ch. 33. The law required a citizen to be equipped to fire at least 20 to 24 shots. This and other state militia laws demonstrate that, contrary to the idea of a firing-capacity ceiling, there was a firing-capacity floor in the Founding era. Each able-bodied man was legally obligated to have at least 20 rounds available for immediate use. *Duncan* at *35. There were no maximum round limits like Colorado's Magazine Ban; instead there were minimum round limits and those minimum limits were well above 15 rounds.

It follows that far from being analogous to a Founding-era law, the Magazine Ban *could not have existed* under the understanding of the Second Amendment at the time of the Founding. This is clear because militia laws of the federal and state governments required citizens to keep and carry supplies of more ammunition than 15 rounds. A prohibition like the Magazine Ban would have been impossible to enforce and runs contrary to legal commands for militia readiness that existed at the time.

## VII.   The Most-Useful-for-Military-Service Nostrum[19] Does Not Help the State's Case

The State argues that magazines holding more than 15 rounds are "most useful in military service" and therefore, can be banned. Def. Mot. 26. This argument mischaracterizes *Heller*. *Duncan* at *16. Indeed, the very passage from *Heller* cited by the State demonstrates why its argument is wrong. In that passage, the Court held that specialized military arms like M-16 machine guns "that are highly unusual in society at large" are not protected for civilian use by the Second Amendment. *Heller*, 554 U.S. at 627. *See also id.* at 625 (contrasting machine guns, which may be banned, with weapons in common use that may not be banned). The passage cited by the State obviously does not apply to weapons in common use like those banned by the State.

The State seems to be arguing that *Heller's* reference to military arms must mean that any arm that could possibly be used in warfare is not protected. But *Heller* said the very opposite. In the same passage it held that weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. *Id*. What do militia members do with those weapons when they bring them to militia service? They fight wars.[20] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons brought by militia members for fighting wars are protected by the Second Amendment, and (2) all weapons used for fighting wars are not protected by the

---

[19] *Duncan's* characterization. *Id*., at *16.
[20] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

Second Amendment. This is obviously not the law. Rather, "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). *See also Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting) (calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens.").

## VIII.  Twentieth Century Laws Are Irrelevant

As discussed above, the State more or less concedes there are no Founding-era or Reconstruction analogues to the Magazine Ban. To make up for this lack, it argues that the laws "[mo]st analogous to the LCM Ban [are those enacted in] the widespread movement to ban fully-automatic machine guns in the 1920s and 30s." Def. Mot. 29. That is exactly correct – and that is why the Magazine Ban is unconstitutional. Those twentieth-century laws are indeed the laws that are most analogous to the Magazine Ban. The problem with the State's argument is that it ignores the Supreme Court's holding in *Bruen*, in which New York also advanced twentieth-century analogues to support its case. The Court simply ignored these laws as irrelevant, writing that such evidence did "not provide insight into the meaning of the Second Amendment." *Id.* 142 S. Ct. at 2154, n. 28. To the extent later history contradicts the earlier record, the earlier record controls. 142 S. Ct. at 2137.

"Liquidating indeterminacies in written laws is far removed from expanding or altering them." *Id* (cleaned up). Thus, the Court should reject the State's effort to make up for the lack of Founding-era analogues by pointing to twentieth-century analogues. Indeed, if analogues from the twentieth century were relevant, both *Heller* and *Bruen* would have surely come out the other way. They are not.

## IX.    The State's "Reducing Fear" Argument is Pure Interest Balancing

The State argues that its "interest in restricting activity that spreads fear amongst the population" justifies the Magazine Ban. Def. Mot. 29. Plaintiffs will not spend much time on this argument because it is once again based on pure interest-balancing of the sort forbidden by *Bruen*. The State asserts that its arms ban is "justified" by its governmental "interest" in reducing "fear amongst the population." But this argument is surely foreclosed by *Bruen*, where the Court wrote: "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As discussed extensively above, the State has failed to demonstrate that its regulation is consistent with this Nation's historical tradition of firearm regulation. Its attempt to fall back on classic interest-balancing must, therefore, fail.

## X.     Plaintiffs Have Standing

Plaintiffs anticipated all of the State's standing arguments in their motion for summary judgment. Rather than repeat that extensive discussion in this brief, they incorporate their prior arguments set forth in pages 12 through 23 of their motion.

## RESPONSE TO STATEMENT OF UNDISPUTED FACTS

1.      Plaintiffs do not deny that Professor Baron, the Governor's "corpus linguistics" expert, was able to find Founding-era documents that used the word "arms" separately from the word "accoutrements."

2.      Plaintiffs do not dispute that there is no Founding-era reference to a "magazine" as an arm, because, as Professor Baron himself points out, during the Founding era the word "magazine" meant a place, often a building or warehouse, to store goods and supplies. Ex. 26 ¶ 24.

3.      Denied. Professor Baron provided his opinions in *Duncan*. *Id.*, at *35, n. 224. Judge Benitez rejected Professor Baron's assertion that "arms" does not include magazines. *Id.*, at *7.

4.      Plaintiffs do not deny that Professor Baron was able to find the phrase "arms and accoutrements" among Founding-era documents.

5.      Denied. The right to keep and bear arms includes the right to have ammunition. *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

6.      Admitted.

7. Denied. The first handgun to use a detachable box magazine was patented in 1862. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 856 (2015).

8. Plaintiffs do not deny that most semiautomatic firearms that come standard with a magazine with a capacity greater than 15 rounds will also function with a magazine with a capacity of less than 16 rounds.

9. Denied. *Duncan* at *11 ("used" means owned to satisfy a subjective need for protection and in this sense LCMs are commonly used).

10. Denied. *Duncan* at *3, n. 25 (citing several instances of use for self-defense).

11. Denied. The FBI table cited as the source of this statistic states that officers fired up to 37 rounds (3 for primary officer; 34 for assisting officers) per incident.

12. Denied. *Duncan* at *3, n. 25 (citing several instances of use for self-defense).

13. Denied. Ex. 30 at 7 (documenting numerous home invasions in Colorado).

14. Plaintiffs admit that Mr. Gates and Mr. Swartz sometimes carry weapons with magazines containing fewer than 16 rounds.

15. Denied. As the State has previously stipulated, America's most popular sporting rifle, the AR-15, is usually sold with magazines with a capacity of

20 or 30 rounds. *COA* Stip. 15; *RMGO* Stip. 10; Kopel, *supra*, at 859 (AR-15 is most popular rifle in American history).

16.     Denied. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 1 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022) ( available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494) (48.0% of gun owners – about 39 million individuals – have owned magazines that hold over 10 rounds (up to 542 million such magazines in total)). See also Duncan at *4 (*citing* English).

17.     Denied. This may be true for the "vast majority" of firearms that accept LCMs, but it is not true for all of them. Ex. 28, ¶ 56.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Denied. Senator Fields' personal motivation for introducing the bill does not establish an undisputed fact about why the statute was enacted.

22.     Denied. Senator Sullivan's personal musings about why legislatures act in general does not establish any undisputed fact.

23.     Denied. Kopel, *supra*, at 855 (repeating rifles introduced in the 1850s).

24.     Plaintiffs admit that repeating arms proliferated after the Founding era. They deny that they did not exist in the Founding era or that they were not dangerous at that time. Kopel, *supra*, at 852.

25.     Denied. *Duncan* at *29 (Henry rifle already popular by 1868 when Fourteenth Amendment enacted).

26.     Denied. Kopel, *supra*, at 854 (Pepperboxes pistols were commercially successful and it took a number of years for Colt revolvers to surpass them in the marketplace.).

27.     Denied. As just one example, 230 persons were murdered in the Sand Creek Massacre. National Park Service, *Sand Creek Massacre* (available at https://bit.ly/469WcCb).

28.     Plaintiffs admit there were probably no repeating rifles at the Sand Creek Massacre, but there were repeating revolvers. William F. Dawson, Ordnance Artifacts at the Sand Creek Massacre Site 15-16 (available at http://npshistory.com/publications/sand/ordnance.pdf).

29.     Plaintiffs admit that 30 double-digit mass shootings occurred in the United States in the 74 years from 1949 to 2022, resulting in a total of 538 fatalities in a country with a current population of 330 million. Ten of these occurred before 2004 and 20 afterwards.

30.     See response to 29.

31.     Denied. *See* David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited Sept. 25, 2023). After an exhaustive review of all

nineteenth-century state and territorial statutes, Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, no state prohibited possession of Bowie knives." *Id.*

32.     Plaintiffs admit that many states regulated melee weapons and blunt weapons. Such regulations are irrelevant to the Court's determination of this matter. *Duncan* at *24.

33.     Denied. "Throughout most of the seventeenth century, the murder rate among unrelated adults in Europe's North American colonies surpassed the worst rates the United States experienced in the twentieth century." Randolph Roth. *American Homicide* 27 (2009).

34.     Admitted.

35.     Admitted. Twentieth-century history is not relevant to the constitutional analysis. *Bruen*, 142 S. Ct. at 2154, n. 28.

36.     Plaintiffs admit that civilians purchased machine guns after World War I. Twentieth-century history is not relevant to the constitutional analysis. *Bruen*, 142 S. Ct. at 2154, n. 28.

37.     Plaintiffs admit that criminal use of machine guns received media coverage after 1926. Twentieth-century history is not relevant to the constitutional analysis. *Bruen*, 142 S. Ct. at 2154, n. 28.

38.     Plaintiffs admit that many states began regulating the possession of machineguns after 1925, though many, like Colorado, require licensure of such

weapons instead of banning them outright. C.R.S. § 18-12-102. Paradoxically, Colorado regulates a 16-round magazine for a .22 more strictly than a 50 caliber machinegun. Twentieth century history is not relevant to the constitutional analysis. *Bruen*, 142 S. Ct. at 2154, n. 28.

39.     Plaintiffs admit that Defendant has quoted the proposed law correctly but deny that it has even a remote relevance to the resolution of this matter.

40.     Plaintiffs admit that Defendant has quoted the referenced law correctly but deny that it has even a remote relevance to the resolution of this matter.

41.     Plaintiffs admit that Congress has imposed requirements on automatic weapons, including registration and taxation, that are far less restrictive than the flat prohibition at issue here. Again, ironically, Colorado imposes stricter requirements on a 16-round .22 magazine than Congress does on machineguns.

42.     Plaintiffs admit that various states imposed limits on ammunition capacity in the twentieth century, but twentieth-century history is not relevant to the constitutional analysis. *Bruen*, 142 S. Ct. at 2154, n. 28.

43.     Denied. Multi-round firearms existed for centuries before laws limiting their capacity were passed. Kopel, *supra*, at 852.

44.     Denied. Nearly a million firearms with detachable box magazines were sold to civilians beginning in 1896. Kopel, *supra*, at 857.

45.    Denied. *Duncan* at *15 (statistical analysis leading to the 2.2 shot statistic "has minimal indicia of accuracy or reliability").

46.    Denied. *Duncan* at *4 ("Woe to the victim who runs out of ammunition before armed attackers do.").

47.    Admitted.

48.    Plaintiffs admit that LCMs make semiautomatic firearms more effective as demonstrated by this statistic, which is why law-abiding citizens should not be deprived of their use in potential confrontations with criminals such as the Aurora theater shooter.

49.    Admitted.

50.    Plaintiffs admit Defendant's expert quoted the FBI report accurately.

51.    Denied. Professor Klarevas defines "mass shootings" in a particular way, but as his report states, a different definition will result in a different result. See page 63 of Ex. 32. Certainly, Professor Klarevas' idiosyncratic definition of "mass shooting" does not establish any undisputed fact.

52.    Denied. Professor Klarevas does not provide any support for this assertion.

53.    Denied. See response to paragraph 51.

54.    Denied. Professor Klarevas admits that it cannot be determined whether many of the shootings in his database involved LCMs. See note 7 to his report.

55. Denied. Professor Klarevas admits that it cannot be determined whether many of the shootings in his database involved LCMs. See note 7 to his report.

56. Denied. See response to paragraph 51.

57. Denied. "The AR-15-type semiautomatic has never been issued as a service rifle to U.S. soldiers. Semiautomatic rifles are not issued as standard service rifles to any army in the world." Halbrook, Stephen. *America's Rifle: The Case for the AR-15* (p. 16). Bombardier Books. Kindle Edition.

58. Denied.

59. Denied. Semiautomatic firearms with magazines with a capacity in excess of 15 rounds were sold to civilians in the late nineteenth century. Kopel, *supra*, at 857.

60. Denied. In addition to the definitional issue described in paragraph 51, there is no evidence that a ban on high-capacity magazines has any effect on criminality. Rand Corp., *Effects of Assault Weapon and High-Capacity Magazine Bans on Violent Crime* (available at https://bit.ly/452NdRP). In addition, mass shootings are so exceedingly rare that it is impossible to distinguish causation and correlation with respect to any particular variable.

61. Plaintiffs admit that Defendant quoted the survey accurately. This survey has no relevance to the Court's determination of this matter.

62. Plaintiffs admit that Defendant quoted the survey accurately. This survey has no relevance to the Court's determination of this matter.

41

63.     Plaintiffs admit that Defendant quoted the survey accurately. This survey has no relevance to the Court's determination of this matter.

64.     Denied. This statistic is absurd on its face.

65.     Denied. Christopher S. Koper, Report to the National Institute of Justice and United States Department of Justice, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*. In this federally funded study, Professor Koper, joined by Professor Roth, concluded that there was no evidence the federal LCM ban reduced gun violence. *Id.* at 2.

66.     The LCM ban is also correlated with the increase in gun violence in Colorado after 2015.

67.     Plaintiffs admit that NFGR's articles state that it shall have no formal members.

68.     Admitted.

69.     Admitted.

70.     Admitted.

71.     Admitted.

72.     Admitted.

73.     Admitted.

74.     Plaintiffs admit that Plaintiff Honegger lived in Colorado prior to the July 1, 2013 effective date of the Magazine Ban and that he has never owned an LCM.

75.     Plaintiffs admit that Plaintiff Honegger would certainly immediately acquire an LCM if the Magazine Ban were repealed. See Declaration of Karl Honegger attached to Plaintiffs' Motion for Summary Judgment, ¶ 8.

76.     Plaintiffs admit that Plaintiff Honegger did not purchase an assault weapon.

77.     Plaintiffs admit that Plaintiff Honegger did not purchase an assault weapon.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to deny the State's motion for summary judgment.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington