# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-01866-GPG-SKC

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## THE GOVERNOR'S OPPOSITION
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

Colorado's large capacity magazine law ("LCM Ban"), in place since 2013, quite literally saves lives. Plaintiffs, relying on their own scant record, ask the Court to strike it down and permanently enjoin its enforcement. But Plaintiffs fail to demonstrate that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.

The Governor also moved for Summary Judgment, D. 73, because the *de minimis* record developed by Plaintiffs cannot establish a dispute of material fact. To the extent the Court disagrees, then the parties should test the facts and expert opinions in support of their claims and defenses at trial, just as the parties did in a previous challenge to Colorado's LCM Ban. *See Colo. Outfitters Ass'n. v. Hickenlooper*, 24 F. Supp. 3d 1050, 1054 (D. Colo. 2014), *vacated and remanded sub nom* 823 F. 3d 537 (10th Cir. 2016). But at minimum, the Court should deny Plaintiffs' motion for summary judgment, D. 76.

**RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. C.R.S. § 18-12-301 *et seq*. shall be referred to herein as the "Magazine Ban."

    1.    Neither admit nor deny. The Governor takes no position on Plaintiffs'

abbreviations. The Governor refers to C.R.S. § 18-12-301 *et seq*. as the "LCM Ban."

2. Pursuant to C.R.S. § 18-12-301(2)(a), "large-capacity magazine" means: [text of statute omitted in Governor's response].

    2.    Admit that § 18-12-301(2)(a) defines "large-capacity magazine."

3. A person who sells, transfers, or possesses a "large-capacity magazine" commits a misdemeanor or a felony depending on the circumstances. C.R.S. § 18-12-302(1)(a).

    3.    Admit.

4. A person may possess a "large capacity magazine" if he or she owned it on July 1, 2013 and maintained continuous possession of it. C.R.S. § 18-12-302(2)(a).

    4.    Admit.

5. For purposes of this motion, "Grandfathered Magazine" means a magazine the possession of which is lawful pursuant to the provisions of C.R.S. § 18-12-302(2)(a).

    5.    Neither admit nor deny. The Governor takes no position on Plaintiffs'

abbreviations.

6. In this motion Plaintiffs will use the statutory term "large capacity magazine" or "LCM" to refer to the magazines banned by the Magazine Ban. That said, the statutory term is a tendentious political term, not an accurate descriptive term. Gates Declaration ¶ 17. Many magazines banned by the statute are in fact standard capacity magazines. *Id*.

    6.    Admit and deny. The Governor agrees that the proper term, as used in the statute,

§ 18-12-301(2), C.R.S., and in the Governor's Motion for Summary Judgment, D. 73 at 1–2, is

"large capacity magazine" or "LCM." Whether "the statutory term is a tendentious political

term" is an opinion, not a fact. To the extent Plaintiffs consider it to be a fact, it is in dispute. *See*.

Ex. 29,[1] D. 74-8 (Depo. Tr. of M. Passamaneck) at 70:15–18 (Plaintiffs' sole expert admitting

that it "is accurate" to say that "standard capacity magazines might be more than 15 [rounds] and

some might be less" than 16 rounds).

7.   Plaintiff Gates is a law-abiding citizen, and he possesses and uses numerous firearms for a
     variety of lawful purposes, including self-defense. Gates Declaration ¶¶ 3, 6-7.

     7.      Admit and deny. The Governor admits that Gates is a law-abiding citizen at this

time, and that he possesses numerous firearms. The Governor denies that Gates has ever fired or

brandished any weapon in self-defense. Ex. 43, D. 73-4 (Depo. Tr. of B. Gates) at 41:9–14.

8.   Since 2013 Gates has purchased approximately 50 firearms, many of which come standard
     (in states that do not have magazine bans) with magazines with a capacity in excess of 15
     rounds. Gates Dec. ¶ 10. For each such firearm, he would have purchased a standard capacity
     magazine with a capacity in excess of 15 rounds but for the fact that the Magazine Ban made
     doing so unlawful. *Id*.

     8.      Admit and deny. The Governor admits that Gates has purchased approximately 50

firearms since 2013, and that he would have purchased a 16-plus round magazine for each such

firearm but for the existence of the LCM Ban. The Governor denies a) that adequate foundation

has been laid to establish that Gates knows how those firearms are sold in states other than

Colorado, and b) that certain firearms "come standard" with a certain magazine size. Instead, the

record reflects that firearms are sold with several different magazine capacities. *See, e.g.*, Ex. 28,

D. 74-7 (Yurgealitis Report) at 24 (noting online catalog screenshot of Fabrique-Nationale's

"Five-seveN" pistol showing both 10 and 20-round options).

---

[1] Unless otherwise noted, the Governor uses the parties' unified exhibit numbers to cite to
exhibits attached to the Governor's Motion for Summary Judgment, D. 73, ("Def.'s MSJ.") and
the Plaintiffs' Motion for Summary Judgment, D. 76, ("Pls.' MSJ.").

9. Gates has frequently purchased firearms in the past. Gates Dec. ¶ 11. On average, Gates purchases approximately five firearms per year. *Id*. Gates will certainly continue to frequently purchase firearms in the coming months and years. *Id*.

    9.    Admit.

10. Many firearms Gates will purchase in the coming months and years come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds, and but for his fear of criminal prosecution under the Magazine Ban, he would purchase such standard capacity magazines when he purchases these firearms. Gates Dec. ¶ 12.

    10.    Admit and deny. The Governor admits that Gates would purchase magazines with

a capacity of more than 15 bullets but for fear of prosecution under the LCM Ban. The Governor

denies a) that adequate foundation has been laid to establish that Gates knows how those

firearms are sold in states other than Colorado, and b) that certain firearms "come standard" with

a certain magazine size. Instead, the record reflects that firearms are sold with several different

magazine capacities. *See, e.g.*, Ex. 28, D. 74-7 (Yurgealitis Report) at 24 (noting online catalog

screenshot of Fabrique-Nationale's "Five-seveN" pistol showing both 10 and 20-round options).

11. Gates owns some Grandfathered Magazines. Gates Dec. ¶ 13. Some of these magazines have become worn through use in the last 10-plus years, and he would immediately replace them but for his fear of criminal prosecution under the Magazine Ban if he were to do so. *Id*.

    11.    Admit.

12. Gates would also certainly purchase additional LCMs but for his fear of criminal prosecution under the Magazine Ban if he were to do so. Gates Dec. ¶ 14.

    12.    Admit.

13. Plaintiff Swartz is a law-abiding citizen, and he possesses and uses numerous firearms for a variety of lawful purposes including self-defense. Swartz Declaration ¶¶ 3, 5-6.

    13.    Admit and deny. The Governor admits Swartz is a law-abiding citizen at this

time, and that he possesses numerous firearms. The Governor denies that Swartz has ever fired

or brandished any weapon in self-defense. Ex. 33, D. 73-1 (Depo. Tr. of T. Swartz) at 34:21–25.

14. Since 2013 Swartz has purchased approximately 20 firearms, many of which come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds. Swartz Dec. ¶ 9. For each such firearm, he would have purchased a standard capacity magazine with a capacity in excess of 15 rounds but for the fact that the Magazine Ban made doing so unlawful. *Id*.

14.   Admit and deny. The Governor admits that Swartz has purchased approximately 20 firearms since 2013, and that he would have purchased a 16-plus round magazine for each such firearm but for the existence of the LCM Ban. The Governor denies a) that adequate foundation has been laid to establish that Swartz knows how those firearms are sold in states other than Colorado, and b) that certain firearms "come standard" with a certain magazine size. Instead, the record reflects that firearms are sold with several different magazine capacities. *See, e.g.*, Ex. 28, D. 74-7 (Yurgealitis Report) at 24 (noting online catalog screenshot of Fabrique-Nationale's "Five-seveN" pistol showing both 10 and 20-round options).

15. Swartz has frequently purchased firearms in the past. Swartz Dec. ¶ 10. On average, he purchases approximately two to three firearms per year. *Id*. He will certainly continue to frequently purchase firearms in the coming months and years. *Id*.

15.   Admit.

16. Many firearms Swartz will purchase in the coming months and years come standard (in states that do not have magazine bans) with magazines with a capacity in excess of 15 rounds, and but for his fear of criminal prosecution under the Magazine Ban, he would purchase such standard capacity magazines when he purchases these firearms. Swartz Dec. ¶ 11.

16.   Admit and deny. The Governor admits that Swartz would purchase magazines with a capacity of more than 15 bullets but for fear of prosecution under the LCM Ban. The Governor denies a) that adequate foundation has been laid to establish that Swartz knows how those firearms are sold in states other than Colorado, and b) that certain firearms "come standard" with a certain magazine size. Instead, the record reflects that firearms are sold with several different magazine capacities. *See, e.g.*, Ex. 28, D. 74-7(Yurgealitis Report) at 24 (noting

5

online catalog screenshot of Fabrique-Nationale's "Five-seveN" pistol showing both 10 and 20-

round options).

17. Swartz owns some Grandfathered Magazines. Swartz Dec. ¶ 12. Some of these magazines
    have become worn through use in the last 10-plus years, and he would immediately replace
    them but for his fear of criminal prosecution under the Magazine Ban if he were to do so. *Id*.

      17.     Admit.

18. Swartz would also certainly immediately purchase additional LCMs but for his fear of
    criminal prosecution under the Magazine Ban if he were to do so. Swartz Dec. ¶ 13.

      18.     Admit.

19. Plaintiff Honegger is a law-abiding citizen, and he possesses and uses firearms for a variety
    of lawful purposes, including self-defense. Honegger Declaration ¶¶ 2, 4, 5.

      19.     Admit and deny. The Governor admits that Honegger is a law-abiding citizen at

this time, and that he possesses numerous firearms. The Governor denies that Honegger has ever

fired or brandished any weapon in self-defense. Ex. 44, D. 73-5 (Depo. Tr. of K. Honegger) at

15:22–16:2.

20. Honegger has never at any time owned an LCM. Honegger Dec. ¶ 7.

      20.     Admit.

21. Honegger would certainly immediately purchase an LCM but for his fear of criminal
    prosecution under the Magazine Ban if he were to do so. Honegger Dec. ¶ 8.

      21.     Deny. The Record shows that Honegger made similar statements in the past but

did not follow-through on his commitment to purchase the weapons in which he indicated an

interest. *See* Def.'s SUMF ("DSUMF"), D. 73 ¶¶ 76, 77.

22. In particular, if the Magazine Ban were repealed or enjoined, he would buy a 6.5 Creedmoor
    rifle with a 20-round magazine or a Glock handgun that accepts a 25- or 30-round magazine.
    Honegger Dec. ¶ 9. He would also immediately purchase a 17-round magazine for one of the
    handguns he currently owns. *Id*.

      22.     Deny, for the same reasons as Paragraph 21.

23. Gates, Swartz and Honegger do not currently have a definite plan to acquire any LCMs because they know the Magazine Ban is enforced and they fear prosecution if they were to acquire LCMs or transfer any Grandfathered Magazine. Gates Dec. ¶ 15; Swartz Dec. ¶ 14; Honegger Dec. ¶ 8. That said, if the Magazine Ban were repealed or enjoined, they would immediately acquire LCMs. *Id*.

      23.     Admit and deny. Admit that Plaintiffs do not currently have a definite plan to

acquire any LCMs. Deny that Plaintiff Honegger would immediately acquire LCMs if the LCM

Ban were repealed or enjoined for the reasons listed in Paragraph 21.

24. Hannah Hill is a law-abiding citizen and the Executive Director of NFGR. Hill Declaration ¶¶ 3, 5.

      24.     Admit that Hill is a law-abiding citizen at this time, and that she is the Executive

Director of NFGR.

25. NFGR has members who would acquire LCMs if the Magazine Ban were repealed or enjoined. Hill Dec. ¶ 6. For example, Hill is a member of NFGR, and if she could legally do so, she would immediately go out and acquire a 30-round magazine for her AR-15. *Id*. Plaintiff Gates is also a member of NFGR who would acquire LCMs if he were legally able to do so. Gates Dec. ¶¶ 4, 15.

      25.     Deny. According to its Articles of Incorporation, NFGR "shall have no

members." Ex. 41, D. 74-18 (Documents Produced by Pls.) at 1.

26. NFGR is a Second Amendment advocacy organization, and it regularly funds challenges to statutes and regulations that burden Second Amendment rights. Hill Dec. ¶ 8. Thus, the interests NFGR seeks to protect in this action are germane to its purpose. *Id*.

      26.     Admit.

27. The State does not dispute that Governor Polis is a proper defendant in this action, and "for the purpose of defending the LCM Ban against Plaintiffs' Second Amendment challenge here, which seeks only declaratory and injunctive relief … the Governor [has agreed] to waive his sovereign immunity and consent[ed] to be sued in this Court in only this case, in only his official capacity, and only for prospective relief." Answer, ECF 43 p.2, n.1.

      27.     Admit.

28. Plaintiffs have designated Mark Passamaneck as an expert regarding two topics: (1) an estimate of the number of magazines with a capacity in excess of 15 rounds in the United

States; and (2) the operation and durability of these magazines. Mr. Passamaneck's qualifications are set forth in paragraph 2 of his attached declaration.

28.     Admit and deny. The Governor admits that Plaintiffs have designated Mark

Passamaneck as an expert on these topics. The Governor denies that Passamaneck is qualified as

an expert to opine on "an estimate of the number of magazines with a capacity in excess of 15

rounds in the United States." The Governor has filed a motion to partially strike Passamaneck's

expert report and exclude Passamaneck's testimony on this topic. D. 56

29. Without a magazine, the operation of a semi-automatic firearm as a semi-automatic firearm is impossible. Passamaneck Declaration ¶ 3.

29.     Deny. A magazine is not required for a semi-automatic firearm to function.

Generally speaking, a semi-automatic firearm, without a magazine inserted, can be loaded

manually with a single cartridge and fired. The magazine, with additional available cartridges, is

what allows the firearm to fire additional shots without manual manipulation of a bolt or slide.

Ex. 35, D. 74-13 (Rebuttal report of J. Yurgealitis) ¶ 18.

30. A magazine is not merely a box in which ammunition is stored; rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id.*

30.     Admit.

31. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id.*

31.     Admit.

32. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id.*

32.     Admit.

33. Thus, without a magazine as a designed dynamic component, semi-automatic firearms would not exist. *Id.*

33.     Defendant can neither admit nor deny. A magazine is not required for a semi-automatic firearm to function. Generally speaking, a semi-automatic firearm, without a magazine inserted, can be loaded manually with a single cartridge and fired. The magazine, with additional available cartridges, is what allows the firearm to fire additional shots without manual manipulation of a bolt or slide. Ex. 35, D. 74-13 (Rebuttal report of J. Yurgealitis) ¶ 18. Passamaneck's statement that semi-automatic firearms would not exist without magazines is speculative and not relevant to the case.

34. It may be technically possible to fire a semi-automatic weapon without a magazine by manually opening the action each time the weapon is fired and manually inserting a single round into the chamber, but, by definition, this turns the firearm into a single-shot firearm and renders semi-automatic fire impossible, which in turn makes it impossible to operate the firearm as designed. Passamaneck Dec. ¶ 4.

34.     Admit and deny. The Governor admits that generally speaking, a semi-automatic firearm, without a magazine inserted, can be loaded manually with a single cartridge and fired. The magazine, with additional available cartridges, is what allows the firearm to fire additional shots without manual manipulation of a bolt or slide. Ex. 35, D. 74-13 (Rebuttal report of J. Yurgealitis) ¶ 18. The Governor denies that a magazine is required for a semi-automatic firearm to function. *Id*.

35. The case of *Colorado Outfitters Assoc. v. Hickenlooper*, Case No. 13-cv-1300, United States District Court for the District of Colorado, shall be referred to in this Statement of Undisputed Material Facts as "*COA*."

35.     Neither admit nor deny. The Governor takes no position on Plaintiffs' abbreviations.

36. The case of *Rocky Mountain Gunowners v. Hickenlooper*, Case No. 2013CV33879, District Court for the City and County of Denver, shall be referred to in this Statement of Undisputed Material Facts as "*RMGO*."

36.     Neither admit nor deny. The Governor takes no position on Plaintiffs'

abbreviations.

37. In *COA*, Governor Hickenlooper was sued in his official capacity. *Cooke v. Hickenlooper*, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016).

37.     Admit.

38. In *RMGO*, Governor Hickenlooper was sued in his official capacity. *Rocky Mountain Gun Owners v. Polis,* 2020 CO 66, 467 P.3d 314.

38.     Admit.

39. A suit against a state official in his or her official capacity is no different than a suit against the State itself.

39.     Neither admit nor deny. This is a legal argument, not a factual statement. The

Governor denies that this legal argument is properly included in Plaintiffs' Statement of

Undisputed Facts.

40. "For litigation purposes, the Governor is the embodiment of the state." *Ainscough v. Owens*, 90 P.3d at 858.

40.     Neither admit nor deny. This is a legal argument, not a factual statement, and an

incorrect one at that because the cited case concerned state law claims brought in state court, so

Eleventh Amendment sovereign immunity was not at-issue. The Governor denies that this legal

argument is properly included in Plaintiffs' Statement of Undisputed Facts.

41. Defendant admits that the parties to *COA*, including the State of Colorado, entered into the stipulations attached as Exhibit 1 for purposes of the trial to the court in that case. Answer ¶ 12.

41.     Admit.

42. Defendant admits that the parties to *RMGO*, including the State of Colorado, entered into the stipulations attached as Exhibit 2 for purposes of the trial to the court in that case. Answer ¶ 13.

42.     Admit.

43. The stipulations in Exhibit 1 shall be referred to as "*COA* Stip. ___."

43.     Neither admit nor deny. The Governor takes no position on Plaintiffs'

abbreviations.

44. The stipulations in Exhibit 2 shall be referred to as "*RMGO* Stip. ___."

44.     Neither admit nor deny. The Governor takes no position on Plaintiffs'

abbreviations.

45. The facts set forth in paragraphs 43 through 58 cannot be genuinely disputed by the State given that they are so obviously true that the State stipulated to them in one or both *COA* and *RMGO*.

45.     Deny.

*COA Stipulations*: The COA stipulations were entered into in January of 2014.

Defendant was not the Governor in January 2014, and neither his current internal legal counsel

nor external legal counsel were involved in the preparation of these stipulations or their

adoption by former Governor Hickenlooper. Defendant states that the judgment in *Colorado*

*Outfitters Association v. Hickenlooper*, 24 F. Supp. 3d 1050 (D. Colo. 2014), was vacated and

remanded on appeal, 823 F.3d 537 (10th Cir. 2016), and therefore the trial court's factual

findings, including any stipulated facts in the Proposed Final Pretrial Order, have no binding or

conclusive effect. *See O'Connor v. Donaldson*, 422 U.S. 563, 577 n. 12 (1975); *Jaffree v.*

*Wallace*, 837 F.2d 1461, 1466 (11th Cir. 1988); *Milam v. Comm'r of Soc. Sec.*, 734 F. App'x

697, 700 (11th Cir. 2018). The COA stipulations are not relevant to any party's claims or

defenses in this case, because, at most, they reflect facts that were true nearly a decade ago.

Defendant further denies because after reasonable inquiry, the information known to Defendant

or that Defendant can readily obtain is insufficient to enable Defendant to admit or deny the truthfulness of the COA stipulations. Ex. 48 (Def.'s Responses to Pls.' First Set of Discovery Requests). And nothing was produced in discovery to enable the Governor to assess, much less agree to, the accuracy of those past stipulations when they were made, nor whether they remain accurate today. Defendant further denies because the COA stipulations are hearsay, and courts can only consider admissible evidence in deciding a motion for summary judgment. *See Johnson v. Weld Cnty.*, Colo., 594 F.3d 1202, 1209 (10th Cir. 2010).

*RMGO Stipulations*: The RMGO stipulations were entered into in April and May 2017. Defendant was not the Governor in 2017, and neither his current internal legal counsel nor external legal counsel were involved in the preparation of these stipulations or their adoption by former Governor Hickenlooper. Defendant also states that while the wording of the stipulated fact it references is correct, it incorrectly cites the Proposed Trial Management Order as the source for the stipulated fact, but all the fact stipulations in the Proposed Trial Management Order were withdrawn and replaced with a new set of stipulations in the middle of the trial. *See The Governor's Renewed Mot. for Ruling that Stipulations from Previous Cases are not Binding*, D. 93 at 2 n.3 (Oct. 13, 2023). Defendant objects to this Request on the grounds that the information contained in this stipulation is not relevant to any party's claims or defenses in this case because *Rocky Mountain Gun Owners, et al. v. Hickenlooper*, No. 2013CV33897 (Denver Dist. Ct.), involved only a state law claim that Colorado's large capacity magazine ban violated Colo. Const. art. II, § 13, and therefore was decided under the Colorado Supreme Court's "reasonable exercise of police powers" test, and not any test articulated by the U.S. Supreme Court in deciding federal question claims for alleged violations of the Second Amendment. *See*

12

*Rocky Mountain Gun Owners v. Hickenlooper*, 371 P.3d 768 (Colo. App. 2016); *Rocky Mountain Gun Owners v. Hickenlooper*, 472 P.3d 10 (Colo. App. 2018), *aff'd sub nom. Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314 (Colo. 2020). The RMGO stipulations are not relevant to any party's claims or defenses in this case, because, at most, they reflect facts that were true over six years. Defendant further denies because after reasonable inquiry, the information known to Defendant or that Defendant can readily obtain is insufficient to enable Defendant to admit or deny the truthfulness of the RMGO stipulations. Ex. 48 (Def.'s Responses to Pls.' First Set of Discovery Requests). And nothing was produced in discovery to enable the Governor to assess, much less agree to, the accuracy of those past stipulations when they were made, nor whether they remain accurate today. Defendant further denies because the RMGO stipulations are hearsay, and courts can only consider admissible evidence in deciding a motion for summary judgment. *See Johnson*, 594 F.3d at 1209.

46. More than 300,000,000 firearms are lawfully owned in the United States. *COA* Stip. 10.

    46.    Deny for the reasons stated in response to Pls.' SUMF 45.

47. A significant percentage of firearms privately owned are semi-automatic, most of which utilize a detachable box magazine. *COA* Stip. 10.

    47.    Deny for the reasons stated in response to Pls.' SUMF 45.

48. The number of lawfully owned semi-automatic firearms in the United States that utilize an LCM is in the tens of millions. *COA* Stip. 10; *RMGO* Stip. 6.

    48.    Deny for the reasons stated in response to Pls.' SUMF 45.

49. Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. *COA* Stip. 12.

    49.    Deny for the reasons stated in response to Pls.' SUMF 45.

50. In states without laws regulating magazine capacity, AR-15 platform rifles are usually sold at retail with a detachable box magazine capable of holding up to 30 rounds, and the majority of owners of AR-15 platform rifles use magazines with a capacity of 20 and/or 30 rounds. *COA* Stip. 15; *RMGO* Stip. 10.

    50.    Deny for the reasons stated in response to Pls.' SUMF 45.

51. Semi-automatic firearms equipped with LCMs are used for multiple lawful purposes, including recreational target shooting, competition shooting, and collecting, and are kept for home defense and defense outside the home. *COA* Stip. 19.

    51.    Deny for the reasons stated in response to Pls.' SUMF 45.

52. Semi-automatic pistols and rifles cannot function as designed without a magazine. *COA* Stip. 20; *RMGO* Stip. 14.

    52.    Deny for the reasons stated in response to Pls.' SUMF 45.

53. Semi-automatic firearms are designed to discharge a bullet for each pull of the trigger, automatically extract and eject the spent cartridge case from the firing chamber, re-cock the firing mechanism, and load a new cartridge into the firing chamber so it can be fired again with another pull of the trigger. *COA* Stip. 20; *RMGO* 15.

    53.    Deny for the reasons stated in response to Pls.' SUMF 45.

54. Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15 rounds; for example the Glock 17, which is one of the most popular handguns sold in the United States. *COA* Stip. 22; *RMGO* Stip. 17.

    54.    Deny for the reasons stated in response to Pls.' SUMF 45.

55. The number of LCMs in the United States is in the tens of millions. *COA* Stip 25.

    55.    Deny for the reasons stated in response to Pls.' SUMF 45.

56. The number of LCMs in the State of Colorado alone is in the millions. *COA* Stip. 26; *RMGO* Stip. 20.

    56.    Deny for the reasons stated in response to Pls.' SUMF 45.

57. Prior to the effective date of the Magazine Ban, LCMs were not unusual in Colorado. *RMGO* Stip. 21.

    57.    Deny for the reasons stated in response to Pls.' SUMF 45.

58. Firearm magazines can become non-operational due to normal wear and tear or other damage. *COA* Stip. 30.

    58.    Deny for the reasons stated in response to Pls.' SUMF 45.

59. Through December 2016 there were 41 prosecutions under the Magazine Ban. *RMGO* Stip. 29. From January 1, 2017 to January 31, 2023, there were 729 more. Exhibit 3. Thus, through January 31, 2023, there were 770 such prosecutions.

    59.    Deny. Defendant denies for the reasons stated in response to Pls.' SUMF 45.

Defendant objects to Plaintiffs' reliance on Exhibit 3 because it was produced to Defendant after the close of discovery. Defendant further objects to Exhibit 3 because it is hearsay and Plaintiffs failed to identify a witness who will attest to Exhibit 3. Defendant further denies that Exhibit 3 establishes that there were 729 prosecutions from January 1, 2017 to January 31, 2023 because Exhibit 3 indicates that the list "will not include, if any exist, cases that are sealed or is either a juvenile, probate, or mental health case type." Defendant further denies because Exhibit 3 is hearsay, and courts can only consider admissible evidence in deciding a motion for summary judgment. *See Johnson*, 94 F.3d at 1209.

60. The Industry Intelligence Report published by the National Shooting Sports Foundation ("NSSF") is a nationally recognized trade report for the firearms industry and shall be referred to herein as the NSSF Report. Passamaneck Dec. ¶ 5.

    60.    Deny. This information was not disclosed as required by the Court's case management order and Fed. R. Civ. P. 26(a)(1) or (e), and should be excluded for the reasons set forth in the Governor's accompanying motion. D. 92. Because of this late disclosure, which occurred well after Passamaneck was deposed on May 31, 2023, the Governor never had an opportunity to test the validity of Passamaneck's opinion as to whether the NSSF is a "nationally recognized trade report for the firearms industry."

61. The data reported in the NSSF report is highly reliable. Passamaneck Dec. ¶ 6.

61.     Deny. Defendant denies because Passamaneck is not qualified to offer an opinion on whether "the data reported in the NSSF report is highly reliable." D. 56. Further, this information was not disclosed as required by the Court's case management order and Fed. R. Civ. P. 26(a)(1) or (e) and should be excluded for the reasons set forth in the Governor's accompanying motion. D. 92. Because of this late disclosure, the Governor has not had an opportunity to test the validity of Passamaneck's opinion as to whether "the data reported in the NSSF report is highly reliable." Defendant denies because Passamaneck testified he did not know whether an NSSF chart was showing cumulative possession or possession in a given year, Ex. 29, D. 74-8 at 139:8–140:15. He also thought that "there is something missing" from the chart. *Id*. at 140:20–21.

62. The 2020 NSSF Report states that as of 2018, there were at least 79 million LCMs in the United States. Passamaneck Dec. ¶ 8.

62.     Deny. Defendant denies because Passamaneck is not qualified to offer an opinion on this topic. D. 56. Defendant further deny because Passamaneck testified that the magazine chart in the NSSF report was "not" "accurate," Ex. 29, D. 74-8 at 167:11–168:9, and he did not know whether the 2018 NSSF chart was showing cumulative possession or possession in a given year, *id.* at 139:8–140:15. Passamaneck also testified that the NSSF chart had "some errors in it as far as specificity as to what [the 79 million figure] actually mean[s]." *Id.* at 140:22–141:10. He also testified that "there is something missing" from the NSSF chart. *Id*. at 140:20–21. Passamaneck's own testimony contradicts and creates factual questions as to what the NSSF report states.

63. The 2020 NSSF Report estimate is a very conservative estimate of the total number of LCMs in the United States, but there cannot be any doubt that – as the State previously stipulated –

the number is at least in the tens of millions and probably as many as 350 million. Passamaneck Dec. ¶ 9.

63.     Deny. Deny for the reasons stated in response to Pls.' SUMF 45. Defendant further denies because Passamaneck is not qualified to offer an opinion on this topic. D. 56. Defendant further denies because Passamaneck testified that the magazine chart in the NSSF report was "not" "accurate," Ex. 29, D. 74-8 at 167:11–168:9, and he did not know whether the 2018 NSSF chart was showing cumulative possession or possession in a given year, *id.* at 139:8–140:15. He also testified that "there is something missing" from the chart. *Id*. at 140:20–21. Defendant denies because the declaration is an untimely attempt to bolster Passamaneck's expert report by referencing new materials. D. 92. In his May 2023 deposition, Passamaneck testified that he had never seen the stipulations he is referencing in that Paragraph before preparing his initial Report and did not rely on them. Ex. 29, D. 74-8 at 188:24–189:1.

## DEFENDANT'S STATEMENT OF ADDITIONAL DISPUTED FACTS[2]

1.     No semi-automatic firearm requires a magazine of sixteen rounds or more to operate. Ex. 28, D. 74-7 ¶ 52; Ex. 35, D. 74-13 (Rebuttal report of J. Yurgealitis) ¶ 17. Ex. 29, D. 74-8 at 40:6–8.

2.     Each firearm currently owned by the individual Plaintiffs can operate with magazines of less than 16 rounds. Ex. 37, D. 74-15 (T. Swartz Interrogatory Responses) at 3; Ex. 43, D. 73-4 at 37:9–12; Ex. 36, D. 74-14 (B. Gates Interrogatory Responses) at 3; Ex. 44, 73-5 at 13:7-16:13 (K. Honegger Interrogatory Deposition Transcript).

---

[2] Hereinafter referred to as "DSADF."

3.      Any firearm that can accept an LCM can also operate with a Colorado-compliant magazine of less than 16 rounds. Ex. 28, D. 74-7 ¶ 52; Ex. 35, D. 74-13 ¶ 17. Ex. 29, D. 74-8 at 40:6–8.

4.      Plaintiffs' own expert admits that "[n]o weapon requires a 16 plus round magazine to operate." Ex. 29, D. 74-8 at 40:6–8.

5.      The studies relied upon by Plaintiffs for LCM ownership do not establish commonality of use for self-defense. At most, they establish that just 15.3% of all Americans have ever owned a magazine with a capacity of greater than 10 rounds (let alone 15), and just 9.6% of all Americans have ever owned a magazine with a capacity greater than 10 rounds for the purpose of "home defense." These percentages are consistent with other traits most persons do not consider "common," including the number of adult Americans who have not graduated from high school (9.6%), the number of adult Americans who have obtained a master's degree (9.6%), and the number of adult Americans who identify as "Atheist" or "Agnostic" (7.1%). Ex. 34, D. 74-12 (Rebuttal Report of J. Zax) at 3–5.

6.      Gates and Swartz possess grandfathered LCMs, but still sometimes carry firearms equipped with non-LCMs for self-defense. DSUMF ¶ 14.

7.      16-plus round magazines are not commonly used for self-defense. Ex. 30, D. 74-9 (Expert Report of J. Zax) at 3–4; Ex. 28, D. 74-7 at ¶¶ 81–83.

8.      Documented instances of threats where self-defense with a firearm equipped with an LCM would be appropriate are rare. Ex. 30, D. 74-9 at 3–4.

9.      According to the FBI's uniform crime report, officers using a firearm to fend off an attack typically fire between three and nine rounds. Ex. 23, D. 74-2 (Expert Report of S. McGraw) at 21.

10.     Home defense and / or street / commercial robbery situations between citizens and criminals are rarely lengthy protracted shootouts with extensive exchanges of gunfire. Ex. 28, D. 74-7 ¶ 81.

11.     Home invasions in Colorado are rare. During home invasions in Colorado, neither the perpetrator nor the victim ever discharges the numbers of rounds that would encourage, much less require, the use of large-capacity magazines. Ex. 30, D. 74-9 at 5.

12.     Both Plaintiffs who currently own LCMs, Travis Swartz and Benjamin Gates, carry weapons with less than 16 rounds of ammunition for the purpose of self-defense, even though they could carry weapons with LCMs. Ex. 43, D. 73-4 at 29:7–15; Ex. 33, D. 73-1 at 19:23–20:3, 21:18–22:6.

13.     Modern semi-automatic rifles and shotguns that are designed, manufactured, and marketed as "hunting rifles" or "sporting shotguns" traditionally have an internal magazine capacity of less than 10 rounds. Ex. 28, D. 74-7 ¶ 55.

14.     Just 15.3% of adult Americans have ever owned a magazine with a capacity greater than 10 rounds. Ex. 34, D. 74-12 at 3.

15.     An average of just 2.2 shots are fired by armed citizens in defensive scenarios. *See* Ex. 30, D. 74-9 at 52; Ex. 28, D. 74-7 ¶¶ 82-83. Documented instances of threats for which self-defense with a firearm equipped with an LCM would be appropriate are rare. *Id*.

19

16.     According to the FBI, even law enforcement officers responding to an attack typically only fire between three and nine rounds, which is well under the LCM Ban's fifteen-round limit. Ex. 23, D. 74-2 at 21.

## LEGAL STANDARD

"The . . . purpose of a summary judgment action is to determine whether trial is necessary." *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Specifically, summary judgment is appropriate only if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine "if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* In determining whether a genuine dispute of material fact exists, the Court considers only "the pleadings and admissible evidence *produced during discovery*, together with any affidavits." *W. Diversified Scis., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005) (emphasis added).[3] "When parties have filed cross motions for summary judgment, the Court can assume that no evidence need be considered other than that filed by the parties, but 'summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *See, e.g.*, *Direxa Eng., LLC v. U.S. Citizenship & Immigration Servs.*, 557 F. Supp. 3d 1144, 1149 (D. Colo. 2021) (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000)). "Cross motions for summary judgment are to be treated separately; the denial

___

[3] As stated in the Governor's Motion to Strike, D. 92, the Passamaneck Declaration contains evidence not produced during discovery and statements not included in Passamaneck's expert report.

of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quotations omitted).

## ARGUMENT

I.     **The *Bruen* framework.**

*Bruen* establishes the framework for assessing the constitutionality of firearm regulations. First, Plaintiffs must prove that "the Second Amendment's plain text" covers the conduct proscribed by the regulation—here, possession of a 16-plus round magazine acquired after July 1, 2013. *Bruen*, 142 S. Ct. at 2126. To meet this burden, Plaintiffs must demonstrate that LCMs are "arms," as used in the Second Amendment, and if so, that LCMs are "in common use today for self-defense," *id.* at 2134 (quotations omitted) and not the type of "dangerous and unusual" weapons that fall outside the Second Amendment, *id.* at 2128.

If Plaintiffs satisfy their burden on this threshold inquiry, the burden shifts to the government, which must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. This historical inquiry involves an assessment of "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133. Courts must ask (a) whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did, and (b) whether it is "comparably justified." *Id. Bruen*'s test does not ask the Court to independently research and examine history. Instead, the Court is "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 2130 n.6; *see also id.* ("In our adversarial system of adjudication, we follow the principle of party presentation[.]" (quotation omitted)).

21

II.     **Plaintiffs fail to prove that LCMs are protected by the Second Amendment.**

    A.  **Plaintiffs present no evidence that LCMs are "bearable arms."**

To establish that LCMs fall within the Second Amendment's reach, Plaintiffs must prove that LCMs are "bearable arms." *Dist. of Columbia v. Heller*, 554 U.S. 570, 582 (2008). But despite carrying the burden at this stage of the *Bruen* inquiry, Plaintiffs fail to present any evidence, historical or otherwise, establishing LCMs are "arms" under the Second Amendment. Instead, they cite to only pre-*Bruen* decisions from outside of this circuit holding as such and offer the *ipse dixit* argument that the "right to keep and bear arms protects those things necessary for its exercise." Pls.' MSJ, D. 76 at 28. But even assuming this is true, the undisputed factual record demonstrates that LCMs are not necessary for any firearm to operate. *See* DSADF ¶ 1.

In *Heller*, the Supreme Court held that all firearms are "arms" within the meaning of the Second Amendment. 554 U.S. at 581. But the LCM Ban does not regulate firearms. Rather, it only regulates accessories to firearms—namely, magazines with a 16 or greater round capacity. In support of the argument LCMs are necessary components to firearms, Plaintiffs rely solely on Passamaneck's proffered expert opinion that semi-automatic firearms cannot operate in a semi-automatic fashion without a magazine of some capacity.[4] Pls.' MSJ  at 8 ¶¶ 29, 33, 28. Plaintiffs then reason that because a magazine of some capacity is necessary to operate certain firearms, *all* magazines fall within the Second Amendment's definition of "arms." Pls.' MSJ at 28.

But Plaintiffs' argument skips a critical step: it does not engage with whether LCMs specifically—*i.e.*, magazines of 16 or more rounds—are necessary to operate semi-automatic

---

[4] Passamaneck expressed no opinion on whether LCMs are arms, nor is he qualified to do so. In contrast, the Governor's experts expressed the opinion that LCMs are accessories, not arms, as discussed herein at pages 24-25.

firearms. The undisputed facts establish that magazines of sixteen rounds or more are *not* necessary for a firearm to operate:

- No semi-automatic firearm requires a magazine of sixteen rounds or more to operate. DSADF ¶ 1.

- Each firearm currently owned by Plaintiffs can operate with magazines of less than 16 rounds. DSADF ¶ 2.

- Any firearm that can accept an LCM can also operate with a Colorado-compliant magazine of less than 16 rounds. DSADF ¶ 3.

- Plaintiffs' own expert admits that "[n]o weapon requires a 16 plus round magazine to operate." DSADF ¶ 4.

And even if Plaintiffs are correct that banning *all* magazines would amount to a restriction on firearms—by constituting, for practical purposes, a ban on semi-automatic firearms—the LCM Ban does not come even close to doing so. Rather, it merely restricts a type of particularly deadly and dangerous magazine favored by mass shooters. But it leaves unrestricted all magazines of fifteen rounds or less. Gates, Swartz, and Honegger each own multiple magazines that hold 15 rounds or less. Ex. 36, D. 74-14 at 2; Ex. 37, D. 74-15; Ex. 44, 73-5 at 13:7-16:13. Simply put, no firearm needs a 16 or 30 or 100 round magazine to operate. *See Ore. Firearms Fed. v. Kotek*, -- F. Supp. 3d --, 2023 WL 4541027, at *9 (D. Ore. July 14, 2023) ("*Oregon*") ("Magazine capacity is not a determining factor in the operability of a firearm."). In the absence of facts proving otherwise, Plaintiffs' argument alone does not establish that LCMs

are "arms" within the meaning of the Second Amendment.[5]

Plaintiffs also suggest that if this Court were to find that LCMs are not arms, such a holding would lead to a slippery slope in which a State could ban all magazines, or even all ammunition, thereby neutering the right to use firearms for self-defense. Pls.' MSJ at 29. But they present no evidence that the LCM Ban has had such an effect even though it has been in place for a decade. And, in fact, Plaintiffs' own record suggests otherwise. *See, e.g.*, DSUMF ¶¶ 9–16. Gates and Swartz possess grandfathered LCMs, but still sometimes carry firearms equipped with non-LCMs for self-defense. DSADF ¶ 6. Honegger owns and carries firearms exclusively equipped with non-LCMs for self-defense. Ex. 44, 73-5 at 13:7-16:13. That they sometimes choose to protect themselves using non-LCMs shows that the LCM Ban does not hinder, much less render meaningless, the right to use firearms for self-defense.

Further, Plaintiffs' argument fails to engage with the historic meaning of "arms." The Supreme Court has explained that "the 18th century meaning" of the term "arms" is "no different from the meaning today." *Heller*, 554 U.S. at 581. Thus, it is necessary for this Court to consider the 18th century meaning of "arms" to understand that term today. Plaintiffs present no evidence on the meaning of "arms" at the time of the founding. By contrast, the Governor has presented detailed, unrebutted evidence demonstrating that LCMs are not "arms" within the historic

---

[5] In other cases where plaintiffs have argued that the court should look at *all* magazines, rather than just LCMs, for the initial inquiry, most courts have rejected those arguments. *See, e.g.*, *Oregon*, 2023 WL 4541027, at * 26 ("This case . . . is not simply about the constitutionality of all magazines generally; it is about magazines that allow the user to shoot eleven or more rounds without reloading."); *Nat'l Assoc. for Gun Rights v. Lamont*, -- F.3d --, 2023 WL 4975979, at *17 (D. Conn. 2023) ("*Connecticut*") ("Plaintiffs' arguments directed to general common use of firearms broadly or of similar firearms made throughout their briefing will not suffice, nor will evidence regarding common use of firearms generally satisfy Plaintiffs' burden to present evidence regarding the specific assault weapons enumerated in the Challenged Statutes.").

meaning of that word in Professor Dennis Baron's expert report. Ex. 26, D. 74-5 (Expert Report of D. Baron) ¶ 9. Specifically, the Governor's evidence demonstrates that the founding generation did not consider "'Arms' to encompass magazines." *Id.*; *see also Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 2022 WL 17721175, at *13 (D.R.I. 2022) (crediting D. Baron's opinion). Indeed, "there is virtually no lexical data" showing that magazines were considered "arms" at the founding. Ex. 26, D. 74-5 ¶ 71. Plaintiffs have not challenged or countered this evidence. They did not even take Baron's deposition, much less move to disqualify him from providing this expert opinion or submit another expert's report rebutting Baron's opinion. Plaintiffs have presented no evidence to meet their burden of proving that LCMs are arms. Instead, the undisputed evidence shows LCMs are accessories, not arms, and therefore they are not protected under the plain language of the Second Amendment. Plaintiffs' claim therefore fails at the first step of the *Bruen* framework and they are not entitled to summary judgment.

### B. Plaintiffs cannot show LCMs are commonly used for self-defense.

Even if Plaintiffs could show that LCMs are arms (which they have not), Plaintiffs would still need to prove LCMs are commonly used for self-defense. They cannot.

#### 1. Plaintiffs bear the burden of proving common use.

Plaintiffs argue that the Governor bears the burden of proving the "common use" element. Pls.' MSJ. at 31. That is incorrect. As explained above in Section I, *Bruen* makes clear that a plaintiff bears the burden of proving "common use" under *Bruen*'s first step. *See Bruen*, 142 S. Ct. at 2134.

Whatever arguments Plaintiffs have to the contrary, *Bruen* itself addressed "common

use" as part of the initial inquiry. 142 S. Ct. at 2134 (applying the plain text step in Part III.A of the opinion, including whether "handguns are weapons 'in common use' today for self-defense"). Even those lower courts that have relied on *Bruen* to strike down longstanding firearm regulations have concluded that the plaintiff bears the burden on this prong. *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 455 (5th Cir. 2023) (considering "common use" at *Bruen*'s first step), *cert. granted* 143 S. Ct. 2688 (2023).

> **2. Evidence that LCMs are "owned in the millions" is insufficient to satisfy Plaintiffs' burden—they must show that LCMs are commonly used for self-defense.**

In both *Bruen* and *Heller*, the Supreme Court grounded the right to bear arms in self-defense. *Bruen*, 142 S. Ct. at 2125 ("In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."). Consistent with this understanding of the "core lawful purpose" of the Second Amendment, *Heller*, 554 U.S. at 630, *Bruen* itself assessed the "common use" inquiry specifically in regard to self-defense. 142 S. Ct. at 2134 (noting, in applying *Bruen* framework to the facts of that case, that "handguns are weapons in common use today *for self-defense*") (quotations omitted) (emphasis added). *See also United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (*Bruen* step one requires that weapon be in common use for self-defense).

Ignoring that *Bruen* applied the "common use" test in relation to self-defense, Plaintiffs suggest that the Supreme Court's reference to "common use" should instead be read as "common ownership." Pls.' MSJ at 35 ("[A]ll that is needed' for Plaintiffs to show that they have a right under the Second Amendment to keep LCMs is to [sic] evidence that LCMs are owned in the millions.") (quoting *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J.,

dissenting from denial of certiorari). But *Friedman* is a thin reed on which to support a weighty argument. First, dissents accompanying a denial of certiorari have no precedential value. *Teague v. Lane*, 489 U.S. 288, 296–97 (1989). Especially when the dissent's author was only able to garner a second vote for his position. *Friedman*, 577 U.S. 1039 (only Justice Scalia joined the dissent). Second, *Friedman* predates *Bruen*, which expressly requires a plaintiff to show to show that the challenged law regulates an "arm" that is "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134–35; *Alaniz*, 69 F.4th at 1128. And third, lower federal courts generally do not take the liberty of rewriting Supreme Court precedent.

The word "commonly" means "very often; frequently." *See* "common," *Merriam-Webster Dictionary Online*, available at https://tinyurl.com/y9z8dznk (accessed Oct. 10, 2023). To satisfy the "common use" inquiry, Plaintiffs must show that LCMs are arms that are frequently used for self-defense by civilians today. Because Plaintiffs present no undisputed facts in support of their bald assertion that LCMs are so used, their motion should be denied.

      **3.   Even if Plaintiffs are correct that common ownership is sufficient to satisfy "common use," they have not carried their burden.**

In support of their argument that LCMs are owned in the "millions," Plaintiffs point to two sources: (1) old, pre-*Bruen* fact stipulations in unrelated litigation; and (2) Passamaneck's unqualified opinion. Neither establishes LCMs are in common use for self-defense today.

      **a)   The stipulations from past cases do not prove LCMs are commonly used in self-defense.**

The fact stipulations from past cases are not binding in this case for the reasons set forth in the *Governor's Renewed Motion for Ruling that Fact Stipulations in Prior Cases are Not Binding*, D. 93. As stated above, the stipulations were entered into by a former Governor, and the

present Governor lacks knowledge or information sufficient to admit or deny them. *See* above, Def.'s responses to Pls.' SUMF ¶¶ 45-58; Ex. 48. Nothing was produced in discovery to enable the Governor to assess, much less agree to, the accuracy of those past stipulations when they were made, nor whether they remain accurate today. Further, the past stipulations are hearsay for which Plaintiffs have not identified an exception, and courts can only consider admissible evidence in deciding a motion for summary judgment. *Johnson*, 594 F.3d at 1209.

Even if the past stipulations were admissible evidence in this case, they would merely establish there were tens of millions of LCMs in the United States and millions of LCMs in Colorado when the stipulations were entered in the *COA* and *RMGO* cases. Pls.' MSJ. at 37. This is insufficient to satisfy Plaintiffs' burden for three reasons.

*First*, these figures fail to distinguish between LCM ownership by government, law enforcement, and military agencies on the one hand, or LCM ownership by law-abiding civilians on the other, even though the former categories are irrelevant to the common use inquiry enunciated in *Heller*. *See* 554 U.S. at 627 (differentiating between weapons commonly used by civilians and "weapons that are most useful in military service"). As a result, the past stipulations fail to supply this Court with relevant information about law-abiding civilian LCM ownership, which is likely just a fraction of total ownership.

*Second*, even if the number of LCMs in the United States today is in the tens of millions, the parties dispute whether that makes them "*common*," let alone commonly used by civilians for self-defense today. *See* DSADF, ¶ 5-14.

*Finally*, the past stipulations do not address the critical question under *Bruen*: whether LCMs are often used by law-abiding civilians for *self-defense* today. In fact, the stipulations fail

to establish that even *one* LCM had ever been used by a law-abiding civilian for self-defense. *See* Def.'s MSJ, D. 73, at 13–16 (explaining the self-defense requirement for commonality). Even if the past stipulations were admissible evidence, they cannot carry Plaintiffs' burden of establishing that law-abiding civilians frequently use LCMs for self-defense today.

### b) Passamaneck's unqualified opinion does not establish LCMs are commonly used for self-defense.

Plaintiffs also rely on figures cited in Passamaneck's report. As set forth in the Governor's motion to partially exclude Passamaneck's opinion, D. 56, Passamaneck lacks the knowledge, skill, experience, training, and education to render an expert opinion as to the commonality of LCMs, and even if he is qualified to do so, the methodology underlying his expert opinion is inherently unreliable. But if the Court does consider Passamaneck's opinion in full, neither that opinion nor any evidence in the undisputed record shows LCMs are commonly used by law-abiding civilians for self-defense.

*First*, Passamaneck's figures relate to production, not use. The relevant question is not how many LCMs exist, but instead "how many Americans actually own and *use* [LCMs] for self defense." *Connecticut*, 2023 WL 4975979, at *21 (emphasis added); *see also Bruen*, 142 S. Ct. at 2134 (framing threshold inquiry as whether the weapon in question is "in common use today for self-defense"). If production or ownership alone were the pertinent inquiry, that would "allow[] the firearms industry to control the bounds of the Second Amendment because of the firearm industry's economic interest in the increased sale of firearms." *Oregon*, 2023 WL 4541027, at *28; *accord Connecticut*, 2023 WL 4975979, at *13 (*Bruen* "abogate[d]" a pre-*Bruen* Second Circuit decision that "treated common use as a solely statistical question").

*Second*, even if numerosity is relevant, Passamaneck's numbers are too general to establish that LCMs are "commonly" owned. Many of Passamaneck's statistics relate to AR-15s, a type of firearm not at issue in this litigation, and ownership of which, according to Passamaneck himself, tells one "nothing" about the capacity of magazines that accompany that weapon. Ex. 29, D. 74-8 at 72:9–73:6. As for the magazine-related statistics Passamaneck used to reach his opinions on LCM-ownership, he does not know whether those are ownership statistics or records of historical production. *Id.* at 139:8–140:15; 150:20–24.[6] Finally, Passamaneck's topline number probably includes magazines owned by the military and law enforcement, neither of which is relevant to whether LCMs are commonly-owned by law-abiding civilians. *Id.* at 151:17–23.

*Third*, Passamaneck provides no data on how common LCM ownership is among the public at large. Not every American owns a gun, and not every gun owner has an LCM. Indeed, a survey cited by Passamaneck contradicts Plaintiffs' assertion that large capacity magazines are commonly owned. The survey indicates that just 15% of American adults have *ever* owned a magazine with a capacity of greater than 10 rounds, let alone 15, and less than 10% of adult Americans have ever owned a magazine of capacity greater than 10 rounds for the purpose of home defense. Ex. 34, D. 74-12 at 1, 3 (discussing William English, "2021 National Firearms Survey: Updated analysis including types of firearms owned", working paper, 13 May 2022.).

---

[6] The closest Passamaneck comes to a statistic involving LCMs is a citation to a "2018 NSSF Magazine Chart." Ex. 25, D. 74-4 (Expert report of M. Passamaneck) at 2. But Passamaneck did not know whether that chart showed cumulative possession or possession in a given year, Ex. 29 at 139:8–140:15. He also testified that "there is something missing" from the chart. *Id.* at 140:20–21. In *Oregon*, the district court concluded this NSSF report "is entitled to little weight." *Oregon*, 2023 WL 4541027, at *11, *27.

The survey does not indicate how many Americans have ever owned a magazine with a capacity for 16 or more rounds. *Id.*

Plaintiffs' failure to prove that LCMs are commonly used by law-abiding civilians for self-defense is enough to deny their Motion. But even if the Court does credit Plaintiffs' evidence, that evidence is plainly disputed by the Governor's experts, who demonstrate that LCMs are *not* so used, DSUMF ¶ 9, and that Plaintiffs' statistics fall short of commonality; Ex. 34, D. 74-12 at 1, 3; *see also Dist. of Columbia*, 2023 WL 3019777, at *8–9 (summarizing pre-*Bruen* cases that held that LCMs were "most useful in military service," not for individual self-defense). "Home defense and / or street / commercial robbery situations between citizens and criminals are rarely lengthy protracted shootouts with extensive exchanges of gunfire." Ex. 28, D. 74-7 ¶ 81. Instead, an average of just 2.2 shots are fired by armed citizens in defensive scenarios.[7] *See* DSADF ¶ 16. Documented instances of threats for which self-defense with a firearm equipped with an LCM would be appropriate are rare. *Id.* According to the FBI, even law enforcement officers responding to an attack typically only fire between three and nine rounds, which is well under the LCM Ban's fifteen-round limit. DSADF ¶ 17.

Not only are lawful instances of civilian self-defense in which LCMs were used virtually nonexistent, but experts generally do not recommend firearms equipped with LCMs for self-defense. "In terms of a carry handgun," one expert is "of the opinion that ten (10) rounds is an adequate amount of ammunition," and "most often recommend[s]" firearms equipped with Colorado-compliant magazines. Ex. 28, D. 74-7 ¶ 87. Plaintiffs' own experience bears this out.

---

[7] Other courts have cited positively to this statistic. *See Oregon*, 2023 WL 4541027, at *12, *32; *Connecticut*, 2023 WL 4975979, at *21; *Dist. of Columbia*, 2023 WL 3019777, at *11.

Even though both Swartz and Gates own LCMs, each carries firearms for self-defense that are equipped with magazines containing 15 rounds or fewer. DSUMF ¶ 14.

As other courts have concluded, "the features unique to LCMs—the ability to shoot more than ten bullets without reloading—are not 'commonly used . . . for self-defense'" *Oregon*, 2023 WL 4541027, at *12 (quoting *Bruen*, 142 S. Ct. at 2138). "In the absence of persuasive evidence that . . . LCMs . . . are commonly used or are particularly suitable for self-defense, Plaintiffs have failed to carry their burden." *Connecticut*, 2023 WL 4975979, at *22. Because LCMs are not commonly used for self-defense, plaintiffs are not entitled to summary judgment. At minimum, the commonality of LCMs, and their utility for self-defense, is a disputed issue of material fact.

### C.  If the Court finds that LCMs are "arms," it also should find that they are "dangerous and unusual" weapons not protected by the Second Amendment.

At the last stage of the *Bruen* step one inquiry, even if the Court finds that LCMs are arms and that LCMs are commonly used for self-defense, Plaintiffs also must prove LCMs are not "dangerous and unusual" arms that lack Second Amendment protection.[8] As Plaintiffs note elsewhere, the "dangerous and unusual" inquiry is the flip side of the "common use"

---

[8] Plaintiffs rely on *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023), for the proposition that "dangerous and unusual" is part of *Bruen*'s second prong. Pls.' MSJ at 33. Although the *Teter* court did assess this inquiry at the history and tradition stage, that decision is an outlier. *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 455 (5th Cir. 2023) (considering "common use" at *Bruen*'s first step); *Alaniz*, 69 F.4th at 1128 (same). Whether weapons are "'in common use at the time,' as opposed to those that 'are highly unusual in society at large,'" is not subject to the history and tradition analysis. *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). *Bruen* rejected that the definition of "common use" or "dangerous and unusual weapons" was fixed in time. *See id.* (handguns might have been considered dangerous in the 1690s, but are in common use for self-defense today).

Additionally, the Hawaii Attorney General has filed a petition for rehearing in *Teter*, which is currently pending before the Ninth Circuit. *See* Petition for Panel Rehearing and Petition for Rehearing En Banc, D. 135, *Teter*, 76 F.4th 938 (No. 20-15948).

requirement. Pls.' Resp. to Def.'s MSJ, D. 87 at 17. In *Bruen*, the Court held that "dangerous and unusual" arms are not protected by the Second Amendment. 142 S. Ct. at 2143 (noting "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,'" so "the Second Amendment protects only the carrying of weapons that are those in common use at the time") (quotations omitted).

Although "all firearms are 'dangerous' in the sense that they are lethal," the "'unusual'" requirement "impl[ies] that there must be some level of lethality or capacity for injury beyond societally accepted norms that makes it especially dangerous." *Connecticut*, 2023 WL 4975979, at *16. So, the purpose of the "dangerous and unusual" inquiry "is to determine whether the firearm's character is such that it is commonly used and typically possessed for self-defense, or instead for the purpose of causing unlawful or excessive harm or fatalities." *Id.*; *see also United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at * (D. Ind. Dec. 15, 2022) ("A weapon generally is covered [by the Second Amendment] if a person can carry it, but not if the weapon is uncommon or unusually dangerous or not typically used by law-abiding people for lawful purposes." (citing *Bruen*, 142 S. Ct. at 2128, 2132)).

Not surprisingly, firearms equipped with LCMs are unusually dangerous. The use of an LCM in a high-fatality mass shooting increases the death toll by 54%. DSUMF ¶ 56. LCMs dramatically increase the fatality-rate of these events by eliminating or reducing the number of life-saving pauses that take place when a shooter goes to reload a spent magazine. Ex. 32, D. 74-11 (Expert report of L. Klarevas) ¶ 15. *See also Bevis v. City of Naperville, Ill.*, -- F. Supp. 3d --, 2023 WL 2077392, at *15 (citing Klarevas). And even when LCMs don't succeed in killing their human targets, they inflict grievous wounds that cause lifelong disabilities. Ex. 21, D. 74 ¶¶ 21–

33; Ex. 47, D. 74-21 ¶¶ 29–38 (declarations of two survivors of Aurora and Columbine detailing the short-term and long-term effects of those mass shootings).

LCMs also are unusual in that they are superfluous to the operation of the firearms they accessorize. Plaintiffs' own expert admits that "[n]o weapon requires a 16 plus round magazine to operate." Ex. 29, D. 74-8 at 40:6–8. And any firearm that can take an LCM—including those owned by the Plaintiffs—can also operate with a Colorado-compliant magazine. DSUMF ¶¶ 17, 18. As *Bruen* reiterated, "the right secured by the Second Amendment is not unlimited." 142 S. Ct. at 2128 (quotations omitted). That right does not extend to accessories like LCMs that are not commonly used in self-defense, that fall outside the plain text of the Second Amendment, and that dramatically increase the lethality of mass shooting events. Because Plaintiffs have no evidence showing LCMs are *not* dangerous and unusual, they are not entitled to summary judgment.

III.    **At *Bruen*'s second prong, Plaintiffs have presented no evidence of history and tradition contrary to Defendant's evidence in his Motion for Summary Judgment.**

Under *Bruen*, if Plaintiffs carry their burden on the first prong, the Governor bears the burden of proving that the LCM Ban is consistent with the nation's history and tradition of regulation. 142 S. Ct. at 2130. In his Motion for Summary Judgment, the Governor presented extensive evidence of the nation's history and tradition of regulating weapons once they begin to circulate among citizens and cause harm, and the similar burdens from, and justifications for, the LCM Ban. *See* D. 73 at 18–31.

In contrast, Plaintiffs offer no factual or expert insight into the historical question. And this is not just a matter of Plaintiffs lacking the burden on this point: Plaintiffs have not identified

*any* historical evidence during the discovery process, including expert testimony, that could be used to contradict the Governor's extensive undisputed record. Instead, Plaintiffs argue only that the LCM Ban is inconsistent with the nation's history and tradition of firearm regulation because LCMs are not "unusual." Pls.' MSJ, D. 76 at 30–41. But that argument fails for two reasons.

*First*, as explained above at pages 32-34, whether an "arm" is "dangerous and unusual" goes to whether it is covered by the Second Amendment at all, not whether it can be regulated consistent with the nation's history and tradition. *See Oregon*, 2023 WL 4541027, at *34.

*Second*, even if Plaintiffs are correct that "dangerous and unusual" is part of *Bruen*'s second prong, such arms are not the only category of arms that may be regulated consistent with the nation's history and tradition. *Contra* Pls.' MSJ, D. 76 at 31. As Justice Kavanaugh, joined by Chief Justice Roberts, stated in *Bruen*, the list of "presumptively lawful regulatory measures" identified in *Heller*, including prohibitions on "the carrying of dangerous and unusual weapons," "does not purport to be exhaustive." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27 n.26); *cf. Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) ("Though *Bruen* created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons.").

Instead, throughout history, from the founding era through Reconstruction and today, States and other governments have responded to threats to their citizens with reasonable firearm regulations. As firearms proliferated, so too did those regulations, including the regulations on machine guns identified in Pls.' MSJ. D. 76 at 31; *see also* D. 73, DSUMF, ¶¶ 35–43.

For most of our nation's history, repeating firearms posed little threat to the broader population. "From the colonial period through the start of the Revolution, homicide rates were low. And when homicides did occur, guns were seldom used." D. 73, DSUMF ¶ 33. "During the founding era, repeating firearms . . . posed no widespread danger to civilians," *Id*. DSUMF ¶ 24, and "[n]one of the repeating rifles available at the founding or during the civil war were used to commit a mass shooting of civilians," DSUMF ¶ 28. In fact, "[t]he first mass shooting resulting in double-digit fatalities did not occur in the United States until 1949." *Id*. DSUMF ¶ 27.

But after World War I, machine guns entered the civilian market and received widespread attention. *Id*. DSUMF ¶¶ 36–37. As they did, states moved quickly to regulate this new danger, with 32 states enacting some form of anti-machine gun laws. *Id*. DSUMF ¶ 38. And when mass shootings harming members of the public began to occur with increased frequency in the 2000s, *id*. DSUMF ¶ 30, States acted to protect the public, as Colorado did by enacting the LCM Ban.

## IV. Plaintiffs are not entitled to a permanent injunction because they have not demonstrated actual success on the merits and undisputed evidence shows the LCM Ban protects the public.

For a party to obtain a permanent injunction, it must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (internal citations omitted).

Plaintiffs cannot meet the standard for a permanent injunction. As demonstrated above and in Def.'s MSJ, D. 73, Plaintiffs cannot achieve actual success on the merits, and thus, cannot show irreparable injury to their constitutional rights. As to the last two factors, which merge

when the government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009), the balance of harms and the public interest clearly weigh in favor of preserving the LCM Ban.

The Colorado General Assembly enacted the LCM Ban in 2013 in response to horrific mass shootings in Colorado and other States. Mass shootings presently pose the deadliest criminal threat to the safety of American society in the post-9/11 era. Ex. 32, D. 74-11 at 5. High-fatality mass shootings involving LCMs, on average, resulted in a substantially larger loss of life than similar incidents that did not involve LCMs. *Id*. Mass shootings inflict considerable damage to people and communities, including economic costs, decreases in quality of life, and considerable medical and mental health costs. Ex. 30, D. 74-9 at 55-65; *see also* Ex. 21, D. 74; Ex. 47, D. 74-21.

LCM restrictions have proven to reduce fatalities and thus, the attendant costs of mass shootings. States that restrict LCMs experience fewer high-fatality mass shooting incidents and deaths, per capita, than States that do not. Ex. 32, D. 74-11 at 5. The Governor's evidence shows that restrictions on LCMs save lives by reducing the frequency and lethality of gun massacres. *See id.* Specifically, from January 1, 1990, through December 31, 2022, accounting for population, states with bans on LCMs experienced a 48% decrease in the rate of high-fatality mass shootings involving LCMs. *Id*. Similarly, jurisdictions with such bans in effect experienced a 63% decrease in the rate of deaths resulting from high-fatality mass shootings involving LCMs. *Id*. When bans on LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving LCMs, where the impact is most striking. *Id*. at 21.

When compared to the compelling public interest in the LCM ban, Plaintiffs' alleged injury is minimal. Plaintiffs have not established that they need or rely on LCMs for self-defense. As set forth above, from pages 27-29, LCMs are not commonly used for self-defense and Plaintiffs themselves carry magazines with less than 16 round capacity for use in self-defense. DSADF ¶¶ 6-16. Indeed, studies show that an average of just 2.2 shots are fired by armed citizens in defensive scenarios, and even trained law enforcement officers responding to an attack typically only fire between three and nine rounds. *See id.*, DSUMF ¶ 11. These numbers are well under the LCM Ban's fifteen-round limit. Because LCMs are simply not useful or necessary for self-defense, the balance of harms tilts strongly in favor of the Governor. The LCM Ban serves a critical and lifesaving role, and the balance of harms and the public interest factors highly disfavor a permanent injunction.

### V. Plaintiffs do not have standing, and the Governor is entitled to dismissal on this basis.

To support their standing to maintain this action, Plaintiffs rely on cases relevant to challenges arising under the First Amendment not the Second, ignore binding precedent from this Circuit, and assert as "facts" information that is contradicted by the evidentiary record.

### A. The "unique interests" that justify a "lenient" standing analysis under the First Amendment are absent here.

Citing to First Amendment cases, including *Peck v. McCann*, 43 F.4th 1116, 1129–30 (10th Cir. 2022), Plaintiffs argue that "after *Bruen*, that [*Peck* arose in the First Amendment context] is a distinction that makes no difference." Pls.' MSJ, D. 76. But standing was not at issue in *Bruen*. Neither *Bruen*'s holding, nor its reasoning, discussed whether First Amendment standards applied to a Plaintiff's standing.

This absence is meaningful because "the First Amendment context creates unique interests that lead [courts] to apply the standing requirements somewhat more leniently, *facilitating pre-enforcement suits*." *Peck,* 43 F.4th at 1129 (emphasis added). These "unique interests" are societal. When an individual chooses not to speak because of a fear of prosecution (*i.e.*, their speech is "chilled"), their expression never enters the marketplace of expression. "Society as a whole then [is] the loser." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984).

In the First Amendment context, then, society's interest in having the statute challenged" justifies a "lessening of prudential limitations on standing." *Ward v. Utah*, 321 F.3d 1263, 1266–67 (10th Cir. 2003) (quotations omitted). No such interest exists in the Second Amendment context. In effect, Plaintiffs are trying to import First Amendment "chilling" doctrine into the Second Amendment context. But the "unique interests" that justify the "chilling" line of cases do not apply here. To the extent Plaintiffs are actually injured by the LCM Ban, they suffer that injury individually. Society is not deprived of their firearm ownership in the same way it is deprived of expression, or injured by having its marketplace of ideas diminished, in the First Amendment context.

Instead, *Colorado Outfitters Association v. Hickenlooper*, 823 F.3d 537, 549–51 (10th Cir. 2016), provides the applicable, and binding, standing framework. There, plaintiffs challenged the same statute at issue here. *Id.* at 549. And because *Bruen* did not address plaintiffs' standing, *Colorado Outfitters* holding on this point remains good law. *See Vincent*, 80 F.4th at 1199–1202 (concluding that *Bruen* did not abrogate a pre-*Bruen* Tenth Circuit decision affirming the constitutionality of the felon-in-possession statute). Under *Colorado Outfitters*, a

plaintiff challenging the LCM Ban must: "(1) possess[] an LCM acquired after July 1, 2013; intend[] to acquire an LCM after July 1, 2013; or intend[] to transfer or sell an LCM after July 1, 2013; and (2) face[] a credible threat of prosecution for such conduct."[9] 823 F.3d at 549–50. Unlike in the First Amendment context, that a Plaintiff is "chilled" from purchasing an LCM by the statute is not enough. A plaintiff must express "concrete plans to engage in conduct" proscribed by the statute. *Id.* at 551.[10]

### B. *Colorado Outfitters* precludes Plaintiff Gates and Plaintiff Swartz's standing.

It is undisputed that both Plaintiff Gates and Plaintiff Swartz lawfully own LCMs. *See* Pls.' SUMF ¶¶ 11, 17. In fact, it's fair to say that both have significant firearm caches and LCMs at their disposal for self-defense. DSUMF ¶¶ 70–73. Some of Swartz's LCMs are in good condition, DSUMF ¶ 73, and some of Gates's LCMs are still in their original packaging, DSUMF ¶ 71. Both, then, are indistinguishable from the plaintiff in *Colorado Outfitters* who also owned grandfathered LCMs and alleged that those LCMs would need to be replaced. 823 F.3d at 551. The Tenth Circuit held that "[s]uch 'some day' speculations are insufficient to establish an injury-in-fact for purposes of Article III standing." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)).

---

[9] The Governor challenges Plaintiffs' standing only under the first prong of this test.

[10] That other courts have found standing in similar cases is of no import. *See* Pls.' MSJ, D. 76 at 20. Just one of the courts cited by Plaintiffs falls within the Tenth Circuit, and the court within the Tenth Circuit was addressing a different statute from the one at issue in *Colorado Outfitters*. And to the extent any of those courts, including within the Tenth Circuit, applied a "chill-based" injury analysis, this Court is not bound by those decisions. *See, e.g.*, *Horton v. Davis*, No. 12-cv-00349-REB-BNB, 2013 WL 1365861, at *1 (D. Colo. April 4, 2013) (noting that district court is "not bound by the decisions of other co-equal courts in this district, or appellate courts in other jurisdictions") (citations omitted). Instead, the Court should apply *Colorado Outfitters* and require "concrete plans to engage in conduct" proscribed by the statute. 823 F.3d at 551.

Through declarations, Plaintiffs Gates and Swartz try and provide some concreteness to their plans for future LCM ownership. *See generally* Pls.' MSJ, D. 76 at 22 (arguing that "*Colorado Outfitters* is distinguishable"). But those declarations fall short for two reasons.

*First*, both Gates and Swartz admit that they lack "definite plan[s]" to purchase LCMs, or otherwise violate the statute. Ex. 4 to Pls.' MSJ, D. 76-4 ¶ 15; Ex. 6 to Pls.' MSJ, D. 76-6 ¶ 14 ("I do not currently have a definite plan to [purchase an LCM] because I know the Magazine ban is enforced and I fear prosecution[.]"). Under *Colorado Outfitters*, these "some day" allegations are insufficient for standing. 823 F.3d at 551.

*Second*, even if Gates and Swartz's indefinite plans to purchase LCMs should the law no longer exist were sufficient under the Tenth Circuit's standing jurisprudence, they are still not injured for Second Amendment purposes. The Second Amendment protects "the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. It is not a pure right of possession. It is a qualified right of possession related to self-defense. *See Bruen*, 142 S. Ct. at 2131 ("The Second Amendment . . . elevates above all other interests the right of law-abiding, responsible citizens *to use arms for self-defense*.") (emphasis added).

Thus, assuming that LCMs are covered by the Second Amendment, neither Gates nor Swartz are injured by the LCM Ban. Both have new or "good condition" LCMs to use "in case of confrontation." *See Heller*, 554 U.S. at 592. That is true today and will be true regardless of the outcome of this litigation. This is fatal to standing. In the procedural due process context, "[p]rocess is not an end in itself," rather, its "constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement," *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). Similarly, armament is not an end in itself in the Second Amendment

context. Rather, armament sufficient to exercise the right of self-defense is all that is protected by the Second Amendment, and the LCM Ban leaves more than sufficient means to do so open to Plaintiffs. To hold otherwise would mean that governments may not impose police power regulations that make any category of arms unavailable to civilians, including machine guns, grenade and rocket launchers, and spring or trap guns.

### C.  Plaintiff Honegger's declaration is a "sham affidavit" that should be ignored.

As a threshold matter, Plaintiff Honegger lacks standing because he admits he does not have a "definite plan" to purchase an LCM. Ex. 5 to Pls.' MSJ, D. 76-5 ¶ 8; *see also Colo. Outfitters*, 823 F.3d at 551. Like Gates and Swartz, Honegger is attempting to bring a First Amendment "chill" basis for standing into the Second Amendment context, but *Colorado Outfitters* precludes that importation. *See supra* Part V.A.

And even if a Plaintiff could establish standing through "chill" in the Second Amendment context, Honegger's assertion that he would "certainly immediately purchase an LCM" but for the LCM Ban, Pls.' SUMF ¶ 21, is contradicted by the record. Where, as here, a sworn statement "conflicts with a witness's earlier sworn statements," the Court may ignore it. *Wasatch Trans., Inc. v. Forest River, Inc.*, 53 F.4th 577, 582 (10th Cir. 2022).

Twice during his deposition, Honegger indicated that he would "someday" like to purchase an LCM. Ex. 44, D. 73-5 at 16:3–13; 44:15–20. This is far from the "certainly immediately" plans expressed in his affidavit.

To be sure, the "sham affidavit" rule does not automatically apply when a declaration "clarifies ambiguous deposition testimony." *Wasatch Trans., Inc.*, 53 F.4th at 582 (citation omitted). But to the extent Honegger's deposition testimony is ambiguous, the Court should still

view its purpose as seeking "to create a sham issue of material fact," *Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1162 n.4 (D. Colo. 2020), for two reasons.

*First*, the paragraph in which Honegger indicates that he "certainly immediately" would purchase an LCM absent the LCM Ban is virtually identical to paragraphs in Swartz's and Gates's declarations. *Compare* Ex. 5 to Pls.' MSJ, D. 76-5 ¶ 8 *with* Ex. 4 to Pls.' MSJ, D. 76-4 ¶ 15 *and* Ex. 6 to Pls.' MSJ, D. 6 to Pls.' MSJ, D. 76-6 ¶ 14. This suggests that these words are not originally Honegger's. In such a case, it is more likely that his own words, expressed during his later deposition testimony, accurately reflect his intentions.

*Second*, Honegger's actions with regards to a separate planned lawsuit cast doubt on the immediacy of his intentions. As the Governor detailed in his Motion for Summary Judgment, NFGR approached Honegger about serving as a named plaintiff in a challenge to an Assault Weapon Ban moving through the Colorado General Assembly last year. *See* D. 73, Def.'s MSJ at 35–36. Honegger agreed to serve as a Plaintiff and told NFGR that he "would like to own [a firearm that meets the description in the current proposed law] in the future." *See* DSUMF ¶ 45 (citing Ex. 41 to Def.'s MSJ, D. 74-18 at Plaint052–54). That bill did not become law, and Honegger still has not purchased a firearm that would have been banned under the proposed law (but is still legal today). DSUMF ¶ 77.

This shows that when Honegger expresses an interest in purchasing a weapon for litigation purposes, that interest is not as immediate as it may sound. The Court should resolve the inconsistencies in Honegger's statements by giving more weight to his more recent deposition testimony that he "someday" would like to own an LCM and conclude that "such

'some day' speculations are insufficient to establish an injury-in-fact for purposes of Article III standing." *Colo. Outfitters*, 823 F.3d at 551 (citation omitted).

### D. Contrary to its sworn testimony, NFGR has no members.

If Honegger's declaration is arguably contradicted by other evidence, the declaration of NFGR's Executive Director is plainly contradicted. In it, Hill stated that NFGR "has members," that she herself is a member of NFGR, and that Gates is as well. Ex. 7 to Pls.' MSJ, D. 76-7 ¶ 6–7. But according to NFGR's own articles of incorporation, it "shall have no members." Ex. 41 to Def's. MSJ, D. 74-18 at Plaint001. By the express terms of its own self-governance documents, NFGR has no members. It therefore should not be allowed to invent a membership solely for the purposes of establishing associational standing in this case.

Should the Court conclude that any of the individual Plaintiffs have standing, NFGR should nonetheless be dismissed. Where one plaintiff to a claim has standing, a court has jurisdiction to consider the merits of that claim. *See, e.g.*, *Rocky Mountain Peace & Justice Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1153 n.19 (10th Cir. 2022). But that does not mean the plaintiffs that plainly lack standing avoid dismissal as a matter of law. At the summary judgment stage, dismissing those Plaintiffs here that lack standing conserves judicial economy and ensures that any trial or appeal focuses only on the Plaintiff who brings jurisdictionally sound challenges. Doing so also conserves the resources of the parties—a particularly salient point where, as here, Plaintiffs seek to recover costs and attorneys' fees against a State entity. *See* Am. Compl., D. 38 at 8.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment should be denied, or the Court should dismiss the case because Plaintiffs lack standing.

DATED: October 13, 2023.

PHILIP J. WEISER
Attorney General

*s/Emily Burke Buckley*
*LEEANN MORRILL**
First Assistant Attorney General
*EMILY B. BUCKLEY**
Senior Assistant Attorney General
*PETER G. BAUMANN**
Senior Assistant Attorney General
*DANIEL R. MAGALOTTI**
Assistant Attorney General Fellow
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: leeann.morrill@coag.gov
        emily.buckley@coag.gov
        peter.baumann@coag.gov
        daniel.magalotti@coag.gov
*Attorneys for Defendant Governor*
  *Jared S. Polis*
*Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2023, I served a true and complete copy of the foregoing parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Eric Paul Apjoke
Shaun Pearman
Pearman Law Firm, P.C.
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
eric@pearmanlawfirm.com
shaun@pearmanlawfirm.com

Barry Kevin Arrington
Arrington Law Firm
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
barry@arringtonpc.com

*Attorneys for Plaintiffs*

<u>s/ Carmen Van Pelt</u>
*Carmen Van Pelt*