## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-1866-GPG-SKC**

BENJAMIN GATES,
TRAVIS SWARTZ
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## REPLY IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

      Plaintiffs Benjamin Gates ("Gates"), Travis Swartz ("Swartz"), Karl Honegger ("Honegger"), and National Foundation for Gun Rights, Inc. ("NFGR") submit the following Reply in support of their Motion for Summary Judgment.

## I.      Argument

## A.      Introduction: This is a Simple Case

      The State has previously stipulated that tens of millions of LCMs are commonly used for lawful purposes. Based on that stipulation, this Court has previously found the following facts to be true: "[L]awfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions . . . [and] semiautomatic firearms are commonly used for

multiple lawful purposes, including self-defense." *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014), vacated and remanded, 823 F.3d 537 (10th Cir. 2016). The Court's vacated decision in *Colorado Outfitters* has no legal effect, but the facts have not changed. The undisputed fact is that tens of millions of LCMs are used for lawful purposes, which makes this a simple case, because "this fact alone entitles such magazines to Second Amendment protection." *Duncan v. Bonta*, 2023 WL 6180472, at *12 (S.D. Cal. Sept. 22, 2023) (stayed). "[T]hat is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari). Such commonality is "dispositive." *Barnett v. Raoul*, 2023 WL 3160285, at *11 (S.D. Ill. Apr. 28, 2023) (stayed). In summary, the undisputed facts are dispositive. So-called "large capacity magazines" are owned in the tens of millions for lawful purposes. They are therefore protected by the Second Amendment.

**B.     The State Offers No Evidence Contradicting Plaintiffs' Evidence That There Are "Tens of Millions" of LCMs in Circulation**

There is no genuine factual issue that there are tens of millions of LCMs in circulation in the United States. Plaintiffs have submitted substantial evidence demonstrating that fact, including their expert's declaration and the State's own prior stipulations. The State has not submitted a scintilla of evidence to the contrary. Indeed, far from denying its prior stipulations, the State affirmatively states that it *cannot* deny those stipulations. "[T]he information known to Defendant or that Defendant can readily obtain is insufficient to enable Defendant to admit or

deny the truthfulness of the *COA* stipulations." State Opposition Brief ("St. Opp.") 11-12.[1]

The State asserts that it is ignorant as to the truthfulness of its prior stipulations. Fair enough. Those stipulations are undisputed for purposes of this summary judgment motion. The moving party has the initial burden of producing facts in support of its case. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). Once that burden is met, the non-moving party must "set forth specific facts" from which the Court could find in its favor, identifying those facts in affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks omitted). The non-moving party cannot rest on ignorance of the facts, as the State has attempted to do here. *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022). "A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, *much less an assertion of ignorance*, does not suffice." *Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008) (emphasis added).

## C.   The State Actually Offers Evidence Supporting Plaintiff

The State offers no evidence contrary to Plaintiffs' evidence that there are tens of millions of LCMs in circulation. It is obvious that no such evidence exists. Moreover, far from offering contrary evidence, the State has offered evidence that confirms Plaintiffs' evidence. In "Additional Fact" 14, the State asserts: "Just 15.3%

---

[1] *See also* St. Opp., 13 ("[T]he information known to Defendant or that Defendant can readily obtain is insufficient to enable Defendant to admit or deny the truthfulness of the *RMGO* stipulations.").

of adult Americans have ever owned a magazine with a capacity greater than 10 rounds. Ex. 34, D. 74-12 at 3." Thus, the State admits that over one in six adults owns a magazine with a capacity of over ten rounds. That admission, standing alone, is sufficient to establish common use.

The Census Bureau counted 234.6 million adult Americans in 2020.[2] If 15.3% of them owned only one magazine, that would be over 35 million magazines, but we know that the average owner owns more than one. In fact, the study upon which the State bases its "Additional Fact" is William English, "2021 National Firearms Survey: Updated analysis including types of firearms owned," working paper, 13 May 2022. Ex. 34, ECF 74-12 at 1, 3.[3] And that study concludes that the total number of rifle and handgun magazines that hold over 10 rounds is 542 million. *Id.*, 25. In *Duncan v. Bonta*, 2023 WL 6180472, at *4 (S.D. Cal. Sept. 22, 2023) (stayed), the court relied on this study in concluding that magazines are in common use. *Id.*, at *4 and n.4 ("A more recent large-scale survey estimates that Americans today own 542 million rifle and handgun magazines that hold more than 10 rounds."). Thus, instead of contradicting its prior stipulations, the State's own evidence confirms them.[4]

---

[2] Census Bureau website, available at https://bit.ly/3Qq88ui.
[3] The English Study is available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.
[4] The English Study deals primarily with magazines with a capacity over ten rounds, but the evidence shows that a significant portion of those magazines have a capacity over 15 rounds. After all, "[f]or handguns, the most popular sizes range up to 17 rounds; the most popular size for rifles is 30 rounds." *Duncan*, at *2.

**D.      The Court Should Decline the State's Request to Avert its Eyes from the Undisputed Facts**

The State advances arguments that amount to a request that the Court avert its eyes from the undisputed (indeed, indisputable) facts. St. Opp. 11-13. Each argument fails, and the Court should decline the State's request.

1. The State argues the Court should disregard its stipulations because it entered into them under Governor Hickenlooper. But the State concedes that the State as an entity entered into the stipulations. In response to Plaintiffs' Undisputed Material Fact ("UMF") 41 and UMF 42, the State admitted that the "*State of Colorado*" entered into the stipulations. St. Opp. 10, 11. The State does not attempt to explain why it should matter that Governor Hickenlooper was the governor (as opposed to anyone else) when the State entered into the stipulations.

2. The State argues the Court should disregard its stipulations because it had different counsel when it entered into them. Again, the State does not attempt to explain why the stipulations should be disregarded because it had a different lawyer when it entered into them.

3. The State argues that its stipulations are not binding judicial admissions. That is correct. They are ordinary evidentiary admissions.[5] That is to say, they are evidence. And, as discussed above, the State has offered no contrary evidence.

4. The State argues its stipulations are not relevant because they were made in the past. Evidence is relevant if "it has any tendency to make a fact more or less probable." Fed. R. Evid. 401(a). The state stipulated that recently there were tens of

---

[5] See discussion on pages 37-38 of Plaintiffs' Motion.

millions of LCMs in circulation. Surely that evidence makes it more probable that there are tens of millions of LCMs in circulation now. Certainly, the State has submitted no evidence that there are *fewer* LCMs now than when it entered into the stipulations. Nor does the State argue that the stipulations were made so long ago that they can provide no insight into the current state of affairs.

5. The State argues its *RMGO* stipulations should be disregarded because that case involved a matter of state law. This argument is hard to understand. In *RMGO*, the State stipulated to certain facts, including the fact that there are tens of millions of LCMs in circulation. The State does not explain why this or any other fact should be disregarded because it was relevant to an issue of state law in addition to an issue of federal law.

6. The State states it is ignorant of the truthfulness of its prior stipulations and thus can neither "admit nor deny" their truthfulness. Therefore, those stipulations must be considered undisputed for purpose of Plaintiffs' motion for summary judgment. *Grynberg v. Total S.A.*, *supra*, at 1345 ("assertion of ignorance [] does not suffice" to dispute fact).

7. The State asserts that nothing was produced in discovery that would allow it to assess its prior stipulations. The State's assertion is not true. Indeed, as discussed in Section I.B., *supra*, the State's own expert pointed it to evidence that confirmed its stipulations. This is not to mention the evidence confirming the State's stipulations supplied by Plaintiffs' expert. Moreover, the argument makes no sense to begin with. If the State desired to dispute its own prior stipulations, it had a duty

to develop evidence for that purpose. Plaintiffs had no duty to develop the evidence and hand it to the State in discovery (especially given the fact that no such evidence exists).

8. Finally, the State makes a half-hearted argument that the stipulations are hearsay. This is not true. The statements are non-hearsay admissions of a party-opponent under Fed. R. Evid. 801(d)(2). As numerous courts have held, the statement of a government agent (1) offered against the government; (2) concerning a matter within the scope of his agency; (3) made during the existence of the agency relationship, is non-hearsay under the rule. *See e.g., L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 359 (2010).

## E.   The NSSF Compilation is Reliable

In UMFs 60-62, Plaintiffs asserted that the Industry Intelligence Report published by the National Shooting Sports Foundation ("NSSF") is a reliable nationally recognized trade report for the firearms industry, and, consistent with the State's prior stipulations, the report contains a compilation that concludes that as of 2018, there were at least 79 million LCMs in the United States. The State objects, asserting that the report was not disclosed in discovery. This is not true. Mr. Passamaneck's report states his reliance on the NSSF report. ECF 56-1, 2-3. And at his deposition, the State examined him extensively regarding the NSSF report, as their own brief indicates. Mr. Passamaneck testified at that deposition that the NSSF is a firearms industry trade group that compiles "very trustworthy" firearms

industry information. Transcript, 19:25–20:5[6]. The State distorts Mr. Passamaneck's discussion of the NSSF data. Mr. Passamaneck never said, as the State implies, that the NSSF data is generally not accurate. Instead, he testified the NSSF data is conservative because it does not encompass data from all manufacturers. Transcript, 179:1-9; 100:20-101:4. And for that reason, while the NSSF numbers are accurate as far as they go, they can only be relied upon as a "bottom number," not a "top number." Transcript, 167:19-168:9.

### F.  The NSSF Compilation is Admissible Independently

Pursuant to Fed. R. Evid. 803(17), industry compilations that are generally relied upon are admissible. Numerous courts have relied on NSSF industry reports to reach conclusions about the number of firearms and/or magazines in circulation, including the same NSSF report relied upon by Mr. Passamaneck and the State's expert Dr. Klarevas. *See Barnett v. Raoul*, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023) (citing NSSF report for number of arms in circulation); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *6 (D. Del. Mar. 27, 2023) (same); *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021), *vacated and remanded on other grounds*, 2022 WL 3095986 (9th Cir. 2022) (same); *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 256 (3d Cir. 2020), *cert. granted, judgment vacated on other grounds,* 142 S. Ct. 2894 (2022) (Matey, J. dissenting) (same); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014) (same); *Kolbe v. O'Malley*,

---

[6] Mr. Passamaneck's deposition transcript was filed as ECF 56-2.

42 F. Supp. 3d 768, 786 (D. Md. 2014) (same); and *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 364 (W.D.N.Y. 2013) (same).

In summary, since the NSSF report is routinely relied upon to estimate the number of firearms and/or magazines in circulation in the United States, it is admissible pursuant to Fed. R. Evid. 803(17).

## G.   The State Admits Facts Sufficient to Establish Plaintiffs' Standing

As the State acknowledges, in *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016), the Tenth Circuit held that a plaintiff has standing to challenge the Magazine Ban if (1) he intends to acquire an LCM; and (2) he faces a credible threat of prosecution if he does so. *Id.*, at 549-50. As for step (1), the State admits that Plaintiffs Gates and Swartz would "immediately" acquire LCMs but for their fear of prosecution. St. Opp. 4, 6. As for step (2), Plaintiffs submitted evidence that there have been over 700 prosecutions under the Magazine Ban. Mot. 15, UMF 59. This is more than enough to establish a credible threat of prosecution. Indeed, in *Teter v. Lopez*, 76 F.4th 938, 945 (9th Cir. 2023), the court held that a mere 30 prosecutions were sufficient. Moreover, in its own brief, the State asserts that enforcement of the Magazine Ban is "critical." St. Opp. 38. The State can hardly argue that enforcement of the statute is simultaneously "critical" and unlikely so that there is no credible threat of prosecution.

Defendant objects to Plaintiffs' evidence regarding the number of prosecutions because it was not authenticated. St. Opp. 15. This objection fails because, as this Court recently held, documents need not be authenticated at the

summary judgment stage so long as the substance of the evidence is admissible.[7] *Houston Cas. Co. v. Swinerton Builders*, 2022 WL 523434, at *3 (D. Colo. Feb. 22, 2022). The substance of this evidence is admissible under Fed. R. Ev. 803(8).

The State argues Gates and Swartz do not have standing because their intention to obtain LCMs is "some day speculation." St. Opp. 40. But this argument is precluded by the State's admission that both Gates and Swartz would "immediately" purchase LCMs but for the Magazine Ban. St. Opp. 4, 6.

The State's remaining standing arguments with respect to Gates and Swartz amount to conflating the standing inquiry with evaluation of the merits of their Second Amendment claim. In other words, the State argues that Gates and Swartz have enough LCMs and therefore their claim that the statutory prohibition on acquiring additional LCMs is unconstitutional fails on its merits and therefore they are not injured. St. Opp. 41. But as Plaintiffs argued in their motion (Mot. 17), conflating standing and merits is not proper. *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014). For purposes of the standing inquiry, Plaintiffs' Second Amendment claim that they have a constitutional right to acquire additional LCMs in addition to the ones they presently possess must be presumed to be valid. *Id*.

In summary, the State admits that Gates and Swartz would immediately acquire LCMs but for fear of prosecution. And their fear of prosecution is obviously

---

[7] The State also complains that the Colorado Judicial Department report of prosecutions was not produced in discovery. But Plaintiffs requested the State to obtain the report, as it had done in prior litigation. Plaintiffs obtained the report only when the State refused to do so. This data was obviously equally accessible to the State and not the sort of information within a party's control that is sought in discovery.

credible. Accordingly, Gates and Swartz have established standing. And when one party establishes standing it is not necessary to consider separately the standing of other parties seeking identical relief. *Igou v. Bank of Am., N.A.*, 634 F. App'x 208, 210 n.3 (10th Cir. 2015), *citing Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (noting if one party has standing there is no need to inquire into the standing of the other parties to bring identical claims).

Nevertheless, the other Plaintiffs do have independent standing. Plaintiff Honegger, like Gates and Swartz, would also immediately purchase an LCM but for his fear of prosecution. UMF 21. The State asserts this is not credible because Honegger expressed interest in acquiring a rifle earlier this year and has not done so yet. St. Opp. 43. In other words, the State argues that the fact that Honegger has not yet purchased a $1,000 rifle means he would not purchase a $10 magazine. This is an obvious non sequitur. Moreover, Honegger has established standing merely through the ongoing harm resulting from his "adherence to the challenged statute." *Teter v. Lopez*, 76 F.4th 938, 944, n.2 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up).

The State argues that NFGR does not have standing because it does not have formal members. But an association without formal members has associational standing to represent non-member constituents if the organization is identified with and influenced by those constituents. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (*citing Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261, 97 S. Ct. 555, 50 L.Ed.2d 450 (1977)). *See also Anderson v. Ghaly*,

2022 WL 717842, at *6, n.7 (N.D. Cal. Mar. 10, 2022) (rejecting similar argument as "overly formalistic").

## H.   The Plaintiffs Met Their Burden Under *Bruen's* Step One

The State argues that Plaintiffs submitted "no evidence" to establish that LCMs are "arms" covered by the plain text of the Second Amendment. St. Opp. 25. This is not true. Indeed, the State actually admits to all of the evidence submitted by Plaintiffs necessary to carry their step one burden. The State admits that without a magazine a semi-automatic firearm can fire only one shot at a time by manually loading each successive cartridge. Response to UMF 34, St. Opp. 9. And the State admits that, therefore, a magazine is what makes semi-automatic fire possible. *Id.* Moreover, the State concedes that it cannot ban all magazines because doing so would amount to a ban on semi-automatic firearms. St. Opp. 23.

The State's admission that a magazine is necessary for a modern semi-automatic firearm to operate as such is fatal to its claim that magazines are not covered by the plain text. "[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. The State admits that a magazine is an instrument that facilitates (indeed is indispensable to) semi-automatic fire in modern semi-automatic firearms. Thus, it would border on the frivolous for the State to argue that magazines do not fall under the definition of "arms" as articulated in *Bruen*. But that is the argument the State

makes when it asserts that magazines are "accessories," not arms, covered by the plain text. St. Opp. 25.

Moreover, the State's arguments regarding the status of magazines as "arms" are internally contradictory. The State concedes that it cannot ban all magazines. But why not? If magazines are merely "accessories" that are not covered by the plain text, they are not constitutionally protected at all and the State would be free to ban them all. But the State knows it cannot get away with an argument that would, as a practical matter, allow it to ban all semi-automatic firearms. St. Opp. 23. So, it tries to straddle a line. Yes, it concedes, a magazine is necessary for the operation of a modern semi-automatic firearm and therefore a magazine with a capacity below some threshold is covered by the plain text of the Second Amendment, and it admits it cannot ban those. But a magazine with a capacity above that threshold is not covered by the plain text and it can ban those.

There are at least two problems with the State's approach. First, the Supreme Court has never described protected arms in subdivided categories. *Duncan v. Bonta*, 2023 WL 6180472, at *8 (S.D. Cal. Sept. 22, 2023) (stayed). For example, in *Heller* the Court did not distinguish between semi-automatic pistols and revolvers when it held handguns are protected. Nor did the Court classify protected handguns according to the number of rounds they could hold. *Heller* never hinted that typically possessed arms can be subcategorized and subjected to "*judicial ad hoc constitutional determinations.*" *Duncan*, at *8 (emphasis added).

Which brings us to the second problem. What separates a magazine covered by the plain text from a magazine that is not covered by the plain text? The State appears to have developed a new "magic bullet theory" under which the plain text of the Constitution means one thing with respect to magazine X but something completely different with respect to magazine Y. The difference? Magazine Y has had a magic additional bullet added to its capacity. But which bullet is the magical one? Is it the fifth? The eleventh? The sixteenth? What is it about magazine X that makes it so radically different from magazine Y that the text covers the former but not the latter? The State does not say. Instead, as *Duncan* foresaw, the State invites the Court to make an ad hoc determination that the text covers some magazines but not the ones at issue in this case.

The State's argument will not do. The plain text covers all bearable arms. The "Second Amendment extends, prima facie, to *all instruments* that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (citation omitted; emphasis added). The plain text does not distinguish between bearable arms that are actually protected and those that are not. That is an issue that arises under *Bruen's* step two. *See Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023) (Under *Heller*, the fact that a ban on a weapon may be consistent with historical tradition does not mean the weapon is not an "arm" in the first place.).

In summary, all magazines, as instruments that facilitate modern self-defense, are covered by the plain text. The State is free to argue that some magazines

(i.e., LCMs) are not protected by the Second Amendment because their prohibition is consistent with the Nation's history and tradition of firearms regulation. But the State's argument that some magazines are covered by the plain text and some are not finds no support in *Bruen*.

## I.    *Bruen* Did Not Consider "Common Use" as Part of the Plain Text Analysis

The State asserts that *Bruen* considered the "common use" issue as part of the plain text analysis. St. Opp. 25. This is not true as the passage pointed to by the State reveals. That passage states: "Nor does any party dispute that handguns are weapons 'in common use' today for self-defense. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct – carrying handguns publicly for self-defense." *Bruen*, 142 S. Ct. at 2134. In this passage, the Court noted that the parties did not dispute that handguns are in common use. Then, *after* noting that point of agreement, the Court turned to the plain text analysis. Thus, it manifestly did not consider common use as part of that analysis.

## J.    LCMs are in Common Use

In their motion for summary judgment, Plaintiffs demonstrated that tens of millions of LCMs are owned by American citizens. Mot. 36-40. The State has offered no evidence contradicting Plaintiffs' evidence. Thus, fact that they are in common use is established. In *Duncan*, Judge Bumatay aptly summarized the matter as follows:

> While estimates vary, it is undisputed that more than 100 million large-capacity magazines circulate in the United States. One recent study cited by the district court found that Americans own 542 million magazines that hold more than 10 rounds today. And this fact isn't surprising given that those magazines are a standard component on many of the Nation's most popular firearms, such as the Glock pistol, which commonly comes with a magazine that can hold 17 rounds. They are lawful in at least 41 States and under federal law. They account for half of all magazines owned in the United States today.

*Duncan v. Bonta*, 2023 WL 6588623, at *8 (9th Cir. Oct. 10, 2023) (Bumatay, J., dissenting).[8]

In *Miller v. Bonta*, 2023 WL 6929336, at *36 and n.231 (S.D. Cal. Oct. 19, 2023), the Court wrote: "If Americans own 24.4 million AR-15s and 24.4 million gun crimes are not being committed with AR-15s, Americans must be using them for lawful purposes . . . [T]he very large number of AR-15s owned by citizens who are not using them to commit crimes *is sufficient evidence* of common use for lawful purposes . . ." (emphasis added). Similarly, Americans own tens of millions (if not hundreds of millions) of LCMs. As a matter of simple logic, the very large number of LCMs owned by citizens who are not committing crimes with them establishes common use for lawful purposes.

## K.   The Supreme Court Has Never Required Empirical Studies of Actual Use

In their response to the State's motion for summary judgment, Plaintiffs argued extensively that the State is wrong when it asserts that the Supreme Court requires empirical studies of the number of times an arm is actually used in self-

---

[8] Plaintiffs cite to Judge Bumatay's well-reasoned opinion. Even though he was in the minority, his analysis is manifestly more in keeping with Supreme Court precedent than the majority opinion, which, inexplicably, engaged in practically no analysis at all.

defense. ECF 87, 12-16. Plaintiffs will not repeat that argument here but incorporate it by reference. In addition, Plaintiffs direct the Court to Judge Bumatay's analysis of the issue:

> Second, and more importantly, California misunderstands the 'lawful purposes' inquiry. As discussed below, the Supreme Court has never looked at the average number of times that a handgun had been fired in self-defense to determine whether it is commonly used for that purpose. . .
>
> *Rather than going down this statistical rabbit hole, the Supreme Court looked to Americans' overall choice to use a firearm for self-defense.* Take *Heller* and the District of Columbia's handgun ban. The Court didn't dissect statistics on self-defense situations or look at anecdotes of a handgun's use in self-defense. Instead, '[i]t is enough to note,' the Court observed, 'that the American people have considered the handgun to be the quintessential self-defense weapon.' *Heller*, 554 U.S. at 629, 128 S.Ct. 2783. To the Court, it was sufficient that the handgun was 'overwhelmingly chosen by American society for th[e] lawful purpose' of self-defense. *Id*. at 628, 128 S.Ct. 2783.

*Duncan v. Bonta*, 2023 WL 6588623, at *9-10 (9th Cir. Oct. 10, 2023) (Bumatay, J., dissenting) (emphasis added).

## L.    Mr. Passamaneck's Opinions are Admissible

When it is not running from its own prior stipulations, the State is arguing that Mr. Passamaneck's conclusions that are consistent with those stipulations, its own expert's opinions, and the findings of several courts are inadmissible. St. Opp. 29-31. But Mr. Passamaneck's opinions are admissible as explained in Plaintiffs' response to the State's motion partially to strike those opinions. ECF 60.

## M.    The Court Should Reject the State's Attempt to Shift its Burden onto Plaintiffs

The State argues that Plaintiffs have the burden of proving that the magazines are *not* dangerous and unusual. This is wrong. As the Ninth Circuit held

in *Teter*, that is an issue that arises under *Bruen's* step two. 76 F.4th at 949-50. *Teter's* conclusion is consistent with *Bruen*. In *Bruen*, the Court discussed the plain text step at 142 S. Ct. at 2134-35. The remainder of the opinion (at 2135-2155) discussed the history and tradition step. The Court addressed the "dangerous and unusual" issue in this section of its opinion. *See* 142 S. Ct. at 2143 (discussing how colonial legislatures banned "dangerous and unusual" weapons).[9] Thus, the State's argument that this issue is addressed under the plain text step is meritless.

The State compounds its error by using the "dangerous and unusual" issue in a thinly veiled attempt to resurrect means-end interest balancing. St. Opp. 33-34 (arguing that LCMs' dangerousness is outweighed by the State's interest in banning them). Again, however, such interest-balancing arguments are precluded by *Bruen*. 142 S. Ct. at 2129 (rejecting means-end scrutiny in Second Amendment cases).

**N.    There is no Historical Tradition of Banning Arms in Common Use**

The State faults Plaintiffs for not producing evidence regarding whether the Magazine Ban is consistent with the Nation's historical tradition of firearm regulation. St. Opp. 34. But as Plaintiffs explained in their motion and in their response to the State's motion, there is no such historical tradition. Thus, it is very odd for the State to insist that Plaintiffs have some obligation to produce evidence regarding the existence of a tradition they assert does not exist. As both *Heller* and *Bruen* demonstrate, that is not how these cases are analyzed. In those cases, the

---

[9] The State actually cites this same passage about the practices of colonial legislatures. St. Opp. 33. Thus, it is difficult to understand why the State argues that the issue does not arise under the historical tradition step.

government offered various proposed historical analogues to the challenged laws, which the Court then analyzed. The Court struck down the challenged laws because the historical evidence advanced by the government failed to meet its burden. In *Bruen*, the Court wrote at the end of its historical analysis: "At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents [i.e., the government] have not met *their burden* to identify an American tradition justifying the State's proper-cause requirement." *Id.*, 42 S. Ct. at 2156. *See also Heller*, 554 U.S. at 629 (no historical analogues). So too in this case, Plaintiffs have reviewed the State's proposed analogues and demonstrated how none of them are analogous to the Magazine Ban. *See* ECF 87, 11-12, 19-30.

## O.    The State Admits It Cannot Point to Any Analogous Historical Laws

Plaintiffs demonstrated in their response brief that there were absolutely zero Founding-era laws that prohibited the mere ownership and possession of any firearm. ECF 87, 19-30. Certainly, Colorado has not identified any. This is not surprising, because after literally years of searching, neither could California:

> It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind. Based on a close review of [California's] law list and the Court's own analysis, there are no Founding-era categorical bans on firearms in this nation's history. Though it is the State's burden, even after having been offered a clear opportunity to do so, the State has not identified any law, anywhere, at any time, between 1791 and 1868 that prohibited simple possession of a gun.

*Miller v. Bonta*, 2023 WL 6929336, at *13 (S.D. Cal. Oct. 19, 2023).

The first prohibition on the possession of a dangerous and unusual firearm was Alabama's 1868 prohibition on carrying a "rifle walking cane." ECF 87, 23. The

State offers no evidence disputing this. Instead, it admits that in analyzing Plaintiffs' challenge to the Magazine Ban, the Court must look beyond the Nation's history and tradition of firearm regulation to various regulations of knives and clubs. Reply in Support of State's Motion ("St. Reply") 16 ("a search for analogous regulations leads to regulatory efforts aimed at clubs, Bowie knifes, and other weapons"). But in *Bruen*, the Court held: "The burden [] falls on [government] to show that [its regulation] is consistent with this Nation's historical tradition of *firearm regulation*." 142 S. Ct. at 2119 (emphasis added). The State cannot meet its obligation to demonstrate that the Magazine Ban is consistent with the Nation's historical tradition of firearms regulation by pointing to various laws regulating knives and clubs. Moreover, as Plaintiffs demonstrate in their response, those regulations – which dealt almost exclusively with use of weapons and not their possession or ownership – were not analogous to a ban on possession even aside from the fact that they did not regulate firearms. Thus, the State has all but admitted that it is unable to carry its burden under *Bruen's* second step.

## P.  "Infringed" and "Rendered Meaningless" Are Not Synonyms

The State argues that its arms ban is constitutional because it did not ban all magazines or render Plaintiffs' right to self-defense completely "meaningless." St. Reply, 1, 5. But *Heller* rejected this precise argument when it held that it is "no answer" to say that banning a commonly possessed arm is permitted so long as other arms are allowed. 554 U.S. at 629. And in *Bruen*, the New York law did not completely bar the practice of carrying firearms, but instead subjected it to a

discretionary licensing regime. Nevertheless, the Court struck the law down even though it did not bar public carry altogether. The Second Amendment states that the right to keep and bear arms shall not be "infringed." It does not say that a law banning arms is permissible so long as it does not render the right to self-defense utterly meaningless. Thus, it is "no answer" for the State to say Plaintiffs should be satisfied because it did not completely destroy their right to self-defense.

## Q.    The Other Injunction Factors Favor Plaintiffs

In their motion, Plaintiffs argued that the "irreparable harm" factor turns solely on the probable success on the merits factor. ECF 76, 41. The State appears to concede that if Plaintiffs have demonstrated a constitutional violation, they have per se demonstrated irreparable harm. St. Opp. 36. *See also Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty.*, 2022 WL 4098998, at *2 (D. Colo. Aug. 30, 2022) (violation of Second Amendment is irreparable harm per se); and *Rocky Mountain Gun Owners v. Town of Superior*, Case No. 22-cv-1685-RM (D. Colo. July 22, 2022) (same).

Similarly, the balance of harms/public interest factors necessarily tip in favor of a plaintiff who has demonstrated a violation of the Second Amendment. *RMGO v. Boulder County*, *supra*, at *2; *RMGO v. Town of Superior*, *supra*.

In their motion, Plaintiffs warned the Court that the State would use the balance of harms/public interest factors as a means of arguing for backdoor means-end scrutiny. ECF 76, 43. And sure enough, that is exactly what it did. *See* St. Opp. 37-38 (arguing that the State's "compelling public interest" outweighs

Plaintiffs' interest in bearing the banned arms). But, again, such interest balancing is expressly and repeatedly foreclosed by *Bruen*. *See, e.g.*, 142 S. Ct. at 2126 and 2129. *Bruen's* rejection of means-end scrutiny would be nullified if courts eschewed such scrutiny while examining the merits, only to bring it back in when determining whether to grant a remedy. After *Bruen*, means-end scrutiny in Second Amendment cases is forbidden, whether on the front end (merits) or on the back end (remedy).

## R. Federal Courts Routinely Cite Academic Literature in Second Amendment Cases

The State objects to Plaintiffs' citation of academic literature. St. Reply 22-25. For example, the State objects to Plaintiffs' citation of articles by law professor David Kopel. But a Westlaw search reveals that federal courts have cited articles by Professor Kopel in at least 53 Second Amendment cases, including the Supreme Court in *Bruen*. *See* 142 S. Ct. at 2133. Courts have cited Professor Kopel in support of both legal and factual conclusions. For example, in *Teter v. Lopez*, 76 F.4th 938, 951 (9th Cir. 2023), the court cited David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 180 (2013), for the proposition that a "bowie knife has a large, fixed blade that is sharp on one side and generally longer than nine inches." If numerous courts, including the Supreme Court, find it acceptable to rely on Professor Kopel's findings, this Court should as well.

## S. The State Objects to the Supreme Court's Methods in *Bruen*

In *Bruen*, the Court engaged in a lengthy and exhaustive examination of the historical record advanced by New York. That analysis, which constituted the vast majority of the opinion, was over 22 pages long. *See* 142 S. Ct. at 2135 to 2156. Again,

*Bruen* was decided on a motion to dismiss record. 142 S. Ct. at 2117. There was not even a summary judgment record, much less a trial record. Nevertheless, the Court had no difficulty assessing the historical evidence. Courts after *Bruen* have followed this practice. *See, e.g.*, *Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023).

The State objects to the Supreme Court's methods and insists that this Court may examine historical evidence only if it is submitted through an expert. St. Reply 22. Needless to say, Plaintiffs believe this Court should be able to assess historical evidence in the same way the Supreme Court did in *Bruen*.

## II.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to enter judgment in their favor and enter a permanent injunction against the Magazine Ban.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington