## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-1866-GPG-SKC**

BENJAMIN GATES,
TRAVIS SWARTZ,
KARL HONEGGER, and
NATIONAL FOUNDATION FOR GUN RIGHTS, INC.,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

**BRIEF OF *AMICI CURIAE***
**INTERNATIONAL LAW ENFORCEMENT TRAINERS AND EDUCATORS ASSOCIATION, COLORADO LAW ENFORCEMENT FIREARMS INSTRUCTORS ASSOCIATION, WESTERN STATES SHERIFFS' ASSOCIATION, COLORADO COUNTY SHERIFFS JOHN FEYEN, GENE LILLARD, DAVE MARTIN, JASON MIKESELL, BRETT POWELL, TODD ROWELL, STEVE REAMS, AARON SHIPLETT, LOU VALLARIO, SAM ZORDEL, AND THE INDEPENDENCE INSTITUTE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

E. Gregory Wallace*
Professor of Law
Campbell University School of Law
225 Hillsborough Street
Raleigh, North Carolina 27603
(919) 696-3057
wallaceg@campbell.edu
  *Not admitted in this court

David B. Kopel
Independence Institute
727 E. 16th Ave.
Denver, Colorado 80203
(303) 279-6536
david@i2i.org
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Identity and Interests of *Amici Curiae* ........................................................................ 1

Summary of Argument ................................................................................................... 1

Argument ...................................................................................................................... 2

   I.     Public safety is improved when citizens follow the good examples of law enforcement officers for the safest and best defensive arms. ........................................... 3

     A. The magazine ban targets the common arms most used by sheriffs and deputies. ........... 3

     B. Law enforcement officers help citizens make good choices for safety. ........................... 4

     C. Citizens with effective arms help law enforcement officers, including in the posse comitatus. ....................................................................................................................... 4

   II.    The importance of reserve capacity……………………………………………...7

   III.   The magazine ban implicitly disparages law enforcement officers and harms community relations…........................................................................................................ 9

   IV. Defendant's legislative facts are implausible. ...................................................... 12

     A. Defendant offers no standard for identifying "uniquely dangerous" magazines. .......... 13

     B. Defendant's experts are unreliable and not credible. ..................................................... 14

     C. Defendant's speculation about the "pause" from magazine changes by mass shooters has no proven examples. ........................................................................................................ 17

Conclusion ................................................................................................................... 20

Certificate of Service .................................................................................................. 22

## Identity and Interests of *Amici Curiae*

Amici offer their perspectives as frontline law enforcement officers and as trainers of those officers, particularly regarding training in armed defense of self and others. International Law Enforcement Educators and Trainers Association (ILEETA) comprises 4,000 professional law enforcement instructors. ILEETA's amicus briefs were cited by Justice Breyer in *Heller* and by Justices Alito and Stevens in *McDonald*. Colorado Law Enforcement Firearms Instructors Association is Colorado's professional association for instructors who train law enforcement officers in firearms use and tactics. The Western States Sheriffs' Association is comprised of more than 300 Sheriffs and their command staff from 18 Western States, including Colorado. Sheriffs John Feyen (Larimer County), Gene Lillard (Montrose), Dave Martin (Morgan), Jason Mikesell (Teller), Brett Powell (Logan), Todd Rowell (Mesa), Steve Reams (Weld), Aaron Shiplett (Baca), Lou Vallario (Garfield), and Sam Zordel (Prowers) are the elected sheriffs of their respective counties. The Independence Institute is a public policy research organization in Denver. More information about amici is detailed in the Motion for Leave to File.

## Summary of Argument

Law enforcement officers carry standard capacity magazines—up to about 20 rounds for handguns, and 30 rounds for rifles—for the same reason that law-abiding citizens often should: they are best for lawful defense of self and others. When defenders have less reserve ammunition, they fire fewer shots, thus increasing the danger that the criminals will injure the victim.

Defendant's and the legislature's calumnies against magazines and their owners disparage law enforcement officers. The ordinary arms of civil peace officers are not "unusually dangerous" weapons made "only" for mass killing. American law enforcement officers are not an army of occupation with military arms.

1

Defendant's experts are unreliable. Most notably, the Klarevas claims that standard magazines increase fatalities in mass shootings are based on data manipulation. His claims that magazine changes allow victims to escape are unsupported by real-world experience.

## Argument

The magazine ban attempts to divorce today's common arms of law-abiding citizens from today's common arms of law enforcement officers, including sheriffs and their deputies. The divorce, contrary to the wishes of both parties, endangers citizens and officers alike.

The arms of ordinary law enforcement officers are carefully selected for only one purpose: lawful defense of innocents in civil society. Throughout American history, many citizens have looked to law enforcement for guidance in choosing arms for the same purpose. Denying those arms to citizens and to retired law enforcement officers (Mot. for Leave, ¶8) endangers them for the same reasons that denying these arms to active law enforcement officers would endanger them. The most important reason is the necessity of reserve capacity, as detailed in Part II.

More fundamentally, the magazine ban violates the principles of our Constitution and of American law enforcement. Policing by consent is the American value, not militarized occupation from above.

The magazine ban is based on the sponsors' repeated claim that the "one purpose" of magazines over 15 rounds is "to kill large numbers of people quickly." *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F. 3d 537 (10th Cir. 2016), JA.19:4058. 19:3921 (twice); 19:4044, 4059-60; 19:4113, 20:4388. This false characterization was never challenged by any legislator who voted for the bill. The pernicious notion that Colorado law enforcement officers routinely carry arms for the "one purpose" of mass killing creates a false division between officers and the citizens whom they serve. The notion reduces citizen cooperation with officers, and also endangers officers.

2

## I.  Public safety is improved when citizens follow the good examples of law enforcement officers for the safest and best defensive arms.

Citizens have always looked to local law enforcement for guidance in choosing defensive arms, because law enforcement arms are selected with care.[1]

### A.  The magazine ban targets the common arms most used by sheriffs and deputies.

The most common type of handgun chosen by sheriffs and their deputies is the full size 9mm pistol.[2] Although larger calibers (such as .45) are available, many deputies and citizens prefer 9mm because its recoil is easier to control, and because its ergonomics make it a good fit, including for many females. The 9mm pistols still have good "stopping power," which is the purpose of defensive shooting.

While compact or subcompact 9mm handguns have small magazines, the standard magazines for a full-size 9mm are commonly 16 or more, as in the 17-round Glock 17; the same is true for full-size 9mm pistols from Springfield, Ruger, Smith & Wesson, and similar companies.

Most law enforcement patrol cars carry a rifle, a shotgun, or both. The rifle is usually a semi-automatic with magazines of 20 or 30 rounds. A typical officer's arms are powerful enough for defense against violent criminals, and appropriate for use in civil society, because ordinary officers' arms are *not* military arms.[3]

According to the magazine ban, the very arms most commonly carried by ordinary law enforcement officers are off-limits to the community. This is backwards. As the Connecticut

---

[1] This brief uses "citizens" in the sense that law enforcement agencies do—to refer respectfully to all persons who are not law enforcement officers.

[2] The three basic sizes of handguns are "full-size," "compact," and "subcompact."

[3] In a typical Sheriff's Office, only a small number of deputies possess genuinely military arms, such as machine guns or stun grenades. These arms are deployed only for unusual situations, such as hostage scenarios or high-risk warrant service. These are certainly not the arms that a citizen would see a deputy carrying during standard foot, bicycle, or automobile patrol. Neither sheriffs nor the public would tolerate the use of military equipment for routine law enforcement.

Supreme Court unanimously ruled, "widespread acceptance … within the law enforcement community also supports the conclusion that they [police batons] are not so dangerous or unusual as to fall outside the purview of the second amendment." *State v. DeCiccio*, 105 A.3d 165, 200 (Conn. 2014).

### B.  Law enforcement officers help citizens make good choices for safety.

Almost always, law enforcement officers are second responders. Because officers cannot be everywhere, and because criminals choose the time and place for their surprise attacks, crime victims are their own first responders. If a victim has the opportunity to call 911, the call is in effect a request to send armed men and women who will bring the arms sufficient to defeat the attacking criminals. While waiting for minutes for armed rescuers to arrive, the victims should have sufficient arms to repel the attackers.

Just as any gun is better than no gun, a small magazine is better than nothing. But in general, the best magazines for defeating violent attackers are the magazines chosen by prudent professionals with extensive collective experience in lawful defense. As described in Part I.A., the magazines chosen as the best for lawful defense of self and others are very often 16 to 30 rounds.

Citizens' prudent consideration of the examples set by responsible law enforcement officers is an American tradition. For example, in the 1870s, both sheriffs and citizens often chose the largest, highest quality, highest capacity handguns of the day, namely, revolvers from Colt, Smith & Wesson, and others. Sheriffs and citizens also chose repeating rifles, such as the Winchester lever actions that could shoot up to 18 rounds.

### C.  Citizens with effective arms help law enforcement officers, including in the posse comitatus.

When victims effectively resist attackers, the victims aid law enforcement. For example, the responding agency can send an ordinary officer to interview the victim and provide information

about the assailants who fled—instead of having to open a resource-intensive homicide investigation about what happened to the dead victim. More generally, when citizens deter or repel criminals, there are fewer emergencies for officers to respond to, and so more resources that can be used proactively.

Law-abiding citizens often come to the aid of law-enforcement officers who are being attacked. Many officers' lives have been saved by these heroic citizens. *See*, *e.g.*, *Bystander Shoots, Kills Suspect in Altercation with Osage Nation Police Officer, OSBI Reports*, PoncaCityNow.com (Nov. 22, 2023).[4] The best arms for these citizen rescuers are the same arms that law enforcement carries. Like anyone being assaulted, an officer being assaulted by a gang would want a rescuer to have sufficient firepower to confront the gang.

Other citizen helpers include the members of the posse comitatus. Since the days of English King Alfred the Great (871-86), sheriffs have had the authority to summon armed members of the community to assist in keeping the peace. *See* David Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminol. 671 (2015). In the words of James Wilson, shortly before President Washington appointed him to the Supreme Court, the posse comitatus is "the high power of ordering to [the sheriff's] assistance the whole strength of the county over which he presides" in order "to suppress . . . unlawful force and resistance." James Wilson, *Of Government*, in 2 Collected Works of James Wilson 1016 (Kermit Hall & Mark David Hall eds., 2007).

Alexander Hamilton maintained in Federalist 29 that a federal posse comitatus power flows from the Necessary and Proper Clause. As Justice Story observed in 1833, the posse comitatus

---

[4]     https://www.poncacitynow.com/bystander-shoots-kills-suspect-in-altercation-with-osage-nation-police-officer-osbi-reports/.

suffices for maintaining law and order in most situations, but there are some circumstances when either a militia or standing army would be necessary. Joseph Story, 3 Commentaries on the Constitution 81–82 (1833) (§1196).

Posses were constantly employed throughout the United States in the 19th century. Kopel at 793–803. In the 21st century, when the number of full-time law enforcement officers is much greater, the use of posses is less common—but it is still common in many jurisdictions. In almost every state, the sheriff's common law posse comitatus power is given expression by a statute on the subject. *Id*. at 830–50 (appendix reprinting statutes). In 2012, the Supreme Court recapitulated some leading posse comitatus precedents. *Filarsky v. Delia*, 566 U.S. 377, 388 (2012).

In Colorado, at least 17 county Sheriffs' Offices have organized posses, composed of citizen volunteers.[5] All posse members are trained by the Sheriff's Office and required to follow regulations promulgated by the sheriff. Posses perform a wide range of duties based on the sheriff's determination. For posse members who carry firearms, they are almost always required to pass the same qualification as full-time deputies, and they have usually been given firearms training by the Sheriff's Office. *Id*. at 808–12, 817–21.

In modern Colorado, sheriffs can and do summon whatever citizens are available to assist in an emergency. Examples include: securing small towns to prevent looting during the September 2013 floods, securing a burglarized building, or manhunts for escaped criminals. *Id*. at 815–17. Most famously, large Colorado volunteer posses thwarted the escape of serial killer Ted Bundy after he escaped from the Pitkin County Courthouse during a hearing recess. A large citizen posse also blocked the escape of a pair of criminals on a nationwide spree; they had murdered Hinsdale County Sheriff Roger Coursey. *Id*. at 812–15.

---

[5] The counties include Adams, Larimer, Weld, and Mesa. *Id*. at 810 n.269.

Whether in an ad hoc manhunt or in a continuing posse that receives regular training, it is preferable for the members of a posse to have arms similar to, and compatible with, the arms of the officers whom they are assisting.

While the Second Amendment is a right of individual Americans, there is an explicit third-party beneficiary: the militia. Creating the conditions for a well-regulated, functional militia also has the additional benefit of ensuring a strong and vigorous posse comitatus. A well-armed population fosters both. The original meaning of the Constitution includes the militia and the posse being able to assist the government.

The militia and the posse are complementary institutions, each of them requiring that the people be armed—especially with arms appropriate for the duties of a citizen. For maintenance of civil order, this means arms like those used by civil law enforcement officers for that purpose.

## II. The importance of reserve capacity

Neither citizens nor law enforcement officers frequently fire more than 15 shots in self-defense. Indeed, the vast majority of Colorado law enforcement officers never fire one defensive shot in their careers. This does not mean that officers should not carry firearms. A firearm, like a fire extinguisher, is a tool for rare emergencies, and in emergencies, essential to survival.

The largest national survey of defensive gun use found that 51.2% of incidents involved multiple attackers. *See* Wiliam English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 10, 14-15 (Sept. 28, 2022).[6]

Most defensive shots are misses. A New York Police Department study of 1998–2006 found an average hit rate "18 percent for gunfights," and 30 percent "in situations in which fire was not

---

[6] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

returned." Bernard Rostker et al., *Evaluation of the New York City Police Department Firearm Training and Firearm-Discharge Review Process* 14 (2008).[7] Another study examined target range shooting at realistic-size targets at various distances; the hit rate for police recruits who had completed academy firearms training was 49 percent, whereas the rates for untrained, "naive" recruits with little if any prior firearms experience was 39 percent. William Lewinski, et al., *The real risks during deadly police shootouts: Accuracy of the naive shooter*, 17 Int'l J. of Police Sci. Management 117 (2015).

Unlike in the movies, many attackers do not desist after being hit once. *See* Police1, *Should cops shoot to incapacitate?* (May 13, 2021);[8] English at 28–33 (examples). In general, only hits to the central nervous system or an airway instantly incapacitate. Emily Lane, *Why do police shoot so many times? FBI, experts answer on officer-involved shootings*, The Times-Picayune (New Orleans), July 19, 2019.[9]

If a citizen or an officer sees one assailant, she does not know if a second assailant is unseen nearby. As officers are taught, "If you see one, there's two. If you see two, there's three." When a defender knows that she has a greater reserve, she is more likely to fire sufficient shots, because she knows she will have sufficient ammunition to deal with a possible second or third attacker.

Conversely, when a defender has fewer available shots, she must make a calculation before each shot to determine whether she can successfully make a threat-ending shot now or whether it is worth the risk to wait a few moments in hopes of a better opportunity. The defender's critical moments of hesitation could cost her life. By constricting reserve capacity, the magazine ban

---

[7] https://www.rand.org/pubs/monographs/MG717.html.

[8] https://www.police1.com/police-training/articles/should-cops-shoot-to-incapacitate-nPxv9KnlMwOUTnSo/.

[9] https://www.nola.com/news/crime_police/why-do-police-shoot-so-many-times-fbi-experts-answer-on-officer-involved-shootings/article_ae82835c-0212-5e50-a175-85601a1ed8bb.html.

increases the risk of injury for victims and reduces it for attackers. That is the opposite of the Second Amendment.

Reserve capacity is even more important for citizens than for law enforcement officers. It may be impossible for a citizen under attack to extract a cell phone and dial 911. Usually, the only magazine the citizen will have is the one in her firearm. In contrast, officers generally wear small always-ready radios on their shoulders, to immediately summon assistance. Unlike the typical citizen, the typical officer will have several back-up magazines ready on a belt. Officers can sometimes call for back-up before taking on a situation, but the citizen never has the option, because the criminals decide the time and place for attack. Persons with mobility disabilities are impacted even more severely because they cannot retreat or take cover to change a magazine.

Law enforcement and citizens also prefer standard magazines for cover fire (a/k/a "suppression fire"). With cover fire, the defender shoots carefully to keep the attacker pinned down. This stops the attacker from being able to target potential victims and allows victims to escape. For example, at the University of Texas in 1966, the criminal shooting from a tower was pinned down by cover fire from citizens and police. Mark Lisheron, *A Killer's Conscience,* AUSTIN AMERICAN-STATESMAN (Dec. 9, 2001). Similarly, at Trolley Square, Salt Lake City, in 2007, an off-duty officer kept the shooter pinned down until a SWAT team arrived. It took 15 hits until the criminal collapsed. *See Off-duty officer shrugs off 'heroic' label*, DESERET NEWS (Feb. 16, 2007).

### III. The magazine ban implicitly disparages law enforcement officers and harms community relations.

Suppose the legislative sponsors' and Defendant's claims about "large capacity magazines" were accurate: The magazines are irrelevant for lawful self-defense; their "only purpose" is mass homicide. According to Defendant, "large capacity magazines" are so pointless for anything

except mass carnage that no one may have them. Except government law enforcement personnel. C.R.S. §18-12-303(b).

Amici reject the implied libel that the ordinary arms of American peace officers are the weapons of mass killers. Consider the following descriptions:

- "Officer X shot the suspect with common Glock 17 equipped with a standard 17-round magazine, well-suited for lawful defense of self and others."

- "Officer X shot the suspect with an 'unusually dangerous' handgun whose only purpose is mass killing."

The first statement is accurate. The second inflames anger and hatred against law-abiding law enforcement officers.

If Defendant prevails because standard magazine are "unusually dangerous," then the most typical arms of average deputies and officers are called into question, as supposedly excessive.

The magazine ban envisions policing from above, employing weapons of war. This is contrary to policing by consent. Law enforcement officers, including elected sheriffs, are part of their community. Colo. Const., art. XIV, §8. They enforce civil law, not martial law.

In 1828, United Kingdom Home Secretary Robert Peel (later Prime Minister) led a committee to study police. The resulting Metropolitan Police Act of 1829 created the first disciplined police force for the Greater London area.[10] Peel's "nine principles" defined a policing system founded on public support.[11] Because the police act with public approval, the public and police cooperate to tip the community balance against the criminals. Peel's principles were designed so that the power granted to government to carry out policing would not be abused. In the Peelian principles

---

[10] *Metropolitan Police: Administrative History*, http://ndad.ulcc.ac.uk/datasets/AH/1.htm.
[11] *Sir Robert Peel's Nineriniples of Policing*, New Westminster Police Service, http://www.newwestpolice.org/peel.html.

of law enforcement, "[T]he police are the public and the public are the police, the police being only members of the public who are paid to give full-time attention to duties which are incumbent on every citizen in the interests of community welfare and existence."[12]

In contrast, the magazine ban treats police like soldiers of an occupying army. The ordinary handgun and rifle magazines routinely carried for reasonable defense by deputies and other LEOs are declared to be weapons for mass murder. Supposedly, possession of weapons for mass killing by law enforcement is to be accepted as normal. What a perverse vision of police-community relations! Law enforcement officers are servants of the people, not their masters.

The idea that an ordinary sheriff's deputy on bike patrol is carrying arms made "only" for militarized mass killers poisons community relations. The divisive attitudes fostered by the magazine ban make the public less willing to cooperate with law enforcement. Sometimes, such attitudes result in attacks on officers.

In truth, the ban's law enforcement exemption falsifies Defendant's thesis that standard magazines are unneeded for lawful defense. The ban is also self-falsified by the provision allowing Colorado manufacturers to produce and export such magazines to other states. C.R.S. §18-12-302(3)(a)(III) & (V), (3)(c). Making arms with no purpose other than mass murder is fine, as long as the murders take place in Kansas?

Defendant might argue that the law enforcement exemption is reasonable because law enforcement officers have more training and stronger vetting than does the average citizen. This is true. But the magazine ban is not a law about extra training or more thorough background checks.

---

[12] Available at https://en.wikipedia.org/wiki/Peelian_principles.

The magazine ban is ban for every citizen, no matter how impeccable of character and no matter how proficient.[13]

Because the ban does not even allow inheritance, Colorado is on a path to become a state where typical law enforcement officers must appear among the people while carrying arms that are forbidden to the people. Such a repressive scenario contradicts our consensual Constitution. The Second Amendment protects "the security of a free State." A *free* State—a state of consent—is the opposite of law enforcement officers being above "the people."

## IV. Defendant's legislative facts are implausible.

Defendant argues he is entitled to summary judgement because Plaintiffs did not develop an evidentiary record beyond the Passamaneck declaration. Doc. 80 at 10–11. The argument overlooks the difference between adjudicative facts and legislative facts.

In the Tenth Circuit, adjudicative facts are "simply the facts of the particular case"; legislative facts are those having "relevance to legal reasoning and the lawmaking process; they are established truths, facts or pronouncements that do not change from case to case but apply universally." *United States v. Iverson*, 818 F.3d 1015, 1030 (10th Cir. 2016). Legislative facts "are applicable to a great many, and wide range of, cases . . . . When the resolution of a dispute turns on legislative facts, courts regularly relax the restrictions on judicial inquiry." *United States v. Hunt,* 63 F.4th 1229, 1250 (10th Cir. 2023). According to the Tenth Circuit:

> As noted by Prof. Frederick Schauer in *The Decline of "The Record": A Comment on Posner*, 51 Duq. L. Rev. 51 (2013), courts . . . sometimes rely on their review of sources never presented to the court (as with the per curiam majority in *Bush v.*

---

[13] Excellent training is readily available to motivated citizens. The relevant "Firearms Skills" standards for Colorado's "Police Officer Standards and Training" can be met by most citizens with several days of quality training. *See P.O.S.T. Firearms Skills Test-Out Grade Sheet*, Colo. Peace Officers Standards Training,
https://post.colorado.gov/sites/post/files/documents/Firearms%20Grade%20Sheet.pdf. This does not include the P.O.S.T. standards involving handgun retention while handcuffing a suspect, since cuffing skills are not emphasized in citizen firearms training.

> *Gore,* 531 U.S. 98 (2000), and Justices Stevens and Breyer on multiple occasions, including for the court in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142–43 (1999).

*Id.* at 1251 (cleaned up). The Supreme Court has long relied on legislative facts not in the record. *See, e.g., Brown v. Board of Educ.,* 347 U.S. 483, 494 n.11 (1954) (social science data); *Muller v. Oregon,* 208 U.S. 412, 419–21 n.1 (1908) (legislative facts from "Brandeis brief").

The expert declarations cited by Defendant to support his claim about magazines contain legislative facts, not adjudicative facts. Doc. 80 at 18, 28, citing Exs. 28 (Yurgealitis), 32 (Klarevas). These supposed legislative facts do not come from the record of the Colorado General Assembly's enactment of the ban, but are post-hoc justifications. This Court is not bound to accept Defendant's legislative facts as conclusively true, especially since some are palpably false.

### A. Defendant offers no standard for identifying "uniquely dangerous" magazines.

Magazine size does not affect a firearm's mechanical rate of fire, accuracy, or wounding power. Whatever the magazine, a semiautomatic firing system still shoots just one bullet for each trigger pull. Colorado's ban applies even to magazines holding the puny .22LR cartridge.[14]

Defendant claims that standard magazines are "unusually dangerous" and therefore not protected by the Second Amendment. Doc. 80 at 17–18. As he acknowledges, "there must be some level of lethality or capacity for injury beyond socially accepted norms that makes it especially dangerous." *Id.* at 17 (quoting *National Ass'n for Gun Rights v. Lamont,* 2023 WL 4975979, at *16 (D. Conn. 2023)) (internal quotation omitted). But he offers no specific benchmark for

---

[14] Defendant attempts to bootstrap adjudicative facts from two crime victims into a general legislative fact that "LCMs . . . inflict grievous wounds that cause lifelong disabilities." Doc. 94 (citing Ex. 21, D. 74 ¶¶ 21–33; Ex. 47, D. 74–21 ¶¶ 29–38) (declarations of two survivors of Aurora and Columbine). While these victims' injuries are tragic, Defendant has offered no evidence to show that they are typical of injuries from firearms with "large capacity magazines." Magazine size does not give a bullet greater wounding power. There are too many variables (*e.g.*, location of impact, bullet's mass, shape, and construction, type of tissues disrupted along the bullet's path) to generalize from two victims' injuries.

measuring the relative dangerousness of one magazine or another. As another court observed in a similar case, "Missing is a constitutionally-permissible standard for testing acceptable lethality. The Attorney General offers no objective standard." *Duncan v. Becerra,* 366 F. Supp. 3d 1131, 1146 (S.D. Cal. 2019), *rev'd sub. nom., Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021) (en banc), *vacated and remanded,* 142 S.Ct. 2895 (2022).

The district court in *Duncan* found that "many larger capacity magazines are not uniquely dangerous because they are not much larger." *Id.* at 1173. Why is a 17 or 20-round magazine "unusually dangerous," but a 15-round magazine not? Lacking a benchmark or explanation, a size limit on common magazines "appears to be arbitrary." *Id.* at 1181.

**B. Defendant's experts are unreliable and not credible.**

Defendant does not claim that the magazine ban will have an ameliorative effect on firearms misuse by ordinary criminals. Instead, he argues solely about mass public shootings. His key alleged facts come from his expert Louis Klarevas, a Teachers College professor at Columbia University. According to Klarevas, standard magazines in mass shootings increase the death toll by 54%. Doc. 80 at 18 (citing Klarevas Decl., Ex. 32). The Klarevas declaration shows that he manipulated data to produce inflated figures.

Klarevas overcounts fatalities from "large capacity magazines." He lists 30 mass shootings in U.S. history with 10 or more deaths and claims that 70% involved such magazines. Klarevas Decl., Ex. 32 ¶20 (citing Table 4). Of these 30 data points, 8 involved multiple weapons, and at least one weapon in each case was *not* a "large" magazine: Austin, San Ysidro, Columbine, Geneva County, Binghamton, Aurora, Newtown, and San Bernadino. The Violence Project, *Mass Shooter*

*Database* (vers. 7.0 5.28.23).[15] Klarevas nevertheless calculated *all* the fatalities as attributable to "large" magazines.

For example, in San Ysidro, California, in 1984, a criminal murdered 21 people; of those, 11 or more were murdered with a shotgun, and 10 or fewer were murdered with a rifle that had magazines over 15 rounds. Christopher Koper & Jeffrey Roth, *The Impact of the 1994 Assault Weapons Ban on Gun Violence Outcomes*, 17 J. Quantitative Criminol. 33, 42 (2001) ("at least half" of the casualties were inflicted by shotgun). Klarevas assigns all 21 deaths to the rifle.

Similarly, Klarevas declares that "since 1990, the use of LCMs in high-fatality mass shootings has resulted in a 54% increase in average fatalities per incident." Doc. 80 at 18 (citing SUMF ¶56, citing Klarevas Decl., Ex. 32 ¶15). Klarevas reports that of the 80 high-fatality mass shootings (more than 6 deaths) since January 1990, the average death toll for the 35 incidents in which magazines banned in Colorado were not used is 8.1 per shooting, while the average death toll for the 45 incidents with banned magazines is 12.5 fatalities, an increase of 54%. Klarevas Decl., Ex. 32 ¶ 15.

Again, Klarevas inaccurately attributes *all* deaths to the "large" magazines, even in crimes when at least one weapon used did *not* have such a magazine. These include Jacksonville, Killeen, Columbine, Wakefield, Indianapolis, Carnation, Kinston/Samson/Geneva, Binghamton, Manchester, Aurora, Newtown, Waco, San Bernadino, Plano, Las Vegas, and Rock Hill.

The Klarevas declaration is contradicted by his sworn testimony in another Colorado case where he had filed a similar report. When cross-examined, he admitted that at least 8 of the 13 Columbine deaths were not from guns with "large" magazines. *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314 (Colo. 2020), trial tr. May 4, 2017, at 177:20–25. Yet Klarevas now lists the

---

[15] https://www.theviolenceproject.org/mass-shooter-database/.

Columbine murders in his data tables blaming every fatality on the larger magazines. Klarevas Decl. at Ex. C, line 10.

Prof. Klarevas self-contradicts from one line to the next. He designates the 2018 Thousand Oaks shooting as involving a magazine banned in Colorado. In fact, the criminal used a Glock 21 .45 caliber handgun, which holds only 13 rounds. Klarevas' very next entry, Virginia Beach, also involved Glock 21 .45 caliber handguns, and this Klarevas entry accurately states that the criminal did not use a "large" magazine. Klarevas Decl., Ex. 32, Table 4, lines 25–26.

In further self-contradiction, Klarevas relies on a study by Charles DiMaggio—which Klarevas previously criticized as unreliable because of a large number of misclassifications. *See* Klarevas Decl. ¶19 n.10; E. Gregory Wallace & George A. Mocsary, *Fact Check: Mass Shootings Actually Increased During Federal 'Assault Weapons' Ban,* The Federalist (Jan. 31, 2023).[16]

Regarding corpus linguistic expert Charles Baron, Defendant admits the Supreme Court in *District of Columbia v. Heller* rejected Baron because the Court "disagreed with Dr. Baron's omission of certain phrases from his analysis." Doc. 100 at 4 (citing 544 U.S. 570, 589 (2008)). The Court derided his methodology as "unknown this side of the looking glass (except, apparently, in some courses on linguistics)." *Id.* Likewise, Baron's amicus brief in *New York State Rifle & Pistol Association v. Bruen* was replete with out-of-context quotes that, when the full context was examined, showed the opposite of what he claimed. *See* David Kopel & Gregory Wallace, *Corpus Linguistics and the Second Amendment*,  Reason/Volokh Conspiracy (Oct. 29, 2021).[17]

Defendant cites his expert Lucy Allen for the claim that "An average of just 2.2 shots are fired by armed citizens in defensive scenarios." Doc. 94, at 19. A judge in another case found:

---

[16]    https://thefederalist.com/2023/01/31/fact-check-mass-shootings-actually-increased-during-federal-assault-weapons-ban/.

[17] https://reason.com/volokh/2021/10/31/corpus-linguistics-and-the-second-amendment/.

> [H]her opinion lacks classic indicia of reliability and her two studies cannot be reproduced and are not peer-reviewed. Her studies cannot be tested because she has not disclosed her data. Her studies have not been replicated. In fact, the formula used to select 200 news stories for the Factiva study is incomprehensible.

*Duncan v. Bonta,* 2023 WL 6180472, *13 (S.D. Cal., Sept. 22, 2023).

### C. Defendant's speculation about the "pause" from magazine changes by mass shooters has no proven examples.

As detailed in Part II, *supra*, crime victims who are forced to rely on magazines with sub-standard capacity will fire fewer defensive shots, even against multiple attackers, for fear of running out ammunition. This reduces the risk of injury to the attackers and increases the risk of injury to the victim. Usually, the citizen defender will have only the one magazine in his or her firearm. Law enforcement officers often carry two spare magazines (sometime more) on their duty belts. This is a better practice, but most citizens do not wear duty belts, so even if they had a spare magazine, they would be defenseless while fishing for a magazine in a pocket or purse.

Mass shooters operate differently. They bring enormous quantities of ammunition, and often two or more firearms. While a well-prepared citizen might have a spare magazine in a compartment in her purse, the mass shooter can arrange for all his magazines to be handy for rapid swaps; this is because the mass shooter knows in advance exactly when he will attack.

For mass shooters, magazine changes are speedy. At Columbine, one criminal used a 9mm TEC-DC9 semiautomatic pistol with one 28-round, one 32-round, and one 52-round magazine to fire 55 rounds total. The other criminal used 13 ten-round magazines in a 9mm Hi-Point 995 semiautomatic carbine to fire 96 rounds during the same period. Carey Vanderborg, *Columbine Shooting Anniversary: Five Other Deadly School Shootings*, Int'l Bus. Times (Apr. 20, 2012).[18]

---

[18] https://www.ibtimes.com/columbine-shooting-anniversary-five-other-deadly-schoolshootings-555158. The two shooters also fired a combined 37 shotgun rounds. A "carbine" is a rifle with a relatively short barrel.

Likewise, the Sutherland Springs shooter changed magazines 15 times, firing at least 450 rounds in seven minutes; the Parkland shooter fired more than 150 rounds in five-and-one-half minutes, changing magazines five times; the Sandy Hook shooter fired 156 rounds in five minutes, emptying three 30-round magazines and replacing two other 30-round magazines that still contained ammunition; the Fort Hood shooter used 20- and 30-round magazines, firing 214 rounds in 10 minutes. *See* E. Gregory Wallace, *"Assault Weapon" Lethality,* 88 Tenn. L. Rev. 1, 31–32 (2020) (citing sources). At Virginia Tech, the criminal fired 174 rounds from two handguns in 10–12 minutes while walking among classrooms, and changed magazines 17 times. All his magazines—of 10 or 15 rounds—were legal in Colorado. The shooting review panel concluded: "10-round magazines . . . would not have made much difference in the incident." TriData Division, *Mass Shootings at Virginia Tech: Addendum to the Report of the Review Panel* 74 (Nov. 2009).[19]

Defendant theorizes that magazine changes provide a "critical pause" allowing the opponents to retreat or to attack the shooter. Doc. 80, at 2. This is an accurate scenario when the shooter is a citizen defending herself. Under the stress of surprise violent attacks, fine motor skills degrade. The victim may need a good number of seconds to retrieve and insert her back-up magazine.

In contrast, mass shooters are not surprised. Defendant's speculation about the "critical pause" for mass shooters is unsupported.

First, the majority of mass shootings take place over an extended time, so that the criminal can change magazines at leisure. "[C]lose examination of mass shootings also indicates that killers typically take their time, firing deliberately at individual victims over fairly long periods of time." Gary Kleck, *Mass Shootings in Schools: The Worst Possible Case for Gun Control*, 52 Am. Behav.

---

[19] https://perma.cc/V8T7-83YW.

Scientist 1447, 1451 (2009). "[M]ass shootings . . . usually progress over the span of several minutes or more. Given that removing a magazine and inserting a new one takes only a few seconds, a mass murderer—especially one armed with a backup gun—would hardly be stymied by the magazine size limit. It's thus hard to see large magazines as materially more dangerous than magazines of normal size." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L. REV. 1443, 1489 (2009).

A study of all U.S. mass shootings 1994-2013 in which shooters used semiautomatic firearms and detachable magazines, found only one case, Tucson 2011, where the shooter may have been tackled by bystanders while swapping magazines. Gary Kleck*, Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages,* 17 Just. Res. & Pol'y 28 (2016). As Kleck noted, eyewitness reports conflicted about whether the Tucson shooter was trying to reload or his gun jammed. *Id.* at 39–40. The reload claim comes down to the testimony of one eyewitness who insisted that Glock handguns never jam—which is not true.[20] Yet Klarevas claims that Tucson involved only a reload. Klarevas Decl., Ex. 32 ¶30.

Klarevas swears as a fact that people escaped the 2007 Virginia Tech shooting because of magazine changes. *Id.* There is nothing in the official report about students escaping while the shooter was reloading. *See* TriData Division, *Mass Shootings at Virginia Tech: Addendum to the Report of the Review Panel* 74 (Nov. 2009).[21]

---

[20] *Colorado Outfitters*, *supra*, JA at16:3358-60. At the district judge's urging, the parties stipulated that Glock pistols can jam. *Id.* at 18:3763. *See also* Sam Quinones & Michael Muskal, *Jared Loughner to be charged in Arizona shootings targeting Gabrielle Giffords,* L.A. TIMES (Jan. 9, 2011) (eyewitness descriptions of the jam).

[21] https://perma.cc/V8T7-83YW.

The Klarevas Declaration likewise states with certainty that the children at Sandy Hook "escaped their attacker as he was swapping out magazines." Klarevas Decl., Ex. 32 ¶30. But the *Hartford Current* article he cites states that children escaped because the shooter "stopped firing briefly, perhaps either to reload his rifle or because it jammed." Dave Altimari, et al., *Shooter Paused, and Six Escaped,* Hartford Courant (Dec. 23, 2012) (Ex. J to Klarevas Decl.). According to the article, it also was possible that the children escaped while the shooter was firing at others in the room. Understandably, the children's statements were "not entirely consistent." *Id.*

Gun jams do interrupt shooters. Clearing a jam involves both of the steps for a magazine swap (remove one magazine, and insert another) *plus* all the intermediate time to do whatever is necessary to clear the jam. Some jams take minutes to clear. No one knows when a gun will jam, but a criminal can anticipate and prepare for magazine changes. The random benefits of long pauses from gun jams are distinct from the very short pauses from magazine switches.

Uncited is Klarevas' prior candid admission: "a person set on inflicting mass casualties will get around any clip prohibitions by having additional clips on his person (as Loughner did) or by carrying more than one fully loaded weapon (as Virginia Tech shooter Seung-Hui Cho did)." He argued that the better approach was to improve laws to stop dangerously deranged people from acquiring firearms. Louis Klarevas, *Closing the Gap,* The New Republic (Jan. 13, 2011).

## Conclusion

Defendant's purported legislative facts are based on patently incorrect and unreliable data. His speculation about the supposed "critical pause" lacks even a single clear real-world example. In contrast, the life-saving advantages of standard magazines are demonstrated by the choices of civil society law enforcement officers, and of the prudent citizens who follow their good example. Plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

David B. Kopel
Independence Institute
727 E. 16th Ave.
Denver, Colorado 80203
(303) 279-6536
david@i2i.org
*Counsel for Amici Curiae*

E. Gregory Wallace*
Professor of Law
Campbell University School of Law
225 Hillsborough Street
Raleigh, North Carolina 27603
(919) 696-3057
wallaceg@campbell.edu
*Not admitted in this court

Nov. 30, 2023

## Certificate of Service

I hereby certify that on November 30, 2023, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado. The pleading will be sent to the following:

/s/David B. Kopel

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
(303) 205-7870
barry@arringtonpc.com

Shaun Pearman
Eric Paul Apjoke
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
(303) 991-7600
Fax: (303) 991-7601
shaun@pearmanlawfirm.com
eric@pearmanlawfirm.com

LeeAnn Morrill, First Assistant Attorney General
Emily B. Buckley, Senior Assistant Attorney General
Peter G. Baumann, Assistant Attorney General
Daniel R. Magalotti, Assistant Attorney General Carr Fellow
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
(720) 508-6000
leeann.morrill@coag.gov
emily.buckley@coag.gov
peter.baumann@coag.gov

daniel.magalotti@coag.gov

Timothy C. Hester
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com

Ryan James Fletcher
Merchant & Gould PC
1801 California Street
Suite 3300
Denver, CO 80202-2654
303-357-1670
Fax: 303-357-1671
Rfletcher@merchantgould.com